**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**DC PRESERVATION LEAGUE**,
1328 Florida Avenue N.W., 2nd Floor,
Washington, DC 20009;

**NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES**,
600 14th Street N.W., Suite 500,Washington, DC
20005;

**THE AMERICAN INSTITUTE OF
ARCHITECTS**,
1735 New York Avenue N.W., Washington, DC
20006;

**AMERICAN SOCIETY OF LANDSCAPE
ARCHITECTS**,
636 I Street N.W., Washington, DC 20001;

**DOCOMOMO US**,
P.O. Box 230977, New York, NY 10023;

**SOCIETY OF ARCHITECTURAL
HISTORIANS**,
1365 N. Astor Street, Chicago, IL 60610;

**THE COMMITTEE OF 100 ON THE
FEDERAL CITY**,
945 G Street N.W., Washington, DC 20001; and

**THE CULTURAL LANDSCAPE
FOUNDATION**,
1711 Connecticut Avenue N.W., Suite 200,
Washington, DC 20009,

        *Plaintiffs*,

    v.

**BOARD OF TRUSTEES OF THE JOHN F.
KENNEDY CENTER FOR THE
PERFORMING ARTS**,
2700 F Street N.W., Washington, DC 20566;

**DONALD J. TRUMP, in his official capacity
as CHAIR OF THE BOARD OF TRUSTEES
OF THE JOHN F. KENNEDY CENTER FOR
THE PERFORMING ARTS**,
2700 F Street N.W., Washington, DC 20566;

Civil Action No. _____

**SMITHSONIAN INSTITUTION**,
1000 Jefferson Drive S.W., Washington, DC
20560;

**NATIONAL PARK SERVICE**,
1849 C Street N.W., Washington, DC 20240;

**UNITED STATES DEPARTMENT OF THE INTERIOR**,
1849 C Street N.W., Washington, DC 20240;

**DOUGLAS J. BURGUM, in his official capacity as SECRETARY OF THE INTERIOR**,
1849 C Street N.W., Washington, DC 20240;

**UNITED STATES ARMY CORPS OF ENGINEERS**,
441 G Street N.W., Washington, DC 20314; and

**NATIONAL CAPITAL PLANNING COMMISSION**,
401 9th Street N.W., Suite 500N, Washington, DC 20004,

> *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      For more than half a century, the John F. Kennedy Center for the Performing Arts has stood on the Potomac River waterfront as a living memorial to a slain president, a national gathering place for the arts, and a defining landmark within the monumental core of the Nation's capital. Its Modernist design, grand public spaces, and role as a premier cultural institution together form an irreplaceable legacy of history, architecture, and civic purpose.

2.      That legacy is in peril. On March 16, 2026, the Board of Trustees of the Kennedy Center and its Chair, Donald J. Trump, announced that in less than four months, the Kennedy Center will close completely for several years. While closed, the Kennedy Center buildings and grounds will undergo major structural work—up to and including demolition and reconstruction. The intent of the Board of Trustees and Mr. Trump is clear: To fundamentally alter this iconic property without complying with bedrock federal historic preservation and environmental laws, and without securing the necessary congressional authorization. And the harm is imminent, as the Board of Trustees and Mr. Trump admit they have already commenced preliminary construction work.

3.      Plaintiffs are a broad coalition of the nation's leading cultural heritage and architectural organizations. They seek declaratory and injunctive relief from this Court, prohibiting the Board of Trustees and Mr. Trump from proceeding with any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center buildings or grounds that exceeds statutory limits, circumvents mandatory federal review, or fails to comply with fundamental historic preservation and environmental laws.

4.      Plaintiffs request that this Court enjoin Defendants from undertaking such work unless and until Defendants submit to (and obtain required review and approvals from) the National Capital Planning Commission and the Commission of Fine Arts; complete review under

Section 106 of the National Historic Preservation Act; complete review under the National Environmental Policy Act; and secure express congressional approval for the erection of any building or structure, for any capital projects more intensive than those necessary to maintain functionality of the existing buildings and site, and for any work that alters or impairs the existing maintenance or operations of the Kennedy Center grounds.

5.      Given the numerous public statements and actions by the Board of Trustees and Mr. Trump—which at minimum signal an intent to hastily gut the Kennedy Center down to its structural steel studs—immediate and effective judicial relief is required to prevent irreparable harm to the Kennedy Center and to the public's right to be meaningfully informed and heard before irrevocable actions are taken.

**PARTIES**

6.      Plaintiff **DC Preservation League** ("DCPL") is a District of Columbia nonprofit 501(c)(3) membership organization dedicated to the preservation, protection, and enhancement of the historic and built environment of Washington, D.C., through advocacy and education. DCPL carries out its mission through research and documentation, review of major development projects in D.C.'s historic districts or affecting individual landmarks, and monitoring legislation that impacts historic preservation laws. DCPL also takes legal action to protect threatened cultural sites in the District of Columbia when necessary. *See, e.g.*, *Cultural Heritage Partners, et al. v. Donald J. Trump, et al.*, No. 25-cv-03969 (D.D.C.) (2025). Members of DCPL include residents, architects, historians, landscape architects, architectural historians, contractors, structural engineers, and arts patrons who use and enjoy the John F. Kennedy Center for the Performing Arts ("Kennedy Center") and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its building and grounds. DCPL regularly participates in consultation

2

review processes under Section 106, and it would submit comments to and engage with the National Capital Planning Commission ("NCPC"), the Commission of Fine Arts ("CFA"), and other federal agencies in any review of alterations to the Kennedy Center.

7. Plaintiff the **National Trust for Historic Preservation in the United States** ("National Trust") is a private charitable, educational, nonprofit corporation headquartered in Washington, D.C. It was chartered by Congress in 1949 to "facilitate public participation" in the preservation of our nation's heritage, and to further the historic preservation policy of the United States. 54 U.S.C. § 312102(a). The National Trust protects America's historic sites through stewardship, advocacy, and direct assistance. It stewards twenty-seven historic sites, all open to the public. It also helps neighbors, partners, and individuals across the country protect threatened historic sites in their own communities. And it takes legal action to protect threatened sites when necessary. Most recently, the National Trust filed a lawsuit challenging federal defendants' construction of a massive ballroom on the site of the East Wing, which the defendants had demolished unlawfully and without advance warning. *See Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv., et al.*, No. 1:25-cv-04316-RJL (D.D.C.) (2025). The National Trust has several hundred thousand members nationwide and in the District of Columbia. Members of the National Trust use and enjoy the Kennedy Center and the federal monumental core; they derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its building and grounds. The National Trust regularly participates in consultation and review processes under Section 106, and it would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

8.      Plaintiff **The American Institute of Architects** ("AIA"), a New York not-for-profit organization founded in 1857, unites architects in fellowship; promotes the aesthetic, scientific, and practical efficiency of the profession; advances the science and art of planning and building; and makes the profession of ever-increasing service to society. In pursuit of its mission, AIA and its members serve as a unified voice in preserving the historic integrity and symbolic significance of national landmarks. Members of AIA—who include over 100,000 architects and design professionals—use and enjoy the Kennedy Center and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its building and grounds. The AIA regularly participates in consultation and review processes under Section 106, and it would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

9.      Plaintiff **American Society of Landscape Architects** ("ASLA") is a 501(c)(6) professional society representing landscape architecture professionals in the United States. Licensed in all 50 states and the District of Columbia, landscape architects are the leading design professionals of our nation's civic spaces. Since its founding in 1899, ASLA and its members have played a critical role in planning, designing, protecting, and preserving our nation's historic and cultural treasures, including the U.S. Capitol Grounds, the National Mall, and more. ASLA has a particular interest in preserving the historical integrity of the Kennedy Center campus, as landscape architects were part of the original design team for the project and subsequent renovations, updates, and expansions, including the REACH Expansion that opened in 2019. Members of ASLA use and enjoy the Kennedy Center and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and

architectural values and the public's continued access to its building and grounds. ASLA regularly advocates for policies and actions that call for public input, and a thorough and transparent review process for federal, state, and local projects. ASLA would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

10.     Plaintiff **Docomomo US** is a nonprofit membership organization representing regional chapters that share knowledge of and enthusiasm for modern architecture, landscapes, and design. Committed to the principle that modern design merits the attention and preservation received by earlier periods, Docomomo US maintains a continuous and constructive dialogue with national, state, and local preservation authorities and organizations to advance the preservation of modern architecture, landscapes, and design. Docomomo US takes legal action to protect threatened cultural sites when necessary. *See, e.g.*, *Univ. of Wash. v. City of Seattle*, 399 P.3d 519 (Wash. 2017). Members of Docomomo US use and enjoy the Kennedy Center and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its building and grounds. Docomomo US regularly participates in consultation review processes under Section 106, and it would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

11.     Plaintiff **Society of Architectural Historians** ("SAH"), a nonprofit membership organization founded at Harvard University in 1940 and currently located in Chicago, promotes the study, interpretation, and conservation of architecture, design, landscapes, and urbanism worldwide. SAH serves an international network of approximately 600 institutions and 2,400 individuals who focus on the history of the built environment and its role in shaping contemporary life. Members include historians, architects, preservationists, urban planners, teachers, students,

5

museum professionals, and individuals from other professions who share a passion for the built environment. SAH produces programs, meetings, and publications that reach scholarly and public communities across the globe. As part of its mission, and as the leading scholarly organization for architectural historians in North America, SAH advocates for the preservation of nationally and internationally significant buildings, districts, sites, and landscapes. Members of SAH use and enjoy the Kennedy Center and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its buildings and grounds. SAH would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

12.     Plaintiff **The Committee of 100 on the Federal City** (the "Committee of 100") is a District of Columbia nonprofit civic organization founded in 1923 to advance thoughtful planning and preservation in the national capital. The Committee of 100 takes legal action to protect threatened cultural sites in the District of Columbia when necessary. *See, e.g.*, *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191 (D.D.C. 2015). Members of the Committee of 100 use and enjoy the Kennedy Center and the adjacent public grounds and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its buildings and grounds. The Committee of 100 regularly participates in consultation and review processes under Section 106, and it would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

13.     Plaintiff **The Cultural Landscape Foundation** ("TCLF") is a 501(c)(3) non-profit founded in 1998 to "connect people to places." TCLF educates and engages the public to make

our shared landscape heritage more visible, identify its value, and empower its stewards. Through its publications, events, and prestigious Cornelia Hahn Oberlander International Landscape Architecture Prize, TCLF broadens support and understanding for cultural landscapes. TCLF also takes legal action to protect threatened cultural landscapes when necessary. *See, e.g.*, *Pres. All. of Minn. v. City of Minneapolis*, 27-CV-12-14220 (Minn. Dist. Ct.). TCLF's Founding President & CEO, Charles A. Birnbaum, is a recognized authority on the nation's cultural landscape legacy and has published extensively on the history and stewardship of Modernist landscape architecture. As Coordinator of the Historic Landscape Initiative at the National Park Service (1992-2007), Mr. Birnbaum authored the Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes, which inform reviews under Section 106 of the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA"). TCLF and Mr. Birnbaum are frequent participants in Section 106, NEPA, NCPC, and CFA reviews. TCLF would submit comments to and engage with NCPC, CFA, and other federal agencies in any review of alterations to the Kennedy Center.

14.    Defendant **Board of Trustees of the John F. Kennedy Center for the Performing Arts** (the "Board") is the governing board established by Congress to administer the Kennedy Center as a bureau within the Smithsonian Institution. 20 U.S.C. § 76h. The Board is responsible for planning and executing capital projects at the Kennedy Center, subject to statutory limits and federal oversight requirements.

15.    Defendant **Donald J. Trump** is sued in his official capacity as Chair of the Board of Trustees of the John F. Kennedy Center for the Performing Arts. In that capacity, he exercises significant influence over the Board's actions and the direction of capital planning for the Kennedy Center.

7

16.    Defendant **Smithsonian Institution** is an establishment of the United States that oversees numerous national museums and educational and research facilities. As relevant here, the Kennedy Center is a "bureau" of the Smithsonian Institution. 20 U.S.C. § 76h(a)(1). For projects in the District of Columbia "subject to the review and approval of the National Capital Planning Commission," the Smithsonian Institution is treated as a federal agency for purposes of Section 106 of the NHPA. Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003). Herein, the Board, Donald J. Trump, and the Smithsonian Institution are referred to collectively as the "Kennedy Center Defendants."

17.    Defendant **National Park Service** ("NPS") is an agency within the United States Department of the Interior responsible for managing the federal lands and grounds adjoining, abutting, and adjacent to the Kennedy Center, including the federal grounds on which the Kennedy Center's REACH Expansion sits. NPS manages the federal lands and public grounds immediately adjacent to and surrounding the Kennedy Center building, including portions of the Rock Creek and Potomac Parkway, a unit of the National Park System listed on the National Register of Historic Places. Not only does the Rock Creek and Potomac Parkway pass directly beside the Kennedy Center, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself. For work affecting those lands, including construction staging, excavation, access, and right-of-way, NPS holds the authority to issue or deny construction permits and rights-of-way. As the REACH Expansion confirmed, NPS permit issuance is itself a federal undertaking triggering Section 106 and a major federal action subject to NEPA review.

8

18.    Defendant **United States Department of the Interior** ("Interior") is the federal executive department that includes NPS and is responsible for federal lands and public grounds in the District of Columbia, including those adjacent to the Kennedy Center.

19.    Defendant **Douglas J. Burgum** is the Secretary of the Interior of the United States and is sued in his official capacity. The Secretary of the Interior is the head of the United States Department of the Interior, a cabinet-level executive agency of the federal government. The Secretary of the Interior has statutory authority and responsibility with respect to the management and operation of the Kennedy Center grounds. Under 20 U.S.C. § 76j(a)(2)(F), no change in the management or operation of those grounds may be made without the express approval of the Secretary of the Interior and of Congress. The Secretary of the Interior is also responsible for the administration of NPS, an agency within the Department of the Interior that manages federal lands adjacent to and associated with the Kennedy Center site and that has independent permitting and land-use authority with respect to federal construction and demolition activities affecting those lands.

20.    Defendant **United States Army Corps of Engineers** ("USACE") is an agency within the Department of Defense responsible for managing federal water resources adjoining, abutting, and adjacent to the Kennedy Center, and issuing permits for work which impacts navigable waters like the Potomac River over which the Kennedy Center extends. The USACE helps maintain the Potomac River through navigation channel maintenance, watershed protection, and ecosystem management. For work affecting the river, including construction staging, excavation, discharge, and dredging, the USACE holds the authority to issue or deny Clean Water Act and Rivers and Harbors Act permits.

21.     Defendant **National Capital Planning Commission** is a federal agency established by Congress as the federal government's central planning agency for the national capital region. Under 40 U.S.C. § 8722(d), the "location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of the Commission." For projects of the Smithsonian Institution within the District of Columbia subject to review and approval by NCPC, NCPC is responsible for compliance with the requirements of the NHPA and NEPA.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action presents federal questions under the laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1361, which grants district courts original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. An actual, justiciable controversy now exists between Plaintiffs and Defendants. Relief may be granted under 28 U.S.C. §§ 2201-2202; the Administrative Procedure Act, 5 U.S.C. §§ 705-706; and the Court's equitable powers.

23.     Venue is proper in this district because parties reside in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(c), (e).

## FACTUAL BACKGROUND

### The Kennedy Center's Establishment, Construction, and Legacy

24.     In 1958, Congress passed, and President Dwight D. Eisenhower signed into law, an act establishing a "National Cultural Center" along the Potomac waterfront in the District of Columbia. Pub. L. No. 85-874, 72 Stat. 1698 (1958). The act authorized the Center's construction, situated the Center on federal lands, set out an artistic mandate and educational mission, and

created a board of trustees as a bureau of the Smithsonian Institution to govern the Center. *Id.* President Eisenhower envisioned that the National Cultural Center would serve as an "artistic mecca" in the Nation's capital.[1]

25.    Fundraising for the Center began in earnest under President John F. Kennedy. Two months after President Kennedy's assassination, in 1964, President Lyndon B. Johnson signed into law legislation renaming the National Cultural Center the John F. Kennedy Center for the Performing Arts as a "living memorial" to President Kennedy and authorizing $15.5 million toward its construction. Pub. L. No. 88-260, 78 Stat. 4 (1964).

26.    The Kennedy Center opened to the public in 1971. Designed in a Modernist style by Edward Durell Stone, the Kennedy Center's building, terraces, and landscape have been integral to the riverfront skyline and to the public's experience of Washington's grand civic spaces for more than five decades.[2] The building's exterior is well known for its marble facade and original golden pillars (*but see infra* ¶¶ 39-40), while its interior features iconic crystal chandeliers and red carpeting, a 2,465-seat concert hall and 2,347-seat opera house, several smaller performance spaces, state-of-the-art acoustics, and numerous public gathering spaces.[3]

---

[1] *History*, Kennedy Center, https://www.kennedy-center.org/our-story/history/ (last visited Mar. 21, 2026).

[2] *See Explore Our Spaces*, Kennedy Center, https://www.kennedy-center.org/visit/exploring-our-spaces/ (last visited Mar. 21, 2026).

[3] Hannah Middlebrook, *On This Day In 1964, Construction On The Kennedy Center Began*, Kennedy Center (Dec. 2, 2024), https://www.kennedy-center.org/our-story/blog?p=on-this-day-in-1964-construction-on-the-kennedy-center-began; Sadie Gronigan, *Kennedy Center Trivia* (July 10, 2024), https://www.kennedy-center.org/our-story/blog?p=kennedy-center-trivia; Myles King, *Walking The Red Carpet At The Kennedy Center*, Kennedy Center (Apr. 19, 2024), https://www.kennedy-center.org/our-story/blog?p=stepping-on-the-red-carpet-at-the-kennedy-center; *Explore Our Spaces*, Kennedy Center, https://www.kennedy-center.org/visit/exploring-our-spaces/ (last visited Mar. 21, 2026).

27.     The Kennedy Center is widely hailed for its exceptional acoustics.[4] Cyril M. Harris, renowned acoustical engineer, designed the Kennedy Center as a "box within a box" to give each auditorium an extra outer shell to protect it from external noise including overhead airplanes.

28.     The Kennedy Center is also much more than just its building; it is a stately seventeen-acre campus with a grand entrance, raised planters, and pools that define a formal plaza, marble terraces overlooking the Potomac River, and a promenade with islands of willow trees accented by fountains. Landscape architect Edward Durell Stone, Jr.'s impressive grounds solidified the Center's iconic presence and national prominence. Additionally, the recently established Kennedy Center REACH Expansion ("REACH Expansion"), designed by landscape architect Edmund Hollander, seamlessly merges building and landscape, offering a single environment that functions simultaneously as performance venue, green infrastructure, and civic gathering space, where the boundaries between indoors and outdoors dissolve.[5]



*Figure 1. Kennedy Center exterior (prior to fall 2025 alteration of columns,* see infra ¶¶ 39-40 *& Figure 5). The John F. Kennedy Center for the Performing Arts.*

---

[4] *Concert Hall*, Kennedy Center, https://www.kennedy-center.org/visit/exploring-our-spaces/ (last visited Mar. 21, 2026) ("This state-of-the-art facility, which originally opened in 1971, sets new standards for accessibility and sound with a high-tech acoustical canopy.").

[5] Jared Green, *The Reach at the Kennedy Center Blends Architecture and Landscape*, The Dirt (Oct. 23, 2019), https://www.asla.org/news-insights/dirt/the-reach-at-the-kennedy-center-blends-architecture-and-landscape.



*Figure 2. Kennedy Center Grand Foyer. The John F. Kennedy Center for the Performing Arts.*



*Figure 3. Kennedy Center Concert Hall. The John F. Kennedy Center for the Performing Arts.*



*Figure 4. Kennedy Center Opera House. The John F. Kennedy Center for the Performing Arts.*

29. Since its opening, the Kennedy Center has served as the Nation's premier performing arts complex and as a vital civic forum, hosting symphony, opera, ballet, theater, jazz, film, education programs, and public ceremonies. It functions as both a world-class cultural venue and a daily public destination, with extensive indoor and outdoor spaces designed for public circulation, free programming, and access to sweeping river and city views. In the past, the Kennedy Center annually has received 2 million visitors and hosted over 2,200 performances and exhibits, including over 400 free performances and events.[6] The Millennium Stage at the Kennedy Center offers free performances to the public every day, 365 days of the year.

30. Congress has, at several junctures, specifically authorized major additions or systems in furtherance of the Kennedy Center's mission, including separate authorization for additions to the underground parking garage, the REACH Expansion,[7] a renewable-energy roof system, and the Kennedy Center Plaza, *see* 20 U.S.C. § 76i (parking garage, expansion project); *id.* § 76m (rooftop renewable-energy system); *id.* § 76q-1 (plaza), while separately appropriating funds for necessary maintenance, repair, and operations, *see id.* § 76r. Upon information and belief, all these projects followed the requisite rules and procedures Plaintiffs allege Defendants have failed to follow with respect to the proposed demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center site or grounds (the "Project").

31. In 2025, Congress appropriated $256,657,000 to remain available through fiscal year 2029 for "necessary expenses for capital repair, restoration, maintenance backlog, and

---

[6] *Our Story*, Kennedy Center, https://www.kennedy-center.org/our-story/ (last visited Mar. 21, 2026).

[7] *The REACH at the Kennedy Center*, Kennedy Center, https://www.kennedy-center.org/reach/ (last visited Mar. 21, 2026); *History*, Kennedy Center, https://www.kennedy-center.org/our-story/history/ (last visited Mar. 21, 2026).

security structures of the building and site of the John F. Kennedy Center for the Performing Arts." Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025). The accompanying House Budget Committee report described the specifics of this appropriation as "funding for capital improvements, operations and maintenance and associated administration costs to address deferred maintenance and upkeep of the Kennedy Center's buildings and grounds as a memorial to the late President Kennedy and to ensure continued proper use as a performing arts center for the American people as intended by President Eisenhower."[8] "More specifically, this funding would generally support water system upgrades, office space improvements, electric enhancements, elevator updates, rigging replacement (suspending lights, cameras, speakers), seating replacement, lighting and backstage improvements, hydronic system (water heaters) modernization, and bathroom upgrades, among other items." *Id.*

32.    The funds appropriated in 2025 for the Kennedy Center are targeted expenditures that reflect Congress's consistent practice of reserving to itself decisions about capital projects that go beyond what is necessary to maintain the functionality of the existing buildings and site.

### Defendant Trump's Unprecedented Takeover of the Kennedy Center and Announcement of the Project

33.    Shortly after reassuming the Presidency in early 2025, Defendant Donald J. Trump seized personal control of the Kennedy Center and, in a break with longstanding institutional norms, arranged for himself to be elected Chairman of the Board.[9] On February 7, 2025, Mr. Trump announced on social media that he would "immediately terminate" multiple Kennedy Center

---

[8] H.R. REP. NO. 119-106, Book 1, at 1175 (2025), https://www.congress.gov/119/crpt/hrpt106/CRPT-119hrpt106-pt1.pdf.

[9] *See* Bob Mondello, *The Kennedy Center's history was marked by cooperation and independence—until now*, NPR (Feb. 19, 2025), https://www.npr.org/2025/02/11/nx-s1-5290878/kennedy-center-history-trump-takeover (noting the Kennedy Center's "history . . . marked by cooperation and independence," as embodied in its previously "bipartisan board").

Board members and declared, simultaneously, that he would soon announce a new Board with himself as Chairman.[10]

34.    On February 10, 2025, Mr. Trump announced Richard Grenell, longtime political ally and former acting Director of National Intelligence, would be appointed interim Executive Director of the Kennedy Center.[11] On the same day, eighteen Kennedy Center Board members including the Chairman—all appointees of President Joseph R. Biden—were removed from the official roster on the Kennedy Center's website. Mr. Trump proceeded to fill the Board with hand-picked appointees, including himself, Second Lady Usha Vance, and several senior White House staff members and other close associates.[12]

35.    On February 12, 2025, five days after Mr. Trump had announced himself as the Chairman of the Kennedy Center Board on social media, the new Board voted to elect him as Chairman.[13] The Kennedy Center announced the vote, the fourteen new Trump-appointed Kennedy Center Board members, and the termination of longtime Kennedy Center President Deborah Rutter with Mr. Grenell as her replacement.[14]

36.    In the months that followed, Mr. Trump and his appointees made statements adverse to the Kennedy Center's former leadership and programming and sought to exert increased control

---

[10]  Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 7, 2025, 5:27 PM), https://truthsocial.com/@realDonaldTrump/posts/113964959500715895.

[11]  Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 10, 2025, 5:09 PM), https://truthsocial.com/@realDonaldTrump/posts/113981872435350592.

[12] Javier C. Hernández et al., *Trump Names Loyalist Interim Leader of Kennedy Center as He Strengthens His Grip*, N.Y. TIMES (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/arts/music/trump-kennedy-center-board-removed.html.

[13]  Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 12, 2025, 2:41 PM), https://truthsocial.com/@realDonaldTrump/posts/113992617804848860.

[14] *Kennedy Center Board Elects President Donald J. Trump as Board Chair*, Kennedy Center, https://www.kennedy-center.org/news-room/press-release-landing-page/kennedy-center-board-elects--president-donald-j.-trump-as-board-chair/ (last visited Mar. 21, 2026).

over the operations of the Center. During a visit to the Kennedy Center on March 17, 2025, Mr. Trump said the building was in "tremendous disrepair" and for the first time shared his intention to "bring it into more modern times."[15]

37.     Further escalating the changes to the Kennedy Center, on July 22, 2025, Republican members of the House Appropriations Committee voted to rename the Kennedy Center's Opera House after First Lady Melania Trump as part of a spending bill for the Department of the Interior—another unprecedented move shifting the Center's focus from a living memorial honoring President John F. Kennedy to a vehicle for honoring President Trump and his wife.[16]

38.     On August 13, 2025, Mr. Trump previewed his planned renovations to the Kennedy Center during a visit, stating that Senator Lindsey Graham had secured "a record $257 million that's going to go toward renovations the building really needs," and claiming that "in the coming months, we'll fully renovate . . . the entire infrastructure of the building."[17]

39.     By September 9, 2025, the Kennedy Center announced that it had already begun work "re-painting [its] 200 iconic [gold] columns" white, claiming that "President Trump ha[d] given the Kennedy Center $257 million to renovate and restore" the institution.[18]

---

[15] Shawn McCreesh & Javier C. Hernández, *Trump Visits the Kennedy Center and Muses on Hosting its Honors Gala*, N.Y. TIMES (Mar. 17, 2025), https://www.nytimes.com/2025/03/17/arts/music/trump-kennedy-center-visit.html.

[16] Michaela Towfighi & Robin Pogrebin, *Republicans Look to Rename Kennedy Center Opera House After Melania Trump*, N.Y. TIMES (July 22, 2025), https://www.nytimes.com/2025/07/22/arts/kennedy-center-opera-melania-trump.html.

[17] *President Trump Announces the 2025 Kennedy Center Honorees*, Senate Democrats (Aug. 13, 2025), https://www.democrats.senate.gov/newsroom/trump-transcripts/transcript-president-trump-announces-the-2025-kennedy-center-honorees-81325 (transcript of remarks); *President Trump Visits the Kennedy Center and Makes an Announcement*, White House (Aug. 13, 2025), https://www.whitehouse.gov/videos/president-trump-visits-the-kennedy-center-and-makes-an-announcement/ (video of remarks).

[18] Trump Kennedy Center (@kencen), X (Sept. 9, 2025, 6:01 PM), https://x.com/kencen/status/1965536128917791012?lang=en.

40.     The Kennedy Center's 200 exterior columns are an original and character-defining feature of the building's Modernist design, integral to the historic character that formed the basis for the D.C. State Historic Preservation Officer's 2012 determination that the Kennedy Center is eligible for the National Register of Historic Places. Repainting the columns from their original gold to white constitutes an adverse effect on the historic property within the meaning of 36 C.F.R. § 800.5(a)(1), which defines adverse effects to include the "alteration, . . . destruction or removal of the property or its [character-defining] features."

41.     On information and belief, the Kennedy Center Defendants undertook this change without consulting the D.C. State Historic Preservation Officer, without notifying the Advisory Council on Historic Preservation ("ACHP"), and without initiating Section 106 review, notwithstanding the Kennedy Center's eligibility for the National Register of Historic Places. Nor did the Kennedy Center Defendants seek review by NCPC or CFA prior to making this significant alteration to the Kennedy Center building.

42.     On December 7, 2025, President Trump became the first sitting or former president to host the Kennedy Center Honors, another unprecedented assertion of personal involvement in a cultural institution widely valued for its independence.[19]

43.     On December 18, 2025, the Board voted to rename the Kennedy Center to "The Donald J. Trump and The John F. Kennedy Memorial Center for the Performing Arts."[20] Although the White House described the vote as "unanimous," *ex officio* board member Rep. Joyce Beatty

[19] Julia Jacobs, *Here's The Latest On The Kennedy Center Honors*, N.Y. TIMES (Dec. 8, 2025), https://www.nytimes.com/live/2025/12/07/us/trump-news#trump-kennedy-center-honors.

[20] Shawn McCreesh, *As Trump Puts His Brand On Washington, The Kennedy Center Gets A New Name*, N.Y. TIMES (Dec. 18, 2025), https://www.nytimes.com/2025/12/18/us/politics/trump-kennedy-center-name.html.

18

reported that she was muted during the proceeding and prevented from voicing her opposition.[21] Notably, Mr. Trump had called the board meeting only earlier that day, and the meeting was held not at the Kennedy Center, but at the Palm Beach home of Board member Andrea Wynn, wife of the casino magnate Steve Wynn.[22]

44.    Twenty-four hours later, on December 19, 2025, Mr. Trump's name was physically added to the Kennedy Center's façade, placed above President Kennedy's name[23]—a swift alteration to the exterior of a historic building determined eligible for the National Register of Historic Places, undertaken without any of the design review or historic preservation consultation that federal law requires.



---

[21] Press Release, Rep. Joyce Beatty, *Statement from Kennedy Center Ex-Officio Board Members on Trump's Illegal Effort to Rename Arts Institution* (Dec. 18, 2025), https://beatty.house.gov/media-center/press-releases/statement-from-kennedy-center-ex-officio-board-members-on-trump-s-illegal-effort-to-rename-arts-institution.

[22] Shawn McCreesh, *As Trump Puts His Brand On Washington, The Kennedy Center Gets A New Name*, N.Y. TIMES (Dec. 18, 2025), https://www.nytimes.com/2025/12/18/us/politics/trump-kennedy-center-name.html.

[23] Shawn McCreesh & Chris Cameron, *Trump's Name Joins Kennedy's On Performing Arts Center's Façade*, N.Y. TIMES (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/us/politics/kennedy-center-name.html.

*Figure 5. New signage at Kennedy Center unveiled on Dec. 19, 2025, behind recently painted columns. Associated Press.*

45.    On information and belief, the Kennedy Center Defendants did not consult with the D.C. Department of Buildings, the D.C. State Historic Preservation Officer, NCPC, or CFA before altering the Kennedy Center's façade. This alteration to a property determined eligible for the National Register of Historic Places constitutes a concrete, completed violation of the review requirements described herein.

46.    The D.C. Department of Buildings requires building permits for a wide array of construction activities, including the "erection of signs or awnings."[24] The Kennedy Center has routinely applied for and obtained building permits from the D.C. Department of Buildings, for both interior and exterior projects including erecting a statue of John F. Kennedy, performing elevator repairs, installing magnetic locks, erecting tents, and conducting soil borings.[25]

47.    Taken together, the repainting of the columns and the installation of new signage on the Kennedy Center's façade, both undertaken without Section 106 consultation, and both occurring in the context of an announced multi-year, major reconstruction program, support a reasonable inference that these alterations were neither inadvertent nor de minimis. They reflect a deliberate pattern of advancing physical changes to a National Register-eligible property ahead of, and without initiating, the federally required review process. Under 36 C.F.R. § 800.9(c), when an applicant intentionally significantly adversely affects a historic property in order to avoid the requirements of Section 106, every responsible federal agency official has a nondiscretionary duty to deny permits, licenses, and approvals unless and until the agency has completed a specific

---

[24] D.C. Department of Buildings, *What Projects Require a Permit?* https://dob.dc.gov/page/get-permit (last visited Mar. 21, 2026).

[25] *See* D.C. Department of Buildings, *Scout Permitting Database*, https://scout.dcra.dc.gov/ (last visited Mar. 20, 2026).

consultation process with the Advisory Council on Historic Preservation ("ACHP") and has made a subsequent determination that circumstances warrant granting the approval to the applicant notwithstanding the adverse effects. The Kennedy Center Defendants have not sought that determination or initiated that process.

48.     These recent alterations to the Kennedy Center—announced only after their completion—are part of Defendants' broader pattern of unauthorized damage to historic buildings in the capital district. In October 2025, President Trump, together with several other Defendants, demolished the 123-year-old East Wing of the White House in order to build a massive ballroom. President Trump demolished the East Wing without obtaining the necessary express authorization from Congress; without completing an adequate NEPA review (or publishing any environmental review at all); and without first submitting the project to NCPC or CFA for advice and approval. The East Wing demolition came with no warning: in July 2025, President Trump offered reassurance that the ballroom "won't interfere with the current building . . . . It'll be near it, but not touching it, and pays total respect to the existing building, which I'm the biggest fan of."[26] On October 20, 2025, President Trump posted a statement on social media announcing that "ground ha[d] been broken" on the project.[27] Within four days, the East Wing was gone.[28]

49.     Like the demolition of the East Wing, the renaming of the Kennedy Center sparked immediate outcry. Several Members of Congress introduced legislation to restore the Kennedy

---

[26] Gabe Gutierrez et al., *White House's entire East Wing to be demolished "within days," officials say*, NBC News (Oct. 23, 2025), https://www.nbcnews.com/politics/white-house/trump-administration-demolishing-entire-east-wing-white-house-add-new-rcna239018.

[27] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 20, 2025, 5:23 PM), https://truthsocial.com/@realDonaldTrump/posts/115408594704490513.

[28] PBS NewsHour, *The East Wing of the White House Has Been Demolished*, (Oct. 24, 2025), https://www.pbs.org/newshour/politics/the-east-wing-of-the-white-house-has-been-demolished-heres-a-look-at-its-history.

Center's former name and signage, and to declare the renaming a violation of law, *see* 20 U.S.C. § 76j(b)(1) (providing that "no additional memorials or plaques in the nature of memorials shall be designated or installed" in the Kennedy Center's public areas).[29]

50.    Following the Center's purported renaming, Mr. Grenell also announced that the annual Kennedy Center Honors ceremony would be renamed the "Trump Kennedy Center Honors."[30]

51.    Mr. Trump's ongoing takeover of the Kennedy Center has led to a lengthy list of high-profile cancellations of performances at the Center, including the Washington National Opera ending its 55-year residence, prominent composer Philip Glass withdrawing the planned premiere of his new Symphony No. 15 honoring President Abraham Lincoln, and the cancellation of scheduled performances of the hit musical *Hamilton*.[31]

52.    Subsequently, in a social media post on February 1, 2026, Mr. Trump detailed a planned closure and rebuilding of the Kennedy Center, stating that he planned to shut down the Center for two years beginning on July 4, 2026.[32] Mr. Trump described the planned work as "Construction, Revitalization, and ***Complete Rebuilding***" of a "new and spectacular Entertainment

---

[29] Press Release, Rep. April McClain Delaney, *Congresswoman McClain Delaney Introduces Legislation to Overturn the Attempted Illegal Renaming of the John F. Kennedy Center for the Performing Arts* (Dec. 23, 2025), https://mcclaindelaney.house.gov/media/press-releases/congresswoman-mcclain-delaney-introduces-legislation-overturn-attempted; H.R. Res. 973, 119th Cong. (2025), https://www.congress.gov/bill/119th-congress/house-resolution/973/text.

[30] Julia Jacobs, *This Year, It Will Be the 'Trump Kennedy Center Honors'*, N.Y. TIMES (Feb. 27, 2026), https://www.nytimes.com/2026/02/27/arts/trump-kennedy-center-honors.html.

[31] Adam Nagourney, *Washington National Opera Is Leaving the Kennedy Center*, N.Y. TIMES (Jan. 9, 2026), https://www.nytimes.com/2026/01/09/arts/music/washington-national-opera-kennedy-center.html; Adam Nagourney, *Philip Glass Withdraws From Kennedy Center, as Its Symphony Vows to Play On*, N.Y. TIMES (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/arts/music/kennedy-center-national-symphony-orchestra-gianandrea-noseda.html; *Kennedy Center: An Updated List of Every Artist Who's Canceled*, Consequence (Jan. 5, 2026), https://consequence.net/2026/01/kennedy-center-every-artist-concert-canceled/.

[32] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 1, 2026, 6:21 PM), https://truthsocial.com/@realDonaldTrump/posts/115997939705121174 (emphasis added).

Complex," and a "new and beautiful Landmark," *id.* (emphasis added)—suggesting that the Project would go well beyond repairs and maintenance, and instead contemplated the erection of a fundamentally new structure.

53.     The following day, February 2, 2026, Mr. Trump elaborated on the scope of the Project during an Oval Office press event, stating that the steel of the Kennedy Center building would be "***fully exposed***" and that he would be "using the steel, . . . the structure," and "***some*** of the marble" to construct a "***brand new*** and really beautiful" building at a cost of "probably around $200 million."[33]

54.     Mr. Trump has also claimed, without basis, that the Center's acoustics will "only be enhanced" by the Project.[34]

55.     On March 13, 2026, Mr. Trump shared via social media renderings of what he called "the new, highly improved, TRUMP KENNEDY CENTER."[35]

56.     Mr. Trump has claimed that "[f]inancing is completed, and fully in place!"[36] for the Project, at an estimated cost of around $200 million.[37] On information and belief, the Project will be funded in whole or in part from the $256,657,000 congressional appropriation enacted in Public

---

[33] Michelle Stoddart et al., *Trump Says Steel To Be 'Fully Exposed' In Kennedy Center Rebuild But 'Not Ripping It Down'*, ABC News (Feb. 2, 2026), https://abcnews.com/US/trump-kennedy-center-closing-2-years-complete-rebuilding/story?id=129764468 (emphasis added).

[34] Alex Gangitano et al., *Acoustics, Gold Paint And Board Spouses*, Politico (Mar. 16, 2026). https://www.politico.com/newsletters/west-wing-playbook-remaking-government/2026/03/16/acoustics-gold-paint-and-board-spouses-00830496.

[35] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 13, 2026, 1:43 PM), https://truthsocial.com/@realDonaldTrump/posts/116223100937937927.

[36] Janay Kingsberry et al., *Trump Plans To Close Kennedy Center For About Two Years, Starting In July,* WASH. POST (Feb. 2, 2026), https://www.washingtonpost.com/style/2026/02/01/kennedy-center-trump-closure-construction/.

[37] Janay Kingsberry & Travis M. Andrews, *Board Approves Trump Plan To Close Kennedy Center For Two Years*, WASH. POST (Mar. 16, 2026), https://www.washingtonpost.com/entertainment/2026/03/16/kennedy-center-closing-trump/.

Law No. 119-21, the same appropriation whose accompanying report described its purpose as addressing "deferred maintenance and upkeep." Federal financial assistance for the Project makes it a "federally assisted" undertaking within the meaning of 36 C.F.R. § 800.16(y) and a "major Federal action" within the meaning of 42 U.S.C. § 4332(2)(C), independently of any agency permit or NCPC submission.

57.    On March 16, 2026, the Board voted to approve Mr. Trump's two-year closure.[38] Although the Kennedy Center called the vote "unanimous," the Board barred Rep. Beatty from voting. At the same meeting, the Board also voted to replace Richard Grenell with Matt Floca, a "facilities management professional with a construction management background" and previously the Center's vice president of operations, as CEO and executive director.[39]

58.    Following the Board vote on March 16, 2026, Mr. Trump indicated that private donations for the Project were being received as well, stating "we have tremendous amounts of money coming in from some people around the table but also from people that are not here but that have made very generous contributions toward the Trump Kennedy Center – people that have never given to it before and would never have given it. Except I asked them to give."[40]

59.    Through public statements, court submissions, and social media posts, the Kennedy Center Defendants have indicated that they will proceed with substantial interior and exterior work on the existing buildings and site on an expedited basis—and, indeed, that "preliminary work" is already underway. *See supra* n.32 (stating that the Center "will close on July 4th,

---

[38] Steven Sloan et al., *Kennedy Center votes to shut down operations for 2 years and names a new president*, Associated Press (Mar. 16, 2026), https://apnews.com/article/trump-kennedy-center-afd7c714c53d8942a4b76b2684a20755.

[39] Kennedy Center, *Kennedy Center Announces New Additions to its Executive Team*, https://www.kennedy-center.org/news-room/press-release-landing-page/kennedy-center-announces-new-additions-to-its-executive-team/ (last visited Mar. 21, 2026).

[40] PBS News Hour, (Mar. 16, 2026), https://www.youtube.com/watch?v=lY43zWnlchs.

2026 . . . whereupon we will simultaneously begin Construction of the new and spectacular Entertainment Complex"); Decl. of Joseph LaFauci, *Beatty v. Trump*, No. 1:25-cv-04480-CRC (D.D.C. Mar. 10, 2026) ("LaFauci Declaration"), ECF 19-1 ¶ 5 (stating that "preliminary work has been started" and that "significant construction work" will begin after July 7, 2026).

60.     Yet, despite asserting that "construction plans were announced on or about February 1, 2026," that preliminary work has already "been started" and that "significant construction work" is set to commence in less than four months, LaFauci Declaration ¶ 5, a review of publicly available records of NCPC and CFA reveals no submissions by Defendants concerning the Project as of the date of this filing. Nor, to Plaintiffs' knowledge, have Defendants initiated the legally required consultation process required for a project of this type and magnitude under the NHPA or NEPA. Nor have Defendants secured necessary congressional authorization for any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center site or grounds.

61.     The Project will require NPS construction and right-of-way permits for any work affecting the adjacent federal grounds and Parkway lands administered by NPS, including access, construction staging, demolition debris removal, and any transfer or use of NPS-administered property. These permits are the same category of federal authorizations that constituted NPS's "undertaking" for the REACH Expansion, which triggered NCPC review and Section 106 and NEPA compliance. NPS has not initiated the required review for the present Project and has not indicated any intent to do so, notwithstanding that "preliminary work has been started" and "significant construction work" is publicly scheduled to begin July 7, 2026. *Id.* ¶ 5.

62.     The Project will require USACE permits for any construction staging, excavation, discharge, and/or dredging work required under the Clean Water Act and Rivers and Harbors Act.

25

The issuance of these permits constitutes an independent federal undertaking within the meaning of 36 C.F.R. § 800.16(y), triggering Section 106 review obligations. USACE may not issue such permits without first completing Section 106 review. USACE has not initiated the required review for the present Project and has not indicated any intent to do so, notwithstanding that "preliminary work has been started" and "significant construction work" is publicly scheduled to begin July 7, 2026. LaFauci Declaration ¶ 5.

63.    NCPC likewise has not issued any notice, initiated any review, or taken any steps under its mandatory approval authority under 40 U.S.C. § 8722(d) with respect to the Project, notwithstanding that "construction plans were announced on or about February 1, 2026," "preliminary work has been started" and "significant construction work" is publicly scheduled to begin July 7, 2026. LaFauci Declaration ¶ 5. Under a 2018 Memorandum of Agreement between NCPC and the Smithsonian Institution, *see infra* ¶ 86, NCPC is responsible for compliance with NHPA and NEPA for Smithsonian projects in the District.

**<u>Irreparable Harm to Plaintiffs</u>**

64.    Plaintiffs and their members face irreparable harm from the Kennedy Center Defendants' proposed Project.

65.    Plaintiffs and their members have concrete aesthetic, cultural, professional, and educational interests in the Kennedy Center that will be directly and irreparably harmed by the unlawful acts or omissions of Defendants as alleged in this Complaint. The mandatory review processes under the NHPA, NEPA, National Capital Planning Act, and CFA Act exist to protect precisely these interests, by ensuring that the effects of proposed federal actions on historic properties and the human environment are identified, analyzed, and mitigated before decisions are made. Once demolition, new construction, major reconstruction, major renovation, or major

aesthetic transformation begins, this required review is rendered little more than a post hoc formality, incapable of preventing the very harm these statutes were designed to avert.

66.     The Kennedy Center Defendants' failure to initiate and complete required consultations and reviews deprive Plaintiffs and their members of information, participation rights, and the opportunity to influence outcomes before decisions are made and work begins.

67.     Historic fabric, once demolished, cannot be restored. The Kennedy Center's original marble facade, its interior finishes, its concert hall, and its Modernist spatial design represent a unique and irreplaceable architectural legacy. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center would permanently destroy historic fabric, degrade the monumental core's vistas and public grounds, and compromise the Kennedy Center's memorial purpose and architectural integrity, causing permanent, irreversible harm that no subsequent remedy can fully undo.

68.     The Kennedy Center serves approximately 2 million visitors annually and hosts over 400 free public performances each year. Its multi-year closure and transformation without the review Congress required harms not only Plaintiffs but the public at large.

69.     The Kennedy Center is the sole congressionally designated national memorial to President Kennedy within the national capital. 20 U.S.C. § 76q. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the building would destroy the memorial purpose Congress intended to preserve, and result in Plaintiffs and the public losing the Nation's principal contemporaneous memorial to President Kennedy, whose assassination remains a defining moment in American history.

27

70.    Money damages cannot compensate for the destruction of historic fabric or the loss of public access to an irreplaceable national memorial. Nor can money damages restore Plaintiffs' procedural participation rights after construction has commenced.

71.    Such major construction activities will also significantly disrupt the use and enjoyment of the Kennedy Center and its grounds by Plaintiffs' members.

## STATUTORY AND REGULATORY BACKGROUND

### The National Capital Planning Act

72.    Enacted in 1952, the National Capital Planning Act established NCPC "as the central planning agency for . . . the appropriate and orderly development and redevelopment of the National Capital and the conservation of the important natural and historical features thereof." National Capital Planning Act of 1952, Pub. L. No. 82-592, § 2(a), 66 Stat. 781, 782 (1952) (codified as amended at 40 U.S.C. § 8711(a)) (NCPC "is the central federal planning agency for the Federal Government in the National Capital, created to preserve the important historical and natural features of the National Capital . . . .").

73.    NCPC consists of twelve members. *See* 40 U.S.C. § 8711(b). Seven—the Secretary of the Interior, the Secretary of Defense, the General Services Administrator, the Mayor of the District of Columbia, the chair of the Council of the District of Columbia, the chair of the Committee on Governmental Affairs of the Senate, and the chair of the Committee on Government Reform of the House of Representatives—are *ex officio*, *see id.*, and ordinarily appoint alternates in connection with NCPC business. The other five members of NCPC are "citizens with experience in city or regional planning" appointed by either the President or the Mayor of the District of Columbia. *Id.*

74.    NCPC is charged by statute with "preparing, adopting, and amending a comprehensive plan for the federal activities" in the District of Columbia and its federal environs,

and with "making related recommendations to the appropriate developmental agencies." *Id.* § 8711(e)(1); *see id.* § 8721. The comprehensive plan ("Comprehensive Plan"), is published on NCPC's website, *see* Comprehensive Plan, NCPC, https://www.ncpc.gov/plans/compplan/ (last visited Mar. 21, 2026).

75.     One of the principal elements of the Comprehensive Plan is the historic preservation of the capital district. *See id.* at 1. The Comprehensive Plan explains that "[t]he federal government's goal is to preserve, protect, and rehabilitate historic properties in the National Capital Region and promote design and development that is respectful of . . . the symbolic character of the capital's setting." *Id.* at 266. It identifies "[t]he protection and management of historic properties" as "critical elements to successful historic preservation planning." *Id.* at 272. To that end, the Comprehensive Plan instructs the federal government to "[s]ustain exemplary standards of historic property stewardship." *Id.* at 273; *see also id.* at 271 (stating that federal agencies should "be careful stewards of the historic properties under their care or affected by their decisions"). The federal government is obligated to "[r]ecognize the role historic properties . . . have in defining the national capital and its image" and to "[p]lan carefully for appropriate uses and compatible design in and near the monumental core to protect and preserve the nation's key historic properties." *Id.* at 276.

76.     The Comprehensive Plan's requirements reflect Congress's desire, as expressed in federal statutes governing NCPC and its operations, for carefully managed development of the capital district, "proceed[ing] along the lines of good order [and] good taste, and with due regard to the public interests involved." *Id.* § 8104(a). Construction in the capital district has broadly adhered to the Comprehensive Plan and these congressional goals, and the district's present state of development stands as evidence of their enduring value.

29

77.    In addition to promulgating and maintaining the Comprehensive Plan, NCPC is charged with reviewing agencies' "development programs" for the District of Columbia and its federal environs; "advis[ing] as to [their] consistency with the [C]omprehensive [P]lan"; and ultimately approving, or disapproving, of various elements of proposed development projects. *Id.* § 8711(e)(2). Separately, federal buildings proposed to be built in the District of Columbia must also receive NCPC's approval. *Id.* § 8722(d).

78.    An agency intending to engage in development in the District of Columbia must "advise and consult" with NCPC "before preparing construction plans the agency originates for proposed developments and projects," and must thereafter continue to advise and consult with NCPC as it "prepares [its] plans and programs in preliminary and successive stages." *Id.* § 8722(b)(1).

79.    "After receiving the [federal agency's] plans," NCPC is tasked with "promptly . . . mak[ing] a preliminary report and recommendations to the agency." *Id.* The agency then has the opportunity, if it disagrees with NCPC's preliminary report and recommendations, to advise NCPC of the reasons for its disagreement. *Id.* Thereafter, NCPC must make a final report and ruling on the project. *Id.*

80.    NCPC's advise-and-consult process is mandatory for projects that would "affect the plan and development" of the District of Columbia or its federal environs, *see id.*, with exceptions made only for buildings within the Capitol grounds and structures erected by the Department of Defense on military installations during wartime, *see id.* § 8722(b)(2)(A).

81.    Separate and distinct from the advise-and-consult process, "[i]n order to ensure the orderly development" of the capital district and its federal environs, "the location, height, bulk,

30

number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around [such] buildings" must be "approv[ed]" by NCPC. *Id.* § 8722(d).

82.    NCPC considers proposed projects in open, public sessions. On its website, NCPC states that it "welcomes public comment" both prior to and during these sessions, and gives "Commenting Tips" to help members of the public craft their submissions.[41] NCPC's website allows members of the public to submit written comments on "projects, plans, or initiatives where NCPC has a lead or shared responsibility," and offers a description of pending projects and information about the type of input NCPC is seeking.[42]

83.    NCPC's website also allows members of the public to register to speak at NCPC meetings. *See id.* Under the heading "Commission Meeting 101," the website offers guidance on various aspects of speaking at NCPC meetings, from how and when to submit testimony in advance of the meeting to where in NCPC's meeting room the podium at which the public should address NCPC can be found. *See id.*

84.    NCPC reviewed and approved the original Kennedy Center plans. Roger Meersman, *The John F. Kennedy Center for the Performing Arts: From Dream to Reality*, 50 RECORDS OF THE COLUMBIA HIST. SOC'Y 525, 544, 559 (1980) (detailing regulatory approvals for original Kennedy Center building and site).

85.    NCPC reviewed and approved the REACH Expansion in 2015.[43]

---

[41] NCPC, *How to Comment*, https://www.ncpc.gov/participate/guidelines/#written (last visited Mar. 21, 2026).

[42] NCPC, *Public Comment Opportunities*, https://www.ncpc.gov/participate/notices/ (last visited Mar. 21, 2026).

[43] Kennedy Center, *John F. Kennedy Center for the Performing Arts Building Expansion*, NCPC (July 9, 2015), https://www.ncpc.gov/files/projects/2015/Kennedy_Center_Expansion__Project_Synopsis_7523_Jul2015.pdf.

31

86.     The 2018 Memorandum of Agreement between NCPC and the Smithsonian Institution ("2018 Memorandum of Agreement") provides that the Smithsonian Institution must submit "projects it undertakes in the District for NCPC's approval, thus triggering NCPC's need to undertake a NEPA assessment."[44] The Memorandum further recognizes that the "Smithsonian must comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District." *Id.* Under the Memorandum, NCPC and the Smithsonian agree that for NEPA and NHPA purposes, "NCPC shall serve as the lead agency and [the] Smithsonian shall be identified as the project owner." *Id.* at 3.

87.     The D.C. State Historic Preservation Officer is a required consulting party in all the Section 106 processes within the District, including for Smithsonian projects submitted to NCPC for review.[45]

88.     NCPC has, and routinely exercises, review and approval authority over exterior renovation projects of the Smithsonian Institution specifically, and across the District of Columbia, more generally. Prior examples include submission by the Smithsonian Institution, and review by NCPC, of renovations to the exterior cladding of the National Air and Space Museum[46] and

---

[44] Memorandum of Agreement Between NCPC and the Smithsonian Institution Regarding Implementation of the Requirements of the National Environmental Policy Act (Dec. 20, 2018), at 2, https://www.ncpc.gov/docs/MOA_NCPC_Smithsonian_NEPA_December2018.pdf.

[45] *See, e.g.*, Programmatic Agreement Among the Smithsonian Inst., the Dist. of Columbia State Historic Pres. Officer, and NCPC Regarding the Nat'l Air and Space Museum East End Project (Mar. 30, 2022), https://ahhp.si.edu/sites/ahhp/files/documents/Agreement_documents/NASM_East_End_PA_Fin al_Signed_Web.pdf.

[46] *See* Smithsonian Inst. & NCPC, NEPA/Section 106 Public Scoping Notice: National Air and Space Museum Building Revitalization and HVAC Replacement (Oct. 29, 2014), https://www.ncpc.gov/docs/Air_and_Space_NEPA_Scoping_Letter.pdf; *Executive Director's Recommendation Re National Air and Space Museum Building Exterior, Vestibules, and Site Improvements*, NCPC (July 7, 2016), https://www.ncpc.gov/docs/actions/2016July/National_Air_and_Space_Museum_Recommendati on_7585_July2016.pdf; Memorandum of Agreement Regarding the Nat'l Air & Space Museum Nat'l Mall Building Revitalization (Dec. 28, 2017), https://www.ncpc.gov/docs/7585_National_Air_and_Space_Museum_Memorandum_of_Agreem

32

exterior renovations at the Smithsonian Institution Building (commonly referred to as the Castle).[47]

## The Commission of Fine Arts

89.     The Commission of Fine Arts ("CFA") is an independent federal agency established by Congress in 1910 to advise on matters of fine art within the District of Columbia. *See* An Act Establishing a Commission of Fine Arts, Pub. L. 61-181, 36 Stat. 371 (1910) (codified as amended at 40 U.S.C. §§ 9101-9104). Like NCPC, CFA is meant to play an important role in shaping the aesthetic built environment of the District of Columbia and protecting its historic buildings.

90.     CFA is to be composed of "seven well-qualified judges of the fine arts" appointed by the President for four-year terms, 40 U.S.C. § 9101(a), who are assisted in their duties by a secretary and by "staff as authorized by [CFA]," 45 C.F.R. § 2101.10; *see* 40 U.S.C. § 9103.

91.     Federal entities intending to undertake development or construction projects in the capital district must seek the advice of CFA on matters concerning fine arts. *See* 40 U.S.C. § 9102(a); 45 C.F.R. § 2101.1(a)(1). "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," federal entities must seek CFA's advice "on the plans and on the merits of the designs" "***before*** final approval" of the plans or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1)

---

ent_December2017.pdf.

[47] *See* Memorandum from Javier Marques, Gen. Couns., Advisory Council on Historic Pres., to Anne R. Schuyler, Gen. Couns., NCPC (Sept. 14, 2022), https://www.ncpc.gov/docs/Section_106_Consultation_Memorandum_September2022.pdf (discussing question of whether NCPC had review authority over certain interior renovations, but accepting as undisputed NCPC's authority over exterior renovations); Programmatic Agreement Regarding the Smithsonian Castle Revitalization, Smithsonian Inst., D.C. State Historic Pres. Officer, NCPC & Advisory Council on Historic Pres. (Mar. 29, 2023), https://ahhp.si.edu/sites/ahhp/files/documents/Agreement_documents/RHC_Executed_PA_with_Exhibits.pdf (recognizing that NCPC "has approval authority over federal projects located within the District of Columbia pursuant to the National Capital Planning Act"); Amendment to the Programmatic Agreement Regarding the Smithsonian Castle Revitalization (Apr. 12, 2024), https://ahhp.si.edu/sites/ahhp/files/documents/rohc/RHC%20Revitalize%20Castle%20Executed%20PA%20Amendment%20with%20Exhibits-2024.pdf.

33

(emphasis added); *see also id.* § 2102.10(a) (requiring submission to CFA "when concept plans for the project are ready but before detailed plans and specifications or working drawings are prepared").

92.     The submission to CFA should state, among other things, "the nature, location, and justification of the project" regarding which CFA's advice is sought, "including any relevant historical information ***about the building or other structure to be altered or razed***," as well as, to the extent relevant, "area studies, site plans, building and landscape schematics, renderings, models, depictions or samples of exterior materials and components, and photographs of existing conditions to be affected by the project." 45 C.F.R. § 2102.10(b)(1) (emphasis added). The information submitted must "be sufficiently complete, detailed, and accurate as will enable [CFA] to judge the ultimate character, siting, height, bulk, and appearance of the project, in its entirety, including the grounds within the scope of the project, its setting and environs, and its effect upon existing conditions and upon historical and prevailing architectural values." *Id.* § 2102.10(b)(2).

93.     After receiving a proposal, CFA will "comment[] and advise[] on the plans and on the merits of the designs" of the proposed "public building[]." *Id.* § 2101.1(a)(1). CFA is generally required to "conduct its deliberations and reach its conclusions" in open meetings, *id.* § 2102.1, and must keep "detailed record[s]" of these meetings and of its decision-making, *see id.* § 2102.5.

94.     Notice of CFA's meetings must be published in the Federal Register. *See id.* § 2102.3. "Interested persons are permitted to attend meetings of [CFA], to file statements with [CFA] at or before a meeting, and to appear before [CFA] when it is in meeting" to present their views on "the matter or issues then before [CFA]." *Id.* § 2102.4.

95.     The only buildings exempt from the advise-and-consult requirement are the Capitol Building and the Library of Congress buildings, *see* 40 U.S.C. § 9102(c); in all other cases, seeking

CFA's advice is mandatory. Further, even if a project is to proceed in multiple stages, "information about the eventual plans should accompany" the initial submission, regardless of whether the first stage only seeks "approval for razing or removal of a building or other structure." 45 C.F.R. § 2102.10(c).

96.    The Kennedy Center was statutorily required to obtain, and did obtain, CFA approval prior to its initial construction. *See* 20 U.S.C. § 76i(a) (The "building shall be in accordance with plans and specifications approved by the Commission of Fine Arts."); Meersman, *supra* ¶ 84, at 544, 548.

## The National Historic Preservation Act

97.    Congress enacted the NHPA "to insure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation." Pub. L. No. 89-665, 80 Stat. 915 (1966). To that end, the act established various mechanisms intended to "accelerate [the federal government's] historic preservation programs and activities," "give maximum encouragement to agencies and individuals undertaking preservation," and "assist State and local governments and the [National Trust] to expand and accelerate their historic preservation programs and activities." *Id.*

98.    Section 106 of the NHPA, codified at 54 U.S.C. § 306108 ("Section 106"), requires federal agencies to take into account the effects of "undertakings" on historic properties and to afford the ACHP a "reasonable opportunity to comment." 80 Stat. at 917; *see id.* at 917-18 (establishing the ACHP and its seventeen members, including various heads within the federal government, the Chair of the National Trust, and ten President-appointed members from outside the federal government).

99.    The NHPA's implementing regulations, 36 C.F.R. pt. 800, require federal agencies to identify historic properties early, evaluate the potential effects of the proposed undertaking on the properties, consult with the State Historic Preservation Officer and other consulting parties,

35

consider alternatives to avoid, minimize, or mitigate adverse effects, and involve the public. *See* 36 C.F.R. §§ 800.1(a), 800.2(d).

100.    The statute and regulations define "undertaking" to mean "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval." *Id.* § 800.16(y); *see* 54 U.S.C. § 300320.

101.    The statute and regulations define "historic property" to mean "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(*l*)(1); *see* 54 U.S.C. § 300308.

102.    The regulations define "effect" to mean "alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register." 36 C.F.R. § 800.16(i).

103.    The Kennedy Center was determined eligible for the National Register of Historic Places on February 13, 2012, by the D.C. State Historic Preservation Officer "in recognition of its significance as the sole national memorial to President John F. Kennedy within the National Capital and its environs and its significance as an important example of the work of Edward Durell Stone, a nationally recognized architect of the Modern Movement."[48]

---

[48] Memorandum of Agreement Regarding the Kennedy Center Expansion Project, NPS, NCPC, D.C. State Historic Pres. Office & John F. Kennedy Ctr. for the Performing Arts, 3 (Jan. 2015), https://www.ncpc.gov/files/Kennedy_Center_Expansion_Project_Memorandum_of_Agreement_7523_May2015.pdf ("2015 REACH Expansion Memorandum of Agreement"); *Kennedy Center Expansion Connection Project*, NPS, https://parkplanning.nps.gov/projectHome.cfm?projectId=61730 (last visited Mar. 21, 2026).

104. The Rock Creek and Potomac Parkway, an NPS unit listed on the National Register of Historic Places in May 2005, not only runs along the western boundary of the Kennedy Center property, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself. The Rock Creek and Potomac Parkway is within the area that would be affected by the proposed Project. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center building, including the removal of the marble facade, the exposure of the structural steel frame, and the construction of a new exterior, will alter the visual character and setting of the Parkway. Changes to the visual setting of a listed historic property constitute an adverse effect under 36 C.F.R. § 800.5(a)(1), which includes "introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features." Section 106 review must consider adverse effects on the Parkway as well as on the Kennedy Center building itself.

105. For projects in the District of Columbia "subject to the review and approval of [NCPC]," the Smithsonian Institution is treated as a federal agency for purposes of Section 106 of the NHPA. Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003).

106. NPS and NCPC previously completed the Section 106 consultation process for the REACH Expansion, for which they acted as co-lead federal agencies to complete. *See supra* n.48. The 2015 REACH Expansion Memorandum of Agreement concluding Section 106 for the REACH Expansion stated that the NPS undertaking consisted of the issuance of construction and right-of-way permits, certain air rights, and a transfer of jurisdiction to the Kennedy Center of a portion of NPS-administered property. *See id.* The 2015 REACH Expansion Memorandum of Agreement stated that the NCPC undertaking consisted of the approval of the design of the

expansion under the National Capital Planning Act and the approval of the transfer of jurisdiction from NPS to the Kennedy Center. In addition, the REACH Expansion required a Clean Water Act Section 404 permit from the USACE Baltimore District, the issuance of which required prior compliance with Section 106, and the 2015 REACH Expansion Memorandum of Agreement designated NPS and NCPC as responsible for fulfilling the Corps Baltimore District responsibilities under Section 106.

107.    For the present Project, NPS's role as undertaking agency will be the same as for the REACH Expansion. The issuance of construction and right-of-way permits authorizing work on or affecting NPS-administered lands will constitute NPS's federal undertaking. Consistent with the REACH Expansion approach, NPS and NCPC should serve as co-lead agencies responsible for completing Section 106 and NEPA review before any permits are issued or approvals granted. On information and belief, NPS has not initiated that process for the current Project.

**The National Environmental Policy Act**

108.    NEPA, codified as amended at 42 U.S.C. § 4321 *et seq.*, has long been described as the "basic national charter for protection of the environment." *Los Angeles v. Nat'l Highway Traffic Safety Admin.,* 912 F.2d 478, 491 (D.C. Cir. 1990). The statute, which is intended "to inform agency decisionmaking," *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025), requires federal agencies to take a "hard look" at the environmental consequences of their proposals before approving or taking action on them, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). It also requires agencies to make their environmental analyses available to the public. *See* 42 U.S.C. §§ 4332(2)(C), 4336(b)(2).

109.    NEPA is "a purely procedural statute." *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 235 (D.C. Cir. 2025). As such, it does not "force . . . agenc[ies] to change the course

of action [they] propose[]"; instead, it obligates them to make "fully-informed and well-considered" decisions. *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023) (first quoting *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008); and then quoting *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799-800 (D.C. Cir. 2022)). In order to carry out that obligation, agencies must "have available, and . . . carefully consider, detailed information concerning significant environmental impacts" of their proposed actions, and share such information with "the larger audience that may play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

110.    In furtherance of those aims, NEPA requires federal agencies to prepare a "detailed statement" for any "major Federal action[]" that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). "Major" federal actions are those that the responsible agency "determines [to be] subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

111.    For a proposed major federal action, an agency must prepare an environmental impact statement ("EIS") unless that proposed major federal action (1) does not have "a reasonably foreseeable significant effect" on the quality of the human environment, or (2) the significance of its effects is unknown. *Id.* § 4336(b)(2). In the latter case, the agency must prepare an "environmental assessment"—"a concise public document" that "set[s] forth the basis of" the agency's findings and concludes either that the proposed action has "no significant impact," or "that an environmental impact statement is necessary." *Id.* The agency may issue a finding of no significant impact only if a contemplated action has no reasonably foreseeable significant effects on the quality of the human environment, *see id.* §§ 4332(2)(C), 4336(b)(2).

39

112. The agency's EIS must take the form of a "detailed written statement," *id.* § 4336e(6), that describes the "reasonably foreseeable environmental effects of the proposed agency action," including "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* §§ 4332(2)(C)(i), (ii).

113. Effects of a proposed agency action "are reasonably foreseeable if they are 'sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision.'" *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (alteration in original) (quoting *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)). They need not be direct or immediate effects of the agency's action to qualify as "reasonably foreseeable." *See id.*

114. The agency's EIS must also propose "a reasonable range of alternatives to the proposed agency action," including a no-action alternative. 42 U.S.C. § 4332(2)(C)(iii). This alternatives analysis, long referred to as "the heart of the environmental impact statement," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991), requires the agency to "look hard" at its options to "bring about the ends of the federal action" proposed, *id.* at 195-96. The agency must "consider[] the relevant factors" and "define goals for its action that fall somewhere within the range of reasonable choices." *Id.* In so doing, the agency may not define "the objectives of its action in terms so unreasonably narrow that only one alternative would accomplish the goals of its action." *Sierra Club v. FERC*, 145 F.4th 74, 88 (D.C. Cir. 2025) (quoting *Citizens Against Burlington*, 938 F.2d at 196) (citation modified).

115. Throughout its analysis, the agency must consider the proposed project as a whole—from the demolition, if any, through to the completion of construction, taking into account all reasonably foreseeable effects. An agency impermissibly "segments" its NEPA review when it

40

divides "connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). "The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Id.* (alteration in original) (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)). The rule also prevents agencies from evading NEPA review with respect to one or more portions of a larger and ostensibly separate project for which the agency has prepared, or will prepare, an EIS.

116.    NEPA review must address projects as a whole, and may not segment projects into separate reviews for discrete phases. Reviewing any portion of work in isolation, without considering the full scope of environmental effects, constitutes impermissible segmentation under 42 U.S.C. § 4332.

117.    NPS and NCPC previously completed the NEPA review process for the REACH Expansion. *See* 2015 REACH Expansion Memorandum of Agreement, *supra* n.48.

### Buildings on Reservations, Parks, or Public Grounds

118.    Federal law prohibits the erection of a "building or structure" on any federal "reservation, park, or public grounds . . . in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106. Section 8106 protects the public's interest in federal lands in the capital and preserves congressional control over their development.

119.    The Kennedy Center and its adjacent grounds constitute federal public grounds within the meaning of § 8106.

120.    The Rock Creek and Potomac Parkway, an NPS unit listed on the National Register of Historic Places which also constitutes a federal "reservation, park, or public grounds," *id.*, not

41

only runs along the western boundary of the Kennedy Center property, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself.

**Kennedy Center Enabling Statutes and Appropriations**

121. The Kennedy Center was established by Congress as a "living memorial" to President Kennedy. Pub. L. No. 88-260, 78 Stat. 4 (1964). By statute, Congress has designated the Kennedy Center as the "sole national memorial to the late John Fitzgerald Kennedy within the city of Washington," 20 U.S.C. § 76q, and has provided that "no additional memorials or plaques in the nature of memorials shall be designated or installed" in the Kennedy Center's public areas, *id.* § 76j(b)(1).

122. The Kennedy Center's enabling act, codified at 20 U.S.C. §§ 76h-76s, establishes the institutional framework for the Center's governance, construction, maintenance, and operation. These statutes vest authority in a Board of Trustees, delineate the Board's duties and powers, and define the scope of capital projects the Board may undertake without additional congressional authorization.

123. Section 76h establishes the Board of Trustees of the John F. Kennedy Center for the Performing Arts as a bureau of the Smithsonian Institution, "whose duty it shall be to maintain and administer the John F. Kennedy Center for the Performing Arts and site thereof as the National Center for the Performing Arts, a living memorial to John Fitzgerald Kennedy." 20 U.S.C. § 76h(a)(1). The Board is composed of designated federal officials—including the Director of NPS, the Secretary of the Smithsonian Institution, and members of Congress—and thirty-six general trustees appointed by the President. *Id.* § 76h(a)(2).

124. Section 76i directed the Board to construct the Kennedy Center building on a designated site in the District of Columbia, "with funds raised by voluntary contributions," and "in

42

accordance with plans and specifications approved by the Commission of Fine Arts." 20 U.S.C. § 76i(a). Subsequent amendments to § 76i authorized specific, discrete capital additions beyond the original building. In 1997, Congress authorized the Board to design and construct additions to the parking garage at the north and south ends of the building and to make site improvements. *Id.* § 76i(b) (incorporating by reference specific project plan); *see* Pub. L. No. 105-95, § 2, 111 Stat. 2148, 2148 (1997). In 2012, Congress authorized the Board to undertake an "expansion project"— defined as an addition to the south end of the building that is less than 100,000 square feet, improves existing accessibility and education functions, and becomes part of the existing structure. 20 U.S.C. § 76i(c); *see* Pub. L. No. 112-131, § 2, 126 Stat. 377, 377 (2012). That expansion project became the REACH Expansion, which opened in 2019.

125.    Separately, § 76m, added in 2008, authorizes the Board to "study, plan, design, engineer, and construct a photovoltaic system for the main roof" of the Kennedy Center, subject to reporting requirements to congressional committees. 20 U.S.C. § 76m; *see* Pub. L. No. 110-338, § 3, 122 Stat. 3731, 3731 (2008). And § 76q-1, added in 2002 and amended in 2004, authorizes the planning and construction of Kennedy Center Plaza. 20 U.S.C. § 76q-1; *see* Pub. L. No. 107-224, § 2, 116 Stat. 1340, 1340-42 (2002); Pub. L. No. 108-410, § 3, 118 Stat. 2303, 2303-04 (2004).

126.    Upon information and belief, all these past capital projects followed the requisite rules and procedures Plaintiffs allege that Defendants have failed to follow with respect to the present proposed Project.

127.    Section 76j sets forth the duties of the Board with respect to the Kennedy Center's programs, facilities, and site. Such duties include presenting "classical and contemporary music, opera, drama, dance, and other performing arts from the United States and other countries,"

43

"developing and maintaining a leadership role in national performing arts education policy and programs," and striving to "ensure that the education and outreach programs and policies of the [Kennedy Center] meet the highest level of excellence and reflect the cultural diversity of the United States." *See* 20 U.S.C. § 76j(a)(1).

128.   With respect to the Kennedy Center's physical structure, the Board is charged with developing "a comprehensive building needs plan for the features . . . in existence on the date of enactment of the John F. Kennedy Center Act Amendments of 1994 [i.e., July 21, 1994]." *Id.* § 76j(a)(1)(F); *see* Pub. L. No. 103-279, 108 Stat. 1409 (1994).

129.   The Board's statutory capital authority is expressly limited to "repair, replacement, improvement, rehabilitation, alteration, or modification" projects "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G).

130.   Section 76j further provides that, with respect to the grounds, the Board must "manage and operate the grounds of the [Kennedy Center] in a manner consistent with NPS regulations and agreements in effect on [July 21, 1994]," and "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." *Id.* § 76j(a)(2)(F); *see* 108 Stat. at 1409.

131.   Section 76r authorizes appropriations to the Board for maintenance, repair, and security, 20 U.S.C. § 76r(a), as well as separately for capital projects, *id.* § 76r(b)-(d). Section 76r expressly limits the use of appropriated funds, providing that "[n]o funds appropriated pursuant to this section may be used for any direct expense incurred in the production of a performing arts attraction" or for other specified non-capital purposes. *Id.* § 76r(e).

132.    Taken together, these enabling statutes reflect a consistent congressional framework in which the Board's standing authority is limited to maintaining the functionality of the existing buildings and site, while major capital expansions—the parking garage additions, the REACH Expansion, the Plaza, and the renewable-energy roof system—have each required separate, specific congressional authorization. Congress has thus reserved to itself decisions about capital projects that go beyond what is necessary to maintain the functionality of the existing buildings and site.

### The Administrative Procedure Act ("APA")

133.    The APA, 5 U.S.C. §§ 701-706, governs judicial review of federal agency action and inaction. It authorizes "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to seek relief in federal court. 5 U.S.C. § 702.

134.    Courts may review "final agency action for which there is no other adequate remedy in a court," *id.* § 704, and may also "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or taken "without observance of procedure required by law." *Id.* §§ 706(2)(A), (C), (D).

135.    The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).

**CLAIMS FOR RELIEF**

**Count I – Failure to Initiate and Complete Section 106 Review in Violation of 54 U.S.C. § 306108, 36 C.F.R. pt. 800, and Administrative Procedure Act, 5 U.S.C. §§ 701-706**

**(Against All Defendants)**

136.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

137.    Section 106 of the NHPA requires federal agencies to take into account the effects of "undertakings" on historic properties and to afford the Advisory Council on Historic Preservation ("ACHP") a reasonable opportunity to comment, following identification of historic properties, assessment of effects, consultation with the State Historic Preservation Officer and consulting parties, consideration of alternatives and mitigation, and allowing for a period of public involvement.

138.    The statute and its regulations define "historic property" to mean "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(*l*)(1); *see* 54 U.S.C. § 300308.

139.    Federal undertakings require consultation under Section 106 "prior to" their approval. Undertakings that may have effects on properties eligible for inclusion in the National Register of Historic Places trigger consultation under Section 106.

140.    By statute, the Smithsonian Institution is treated as a federal agency for purposes of compliance with Section 106 with respect to design and construction projects in the District of Columbia. Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3, 117 Stat. 888, 889 (2003). The Smithsonian Institution therefore has independent Section 106 consultation obligations for the Project.

46

141.    The Kennedy Center is a "bureau" of the Smithsonian Institution. 20 U.S.C. § 76h(a)(1).

142.    The Kennedy Center is eligible for inclusion in the National Register of Historic Places. The NPS unit Rock Creek and Potomac Parkway was listed on the National Register of Historic Places in May 2005, and not only does it pass directly beside the Kennedy Center, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself. Changes to the Kennedy Center therefore have the potential to adversely affect other historic properties in the immediate vicinity that are listed on the National Register of Historic Places, such as the Rock Creek and Potomac Parkway and the Watergate complex. The 2015 REACH Expansion Memorandum of Agreement defined the undertakings' area of potential effects to include "the parcels, buildings, cultural landscapes, and view corridors surrounding the Project Area" and to include the areas where the undertakings could directly or indirectly cause alterations in the character or use of historic properties. *See supra* n.48.

143.    Defendants NPS and NCPC previously acted as co-lead federal agencies to complete the Section 106 consultation process for the REACH Expansion. The 2015 REACH Expansion Memorandum of Agreement concluding Section 106 consultation for the REACH Expansion stated that the NPS undertaking consisted of the issuance of construction and right-of-way permits, certain air rights, and a transfer of jurisdiction to the Kennedy Center of a portion of NPS-administered property. *See id.* at 2. The 2015 REACH Expansion Memorandum of Agreement stated that the NCPC undertaking consisted of the approval of the design of the expansion under the National Capital Planning Act and the approval of the transfer of jurisdiction from NPS to the Kennedy Center. *See id.* In addition, the REACH Expansion required a Clean Water Act Section 404 permit from the USACE Baltimore District, the issuance of which required

47

prior compliance with Section 106, and the 2015 REACH Expansion Memorandum of Agreement designated NPS and NCPC as responsible for fulfilling the Corps Baltimore District responsibilities under Section 106, *see id.*

144.    The 2018 Memorandum of Agreement between Defendant NCPC and Defendant Smithsonian Institution states that the Smithsonian "must comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District." *See* 2018 Memorandum of Agreement, 2. Under the Memorandum, NCPC and the Smithsonian Institution agree that for Section 106 purposes, "NCPC shall serve as the lead agency and [the] Smithsonian shall be identified as the project owner." *Id.* at 3.

145.    The 2018 Memorandum of Agreement states that "NCPC and the Smithsonian shall integrate the requirements of NEPA as set forth in this [Memorandum] with the requirements of Section 106 of the [NHPA] to ensure that the two procedures run concurrently." *Id.* at 11. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center is an undertaking with adverse effects on historic properties.

146.    The 2018 Memorandum of Agreement states that "[t]he Smithsonian shall formally notify NCPC of a pending Smithsonian project subject to NCPC's authority and NEPA." *Id.* at 3.

147.    Although the Kennedy Center Defendants assert that "construction plans were announced on or about February 1, 2026," LaFauci Declaration ¶ 5, the Smithsonian has not formally notified NCPC of any such project plans as required by the 2018 Memorandum of Agreement.

148.    NPS's issuance of construction and right-of-way permits for the Project, along with any transfer of jurisdiction over NPS-administered lands, constitutes an independent federal undertaking within the meaning of 36 C.F.R. § 800.16(y), triggering Section 106 review

48

obligations independent of any NCPC submission or Smithsonian action. The 2015 REACH Expansion Memorandum of Agreement confirms this interpretation: The NPS undertaking for that prior project consisted specifically of the issuance of construction and right-of-way permits, air rights, and a transfer of jurisdiction to the Kennedy Center. *See* 2015 REACH Expansion Memorandum of Agreement, 2. The same analysis applies to the current Project. NPS may not issue such permits without first completing Section 106 review.

149.   USACE's issuance of construction staging, excavation, discharge, or dredging permits for the Project, also constitutes a federal undertaking within the meaning of 36 C.F.R. § 800.16(y), triggering independent Section 106 review obligations. USACE may not issue such permits without first completing Section 106 review.

150.   Defendants NCPC and the Smithsonian Institution have not initiated or completed Section 106 review for the proposed Project, have not consulted with the D.C. State Historic Preservation Officer or the ACHP, and have not provided the public or Plaintiffs a meaningful opportunity to participate.

151.   This failure violates Section 106 and its regulations, the 2018 Memorandum of Agreement, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

152.   Defendants have a nondiscretionary obligation to initiate and complete the Section 106 review process "prior to" any federal undertaking, and to refrain from issuing any permits, approvals, or other authorizations that would facilitate such undertaking prior to completing that process. Their failure to perform that duty constitutes agency action unlawfully withheld. 5 U.S.C. § 706(1).

153.   Proceeding with the Project, or issuing any permits, approvals or other authorizations that would facilitate such Project, "prior to" completing the Section 106 process

49

exceeds Defendants' statutory authority under Section 106, *id.* § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

154.    If Defendants had submitted plans for the Project to NCPC and NCPC had initiated the Section 106 review process, Plaintiffs would have requested consulting party status and provided comments on those plans, which comments would have informed NCPC of Plaintiffs' concerns with the Project.

155.    Plaintiffs are entitled to a declaration that the failure of Defendants to submit plans for the Project to NCPC, and NCPC's failure to consult with the D.C. State Historic Preservation Officer, consulting parties, and the ACHP violates 54 U.S.C. § 306108 and 36 C.F.R. pt. 800, and that the performance of any further work on the Project without having advised and consulted with the D.C. State Historic Preservation Officer, consulting parties, and the ACHP (including by submitting plans for the Project to such entities), without having submitted plans for the Project to Defendant NCPC, and without Defendant NCPC having complied with its obligations under 54 U.S.C. § 306108 and 36 C.F.R. pt. 800, is unlawful.

156.    Plaintiffs are further entitled to a declaration that issuance of any permits or approvals by NPS, USACE, or NCPC without the Project first completing the Section 106 review process violates 54 U.S.C. § 306108 and 36 C.F.R. pt. 800.

157.    Plaintiffs are further entitled to an injunction against the performance of any further work on, or the issuance of any permits or approvals for, the Project until Defendants have submitted plans for the Project to the D.C. State Historic Preservation Officer and the ACHP, until Defendants have submitted plans for the Project to Defendant NCPC, and until Defendants have complied with their obligations under 54 U.S.C. § 306108 and 36 C.F.R. pt. 800.

**Count II – Intentional Significant Adverse Effect on a Historic Property in Violation of 54 U.S.C § 306113, 36 C.F.R. § 800.9(c), and Administrative Procedure Act, 5 U.S.C. §§ 701-706**

**(Against All Defendants)**

158.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

159.    Under 54 U.S.C. § 306113 and its implementing regulation, 36 C.F.R. § 800.9(c), federal agencies are prohibited from granting a "loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of" Section 106 of the NHPA "has intentionally significantly adversely affected a historic property . . . or having legal power to prevent it, has allowed the significant adverse effect to occur."

160.    Under 36 C.F.R. § 800.5(a)(1), an adverse effect occurs when an applicant alters "any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."

161.    The Kennedy Center is a historic property determined eligible for the National Register of Historic Places. Its 200 iconic gold columns and Modernist design are character-defining features integral to the historic character of the building.

162.    Defendant Board is an independent bureau of Defendant Smithsonian Institution, which has an obligation under the 2018 Memorandum of Agreement to "comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District." The 2018 Memorandum of Agreement between Defendant Smithsonian Institution and Defendant NCPC designates NCPC as the lead federal agency for purposes of Section 106 review and the Smithsonian Institution as the project owner, or applicant. *Id.* at 3.

163.    Between February and December 2025, rather than complying with Section 106, the Kennedy Center Defendants intentionally caused "significant adverse effects" as defined by

51

36 C.F.R. § 800.5(a)(2), including painting the Center's 200 iconic gold columns white and altering the Center's façade and physical features by installing new signage placing Defendant Trump's name above President Kennedy's.

164.    These intentional alterations to the Kennedy Center's characteristics "diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, [and] association." 36 C.F.R. § 800.5(a)(1).

165.    These completed alterations reflect a deliberate pattern of advancing physical changes to a National Register-eligible property, inflicting significant adverse effects on the Center without initiating the federally required review process under Section 106 of NHPA.

166.    Pursuant to 54 U.S.C. § 306113, Defendants NCPC, NPS, Interior, Burgum, and USACE (the "Agency Defendants") each have a nondiscretionary duty to deny approval or assistance to an applicant that has intentionally significantly adversely affected, or permitted adverse effects to, a historic property, unless and until the agency has completed a special consultation process with the ACHP and has made a subsequent determination that circumstances warrant granting the approval notwithstanding the adverse effects. In this case, as designated by the 2018 Memorandum of Agreement, the project owner or applicant is the Smithsonian Institution.

167.    To date, none of the Agency Defendants has initiated the process required by 54 U.S.C. § 306113 and 36 C.F.R. § 800.9(c)(2) to determine if circumstances justify granting assistance despite the adverse effects, including obtaining the opinion from the ACHP required to make that determination.

168.    This failure violates 54 U.S.C. § 306113 and its regulations and the APA, 5 U.S.C. §§ 701-706.

169.    The Agency Defendants' failure to fulfill their statutory duties under 54 U.S.C. § 306113, in the face of these completed alterations to a federally owned historic property, constitutes agency action "unlawfully withheld" under 5 U.S.C. § 706(1).

170.    Proceeding with the Project without complying with the requirements of 54 U.S.C. § 306113 and its regulations exceeds Defendants' statutory authority, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

171.    Plaintiffs are entitled to a declaration that Defendants' actions and failures to act with respect to the proposed Project violate 54 U.S.C. § 306113, 36 C.F.R. § 800.9(c), and the APA, 5 U.S.C. §§ 701-706.

172.    Plaintiffs are further entitled to an injunction against the performance of any further work on the Project until Defendants have complied with their obligations under 54 U.S.C. § 306113 and 36 C.F.R. § 800.9(c), and against the granting of any approval, permit, license, or other assistance to the proposed undertaking at the Kennedy Center—including by the Agency Defendants—until such time.

## Count III – Failure to Conduct the Required Environmental Review under the National Environmental Policy Act in Violation of 42 U.S.C. §§ 4332, 4336, and Administrative Procedure Act, 5 U.S.C. §§ 701-706

### (Against NCPC, NPS, Interior, Secretary Burgum, and USACE)

173.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

174.    The Kennedy Center Defendants have authority over the management and operation of the Kennedy Center's federal grounds and are responsible for coordinating federal planning and approvals that enable or constrain major construction at the site. Further, Defendants Interior and NPS have authority over the management and operation of the federal grounds on which the REACH Expansion sits, and the Rock Creek and Potomac Parkway. Not only is the Rock Creek and Potomac Parkway is an NPS unit that runs along the western boundary of the

Kennedy Center property, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself. Interior and NPS are responsible for coordinating federal planning and approvals that enable or constrain major construction at these sites. Thus, the Project is "subject to substantial Federal control and responsibility" and is therefore a "major Federal action." *Id.* § 4336e(10)(A).

175.    As a major federal action, the Project requires the Agency Defendants to prepare at least an environmental assessment. *See id.* §§ 4332(2)(C), 4336(b).

176.    The 2018 Memorandum of Agreement states that "The Smithsonian shall formally notify NCPC of a pending Smithsonian project subject to NCPC's authority and NEPA." 2018 Memorandum of Agreement, 3.

177.    Although the Kennedy Center Defendants assert that "construction plans were announced on or about February 1, 2026," LaFauci Declaration ¶ 5, the Smithsonian Institution has not formally notified NCPC of any such project plans as required by the 2018 Memorandum of Agreement.

178.    The 2018 Memorandum of Agreement between Defendant NCPC and Defendant Smithsonian Institution states that the Smithsonian Institution must submit "projects it undertakes in the District for NCPC's approval, thus triggering NCPC's need to undertake a NEPA assessment." 2018 Memorandum of Agreement, 2. Under the Memorandum, NCPC and the Smithsonian Institution agree that for NEPA purposes, "NCPC shall serve as the lead agency and [the] Smithsonian shall be identified as the project owner." *Id.* at 3.

179.    Under the 2018 Memorandum of Agreement, "[t]he Smithsonian shall formally notify NCPC of a pending Smithsonian project subject to NCPC's authority and NEPA," *id.* The Smithsonian "shall provide NCPC in writing" the "form of environmental assessment (EA or EIS)

54

the Smithsonian believes appropriate"; a "description of the project including maps, drawings, and other reference materials that help explain the project"; "the purpose and need for the project," "any proposed alternatives under consideration"; "any resources identified on the project site and a list of potential impacts identified"; "a list of proposed cooperating agencies and stakeholders (public and private)"; and "a timeline identifying key milestones of the environmental/project review process," *id.* at 3-4. No such submissions have been made to Defendant NCPC to date.

180.  Under the 2018 Memorandum of Agreement, "[t]o facilitate preparation of a draft [environmental assessment] the Smithsonian shall submit a series of written reports to NCPC for review and discussion between the Parties," *id.* at 5, which shall include a project description; the project purpose and need; a "description of all alternatives considered including a no action alternative"; a description of the affected environment; a "description of the environmental impacts of the project and the alternatives"; a "description of all mitigation measures proposed to mitigate environmental impacts"; and a "list of all parties consulted in the preparation of the [d]raft [environmental assessment]," *id.* No such submissions have been made to Defendant NCPC to date.

181.  On information and belief, Defendant NCPC has not prepared or published an environmental assessment or an EIS analyzing the proposed action, reasonable alternatives, and mitigation measures, nor has it identified a categorical exclusion that would apply. On information and belief, Defendant NCPC has not coordinated any NEPA process with related federal approvals to avoid segmentation.

182.  On information and belief, Defendants NPS and Interior have not prepared or published an environmental assessment or an EIS analyzing the proposed action, reasonable alternatives, and mitigation measures, nor have they identified a categorical exclusion that would

apply. On information and belief, Defendants NPS and Interior have not coordinated any NEPA process with related federal approvals to avoid segmentation.

183. On information and belief, Defendant USACE has not prepared or published an environmental assessment or an EIS analyzing the proposed action, reasonable alternatives, and mitigation measures, nor have they identified a categorical exclusion that would apply. On information and belief, Defendant USACE has not coordinated any NEPA process with related federal approvals to avoid segmentation.

184. Proceeding without NEPA review violates NEPA and its regulations and the APA, 5 U.S.C. §§ 701-706.

185. The Agency Defendants have a nondiscretionary obligation to prepare NEPA review before authorizing or enabling any major federal action significantly affecting the quality of the human environment. The Project is major federal action: It involves federal entities, federal lands, federal funding, and federal permits, and its environmental effects on the monumental core, the historic parkway, and the public grounds are both significant and reasonably foreseeable. Each Agency Defendant's failure to initiate that process constitutes agency action unlawfully withheld. 5 U.S.C. § 706(1).

186. Plaintiffs are entitled to a declaration that proceeding with the Project without completing the required NEPA review exceeds the Agency Defendants' statutory authority under NEPA, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

187. Plaintiffs are entitled to a declaration that the Agency Defendants must complete a NEPA review process in connection with the Project, prior to proceeding with implementation of the Project.

188.    Plaintiffs are further entitled to an injunction against the performance of any work in connection with the Project, and otherwise precluding federal approvals, permits, or management decisions enabling demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center until such NEPA review is completed.

**Count IV – Failure to Advise and Consult with NCPC and to Obtain NCPC Approval in Violation of 40 U.S.C. §§ 8721 and 8722 and Administrative Procedure Act, 5 U.S.C. §§ 701-706**

**(Against Defendants NPS, Interior, Secretary Burgum)**

189.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

190.    Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with NCPC with respect to those plans. 40 U.S.C. § 8722(b)(1). Specifically, such federal agencies must "advise and consult" with NCPC "before preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." *Id.*

191.    Separately, the federal agency must also secure NCPC's approval of various aspects of the proposed project, namely its "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" the proposed development. *Id.* § 8722(d).

192.    NCPC has, and routinely exercises, review and approval authority over exterior renovation projects of the Smithsonian Institution specifically, and across the District of Columbia more generally. Prior examples include submission by the Smithsonian Institution, and review by NCPC, of renovations to the exterior cladding of the National Air and Space Museum and exterior renovations at the Smithsonian Institution Building (commonly referred to as the Castle).

193.    NCPC reviewed and approved the REACH Expansion in 2015.

57

194. The Kennedy Center Defendants have announced a project that, on information and belief, will significantly affect the appearance and massing of the Kennedy Center and its setting within the monumental core.

195. Defendants NPS, Burgum, and Interior have authority over the management and operation of the federal grounds on which the REACH Expansion sits and are responsible for coordinating federal planning and approvals that enable or constrain major construction at that site.

196. Despite public announcements indicating a two-year closure and major structural work, Defendants NPS, Burgum, and Interior have not advised and consulted with NCPC concerning the project. This failure violates 40 U.S.C. § 8721 and the APA, 5 U.S.C. §§ 701-706.

197. Despite public announcements indicating a two-year closure and major structural work, Defendants NPS, Burgum, and Interior have not requested or obtained the approval of NCPC concerning the project. This failure violates 40 U.S.C. § 8722 and the APA, 5 U.S.C. §§ 701-706.

198. Defendants NPS, Burgum, and Interior have a nondiscretionary obligation to initiate the advise-and-consult process under 40 U.S.C. § 8722(b) and to secure NCPC approval under 40 U.S.C. § 8722(d) before the Project proceeds. Their failure to do so, or to compel such compliance, constitutes agency action unlawfully withheld. 5 U.S.C. § 706(1).

199. Proceeding with the Project without advising and consulting with NCPC and obtaining NCPC approval exceeds Defendants NPS, Burgum, and Interior's statutory authority under 40 U.S.C. §§ 8721 and 8722, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

200. If Defendants NPS, Burgum, and Interior had submitted plans for the Project to NCPC, Plaintiffs would have provided comments on those plans, which comments would have informed NCPC of Plaintiffs' concerns with the Project.

201.    Plaintiffs are entitled to a declaration that Defendants NPS, Burgum, and Interior's failure to submit plans for the Kennedy Center Project to NCPC violates 40 U.S.C. §§ 8721 and 8722, and that any work on the Kennedy Center Project without both plans having been submitted to NCPC, and NCPC's approval of those plans having been secured, is unlawful, in violation of 40 U.S.C. §§ 8721 and 8722.

202.    Plaintiffs are further entitled to an injunction against the performance of any further work on the Project until Defendants NPS, Burgum, and Interior have both submitted plans for the Project to NCPC and have obtained NCPC approval of those plans.

## Count V – Failure to Request Advice from CFA in Violation of 40 U.S.C. § 9102, 45 C.F.R. pt. 2101, and Administrative Procedure Act, 5 U.S.C. §§ 701-706

### (Against NPS, Interior, and Secretary Burgum)

203.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

204.    Federal officers and agencies intending to undertake development or construction projects in the capital district, including demolition in furtherance thereof, "shall request the Commission [of Fine Arts] to provide . . . advice" with respect thereto. 40 U.S.C. § 9102. "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," CFA must "comment[] and advise[] on the plans and on the merits of the designs" "before" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1). This expressly includes providing CFA with "any relevant historical information about the building or other structure to be altered or razed," *Id.* § 2102.10(b)(1).

205.    The Kennedy Center Defendants have announced a project that, on information and belief, will significantly affect the appearance and massing of the Kennedy Center and its setting within the monumental core.

206. The Kennedy Center affects the appearance of the city and any "new . . . Entertainment Complex" at its site is a "public building[] to be erected in the District of Columbia by the federal government." *Id.* As such, it is a structure for which CFA's review is required under 40 U.S.C. § 9102.

207. The Project will also affect the Rock Creek and Potomac Parkway. Not only does the Rock Creek and Potomac Parkway, an NPS unit listed on the National Register of Historic Places in May 2005, run along the western boundary of the Kennedy Center property, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself.

208. Despite public announcements indicating a two-year closure and major structural work, Defendants NPS, Burgum, and Interior have not submitted project plans to CFA, or otherwise consulted with CFA in connection with the project. This failure violates 40 U.S.C. § 9102 and its regulations, and the APA, 5 U.S.C. §§ 701-706.

209. Defendants NPS, Burgum, and Interior have a nondiscretionary obligation to initiate the CFA advise-and-consult process under 40 U.S.C. § 9102 before the Project proceeds. Their failure to do so, or to compel such compliance, constitutes agency action unlawfully withheld. 5 U.S.C. § 706(1).

210. Proceeding with the Project without requesting advice from CFA and submitting project plans for mandatory review by CFA exceeds Defendants NPS, Burgum, and Interior's statutory authority under 40 U.S.C. § 9102, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

211.    If Defendants NPS, Burgum, and Interior had submitted plans for the Project to CFA, Plaintiffs would have provided comments on those plans, which comments would have informed CFA of Plaintiffs' concerns with the Project.

212.    Plaintiffs are entitled to a declaration that Defendants NPS, Burgum, and Interior's failure to submit plans for the Project to CFA violates 40 U.S.C. § 9102 and 45 C.F.R. § 2101.1 and that the performance of any further work on the Project without having advised and consulted with CFA, including by submitting plans for the project to CFA, is unlawful.

213.    Plaintiffs are further entitled to an injunction against the performance of any further work on the Project until Defendants NPS, Burgum, and Interior have submitted plans for the Project to CFA.

### Count VI – Erection of a Building or Structure on Federal Public Grounds Within D.C. Without Express Congressional Authority in Violation of 40 U.S.C. § 8106 and Administrative Procedure Act, 5 U.S.C. §§ 701-706

**(Against Defendants NPS, Interior, and Secretary Burgum)**

214.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

215.    Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia *without express authority of Congress*." 40 U.S.C. § 8106 (emphasis added).

216.    The Kennedy Center and its grounds are on federal public grounds and are within the air rights of a federal park, managed and operated by the Kennedy Center Defendants in coordination with Defendants NPS, Burgum, and Interior. If any Defendants demolish the existing building and erect a new structure, or if they propose to expand the building's footprint, construct new exterior pavilions, or otherwise erect structures beyond repair and restoration, they must first obtain express congressional authorization.

217.    Congress has not authorized, expressly or otherwise, the Project.

61

218.    The 2025 appropriation of $256,657,000 "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures," Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025), does not authorize the erection of a new building or discretionary structural expansions, nor does it supply the express authority § 8106 requires. *See* H.R. REP. NO. 119-106, Book 1, at 1175 (2025) (describing this appropriation as providing "funding for capital improvements, operations and maintenance and associated administration costs ***to address deferred maintenance and upkeep*** of the Kennedy Center's buildings and grounds as a memorial to the late President Kennedy" (emphasis added)).

219.    Absent express congressional authorization, the Project violates 40 U.S.C. § 8106 and the APA, 5 U.S.C. §§ 701-706.

220.    Absent express authorization from Congress, for Defendants NPS, Burgum, and Interior to either engage in or allow any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center amounting to or resulting in the erection of a building or structure on the Kennedy Center grounds exceeds Defendants NPS, Burgum, and Interior's statutory authority under 40 U.S.C. § 8106, 5 U.S.C. § 706(2)(C), and is arbitrary and capricious and otherwise not in accordance with law, *id.* § 706(2)(A).

221.    Plaintiffs are entitled to a declaration that, absent express authorization from Congress, engaging in or allowing any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center amounting to or resulting in the erection of a building or structure on the Kennedy Center grounds violates 40 U.S.C. § 8106 and the APA, 5 U.S.C. §§ 701-706.

222.    Plaintiffs are further entitled to an injunction barring any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the

Kennedy Center amounting to or resulting in the erection of a building or structure on the Kennedy Center grounds without having first obtained express authorization to do so from Congress.

**Count VII – Unlawful Change in Management and Operation of Kennedy Center Grounds in Violation of 20 U.S.C. § 76j(a)(2)(F) and Administrative Procedure Act, 5 U.S.C. §§ 701-706**

**(Against Defendants NPS, Interior, and Secretary Burgum)**

223.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

224.    The Kennedy Center's governing statute requires that the Board "manage and operate the grounds" of the Kennedy Center "in a manner consistent with National Park Service regulations and agreements in effect on [July 21, 1994]," and provides that "*[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior*." 20 U.S.C. § 76j(a)(2)(F) (emphasis added).

225.    A two-year closure of public grounds, use of public grounds as construction staging areas, reconfiguration of terraces and open spaces, or expansion of the building footprint onto areas now part of the grounds constitute changes in the management and operation of the grounds requiring express approvals. Defendants NPS and Interior have not secured the express approval of either Congress or the Secretary of the Interior for such changes.

226.    Absent express authorization of Congress and the Secretary of the Interior, the Project violates 20 U.S.C. § 76j(a)(2)(F) and the APA, 5 U.S.C. §§ 701-706.

227.    By approving or acquiescing to the Project without congressional authorization, the Secretary of the Interior acted in excess of his statutory authority under 20 U.S.C. § 76j(a)(2)(F). 5 U.S.C. § 706(2)(C). In the alternative, even if the Secretary's approval or acquiescence was within his authority, it was arbitrary and capricious because the Secretary disregarded the Project's lack of congressional authorization. *Id.* § 706(2)(A).

63

228.    Absent express authorization of Congress and the Secretary of the Interior, allowing any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center amounting to or resulting in a change in management and operation of the Kennedy Center grounds exceeds NPS and Interior's statutory authority under 20 U.S.C. § 76j(a)(2)(F), 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A).

229.    Plaintiffs are entitled to a declaration that Defendants' actions and failures to act with respect to the proposed Project violate 20 U.S.C. § 76j(a)(2)(F) and the APA, 5 U.S.C. §§ 701-706.

230.    Plaintiffs are further entitled to an injunction prohibiting any changes in grounds management and operation at the Kennedy Center without congressional authorization.

## Count VIII – *Ultra Vires* (Failure to Initiate and Complete Section 106 Review, Smithsonian Facilities Authorization Act (Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003)); 54 U.S.C. § 306108; 36 C.F.R. pt. 800)

### (Against Defendants Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)

231.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

232.    This Court has authority to grant equitable relief against federal officers acting outside the bounds of their statutory authority pursuant to the Court's inherent equitable jurisdiction, independent of the APA.

233.    Section 106 of the NHPA requires federal agencies to take into account the effects of "undertakings" on historic properties and to afford the ACHP a reasonable opportunity to comment, following identification of historic properties, assessment of effects, consultation with the State Historic Preservation Officer and consulting parties, consideration of alternatives and mitigation, and allowing for a period of public involvement.

64

234. The statute and its regulations define "historic property" to mean "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior." 36 C.F.R. § 800.16(*l*)(1); *see* 54 U.S.C. § 300308.

235. Undertakings that may have effects on properties eligible for inclusion in the National Register of Historic Places trigger consultation under Section 106.

236. The Kennedy Center is eligible for inclusion in the National Register of Historic Places.

237. By statute, the Smithsonian Institution is treated as a federal agency for purposes of compliance with Section 106 with respect to design and construction projects in the District of Columbia. Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3, 117 Stat. 888, 889 (2003). The Smithsonian Institution therefore has independent Section 106 consultation obligations for the Project.

238. The Kennedy Center is a "bureau" of the Smithsonian Institution. 20 U.S.C. § 76h(a)(1).

239. Defendants NPS and NCPC previously completed the Section 106 consultation process for the REACH Expansion.

240. The 2018 Memorandum of Agreement between Defendant NCPC and Defendant Smithsonian Institution states that the Smithsonian Institution "must comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District." 2018 Memorandum of Agreement, 2. Under the 2018 Memorandum of Agreement, NCPC and the Smithsonian Institution agree that for Section 106 purposes, "NCPC shall serve as the lead agency and [the] Smithsonian shall be identified as the project owner." *Id.* at 3.

241. The 2018 Memorandum of Agreement states that "NCPC and the Smithsonian shall integrate the requirements of NEPA as set forth in this [Memorandum] with the requirements of Section 106 of the National Historic Preservation Act (54 U.S.C. 306108) (NHPA) to ensure that the two procedures run concurrently." *Id.* at 11. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center is an undertaking with adverse effects on historic properties.

242. The Kennedy Center Defendants are statutorily prohibited from commencing any work on the Project that would constitute an "undertaking" under Section 106 without first initiating and completing Section 106 review.

243. The Kennedy Center Defendants have not initiated or completed Section 106 review for the proposed Project, have not consulted with the D.C. State Historic Preservation Officer or the ACHP, have not submitted the Project to NCPC, and have not provided the public or Plaintiffs a meaningful opportunity to participate.

244. This failure is *ultra vires* of the Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3, 117 Stat. 888, 889 (2003), and Section 106 and its regulations, 54 U.S.C. § 306108; 36 C.F.R. pt. 800.

245. Insofar as none of the Kennedy Center Defendants is an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Project.

246. No statutory review scheme forecloses all other forms of judicial review.

247. If the Kennedy Center Defendants had submitted plans for the Project to the ACHP and to NCPC, Plaintiffs would have provided comments on those plans, which comments would have informed the ACHP and NCPC of Plaintiffs' concerns with the Project.

248.    Plaintiffs are entitled to a declaration that the Kennedy Center Defendants' failure to submit plans for the Project to the D.C. State Historic Preservation Officer, the ACHP, or NCPC is *ultra vires* of 54 U.S.C. § 306108 and 36 C.F.R. pt. 800, and that the performance of any further work on the Project without having advised and consulted with the D.C. State Historic Preservation Officer and the ACHP (including by submitting plans for the Project to such entities), without having submitted plans for the Project to Defendant NCPC, and without Defendant NCPC having complied with its obligations under 54 U.S.C. § 306108 and 36 C.F.R. pt. 800, is unlawful.

249.    Plaintiffs are further entitled to an injunction against the performance of any further work on the Project until the Kennedy Center Defendants have submitted plans for the Project to the D.C. State Historic Preservation Officer and the ACHP, until the Kennedy Center Defendants have submitted plans for the Project to Defendant NCPC, and until Defendant NCPC has complied with its obligations under 54 U.S.C. § 306108 and 36 C.F.R. pt. 800.

### Count IX – *Ultra Vires* (Erection of a Building or Structure on Federal Public Grounds Within D.C. Without Express Congressional Authority, 40 U.S.C. § 8106)

**(Against Defendants Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)**

250.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

251.    This Court has authority to grant equitable relief against federal officers acting outside the bounds of their statutory authority pursuant to the Court's inherent equitable jurisdiction, independent of the APA.

252.    Under 40 U.S.C. § 8106, "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." 40 U.S.C. § 8106.

253.    The Kennedy Center and its grounds are on federal public grounds and are within the air rights of a federal park, managed and operated by the Kennedy Center Defendants in

coordination with Defendants NPS, Burgum, and Interior. The Kennedy Center Defendants are statutorily prohibited from demolishing the existing building and erecting a new structure, or expanding the building's footprint, constructing new exterior pavilions, or otherwise erecting structures beyond repair and restoration, without express congressional authorization.

254. Congress has not authorized, expressly or otherwise, the Project.

255. The 2025 appropriation of $256,657,000 "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures," 139 Stat. at 157, does not authorize the erection of a new building or discretionary structural expansions; nor does it supply the express authority § 8106 requires. *See* H.R. REP. NO. 119-106, Book 1, at 1175 (2025) (describing this appropriation as providing "funding for capital improvements, operations and maintenance and associated administration costs *to address deferred maintenance and upkeep* of the Kennedy Center's buildings and grounds as a memorial to the late President Kennedy" (emphasis added)).

256. Absent express congressional authorization, the Project is *ultra vires* of the Kennedy Center Defendants' statutory authority under 40 U.S.C. § 8106.

257. Insofar as none of the Kennedy Center Defendants is an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Project.

258. No statutory review scheme forecloses all other forms of judicial review.

259. Plaintiffs are entitled to a declaration that, absent express authorization from Congress, any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center amounting to or resulting in the erection of a building or structure on the Kennedy Center grounds is *ultra vires* of 40 U.S.C. § 8106.

260. Plaintiffs are further entitled to an injunction against the Kennedy Center Defendants barring any demolition, new construction, major reconstruction, major renovation, or

major aesthetic transformation of the Kennedy Center amounting to or resulting in the erection of a building or structure on the Kennedy Center grounds without having first obtained express authorization to do so from Congress.

**Count X – *Ultra Vires* (Action Beyond Capital Authority, 20 U.S.C. § 76j(a)(1)(G))**

**(Against Defendants Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)**

261.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

262.    This Court has authority to grant equitable relief against federal officers acting outside the bounds of their statutory authority pursuant to the Court's inherent equitable jurisdiction, independent of the APA.

263.    The Board's limited capital authority extends only to "capital repair, replacement, improvement, rehabilitation, alteration, or modification" projects that are "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G). Congress has separately authorized and appropriated funds for major capital expansions when it has intended the Kennedy Center to grow or change beyond necessary maintenance of functionality. *See id.* §§ 76i, 76m, 76r.

264.    No source of funding, whether appropriated by Congress, raised through private donations, or contributed by corporate sponsors, substitutes for the express congressional authorization that 20 U.S.C. § 76j(a)(1)(G) requires for capital projects beyond those necessary to maintain the functionality of the existing buildings and site. The Board's statutory authority is defined by what Congress has authorized it to do, not by what funds it may have available. To the extent any portion of the Project is or will be funded through private fundraising or non-appropriated sources, that does not enlarge the Board's authority; the Kennedy Center Defendants

69

are statutorily prohibited from proceeding with the Project without first obtaining congressional authorization.

265.   By announcing and advancing plans for any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation not shown to be necessary to maintain functionality, the Board and the Smithsonian Institution are exceeding their statutory authority absent new, specific congressional authorization.

266.   None of the words "repair, replacement, improvement, rehabilitation, alteration, or modification" can be interpreted to mean demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation not "***necessary to maintain the functionality*** of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G) (emphasis added); *see also Learning Res., Inc. v. Trump*, 607 U.S. __, 2026 U.S. LEXIS 714, at *26-27 (Feb. 20, 2026).

267.   Further, the 2025 appropriation for "repair, restoration, maintenance backlog, and security structures," 139 Stat. at 157, cannot lawfully be used to finance demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation, particularly where Congress has historically authorized such projects through separate enactments. By using the words "repair," "restoration," and "maintenance backlog," *see id.*, which words are synonymous with "repair" and "rehabilitation" used in 20 U.S.C. § 76j(a)(1)(G), the 2025 appropriation intentionally did not authorize use of those funds for any of the other purposes within the Board's authorizing statute—i.e., "replacement," "improvement," "alteration," or "modification."

268.   Absent express congressional authorization, the Project is *ultra vires* of the Kennedy Center Defendants' statutory authority under 20 U.S.C. § 76j(a)(1)(G).

70

269. Insofar as none of the Kennedy Center Defendants is an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Project.

270. No statutory review scheme forecloses all other forms of judicial review.

271. Plaintiffs are entitled to a declaration that the Kennedy Center Defendants' actions and failures to act with respect to the proposed Project are *ultra vires* of the Kennedy Center Defendants' statutory authority under 20 U.S.C. § 76j(a)(1)(G).

272. Plaintiffs are further entitled to an injunction prohibiting any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center without congressional authorization.

### Count XI – *Ultra Vires* (Unlawful Change in Management and Operation of Kennedy Center Grounds, 20 U.S.C. § 76j(a)(2)(F))

**(Against Defendants Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)**

273. Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

274. This Court has authority to grant equitable relief against federal officers acting outside the bounds of their statutory authority pursuant to the Court's inherent equitable jurisdiction, independent of the APA.

275. The Kennedy Center's governing statute requires that the Board "manage and operate the grounds" of the Kennedy Center "in a manner consistent with National Park Service regulations and agreements in effect on [July 21, 1994]," and provides that "*[n]o change in the management and operation of the grounds may be made without the express approval of Congress* and of the Secretary of the Interior." 20 U.S.C. § 76j(a)(2)(F) (emphasis added).

276. A two-year closure of public grounds, use of public grounds as construction staging areas, reconfiguration of terraces and open spaces, or expansion of the building footprint onto areas now part of the grounds constitute changes in the management and operation of the grounds

71

requiring express approvals. Thus, the Kennedy Center Defendants are statutorily prohibited from enacting such changes without express approval of Congress.

277. The Kennedy Center Defendants have not secured the express approval of either Congress or the Secretary of the Interior for such changes.

278. Absent express congressional authorization, the Project is *ultra vires* of the Kennedy Center Defendants' statutory authority under 20 U.S.C. § 76j(a)(2)(F).

279. Insofar as none of the Kennedy Center Defendants is an "agency" for the purposes of the APA, there is no alternate path for statutory review of the Project.

280. No statutory review scheme forecloses all other forms of judicial review.

281. Plaintiffs are entitled to a declaration that the Kennedy Center Defendants' actions and failures to act with respect to the proposed Project are *ultra vires* of the Kennedy Center Defendants' statutory authority under 20 U.S.C. § 76j(a)(2)(F).

282. Plaintiffs are further entitled to an injunction prohibiting any changes in grounds management and operation at the Kennedy Center without congressional authorization.

## Count XII – Mandamus (Failure to Request Review and Approval from NCPC, 40 U.S.C. §§ 8722(b)(1) & (d))

**(Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)**

283. Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

284. Under 40 U.S.C. § 8722(d), "[i]n order to ensure the orderly development of the National Capital, the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of [NCPC]." This statutory mandate imposes a nondiscretionary duty on parties proposing federal public buildings or substantial modifications thereto within the District of Columbia to submit such proposals to NCPC for its review and

approval before proceeding. The duty to submit runs to any federal entity that proposes to construct, reconstruct, or substantially alter a federal public building in the District of Columbia, whether or not that entity qualifies as an "agency" under the APA.

285.    The Kennedy Center is a federal public building situated on federal lands in the District of Columbia. The Board has authority over the management and operation of the Kennedy Center's buildings and site and is responsible for planning and executing capital projects thereon. Defendant Trump, in his official capacity as Chair of the Board, exercises significant influence over the Board's actions and the direction of capital planning for the Kennedy Center.

286.    The Kennedy Center is a "bureau" of the Smithsonian Institution. 20 U.S.C. § 76h(a)(1).

287.    The Smithsonian Institution has a clear, nondiscretionary duty to submit the Project to NCPC for review and approval.

288.    For projects of Defendant Smithsonian Institution within the District of Columbia subject to review and approval by NCPC, NCPC is responsible for compliance with the requirements of the NHPA and NEPA.

289.    The Kennedy Center Defendants have announced and begun to advance the Project—a multi-year closure of the Kennedy Center and major structural work, up to and including demolition and reconstruction—that would fundamentally alter the Kennedy Center's location, height, bulk, number of stories, size, and provision for open space. The Kennedy Center Defendants, therefore, have a clear, nondiscretionary duty to submit the Project to NCPC for review and approval.

290.    Despite having conceded that "[c]onstruction plans were announced on or about February 1, 2026," that "preliminary work has been started" and that "significant construction

73

work" is anticipated to begin in less than four months, LaFauci Declaration ¶ 5, the Kennedy Center Defendants have not submitted plans for the Project to NCPC for review and approval as required by 40 U.S.C. § 8722(d).

291.    Plaintiffs have a clear right to be informed about the Project and to participate in the NCPC review process. Plaintiffs and their members use and enjoy the Kennedy Center and derive aesthetic, cultural, professional, and educational benefits from the preservation of its historic and architectural values and the public's continued access to its building and grounds. Plaintiffs regularly participate in NCPC review processes and would submit comments to and engage with NCPC in any review of the Project. NCPC's public review process affords Plaintiffs and their members a meaningful opportunity to be informed about and to comment on proposed development affecting the Kennedy Center. The Kennedy Center Defendants' failure to submit the Project to NCPC deprives Plaintiffs and their members of these information and participation rights.

292.    Insofar as none of the Kennedy Center Defendants is an "agency" for the purposes of the APA, there is no adequate alternate path for Plaintiffs to compel the Kennedy Center Defendants to submit the Project to NCPC for review and approval.

293.    This Court has jurisdiction under 28 U.S.C. § 1361 over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

294.    Plaintiffs are entitled to an order in the nature of mandamus compelling the Kennedy Center Defendants to submit plans for the Project to NCPC for review and approval under 40 U.S.C. § 8722(d), and enjoining the Kennedy Center Defendants from undertaking any demolition, new construction, major reconstruction, major renovation, or major aesthetic

74

transformation of the Kennedy Center until such submission has been made and NCPC's approval has been obtained.

### Count XIII – Mandamus (Failure to Request Advice from CFA, 40 U.S.C. § 9102; 45 C.F.R. pt. 2101)

**(Against Defendants Board of Trustees of the Kennedy Center, Donald J. Trump in his official capacity as Chair of the Board, and Smithsonian Institution)**

295.    Plaintiffs incorporate by reference the allegations in paragraphs 1 to 135.

296.    Federal officers and agencies intending to undertake development or construction projects in the capital district, including demolition in furtherance thereof, "shall request the Commission [of Fine Arts] to provide the advice" with respect thereto. *See* 40 U.S.C. § 9102. "For public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," CFA must "comment[] and advise[] on the plans and on the merits of the designs" "before" the plans are "final[ly] approv[ed]" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1). This expressly includes providing CFA with "any relevant historical information about the building or other structure to be altered or razed," 45 C.F.R. § 2102.10(b)(1).

297.    The Kennedy Center Defendants have announced a Project that, on information and belief, will significantly affect the appearance and massing of the Kennedy Center and its setting within the monumental core. Thus, the Kennedy Center Defendants have a clear, nondiscretionary duty to submit the Project to CFA for review.

298.    The Kennedy Center affects the appearance of the city and any "new . . . Entertainment Complex" at its site is a "public building[] to be erected in the District of Columbia by the federal government." 45 C.F.R. § 2101.1(a)(1). As such, it is a structure for which CFA's review is required under 40 U.S.C. § 9102.

75

299.     The Project will also affect the Rock Creek and Potomac Parkway. Not only does the Rock Creek and Potomac Parkway, an NPS unit listed on the National Register of Historic Places in May 2005, run along the western boundary of the Kennedy Center property, but the Kennedy Center's cantilevered west patio is within the vertical air rights of the Rock Creek and Potomac Parkway itself.

300.     Despite public announcements indicating a two-year closure and major structural work, the Kennedy Center Defendants have not submitted project plans to CFA or otherwise consulted with CFA in connection with the project. This failure violates 40 U.S.C. § 9102 and its regulations.

301.     Plaintiffs have a clear right to be informed about the Project and to participate in the CFA review process. Plaintiffs and their members use and enjoy the Kennedy Center and derive aesthetic, cultural, professional, and educational benefits from the preservation of its historic and architectural values and the public's continued access to its building and grounds. Plaintiffs regularly participate in CFA review processes and would submit comments to and engage with CFA in any review of the Project. CFA's public review process affords Plaintiffs and their members a meaningful opportunity to be informed about and to comment on proposed development affecting the Kennedy Center. The Kennedy Center Defendants' failure to submit the Project to CFA deprives Plaintiffs and their members of these information and participation rights.

302.     This Court has jurisdiction under 28 U.S.C. § 1361 over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

303.     Plaintiffs are entitled to an order in the nature of mandamus compelling the Kennedy Center Defendants to submit plans for the Project to CFA for review under 40 U.S.C.

§ 9102 and 45 C.F.R. § 2101.1, and enjoining the Kennedy Center Defendants from undertaking any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center until such submission has been made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

i.    Declare that the Kennedy Center Defendants have violated, and enjoin the Kennedy Center Defendants from further violating, the NHPA by failing to initiate and complete Section 106 review for the proposed undertaking at the Kennedy Center, and require all Defendants to conduct and complete Section 106 consultation before taking any actions enabling or affecting demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center;

ii.   Declare that all Defendants shall comply with the NHPA's prohibition on intentionally significantly adversely affecting a historic property and deny any approval, permit, license, or other assistance to the proposed undertaking at the Kennedy Center, insofar as Kennedy Center Defendants, acting as applicants for Project approval, have already intentionally created or permitted significant adverse effects to the Center with the intent to avoid compliance with Section 106;

iii.  Declare that the Agency Defendants have violated, and enjoin them from further violating, NEPA by failing to prepare and publish required environmental review for actions enabling or affecting demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center, and require the Agency Defendants to conduct and complete NEPA review before any such federal actions occur;

77

iv.    Declare that Defendants are required to advise and consult with NCPC prior to any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center and its site, and enjoin Defendants from proceeding until those reviews are obtained;

v.    Declare that Defendants are required to submit to and obtain the approval of NCPC any plans for demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center and its site, and enjoin Defendants from proceeding until that approval is obtained;

vi.    Declare that Defendants are required to submit concept and design plans to CFA for review before final approval or action on any plans for demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center, and enjoin Defendants from proceeding until that review is obtained;

vii.    Declare that Defendants may not demolish, reconstruct, renovate, or transform the Kennedy Center building or grounds in a manner that amounts to the erection of a new structure without express congressional authorization under 40 U.S.C. § 8106, or that exceeds the statutory limits of 20 U.S.C. § 76j(a)(1)(G), and enjoin such changes absent those approvals;

viii.    Declare that the 2025 congressional appropriation of $256,657,000 "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures," 139 Stat. at 157, does not authorize the erection of new structures or discretionary aesthetic transformation of the Kennedy Center, and enjoin the use of those funds for demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation not necessary to maintain functionality;

ix.  Declare that no change in the management and operation of the Kennedy Center's grounds, including prolonged closure or reconfiguration of open spaces, may be made without the express approval of Congress and of the Secretary of the Interior, as required by 20 U.S.C. § 76j(a)(2)(F), and enjoin such changes absent those approvals;

x.  Preliminarily and permanently enjoin the Kennedy Center Defendants, the Agency Defendants, and all those acting in concert with them, from any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center, or changing the management and operation of its grounds, unless and until they have complied with the NHPA, NEPA, and federal design-review statutes and have obtained any required express approvals from Congress and the Secretary of the Interior;

xi.  Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

xii.  Grant any such other relief that the Court deems just and proper.

## REQUEST FOR EXPEDITED RELIEF

Given the Kennedy Center Defendants' public announcement on March 16, 2026 of a two-year closure commencing on or about July 4, 2026, and the imminent risk of irreversible harm to the Kennedy Center's historic fabric and to the public's participatory rights, Plaintiffs respectfully request expedited consideration of their forthcoming motion for preliminary injunctive relief preserving the status quo pending full compliance with applicable law.

Respectfully submitted,

DC PRESERVATION LEAGUE,
NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,
THE AMERICAN INSTITUTE OF ARCHITECTS,
AMERICAN SOCIETY OF LANDSCAPE ARCHITECTS,
DOCOMOMO US,
SOCIETY OF ARCHITECTURAL HISTORIANS,
THE COMMITTEE OF 100 ON THE FEDERAL CITY, and
THE CULTURAL LANDSCAPE FOUNDATION

By their attorneys,

*/s/ Gregory B. Craig*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer*
Kevin Y. Chen*
Matthew F. Casassa*
Marilyn Icsman*
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel: (617) 832-1000
theuer@foleyhoag.com
kchen@foleyhoag.com
mcasassa@foleyhoag.com
micsman@foleyhoag.com

*Application for admission
*pro hac vice* forthcoming

*/s/ Gregory Alan Werkheiser*
Gregory Alan Werkheiser (VA210)
Marion Forsyth Werkheiser (486465)
Lydia Dexter (OR0032)
Jessie Barrington (VA224)
Caitlin McCurdy (NH0004)
Katherine Lee Sorrell (TX0109)
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
lydia@culturalheritagepartners.com
jessie@culturalheritagepartners.com
caitlin@culturalheritagepartners.com
katherine@culturalheritagepartners.com

*/s/ Abbe David Lowell*
Abbe David Lowell (358651)
Caleb Hayes-Deats (1643213)
Isabella M. Oishi (90018056)
Angela Reilly*
LOWELL & ASSOCIATES, PLLC
1250 H Street N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
chayes-deats@lowellandassociates.com
ioishi@lowellandassociates.com
areilly@lowellandassociates.com

Dated: March 23, 2026

80