**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DC PRESERVATION LEAGUE**, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:26-cv-00981 |

**MEMORANDUM IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 3

    I.    Congress Establishes the Kennedy Center. ...................................................................... 3

    II.   Congress Authorizes Subsequent Major Additions or Changes to the Kennedy
        Center. .............................................................................................................................. 5

    III.  Mr. Trump Takes Over the Kennedy Center, Purports to Rename It After Himself,
        and Unlawfully Damages Its Historic Columns. .............................................................. 7

    IV.  Mr. Trump Announces the Project and the Board Approves the Kennedy Center's
        Two-Year Closure. ..........................................................................................................11

ARGUMENT ............................................................................................................................... 13

    I.    Plaintiffs Are Likely to Succeed on the Merits. .............................................................. 14

        A.  Defendants Lack Statutory Authority to Demolish, Reconstruct, Renovate, or
            Transform the Kennedy Center's Buildings or Grounds. ............................................. 16

            1.    40 U.S.C. § 8106 Prohibits Defendants from Erecting Any Building or Structure
                 on Federal Public Grounds in the District of Columbia Without Express
                 Congressional Authorization (Counts VI & IX). ..................................................... 17

            2.    The Kennedy Center's Governing Statute Limits the Board's Capital Authority
                 to Projects "Necessary" to "Maintain Functionality" (Count X). ............................ 20

            3.    The Kennedy Center's Governing Statute Prohibits Any Change in the
                 Management and Operation of the Kennedy Center's Grounds Absent
                 Authorization of Both Congress and the Secretary of the Interior (Counts VII
                 & XI). ...................................................................................................................... 22

        B.  Defendants Have Failed to Comply with Mandatory Historic Preservation, Design
            Review, and Environmental Review Statutes. ........................................................... 23

            1.    Defendants Have Failed to Comply with Their NHPA Obligations (Counts I, II
                 & VIII). .................................................................................................................... 23

            2.    Defendants Have Failed to Comply with Their Statutory Obligation to Seek
                 NCPC's Advice, and Obtain NCPC's Approval of the Project (Counts IV & XII). . 28

            3.    Defendants Have Failed to Request Legally Required Advice from CFA (Counts
                 V & XIII). ............................................................................................................... 31

4.      Agency Defendants Have Failed to Comply with NEPA (Count III)......................... 33

II.    Plaintiffs Will Be Irreparably Harmed Without a Preliminary Injunction. ....................... 36

III.   The Balance of Equities and Public Interest Favor a Preliminary Injunction................... 41

IV.    The Court Should Waive Any Bond Requirement Because Defendants Face No
       Harm and Plaintiffs Are Nonprofit Entities Pursuing Public Interest Litigation. ............. 42

CONCLUSION.................................................................................................................... 44

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...................................................................................31, 33

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) ..............................................................................38, 40

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ...........................................................................20, 22, 23

*City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*,
    912 F.2d 478 (D.C. Cir. 1990) ........................................................................................33

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) ........................................................................................14

*Corley v. United States*,
    556 U.S. 303 (2009) .......................................................................................................21

*Deal v. United States*,
    508 U.S. 129 (1993) .......................................................................................................19

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ......................................................................................35

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ..........................................................................43, 44

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .......................................................................................................37

*Food Mktg. Inst. v. Argus Leader Media*,
    588 U.S. 427 (2019) .......................................................................................................19

*Fund for Animals v. Clark*,
    27 F. Supp. 2d 8 (D.D.C. 1998) .....................................................................................40

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ..........................................................................................41

*Hunt v. Washington State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..................................................................................................37, 40

*Kirwa v. U.S. Dep't of Def.*,
    285 F. Supp. 3d 21 (D.D.C. 2017) .................................................................................16

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) .......................................................................................................34

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................... *passim*

iii

*Learning Res., Inc. v. Trump,*
   146 S. Ct. 628 (2026) ...................................................................................................... 19, 21

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ........................................................................................................ 34, 35

*Massachusetts v. Watt,*
   716 F.2d 946 (1st Cir. 1983) ............................................................................................ 39

*N. Am. Building Trades Unions v. U.S. Dep't of Def.,*
   783 F. Supp. 3d 290 (D.D.C. 2025) ................................................................................ 43, 44

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
   26 F.4th 960 (D.C. Cir. 2022) ......................................................................................... 20

*Nat'l Council of Nonprofits v. OMB,*
   775 F.Supp.3d 100 (D.D.C. 2025) .................................................................................. 43

*Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.,*
   No. 25-4316, 2026 U.S. Dist. LEXIS 39946 (D.D.C. Feb. 26, 2026) ............................. 10, 30

*Nat'l Trust for Hist. Pres. v. FDIC,*
   No. 93-0904, 1993 U.S. Dist. LEXIS 21469 (D.D.C. May 7, 1993) ................................. 36

*In re Nofziger,*
   925 F.2d 428 (D.C. Cir. 1991) ......................................................................................... 18

*Nuclear Reg. Comm'n v. Texas,*
   605 U.S. 665 (2025) ......................................................................................................... 20

*Open Cmtys. All. v. Carson,*
   286 F. Supp. 3d 148 (D.D.C. 2017) ................................................................................. 42

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
   797 F.3d 1087 (D.C. Cir. 2015) ....................................................................................... 39

*Powder River Basin Resource Council v. Dep't of Interior,*
   749 F. Supp. 3d 151 (D.D.C. 2024) ................................................................................. 40

*Pursuing America's Greatness v. FEC,*
   831 F.3d 500 (D.C. Cir. 2016) ......................................................................................... 41

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ......................................................................................................... 34, 38, 39

*Sierra Club v. FERC,*
   827 F.3d 36 (D.C. Cir. 2016) ........................................................................................... 39

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   803 F.3d 31 (D.C. Cir. 2015) ........................................................................................... 33

*TikTok Inc. v. Trump,*
   490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................................... 41, 42

*Tohono O'Odham Nation v. U.S. Dep't of Interior,*
   138 F.4th 1189 (9th Cir. 2025) ........................................................................................ 24

iv

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978)................................................................................................35

*Winter v. NRDC,*
  555 U.S. 7 (2008)...........................................................................................13, 41

**Statutes, Regulations, and Rules**

5 U.S.C. § 551...................................................................................................................16

5 U.S.C. § 706(1) ............................................................................................28, 30, 32, 35

5 U.S.C. § 706(2) ......................................................................................................*passim*

20 U.S.C. § 76h............................................................................................................3, 33

20 U.S.C. § 76i.......................................................................................................5, 19, 33

20 U.S.C. § 76i(a) ...............................................................................................................32

20 U.S.C. § 76i(c) .................................................................................................................5

20 U.S.C. § 76j(a) ....................................................................................................*passim*

20 U.S.C. § 76j(b)...............................................................................................................10

20 U.S.C. § 76m...............................................................................................................5, 19

20 U.S.C. § 76q.....................................................................................................................4

20 U.S.C. § 76q-1 ............................................................................................................5, 19

20 U.S.C. § 76r ................................................................................................................6, 19

33 U.S.C. § 403..............................................................................................................15, 25

33 U.S.C. § 1344.............................................................................................................15, 25

40 U.S.C. § 8106 .......................................................................................................*passim*

40 U.S.C. § 8722(b)(1) ...............................................................................................*passim*

40 U.S.C. § 8722(d)...........................................................................................................29

40 U.S.C. § 9102...................................................................................................31, 32, 33

42 U.S.C. § 4332(2) ...........................................................................................................34

42 U.S.C. § 4336(b) ...........................................................................................................34

42 U.S.C. § 4336e(10) .......................................................................................................33

54 U.S.C. § 300301............................................................................................................15

54 U.S.C. § 300308............................................................................................................24

54 U.S.C. § 304101............................................................................................................24

54 U.S.C. § 304102............................................................................................................24

54 U.S.C. § 306108.......................................................................................................23, 24

54 U.S.C. § 306113...................................................................................................26, 27, 28

Pub. L. No. 61-181, 36 Stat. 371 (1910)...................................................................................31

Pub. L. No. 85-874, 72 Stat. 1698 (1958)..................................................................................3

Pub. L. No. 88-260, 78 Stat. 4 (1964).......................................................................................4

Pub. L. No. 96-514, 94 Stat. 2957 (1980)..................................................................................6

Pub. L. No. 104-208, 110 Stat. 3009-215 (1996) ......................................................................6

Pub. L. No. 105-95, 111 Stat. 2148 (1997)................................................................................5

Pub. L. No. 107-224, 116 Stat. 1340 (2002)..............................................................................5

Pub. L. No. 108-72, 117 Stat. 888 (2003)............................................................................5, 15

Pub. L. No. 108-447, 118 Stat. 3087 (2004)..............................................................................6

Pub. L. No. 110-338, 122 Stat. 3731 (2008)..............................................................................5

Pub. L. No. 112-131, 126 Stat. 377 (2012)................................................................................5

Pub. L. No. 114-113, 129 Stat. 2569 (2015)..............................................................................6

Pub. L. No. 116-260, 134 Stat. 1182 (2020)..............................................................................6

Pub. L. No. 117-103, 136 Stat. 49 (2022)..................................................................................7

Pub. L. No. 117-328, 136 Stat. 4459 (2022)..............................................................................7

Pub. L. No. 118-42, 138 Stat. 25 (2024)....................................................................................7

Pub. L. No. 119-21, 139 Stat. 72 (2025).................................................................6, 7, 18, 21

36 C.F.R. § 800.1(a)..................................................................................................................24

36 C.F.R. § 800.2(d) .................................................................................................................24

36 C.F.R. § 800.5(a)......................................................................................................24, 26, 27

36 C.F.R. § 800.9(c)..............................................................................................................26, 27

36 C.F.R. § 800.16(*l*) .................................................................................................................24

36 C.F.R. § 800.16(y) ................................................................................................................24

45 C.F.R. § 2101.1(a)............................................................................................................31, 32

45 C.F.R. § 2102.10(b) ..............................................................................................................32

45 C.F.R. § 2102.10(c)...............................................................................................................32

Federal Rule of Civil Procedure 65(c) ......................................................................................42

**Other Authorities**

H.R. Rep. No. 119-106, Book 1 (2025).......................................................................................7

John F. Kennedy, *Remarks at Amherst College* (Oct. 26, 1963),
    https://www.arts.gov/about/kennedy-transcript (last visited Mar. 29, 2026) ........................44

Lyndon B. Johnson, *Remarks Upon Signing Bill Concerning the John F. Kennedy Center for the Performing Arts* (Jan. 23, 1964), https://www.presidency.ucsb.edu/documents/remarks-upon-signing-bill-concerning-the-john-f-kennedy-center-for-the-performing-arts (last visited Mar. 30, 2026) .................................................................................................44

NCPC, Comprehensive Plan for the National Capital: Federal Elements, Historic Preservation Element, *available at* https://www.ncpc.gov/plans/compplan/ (last visited Mar. 30, 2026) ..........................................................................................29

NCPC, Project Information, https://www.ncpc.gov/review/project/8113/ (last visited Mar. 30, 2026) ............................................................................................28

NCPC, Project Information, https://www.ncpc.gov/review/project/8351/ (last visited Mar. 30, 2026) ............................................................................................28

NCPC, Project Information, https://www.ncpc.gov/review/project/8733/ (last visited Mar. 30, 2026) ............................................................................................30

NCPC, Memorandum of Agreement Regarding the Nat'l Air & Space Museum Nat'l Mall Building Revitalization (Dec. 28, 2017), https://www.ncpc.gov/docs/7585_National_Air_and_Space_Museum_Memor andum_of_Agreement_December2017.pdf. ............................................................30

NCPC, Executive Director's Recommendation Re Nat'l Air & Space Museum Building Exterior, Vestibules, and Site Improvements, (July 7, 2016), https://www.ncpc.gov/docs/actions/2016July/National_Air_and_Space_Muse um_Recommendation_7585_July2016.pdf ...........................................................30

Smithsonian Inst. & NCPC, NEPA/Section 106, Public Scoping Notice: Nat'l Air & Space Museum Building Revitalization and HVAC Replacement (Oct. 29, 2014), https://www.ncpc.gov/docs/Air_and_Space_NEPA_Scoping_Letter.pdf..............30

White House, President Trump Participates in a Lunch with the Trump Kennedy Center Board Members, https://www.whitehouse.gov/videos/president-trump-participates-in-a-lunch-with-the-trump-kennedy-center-board-members/ (Mar. 16, 2026) ...........................................................................................................13, 40

**INTRODUCTION**

Even in a city full of historic buildings, the John F. Kennedy Center for the Performing Arts (the "Kennedy Center") stands out. It is at once a "living memorial" to an iconic President, a world-class arts venue, a towering example of Modernist architecture, and a verdant campus that offers visitors a panoramic view of Washington Harbor and Roosevelt Island. It has welcomed the world's finest performers, playwrights, musicians, and artists. It testifies, in President Kennedy's words, to the "connection, hard to explain logically but easy to feel, between achievement in public life and progress in the arts."

Congress has taken pains to preserve that legacy. Before any major change to the Kennedy Center may be carried out, it must be authorized by Congress. It must be reviewed and approved by the National Capital Planning Commission ("NCPC"), which serves as the District's central planning agency, and reviewed by the Commission of Fine Arts ("CFA"), the federal commission responsible for advising on fine-arts matters. And it must comply with the National Historic Preservation Act ("NHPA") and the National Environmental Policy Act ("NEPA"). Together, these requirements serve an essential purpose: to ensure that alterations to the Kennedy Center are undertaken only after careful consideration of the potential consequences by Congress, experts, and the broader public.

But the Kennedy Center's legacy is now in jeopardy, because another President seeks to remake the Center in his own image. Just eighteen days after taking office—before even proposing a federal budget or nominating hosts of executive officers—President Trump announced he would terminate members of the Kennedy Center's Board of Trustees ("Board"). Three days later, he summarily fired all board members appointed by the prior administration and replaced them with allies who promptly elected him Chair. And in December 2025, his hand-picked board unlawfully

1

purported to rename the Kennedy Center the "Trump Kennedy Center," affixing President Trump's name to the building's exterior above the name of the slain President it was built to honor.

Then, on February 1, 2026, Mr. Trump announced plans to shutter the Kennedy Center for two years to permit "Construction, Revitalization, and *Complete Rebuilding*" of a "new and spectacular Entertainment Complex" and a "new and beautiful landmark" (the "Project"). While Mr. Trump's explanation of the Project has varied—sometimes describing a "highly improved" version of the existing facility, and at others a "brand new" building—it has never included any plan to comply with the law. NCPC and CFA have received no submissions for the Project, even though Defendants admit "preliminary work" has already "been started." Nor is there any indication that Defendants have initiated the review processes required by the NHPA or NEPA, or obtained any of the necessary permits. Nor have they sought or obtained the congressional approval required for any substantial renovation of the Kennedy Center, much less its replacement with a new building.

Plaintiffs, a coalition of the nation's leading cultural heritage and architectural organizations, brought this action to require Defendants to comply with these legal obligations. With "preliminary work" already begun, and the two-year closure of the Kennedy Center mere months away, Plaintiffs request that the Court preliminarily enjoin Defendants from carrying out further work on the Project until they have completed all required reviews, secured all necessary approvals and permits, and been expressly authorized by Congress to proceed.

The Court should grant Plaintiffs' motion. To start, Plaintiffs are likely to succeed on their claims. Multiple statutes and regulations unequivocally require Defendants to consult with stakeholders and obtain approvals *before* undertaking the major changes to the Kennedy Center that they propose—yet Defendants have complied with none of them. Proceeding with the Project

2

without these required reviews and approvals will cause irreparable harm. Demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center will irrevocably alter the historic building and its grounds while depriving Plaintiffs and the public of a meaningful opportunity to exercise their lawful right to provide comments and input on the Project. Finally, the equities and public interest overwhelmingly favor a preliminary injunction: Plaintiffs and the public have a profound stake in ensuring that any changes to the Kennedy Center comply with laws designed to protect its historic significance, whereas Defendants have no legitimate interest in violating those laws.

The Kennedy Center is a national public treasure, not a personal vanity project. This Court should enjoin Defendants from proceeding with the Project unless and until they comply with the law.

## BACKGROUND

### I.   Congress Establishes the Kennedy Center.

In 1958, Congress passed, and President Dwight D. Eisenhower signed into law, an act establishing a "National Cultural Center" along the Potomac waterfront in the District of Columbia. Pub. L. No. 85-874, 72 Stat. 1698 (1958) (codified as amended at 20 U.S.C. §§ 76h-76s). The act authorized the construction of the Center—which President Eisenhower envisioned as an "artistic mecca" in the Nation's capital, Declaration of Thaddeus A. Heuer, Ex. 2 at 1— situated it on federal lands, set out its artistic mandate and educational mission, and created a governing board of trustees as a bureau of the Smithsonian Institution.[1] *See* 72 Stat. at 1698-1700.

Fundraising for the Center began in earnest under President John F. Kennedy. Ex. 2 at 3-4. Shortly after President Kennedy's assassination, President Lyndon B. Johnson signed into law

---

[1] "Ex. __" refers to exhibits to the Declaration of Thaddeus A. Heuer, filed herewith.

legislation renaming the National Cultural Center the John F. Kennedy Center for the Performing Arts as a "living memorial" to President Kennedy and authorizing $15.5 million toward its construction. Pub. L. No. 88-260, 78 Stat. 4 (1964). The legislation designated the Kennedy Center as the "sole national memorial" to President Kennedy in the capital district and its environs, which it remains to this day. *Id.* (codified at 20 U.S.C. § 76q).

In 1971, the Kennedy Center opened to the public. *See* Ex. 2 at 5. In the more than five decades since, its building, terraces, and landscape have been integral to the riverfront skyline and to the public's experience of Washington's grand civic spaces. Designed in a Modernist style by Edward Durell Stone, Sr., the building's exterior is well known for its marble façade and original golden pillars, while its interior features iconic crystal chandeliers and red carpeting, a 2,465-seat concert hall and 2,347-seat opera house, several smaller performance spaces, state-of-the-art acoustics, and numerous public gathering spaces. *See* Exs. 3-6. It has served as the Nation's premier performing arts complex and as a vital civic forum, hosting symphony, opera, ballet, theater, jazz, film, education programs, and public ceremonies. Ex. 7.

But the Kennedy Center is much more than just its building. It is also a stately seventeen-acre campus, with grounds designed by the noted landscape architect Edward Durell Stone, Jr., that features a grand entrance, raised planters, pools defining a formal plaza, marble terraces overlooking the Potomac River, and a promenade accented by fountains. *See* Exs. 3, 7, 8. And it is a civic destination, with these extensive indoor and outdoor spaces permitting public access to sweeping river and city views and a wide variety of programming. Attesting to the central place that the Kennedy Center holds in the public life of the District and the nation, it has in past years received approximately two million annual visitors and hosted over 2,200 performances and exhibits annually, including hundreds free of charge. *See* Ex. 7.

**II.    Congress Authorizes Subsequent Major Additions or Changes to the Kennedy Center.**

Since the Kennedy Center opened, Congress has authorized major additions or systems in furtherance of its mission, including an addition to the Center's underground parking garage, 20 U.S.C. § 76i(b); Pub. L. No. 105-95, § 2, 111 Stat. 2148, 2148 (1997); the REACH, a theater housed in a separate structure on the Center's grounds that opened in 2019, 20 U.S.C. § 76i(c); Pub. L. No. 112-131, § 2, 126 Stat. 377, 377 (2012); a large plaza, 20 U.S.C. § 76q-1; Pub. L. No. 107-224, § 2, 116 Stat. 1340, 1340-42 (2002); and a renewable energy roof system, 20 U.S.C. § 76m; Pub. L. No. 110-338, § 3, 122 Stat. 3731, 3731 (2008). Congress specifically authorized each of these projects and detailed how they would be financed—whether with private funds or through appropriations.[2]

Congress has also made clear that no major changes to the Kennedy Center's buildings or grounds can be made without its authorization. The Kennedy Center's governing statutes expressly limit the Board's capital authority to "repair, replacement, improvement, rehabilitation, alteration, or modification" projects "necessary to maintain the functionality" of the Kennedy Center buildings and site "at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G); *see also id.* § 76j(a)(2)(E) (requiring the Board to "maintain the Hall of Nations,

---

[2] *See* Pub. L. No. 105-95, § 3, 111 Stat. 2148, 2148 (1997) (authorizing "an addition to the parking garage at each of the north and south ends of the John F. Kennedy Center for the Performing Arts" and prohibiting use of appropriated funds for the purpose); Pub. L. No. 110-338, §§ 3, 4, 122 Stat. 3731, 3731-32 (2008) ("The Board may study, plan, design, engineer, and construct a photovoltaic system for the main roof of the John F. Kennedy Center for the Performing Arts . . . . There are authorized to be appropriated to the Board such sums as are necessary to carry out [the photovoltaic system project]."); Pub. L. No. 112-131, § 2, 126 Stat. 377, 377 (2012) ("The Board may construct the [REACH] expansion project, and shall be responsible for the planning, design, engineering, and construction of the expansion project."); *id.* ("The costs of planning, design, engineering, and construction of the [REACH] expansion project shall be paid for using nonappropriated funds."); Pub. L. No. 107-224, § 2, 116 Stat. 1340, 1342-43 (2002) (authorizing appropriation of "$400,000,000 for fiscal years 2003 through 2010" in connection with plaza).

5

the Hall of States, and the Grand Foyer of the John F. Kennedy Center for the Performing Arts in a manner that is suitable to a national performing arts center that is operated as a Presidential memorial"). And they obligate the Board to "manage and operate" the Center's "grounds . . . in a manner consistent with National Park Service [("NPS")] regulations and agreements in effect on July 21, 1994," with "no change[s]" being permitted "without the express approval of Congress and of the Secretary of the Interior," *id.* § 76j(a)(2)(F).

In addition to exercising close control over major changes to the Kennedy Center, Congress has regularly appropriated funds for its routine maintenance and repair—both big and small. *See id.* § 76r (authorizing appropriations for "maintenance, repair, and security" as well as for certain "capital projects," and setting annual appropriations limits (capitalization omitted)).[3] In 2025, as in many years prior, Congress did just that, appropriating $256,657,000, to remain available until 2029, for "necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy Center for the Performing Arts." Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025).[4] As the appropriations act makes clear, and the

---

[3] *See, e.g.*, Pub. L. No. 96-514, 94 Stat. 2957, 2963 (1980) ("For expenses necessary for operating and maintaining the nonperforming arts functions of the [Kennedy Center], $4,400,000."); Pub. L. No. 104-208, 110 Stat. 3009-215, 3009-217 (1996) ("For necessary expenses of capital repair and rehabilitation of the existing features of the building and site of the [Kennedy Center], $9,000,000, to remain available until expended."); Pub. L. No. 108-447, 118 Stat. 3087, 3090 (2004) ("For necessary expenses for the operation, maintenance and security of [Kennedy Center], $17,152,000."); Pub. L. No. 114-113, 129 Stat. 2569, 2571 (2015) ("For necessary expenses for capital repair and restoration of the existing features of the building and site of the [Kennedy Center], $14,740,000, to remain available until expended.").

[4] The 2025 appropriation, although large, was not unusual. For fiscal years 2020 to 2024, for example, Congress authorized the appropriation of a total of $235,490,000 for "maintenance, repair, and security," and certain capital projects, *see* 20 U.S.C. 76r(a)-(b), and appropriated large sums for those purposes, *see, e.g.*, Pub. L. No. 116-260, 134 Stat. 1182, 1531 (2020) (appropriating $26,400,000 "[f]or necessary expenses for the operation, maintenance, and security of the [Kennedy Center]" and $14,000,000 "[f]or necessary expenses for capital repair and restoration of the existing features of the building and site"); Pub. L. No. 117-103, 136 Stat. 49, 405 (2022) (appropriating $27,000,000 for maintenance expenses and $13,440,000 for "capital repair and

accompanying House Budget Committee report confirms, the 2025 appropriation is intended to fund "capital improvements, operations and maintenance and associated administration costs to address deferred maintenance and upkeep of the Kennedy Center's buildings and grounds as a memorial to the late President Kennedy and to ensure continued proper use as a performing arts center for the American people as intended by President Eisenhower." H.R. Rep. No. 119-106, Book 1, at 1175 (2025). "More specifically," the House report explained, "this funding would generally support water system upgrades, office space improvements, electric enhancements, elevator updates, rigging replacement (suspending lights, cameras, speakers), seating replacement, lighting and backstage improvements, hydronic system (water heaters) modernization, and bathroom upgrades, among other items." *Id.* Nowhere in the appropriations act or the House report was any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center buildings or grounds contemplated, let alone authorized. *See id.*; Pub. L. No. 119-21, § 60025, 139 Stat. at 157.

### III.   Mr. Trump Takes Over the Kennedy Center, Purports to Rename It After Himself, and Unlawfully Damages Its Historic Columns.

Shortly after reassuming the Presidency, Mr. Trump seized personal control of the Kennedy Center and, in a break with longstanding institutional norms, arranged for himself to be elected Chair of the Board. *See* Exs. 9-10. On February 7, 2025, Mr. Trump announced on social media that he would "immediately terminate" multiple Kennedy Center Board members and declared, simultaneously, that he would soon announce a new Board chaired by himself. Ex. 10. Several

---

restoration of the existing features of the building and site"); Pub. L. No. 117-328, 136 Stat. 4459, 4816 (2022) (appropriating $27,640,000 for "operation, maintenance, and security" and $17,740,000 for "necessary expenses for capital repair and restoration of the existing features of the building and site"); Pub. L. No. 118-42, 138 Stat. 25, 281 (2024) (appropriating $32,293,000 for operation, maintenance, and security, and $12,633,000 for capital repairs).

days later, Mr. Trump announced that Richard Grenell, longtime political ally and former acting Director of National Intelligence, would be appointed interim Executive Director of the Kennedy Center. *See* Exs. 11-12. Eighteen Kennedy Center Board members including the Chair—all appointees of President Joseph R. Biden—were then removed from the official roster on the Kennedy Center's website. *See* Ex. 12 at 2.

On February 12, 2025, the Board voted to elect Mr. Trump as Chair. *See* Exs. 13-14. Later that day, the Kennedy Center announced the vote, the names of the fourteen new Trump-appointed Kennedy Center Board members, and the replacement of longtime Kennedy Center President Deborah Rutter with Mr. Grenell. Ex. 14.

In the months that followed, Mr. Trump began suggesting that changes were coming not just for the Kennedy Center's management, but for the Center itself. During a visit to the Kennedy Center on March 17, 2025, Mr. Trump asserted that the building was in "tremendous disrepair" and announced his intention to "bring it into more modern times." Ex. 15 at 3. Mr. Trump previewed his planned changes to the Kennedy Center during a visit several months later, stating that Senator Lindsey Graham had secured "a record $257 million that's going to go toward renovations the building really needs," and claiming that "in the coming months, we'll fully renovate . . . the entire infrastructure of the building." Ex. 17 at 4.

Unauthorized alterations soon followed without notice or warning. On September 9, 2025, claiming that Mr. Trump "ha[d] given the Kennedy Center $257 million to renovate and restore" the institution, the Kennedy Center announced that it had already begun work "re-painting [its] 200 iconic [gold] columns" white. Ex. 17. The Kennedy Center's 200 exterior columns are an original and character-defining feature of the building's Modernist design, integral to the historic character that formed the basis for the D.C. State Historic Preservation Officer's 2012

8

determination that the Kennedy Center is eligible for the National Register of Historic Places, *see* Ex. 18 at 3. To the best of Plaintiffs' knowledge, the Board, Mr. Trump, and the Smithsonian Institution (collectively, "Kennedy Center Defendants") repainted the columns without consulting the D.C. State Historic Preservation Officer, without notifying the Advisory Council on Historic Preservation ("ACHP"), without initiating review under Section 106 of the NHPA, and without submitting plans to NCPC or CFA.

Then, on December 18, 2025, the Board voted to rename the Kennedy Center to the "Trump Kennedy Center." Exs. 19, 21. Although the White House described the vote as "unanimous," *ex officio* board member Rep. Joyce Beatty reported that she was muted during the proceeding and prevented from voicing her opposition. Ex. 20. The next day, Mr. Trump's name was physically added to the Kennedy Center's façade, placed above President Kennedy's name—a swift alteration to the exterior of a historic building, again apparently undertaken without any of the design review or historic preservation consultation required by federal law.[5] *See* Ex. 21 (façade altered to read "The Donald J. Trump And The John F. Kennedy Memorial Center For The Performing Arts").

These alterations to a property determined eligible for the National Register of Historic Places constitute concrete, completed violations of the federal review requirements further described herein. And they are part of a pattern of illegal damage—up to and including demolition—of historic sites in the capital district. In October 2025, President Trump, together with several other Defendants, demolished the 123-year-old East Wing of the White House to build

---

[5] Nor did it comply with D.C. law. The D.C. Department of Buildings requires building permits for a wide array of construction activities, including the "erection of signs or awnings." D.C. Department of Buildings, "How to Get a Permit," https://dob.dc.gov/page/get-permit (last visited Mar. 30, 2026). A search of the Department of Buildings' public permits repository (available at https://scout.dcra.dc.gov/login-32554) reflects that the Kennedy Center has routinely applied for and obtained building permits from the D.C. Department of Buildings.

a massive ballroom on its site. *See Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, __ F. Supp. 3d __, No. 25-4316, 2026 U.S. Dist. LEXIS 39946, at *3-5 (D.D.C. Feb. 26, 2026); Ex. 24. They did so without the necessary express authorization from Congress; without completing adequate NEPA review (or publishing any environmental review at all); and without first submitting the project to NCPC or CFA for advice and approval.

Nor did they provide the public with any warning. To the contrary, in July 2025, President Trump offered reassurance that the proposed ballroom would not "interfere with the current building" and that it would "be near [the building], but not touching it, and pay[] total respect to the existing building"—which, President Trump asserted, he was "the biggest fan of." Ex. 22. On October 20, 2025, however, President Trump posted a statement on social media announcing that "ground ha[d] been broken" on the project, Ex. 23, and within four days, the East Wing was gone. Ex. 24.

Like the demolition of the East Wing, the renaming of the Kennedy Center sparked immediate outcry. Several Members of Congress introduced legislation to restore the Kennedy Center's former name and signage, and to declare the renaming a violation of law, *see* 20 U.S.C. § 76j(b)(1) (providing that "no additional memorials or plaques in the nature of memorials shall be designated or installed" in the Kennedy Center's public areas); Exs. 25-26. A lengthy list of high-profile cancellations of performances at the Center followed, including the Washington National Opera ending its 55-year residence, prominent composer Philip Glass withdrawing the planned premiere of his new Symphony No. 15 honoring President Abraham Lincoln, and the cancellation of scheduled performances of the hit musical *Hamilton*. *See* Exs. 27-29.

10

**IV.    Mr. Trump Announces the Project and the Board Approves the Kennedy Center's Two-Year Closure.**

Recent statements by Mr. Trump have made clear that more—and more grave—changes to the Kennedy Center are to come. On February 1, 2026, Mr. Trump stated that he planned to shut down the Kennedy Center for two years beginning on July 4, 2026. *See* Ex. 1. Mr. Trump stated that the closure was to enable the "Construction, Revitalization, and ***Complete Rebuilding***" of a "new and spectacular Entertainment Complex," and a "new and beautiful Landmark," *id.* (emphasis added)—indicating that the Project will go well beyond repairs and maintenance, and instead amount to the erection of a fundamentally new structure. Mr. Trump confirmed as much the following day when, in a press event, he elaborated on the scope of the Project, stating that the steel of the Kennedy Center building would be "***fully exposed***" and that he would be "using the steel, . . . the structure," and "***some*** of the marble" to construct a "***brand new*** and really beautiful" building at a cost of "probably around $200 million." Ex. 30 at 2-3 (emphasis added).

Although Mr. Trump claimed that the decision to close the Kennedy Center had followed "a one year review . . . that ha[d] taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants," Ex. 1, there is no evidence to suggest that such a review was actually carried out. In response to this Court's order that several Defendants provide Rep. Beatty with, *inter alia*, "[a] list of the experts or advisors who provided input during [the] 'one year review,'" Mem. Opinion & Order, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 14, 2026), ECF 24 at 25, Defendants stated that they relied on four reports (each prepared under the Center's prior management and none more recently than 2024), *none* of which contemplated the closure of the entire Kennedy Center for multiple years for a Project of still undisclosed scope, *see* Suppl. Br. in Supp. of Mot. for Prelim. Inj., *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 25, 2026), ECF 29 at 2, 6-8 (citing ECF 29-15 to ECF 29-20); *see also* Decl. of Craig Williams, *Beatty v. Trump*, 25-

11

cv-04480 (D.D.C. Mar. 25, 2026), ECF 29-24 ¶ 4 (explaining how "all the work identified in the 2021, 2022, and 2024 assessment documents can be performed while maintaining operations in the Kennedy Center, through phased sequencing of the work"). Matthew Floca, who recently replaced Mr. Grenell as the director of the Kennedy Center, *see* Ex. 33 at 3, stated under oath that there were to the best of his knowledge "no other reports sourced from experts or advisors" during the supposed one-year review period, Suppl. Decl. of Charles Matthew Floca, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 25, 2026), ECF 29-3 ¶ 10. And Mr. Floca confirmed that he had consulted *no* "experts or advisors" beyond a handful of members of the Kennedy Center's staff, *id.* ¶¶ 11-12—even though extensive engagement of a large number of external experts (from architects to acousticians) over the course of several years would be expected and standard practice in connection with a multi-year closure of a major performing-arts venue.[6]

Despite this patently inadequate "one year review," the complete absence of congressional authorization for the Project, and Defendants' failure to begin (let alone complete) any of the required design or environmental reviews, the Board voted on March 16, 2026, to approve Mr. Trump's two-year closure of the Kennedy Center. *See* Ex. 33. The Kennedy Center called the vote "unanimous," despite barring Rep. Beatty from voting, *id.* at 1-2; Mr. Trump, for his part, treated it as perfunctory, stating that the Board's ratification of the Project came "a little late" because he

---

[6] *See* Decl. of Deborah Borda, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 6, 2026), ECF 13-19 ¶ 16 (detailing how "[a] major renovation requires architects, acoustical specialists—of whom there are perhaps five or six in the world with the expertise required for concert hall acoustics— interior designers, accessibility specialists, lighting designers, and other highly specialized professionals" for whom "engaging . . . , reviewing their proposals, and developing and refining detailed plans takes years"); Decl. of Edwin Andrew Taylor, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 6, 2026), ECF 13-20 ¶ 15 (explaining that commissioning of "extensive reports, cost analyses, construction plans, and third-party validated budgets, including but not limited to architectural plans, blueprints, identification of primary engineers, general contractor(s), and acoustical specialists, specific site planning, and independent cost analysts" standard for major renovations or rebuilding "typically takes at least six to eighteen months").

had "already announced it," *id.* at 4. Mr. Trump also indicated that private donations for the Project were being received, stating "we have tremendous amounts of money coming in from some people around the table but also from people that are not here but that have made very generous contributions toward the Trump Kennedy Center—people that have never given to it before and would never have given it" had he not "asked them to give."[7]

"[S]ignificant construction work" on the Project—up to and potentially including the destruction of the Kennedy Center itself—is now set to commence as soon as early July. Decl. of Joseph LaFauci, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Mar. 10, 2026) ("LaFauci Decl."), ECF 19-1 ¶ 5 (stating that "preliminary work has been started" and that "significant construction work" will begin after July 7, 2026). Yet a review of publicly available records of NCPC and CFA still reveals no submissions by Defendants concerning the Project. Nor, to Plaintiffs' knowledge, have Defendants initiated the legally required consultation process required for a project of this type and magnitude under the NHPA or NEPA; secured necessary congressional authorization for any demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of the Kennedy Center site or grounds; or secured the necessary permits from NPS and the U.S. Army Corps of Engineers ("USACE") or carried out the related reviews.

## ARGUMENT

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: [1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest.'" *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting

---

[7] The White House, President Trump Participates in a Lunch with the Trump Kennedy Center Board Members, at 34:25-34, https://www.whitehouse.gov/videos/president-trump-participates-in-a-lunch-with-the-trump-kennedy-center-board-members/ (Mar. 16, 2026).

*Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)); *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (same). Here, the four factors decisively favor preliminary injunctive relief to "preserve the status quo"—and the Kennedy Center itself—"pending the outcome of [this] litigation," *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).

## I.     Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims. Broadly, Plaintiffs' claims require Defendants to comply with two sets of mandatory legal obligations: (1) that Defendants obtain express congressional authorization for the Project, and (2) that Defendants complete all required federal reviews and obtain all necessary approvals and permits before proceeding with the Project. Both support preliminary injunctive relief.

*First*, for any major project at the Kennedy Center—whether the "[c]omplete [r]ebuilding" of the Center promised by Mr. Trump, Ex. 1, or any other deployment of capital beyond what is "necessary" to maintain the building and grounds—Defendants must obtain express authorization from Congress. *See* 40 U.S.C. § 8106 ("A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."); 20 U.S.C. § 76j(a)(2)(F) (prohibiting changes to the use of the grounds "without the express approval of Congress and of the Secretary of the Interior"); *id.* § 76j(a)(1)(G), (a)(2)(E) (limiting the Board's capital authority to work "necessary" to "maintain the functionality" of the Kennedy Center building and site).

Because Defendants have not sought, let alone obtained, the necessary congressional authorization for the Project, Plaintiffs are likely to succeed on these claims, which are brought under the APA against Defendants NPS, United States Department of the Interior ("Interior"), and

14

Secretary of the Interior Douglas J. Burgum (Counts VI & VII) and as *ultra vires* counts against the Kennedy Center Defendants (Counts IX, X & XI), who are not subject to the APA for the purposes of these statutes.

*Second*, as with any major federal project undertaken in the capital district, Defendants must complete various design and environmental reviews and obtain all necessary permits *before* construction begins. Those reviews—which are iterative, collaborative processes involving numerous federal agencies and the public—include: (1) Section 106 historic preservation review under the NHPA (Count I); (2) additional historic preservation consultation under Section 110 of the NHPA, triggered by the unauthorized damage Defendants have already done to the Kennedy Center (Count II); (3) design review and approval by NCPC (Counts IV & XII); (4) design review by CFA (Counts V & XIII); and (5) environmental review under NEPA (Count III). Additionally, Defendants must obtain all necessary permits for the Project—including rights-of-way from NPS for any work affecting the adjacent federal grounds and parkway lands administered by NPS, and USACE permits for any construction staging, excavation, or discharge under the Clean Water Act and Rivers and Harbors Act, *see* 33 U.S.C. §§ 403, 1344—which cannot be issued without those agencies conducting their own NHPA and NEPA reviews (Counts I & III).

Yet, there is no indication that Defendants have commenced *any* of these processes, let alone completed them. Plaintiffs are therefore likely to succeed on these claims, which are brought under the APA against NPS, Interior, Burgum, USACE, and NCPC (collectively, "Agency Defendants") (Counts I, II, III, IV & V) and the Kennedy Center Defendants (Counts I and II),[8]

---

[8] The Smithsonian Facilities Authorization Act of 2003 makes the Smithsonian an "agency" for the purposes of Section 106 and regulations promulgated thereunder insofar as it undertakes projects in the capital district subject to NCPC approval. Pub. L. 108-72, § 3, 117 Stat. 888, 889 (2003) (citing what is now 54 U.S.C. § 306108). Section 106, in turn, adopts the APA's definition of agency, *see* 54 U.S.C. § 300301 (defining "agency" for the purposes of Title 54, subtitle III,

15

and as mandamus counts against the Kennedy Center Defendants to compel the obligatory submissions to NCPC and CFA that the Kennedy Center Defendants have to date failed to make (Counts XII & XIII).

A likelihood of success on any one of these claims would be sufficient to support a preliminary injunction: Defendants cannot begin the Project without congressional authorization, completion of all required reviews, and issuance of all necessary approvals and permits. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 35 (D.D.C. 2017) ("Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." (citation omitted)). Yet Defendants are forging ahead despite having satisfied *none* of these requirements. Plaintiffs are therefore likely to succeed on the merits on multiple, independent grounds.

### A. Defendants Lack Statutory Authority to Demolish, Reconstruct, Renovate, or Transform the Kennedy Center's Buildings or Grounds.

As noted, at least three independent statutory barriers foreclose the Project absent the express approval of Congress. *First*, 40 U.S.C. § 8106 categorically prohibits the erection of any "building or structure" on federal public grounds in the District of Columbia without "express authority" of Congress—authority that has never been granted for this Project. *Second*, the Kennedy Center's governing statute, 20 U.S.C. § 76j(a)(1)(G), independently confines the Board's capital authority to projects "necessary" to "maintain the functionality" of the existing building and site, a limitation that excludes demolition and wholesale reconstruction by its plain terms.

---

division A, by reference to 5 U.S.C. § 551), subjecting the Smithsonian to APA review for Section 106 purposes. Plaintiffs therefore bring a Section 106 claim against the Kennedy Center Defendants under the APA (Count I). In the event the Court nevertheless concludes that the Smithsonian's failure to conduct Section 106 review is not reviewable under the APA, Plaintiffs have, in the alternative, brought an *ultra vires* claim against the Kennedy Center Defendants to prevent them from carrying out the Project without complying with Section 106 (Count VIII).

*Third*, 20 U.S.C. § 76j(a)(2)(F) mandates the "express approval of Congress and the Secretary of the Interior" before any change may be made in the "management and operation" of the Kennedy Center's grounds. Each provision standing alone is sufficient to bar the Project; together, they are insurmountable.

**1. 40 U.S.C. § 8106 Prohibits Defendants from Erecting Any Building or Structure on Federal Public Grounds in the District of Columbia Without Express Congressional Authorization (Counts VI & IX).**

The threshold legal obstacle to the Project is categorical and unambiguous: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia *without express authority of Congress*." 40 U.S.C. § 8106 (emphasis added). The Kennedy Center is located on federal public grounds and—as to the Center's cantilevered west patio—falls within the vertical air rights of the Rock Creek and Potomac Parkway, a federally managed NPS unit listed on the National Register of Historic Places. *See* Ex. 18 at 2. The prohibition of § 8106 therefore applies with full force to any project that would demolish the existing Kennedy Center building and erect a new structure in its place, expand the building's footprint, construct new exterior pavilions, or otherwise erect structures beyond repair and restoration.

Congress has not authorized the Project, expressly or otherwise. Yet by Defendants' own admission, the Project contemplates the erection of a fundamentally new structure on federal public grounds. *See* Ex. 1 (announcing plans to undertake "Construction, Revitalization, and *Complete Rebuilding*" of a "*new* and spectacular Entertainment Complex" and a "*new* and beautiful Landmark" (emphasis added)); Ex. 30 at 2-3 (stating that Defendants would be "using the steel, . . . the structure," and "some of the marble" to construct a "*brand new* and really beautiful" building (emphasis added)); *see also* Ex. 34 at 4 (citing a "source close to the [C]enter"

17

as stating that Mr. Trump "has very specific ideas about what he wants to do to the building, and those ideas—*which have not been publicly released*—don't align with the complex's current state" (emphasis added)).

Defendants cannot circumvent § 8106 by calling the Project a mere renovation; they have made clear their intent to strip the Kennedy Center down to its structural steel studs and erect a "brand new" building in its place, Ex. 30 at 3. Through § 8106, Congress reserved for itself decisions about what stands on federal public grounds. An interpretation of "erect[]" that allowed Defendants to bypass express Congressional approval simply because their new construction retained the skeleton of the prior building (or repurposed some of its original parts) would be an absurd and self-defeating reading of § 8106. *See In re Nofziger*, 925 F.2d 428, 434 (D.C. Cir. 1991) ("[S]tatutes must be construed reasonably so as to avoid absurdities.").

Moreover, Defendants cannot manufacture the "express authority" that § 8106 demands by invoking the 2025 appropriation of $256,657,000 "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures," as the source (in whole or in part; it is not clear which, *see supra* p. 13) of the Project's funding, Pub. L. No. 119-21, § 60025, 139 Stat. at 157. *See* Ex. 16 at 4 (claiming that such appropriation would fund the Project); Ex. 17 (same). That appropriation does not authorize the erection of a new building or discretionary structural expansions—and it plainly does not supply the express authority § 8106 requires.

The absence of authority is confirmed by the accompanying House Budget Committee report, which describes the appropriation as providing "funding for capital improvements, operations and maintenance and associated administration costs *to address deferred maintenance and upkeep* of the Kennedy Center's buildings and grounds as a memorial to the late President Kennedy," *see* H.R. Rep. No. 119-106, Book 1, at 1175 (2025) (emphasis added)—a description

18

wholly incompatible with authorization to demolish and reconstruct the building from the structural steel up. Appropriation of maintenance funds for a building cannot possibly be read to "express[ly] authori[ze]" reconstruction of that same building as an entirely new or a fundamentally altered structure. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) (looking to "neighboring words" with which statutory terms "[are] associated" inform their meaning); *Deal v. United States*, 508 U.S. 129, 132 (1993) (explaining a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").

If more were needed—and in light of § 8106's clear text, more is not, *see Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)—the historical practice of Congress confirms that § 8106 means exactly what it says. When Congress has intended to authorize a major capital expansion of the Kennedy Center—from the additions to the underground parking garage, to the REACH, to the rooftop renewable energy system, to the Kennedy Center plaza—it has done so through separate, express statutory enactments. *See* 20 U.S.C. §§ 76i, 76m, 76q-1; *see also id.* § 76r (separately and distinctly appropriating funds for necessary maintenance, repair, and operations). The absence of any historical precedent for proceeding in the manner proposed by Defendants here is another "telling indication" that the Project "extend[s] beyond the [Defendants'] legitimate reach." *See Learning Res.*, 146 S. Ct. at 641 (cleaned up).

Because Congress has not expressly authorized Defendants to build or erect a new structure at the Kennedy Center's site, the Project exceeds Defendants' statutory authority to carry it out, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and not in accordance with law, *id.* § 706(2)(A)—meaning that NPS, Interior, and Secretary Burgum can be enjoined for their violations of the APA (Count VI). And because the Project is "specific[ally] prohibit[ed]" by

19

§ 8106, it is also *ultra vires* of Defendants' authority—meaning that injunctive relief can issue against the Kennedy Center Defendants, who are not subject to the APA for purposes of § 8106 (Count IX).[9] *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (explaining that action is *ultra vires* if the defendant has "patently . . . misconstru[ed]" the statute at issue; "disregard[ed] a specific and unambiguous statutory directive"; or "violate[d] some specific [statutory] command" (citations omitted)).

### 2. The Kennedy Center's Governing Statute Limits the Board's Capital Authority to Projects "Necessary" to "Maintain Functionality" (Count X).

Independent of the prohibition imposed by § 8106, the Board's limited statutory capital authority bars the Project. The Kennedy Center's governing statute expressly confines the Board's capital authority to "repair, replacement, improvement, rehabilitation, alteration, or modification" projects that are "***necessary to maintain the functionality of the building and site at current standards*** of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G) (emphasis added).

The plain terms of § 76j(a)(1)(G) cannot accommodate the Project, which—again, according to Defendants themselves—involves "Construction, Revitalization, and ***Complete Rebuilding***" of a "***new*** and spectacular Entertainment Complex" and a "***new*** and beautiful Landmark." *See* Ex. 1 (emphasis added); Ex. 30 at 3 (stating that Defendants plan to construct a "***brand new*** and really beautiful" building (emphasis added)). None of the words "repair,

---

[9] *Ultra vires* review "rests on the longstanding principle" that if the actions of a government official or entity are "unauthorized by the statute under which [they] assume[] to act," they have "violate[d] the law" and "the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (third alteration in original) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). Such review is available where, as here, (1) "statutory provision[s] plainly delineate[] the outer limits" of the defendants' authority; (2) "Congress has not expressly precluded judicial review"; and (3) no statute otherwise provides for review. *Id.* at 971; *see Nuclear Reg. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025).

replacement, improvement, rehabilitation, alteration, or modification" can be interpreted to mean a demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation project, much less one "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility," 20 U.S.C. § 76j(a)(1)(G). *See Learning Res.*, 146 S. Ct. at 643 (where the "neighboring words" in a statutory list share a common character, a court will not read one term to encompass a "distinct and extraordinary power" not suggested by the others). The terms "repair," "replacement," "improvement," "rehabilitation," "alteration," and "modification," 20 U.S.C. § 76j(a)(1)(G), all presuppose the continuation of an existing structure. The statute's functional limiting clause—"necessary to maintain the functionality of the building and site at current standards," *id.*—reinforces this conclusion: any project that goes beyond what is necessary to maintain the building in its "current" state, whether by destroying it, transforming it beyond recognition, or otherwise exceeding the scope of necessary maintenance, falls outside the Board's statutory authority.[10]

Further, the Kennedy Center Defendants' planned two-year closure of the Center itself exceeds the Board's statutory capital authority for work "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." *See id*. A two-year closure does not "maintain" the Kennedy Center's functionality; it eliminates it. An interpretation of "maintain" that would permit the Board to close the Center entirely for years at a time would read the limiting clause out of the statute. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that "[a] statute should be construed so that effect is given to all its

---

[10] The 2025 appropriation does not change this analysis. The appropriation's stated narrow purposes—for "repair, restoration, maintenance backlog, and security structures," Pub. L. No. 119-21, § 60025, 139 Stat. at 157—are synonymous with the narrow terms "repair" and "rehabilitation" used in § 76j(a)(1)(G). By funding maintenance and deferred upkeep, not transformation, Congress confirmed that the appropriation was not a grant of authority for the Project.

provisions, so that no part will be inoperative or superfluous, void or insignificant" (citation omitted)).

The Board's pursuit of the Project therefore rests on a "patent[] . . . misconstru[ction]" of its limited authority under § 76j(a)(1)(G) (as well as the related appropriations act), and therefore is *ultra vires*, meaning that the Kennedy Center Defendants can be enjoined. *Changji*, 40 F.4th at 722.

> **3. The Kennedy Center's Governing Statute Prohibits Any Change in the Management and Operation of the Kennedy Center's Grounds Absent Authorization of Both Congress and the Secretary of the Interior (Counts VII & XI).**

The prohibitions on the Project do not run to the Kennedy Center's buildings alone. Section 76j(a)(2)(F) separately provides that "*[n]o change in the management and operation of the [Kennedy Center] grounds may be made without the express approval of Congress and of the Secretary of the Interior*." 20 U.S.C. § 76j(a)(2)(F) (emphasis added).

The Project inevitably entails precisely such changes. A two-year closure of the Kennedy Center's public grounds constitutes a material change in the management and operation of the grounds, as would the use of those grounds as construction staging areas, the reconfiguration of terraces and open spaces, and any expansion of the building footprint onto areas now part of the grounds. The Kennedy Center currently receives approximately two million visitors annually. *See* Ex. 7 at 6. This level of access and use defines the normal management of the Kennedy Center grounds; a multi-year closure, for the purpose of unauthorized demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation, fundamentally alters that management regime.

Because Defendants have not secured the express approval of Congress, any action of NPS, Interior, or Secretary Burgum to engage in or authorize the Project (including any approval of or

22

acquiescence to the Project without congressional sanction) exceeds their statutory authority, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and not in accordance with law, *id.* § 706(2)(A)—meaning that NPS, Interior, and Secretary Burgum can be enjoined for their violations of the APA (Count VII). And because the Project is "specific[ally] prohibit[ed]" by § 76j(a)(2)(F), it is also *ultra vires* of Defendants' authority—meaning that injunctive relief can issue against the Kennedy Center Defendants, who are not subject to the APA for purposes of § 76j(a)(2)(F) (Count XI). *See Changji*, 40 F.4th at 722.

### B. Defendants Have Failed to Comply with Mandatory Historic Preservation, Design Review, and Environmental Review Statutes.

Before undertaking any major project at the Kennedy Center, Defendants must complete a series of mandatory review processes: review and consultation under the NHPA to assess impacts on historic properties; submission to NCPC for planning review and approval; submission to CFA for design review; and environmental analysis under NEPA. Defendants have failed to initiate, let alone complete, any of these legally required processes. Each statutory framework serves a distinct purpose—historic preservation, federal planning coordination, aesthetic oversight, and environmental protection—and each independently imposes binding obligations on Defendants. Compliance with one does not excuse noncompliance with another; Defendants must satisfy all of them before proceeding with the Project. They have satisfied none.

#### 1. Defendants Have Failed to Comply with Their NHPA Obligations (Counts I, II & VIII).

To start, the Defendants have failed to comply with their obligations under Section 106 (Count I) and Section 110(k) (Count II) of the NHPA.

***Section 106.*** Codified at 54 U.S.C. § 306108, Section 106 requires federal agencies to take into account the effects of "undertakings" on historic properties, and to afford the ACHP "a reasonable opportunity to comment with regard to [those] undertaking[s]" "*prior* to the approval

23

of the expenditure of any Federal funds on the undertaking or *prior* to the issuance of any license."

54 U.S.C. § 306108 (emphasis added).[11] Section 106's implementing regulations, 36 C.F.R.

pt. 800, require federal agencies contemplating construction projects to (i) identify historic

properties early in the planning process, (ii) assess the potential effects of the proposed undertaking

on the properties, (iii) consult with the State Historic Preservation Officer ("SHPO") and other

consulting parties, (iv) consider alternatives to avoid, minimize, or mitigate adverse effects, and

(v) involve the public. *See* 36 C.F.R. §§ 800.1(a), 800.2(d). An adverse effect occurs when an

undertaking alters the characteristics of a historic property in a manner that diminishes the integrity

of its "location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1).

In sum, Section 106 is a "stop, look, and listen" statute: It requires federal agencies to fully

consider the effects of their actions on historic properties *before* proceeding. *Tohono O'Odham*

*Nation v. U.S. Dep't of Interior*, 138 F.4th 1189, 1194 (9th Cir. 2025) (quoting *Muckleshoot Indian*

*Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999)).

Section 106 applies to the Project. The Kennedy Center is a historic property that has been

determined eligible for the National Register of Historic Places in 2012. *See* 54 U.S.C. § 300308

(defining "historic property" as "any prehistoric or historic district, site, building, structure, or

object included on, or eligible for inclusion on, the National Register"); 36 C.F.R. § 800.16(*l*)

(same); *see* Ex. 18 at 3. The Project—described by Defendants as a "complete rebuilding" that will

"fully expose[]" the building's structural steel, *see* Exs. 1, 30 at 3—constitutes a federal

undertaking of the Smithsonian and NCPC. *See* 36 C.F.R. § 800.16(y) (defining "undertaking" as

"a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction

---

[11] *See also* 54 U.S.C. §§ 304101, 304102 (establishing the ACHP as an independent federal agency with seventeen members, including various heads within the federal government, the Chair of the National Trust, and ten President-appointed members from outside the federal government).

of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval"); *see also* Ex. 35 at 3 (providing that for Smithsonian projects within the District of Columbia, for Section 106 purposes "NCPC shall serve as the lead agency and [the] Smithsonian shall be identified as the project owner").[12]

In fact, the Project will comprise *several* federal undertakings—each of which requires its own Section 106 review. In addition to work on the Kennedy Center building itself, issuance of construction and right-of-way permits authorizing work on or affecting NPS-administered lands (such as Rock Creek and Potomac Parkway, an NPS unit listed in the National Register of Historic Places, *see* Ex. 18 at 2) constitutes federal undertakings for which NPS is responsible, and for which NPS will need to conduct separate Section 106 review—just as it did for the REACH Expansion, *see* Ex. 18 at 2. Similarly, USACE's issuance of required construction staging, excavation, or discharge permits for the Project under Clean Water Act and Rivers and Harbors Act, *see* 33 U.S.C. §§ 1344, 403, are also federal undertakings, triggering independent Section 106 review obligations that must be completed before USACE can issue any such permits.

Yet despite these obligations—running, at minimum, to four separate agencies and two separate National Register-eligible properties—Defendants have not initiated or carried out any Section 106 review or consultation whatsoever. NCPC and the Smithsonian have not initiated or completed Section 106 review for the proposed Project (including identifying historic properties that will be affected by the Project; assessing adverse effects; or seeking to resolve those adverse effects), have not consulted with the D.C. SHPO or the ACHP, and have not provided the public

---

[12] As explained *supra* at n. 8, Plaintiffs have, in the alternative, brought an *ultra vires* claim against the Kennedy Center Defendants to prevent them from carrying out the Project without complying with Section 106.

or Plaintiffs a meaningful opportunity to participate. Nor have NPS or USACE done so for their respective undertakings. Each of these failures violates Section 106, its regulations, and the APA (and, for NCPC and the Smithsonian, the 2018 Memorandum of Agreement).

*Section 110(k)*. Despite Defendants' failure to carry out the required Section 106 consultation and review, they have already undertaken significant work on the Kennedy Center, including painting white the Center's 200 iconic gold columns and altering the Center's façade and physical features by installing new signage placing Defendant Trump's name above President Kennedy's. Not only was this work unauthorized, but it has also triggered a second, heightened federal review requirement, with which none of Defendants have complied.

Under Section 110(k) (codified at 54 U.S.C. § 306113) and its implementing regulation, 36 C.F.R. § 800.9(c), federal agencies are prohibited from granting a "loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of" Section 106, "has intentionally significantly adversely affected a historic property . . . or having legal power to prevent it, has allowed the significant adverse effect to occur." 54 U.S.C. § 306113. A "significant adverse effect," *id.*, occurs when an applicant significantly alters "any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association," 36 C.F.R. § 800.5(a)(1) (defining "adverse effect").

By painting white the Center's 200 iconic gold columns, and by installing new signage placing Defendant Trump's name above President Kennedy's on the Center's façade, the Kennedy Center Defendants have established a deliberate pattern of advancing physical changes to a National Register-eligible property while avoiding mandatory review processes. The Kennedy Center Defendants have now *twice* altered the external appearance of the Kennedy Center without

26

conducting the Section 106 review to which previous Kennedy Center projects have been subjected. And these unauthorized alterations have proceeded either unannounced (as with the column painting) or at a rapid pace (altering the façade only one day after the Defendant Board of Trustees voted on the name change). Such unauthorized alterations are a transparent attempt by the Kennedy Center Defendants to frustrate the normal review processes, and have intentionally caused significant "adverse effects" to the Kennedy Center, *see* 36 C.F.R. § 800.5(a)(2) (listing examples of adverse effects).

As a result, the Agency Defendants each have a nondiscretionary duty to deny approval or assistance to the Kennedy Center Defendants in connection with the Project unless and until each agency has completed a special consultation process with the ACHP and has made a subsequent determination that circumstances warrant granting the approval or assistance for the specific undertaking subject to the Agency Defendant's jurisdiction, *notwithstanding* the adverse effects already suffered by the Kennedy Center. *See* 54 U.S.C. § 306113. Yet, to date, none of the Agency Defendants has initiated the process required by 54 U.S.C. § 306113 and 36 C.F.R. § 800.9(c)(2) to determine if circumstances justify granting assistance or approvals to the Kennedy Center Defendants despite these adverse effects, including obtaining the opinion from the ACHP required to make that determination.

Proceeding with the Project—which, as noted, requires various permits and approvals from Agency Defendants—without complying with the requirements of 54 U.S.C. § 306113 and its implementing regulations exceeds Defendants' statutory authority, 5 U.S.C. § 706(2)(C), and is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A). And the Agency Defendants' failure to fulfill their statutory duties under 54 U.S.C. § 306113, in the face of these

27

completed alterations to a federally owned historic property, constitutes agency action "unlawfully withheld" under 5 U.S.C. § 706(1).

### 2. Defendants Have Failed to Comply with Their Statutory Obligation to Seek NCPC's Advice, and Obtain NCPC's Approval of the Project (Counts IV & XII).

Despite commencing preliminary work on the Project, and announcing that substantial construction work will begin as soon as July, Defendants have also failed to submit plans for the Project to NCPC for NCPC's review and approval—a robust and iterative process which can take over a year of careful review by NCPC and the public. *See* 40 U.S.C. § 8722(b)(1) (requiring agency to advise and consult with NCPC "*before* preparing construction plans the agency originates for proposed developments and projects" (emphasis added)); *id.* § 8722(d) (requiring NCPC approval of certain project elements); *see, e.g.*, NCPC, Project Information, https://www.ncpc.gov/review/project/8113/ (last visited Mar. 30, 2026) (approximately twenty-two-month review-and-approval process for Federal Reserve headquarters renovation); NCPC, Project Information, https://www.ncpc.gov/review/project/8351/ (last visited Mar. 30, 2026) (over three years from information presentation to approval of Bezos Learning Center at the Smithsonian National Air and Space Museum).

Submission of plans for major federal projects to NCPC for review is mandatory. 40 U.S.C. § 8722(b)(1), (d). Federal agencies that "originate[ plans] for proposed developments and projects" that "affect the plan and development of the National Capital" must "advise and consult" with NCPC with respect to those plans on an ongoing basis. *Id.* § 8722(b)(1). Such federal agencies must "advise and consult" with NCPC both "*before* preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." *Id.* (emphasis added). Ordinarily, this advise-and-consult process begins with the agency's submission of an initial informational presentation or set of plans to NCPC; then, in response to comments from NCPC

and the public—which may be submitted both on NCPC's online forum and at NCPC's meetings, *see generally* ECF 1 ¶¶ 82-83—the agency will submit one or more subsequent iterations of its plans for additional review and feedback. Securing NCPC's approval of the plans is mandatory as well: Federal agencies cannot proceed with proposed projects unless NCPC, at the conclusion of its review, approves the project's "location, height, bulk, number of stories, and size . . . and the provision for open space in and around" it. 40 U.S.C. § 8722(d).

NCPC's review-and-approval requirements plainly apply to the Project—a major, multi-year overhaul of a prominent and highly visible building with significant open space in the heart of the capital district. *See id.* § 8722(b)(1) (requiring review of projects that "affect the plan and development of the National Capital"); *see also* NCPC, Comprehensive Plan for the National Capital: Federal Elements, Historic Preservation Element, 11, *available at* https://www.ncpc.gov/plans/compplan/ (recognizing "the role historic properties . . . have in defining the national capital and its image" and urging "careful[]" planning "for appropriate uses and compatible design in and near the monumental core to protect and preserve the nation's key historic properties").

If any doubt remained, Defendants' own statements, which indicate an intent to reduce the Kennedy Center to a steel frame or less; the significant alterations they have already unlawfully undertaken; and the anticipated two-year closure all promise a project whose scope is more than enough to trigger the requirement that NCPC review and approve the Project. *Cf.* Ex. 36 at 3 (Apr. 2, 2026 NCPC Meeting Agenda, listing presentations, including review and approval of National Zoological Park's preliminary site and building plans for a new Arabian leopard habitat).

29

Yet Defendants have neither submitted plans to NCPC nor obtained its legally required approval for the Project.[13] The failure of NPS, Interior, and Secretary Burgum to initiate NCPC review for the portions of the Project within their jurisdiction constitutes unlawfully withheld agency action, 5 U.S.C. § 706(1), and any decision to proceed with the Project without compliance with § 8722 is arbitrary, capricious, and otherwise not in accordance with law, *id.* § 706(2)(A)— meaning that those Defendants can be enjoined for their violations of the APA.

Separately, the Kennedy Center Defendants' failure to submit the Project to NCPC for review and approval—thereby frustrating both NCPC's ability to carry out the required NEPA and NHPA review, which it has committed itself to undertake, Ex. 35 at 3 (requiring the Smithsonian to "formally notify NCPC of a pending Smithsonian project subject to NCPC's authority and NEPA"),[14] as well as Plaintiffs' and their members' exercise of their right to comment on the Project—is a "transparent violation[] of a clear duty to act" that can be remedied by a writ of

---

[13] By way of comparison, even the irregular and highly expedited NCPC review of the White House ballroom project—which consisted of the submission of a single set of plans and a truncated public-comment period—has taken more than three months from initial submission of project plans on December 22, 2025 to a final vote, which is scheduled for April 2, 2026. *See* Project Information, NCPC, *available at* https://www.ncpc.gov/review/project/8733/ (last visited Mar. 30, 2026); Defs.' Suppl. Resp. Br. in Opp. to Mot. for Prelim. Inj., *Nat'l Tr. for Hist. Pres. v. Nat'l Park Serv.*, No. 25-4316 (D.D.C. Jan. 15, 2026), ECF 30 at 20-21 (detailing outreach to NCPC).

[14] NCPC has, and routinely exercises, review and approval authority over exterior renovation projects of the Smithsonian specifically. Recent examples including renovations to the exterior cladding of the National Air and Space Museum and exterior renovations at the Smithsonian Institution building. *See* Smithsonian Inst. & NCPC, NEPA/Section 106 Public Scoping Notice: National Air and Space Museum Building Revitalization and HVAC Replacement (Oct. 29, 2014), https://www.ncpc.gov/docs/Air_and_Space_NEPA_Scoping_Letter.pdf; NCPC, *Executive Director's Recommendation Re National Air and Space Museum Building Exterior, Vestibules, and Site Improvements*, (July 7, 2016), https://www.ncpc.gov/docs/actions/2016July/National_Air_and_Space_Museum_Recommendati on_7585_July2016.pdf; NCPC, Memorandum of Agreement Regarding the Nat'l Air & Space Museum Nat'l Mall Building Revitalization (Dec. 28, 2017), https://www.ncpc.gov/docs/7585_National_Air_and_Space_Museum_Memorandum_of_Agreem ent_December2017.pdf.

mandamus, *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (quoting *In re American Rivers and Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)); *see* 40 U.S.C. § 8722(b)(1).

For all those reasons, Plaintiffs are therefore likely to succeed on the merits of their NCPC claims.

### 3. Defendants Have Failed to Request Legally Required Advice from CFA (Counts V & XIII).

The Kennedy Center Defendants and Defendants NPS, Burgum, and Interior have also failed to submit the Project to CFA for review, in violation of their obligations under 40 U.S.C. § 9102. Despite public announcements of construction plans on February 1, 2026, and the sharing of architectural renderings on social media on March 13, 2026, Defendants have made no submission to CFA. Preliminary work has already begun, and significant construction is scheduled to commence as soon as July 2026. Yet CFA has been given no opportunity to advise on the design. Indeed, Defendants have already undertaken major design alterations—including repainting the building's iconic gold columns white—without any CFA input whatsoever.

CFA is an independent federal agency established by Congress to advise on matters of fine art within the District of Columbia. *See* An Act Establishing a Commission of Fine Arts, Pub. L. No. 61-181, 36 Stat. 371 (1910) (codified as amended at 40 U.S.C. §§ 9101-9104). Federal officers and agencies undertaking construction or development in the capital district must first "request the Commission [of Fine Arts] to provide advice." 40 U.S.C. § 9102(b). For "public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city," that advice must be obtained *before* plans receive "final approval" or "action" is taken thereon. 45 C.F.R. § 2101.1(a)(1).

CFA's implementing regulations reinforce the mandatory and early nature of this review. Submissions must occur "when concept plans for the project are ready but before detailed plans

31

and specifications or working drawings are prepared," *id.* § 2102.10(a), and must be sufficiently complete to evaluate "the ultimate character, siting, height, bulk, and appearance of the project, in its entirety, including the grounds within the scope of the project, its setting and environs, and its effect upon existing conditions and upon historical and prevailing architectural values," *id.* § 2102.10(b)(2). Critically, where a project proceeds in stages, "information about the eventual plans should accompany" the initial submission, even if the first stage involves only demolition. *Id.* § 2102.10(c).

The Project plainly triggers the requirement to undertake CFA review. It involves the proposed demolition, new construction, major reconstruction, major renovation, or major aesthetic transformation of a prominent federal building in the District—one that has defined Washington's riverfront skyline for more than fifty years—into what Mr. Trump has described as a "new and spectacular Entertainment Complex" and a "brand new and really beautiful" building. Exs. 1, 30 at 3. The Kennedy Center's own enabling statute confirms that CFA review is not merely customary; it is a legal prerequisite embedded in the Center's founding legislation. *See* 20 U.S.C. § 76i(a) ("[The Kennedy Center] building shall be in accordance with plans and specifications approved by the Commission of Fine Arts."). The Project will also materially affect the visual character of the adjacent Rock Creek and Potomac Parkway, a National Register-listed property, independently reinforcing the scope of CFA's review obligation.

Defendants NPS, Burgum, and Interior have a nondiscretionary obligation to initiate the CFA advise-and-consult process under 40 U.S.C. § 9102 for the portions of the Project within their jurisdiction. Their failure to do so constitutes unlawfully "withheld" agency action, 5 U.S.C. § 706(1), and any decision to proceed with the Project without compliance with § 9102 is arbitrary, capricious, and not in accordance with law, *id.* § 706(2)(A). Separately, the Kennedy Center

32

Defendants' failure to submit the portions of the Project over which they have jurisdiction (including but not limited to repainting the Center's columns) to CFA for review is a "transparent violation[] of a clear duty to act" that can be remedied by a writ of mandamus, *In re Aiken Cnty.*, 725 F.3d at 258 (quoting *American Rivers*, 372 F.3d at 418); *see* 40 U.S.C. § 9102(b) (providing that "[t]he officers required to decide" on fine-arts matters "*shall* request the Commission to provide the advice" (emphasis added)). Plaintiffs are therefore likely to succeed on the merits of their CFA claims.

### 4. Agency Defendants Have Failed to Comply with NEPA (Count III).

Long described as the "basic national charter for protection of the environment," *City of Los Angeles v. Nat'l Highway Traffic Safety Admin.*, 912 F.2d 478, 491 (D.C. Cir. 1990) (Wald, C.J., dissenting), NEPA requires environmental review of "major federal action[s]," defined as actions "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see Sierra Club v. United States Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015). The Project, which will entail construction work on one or more federal buildings, *see* 20 U.S.C. §§ 76h, 76i, and will require agency-issued approvals, is indisputably a major federal action and therefore subject to NEPA.

Yet Agency Defendants have failed to comply with their NEPA obligations. Under a 2018 Memorandum of Agreement between NCPC and the Smithsonian Institution, NCPC serves as the lead agency for NEPA review on every Smithsonian project within the District, triggered by Smithsonian's submission of project plans to NCPC, *see* Ex. 35 at 3. Interior and NPS have independent NEPA obligations given their shared authority with the Kennedy Center Defendants over the management and operation of a portion of the federal grounds comprising the campus, and their authority over the Rock Creek and Potomac Parkway—an NPS unit that runs along the

33

Kennedy Center's western boundary and over which the Center's cantilevered west patio extends. And the Project will require federal approvals, including construction and right-of-way permits from NPS and permits from USACE, which—because they will further a "major federal action"— require their own agency NEPA reviews.

None of that review has been conducted. NEPA requires federal agencies to produce and publish a "detailed" environmental impact statement ("EIS") for every "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C). The EIS must document and analyze, among other things, the proposed action's reasonably foreseeable environmental effects, reasonable alternatives to the action, and "irreversible and irretrievable commitments of Federal resources." *Id.* NEPA also expressly requires federal agencies to consult with and obtain comments from other agencies and the public before proceeding with major federal actions. *Id.* Where an agency is uncertain whether the proposed "major Federal action" will significantly affect the human environment, it must at minimum prepare an environmental assessment ("EA")—"a concise public document" that "set[s] forth the basis of [the] agency's finding of no significant impact or determination that an environmental impact statement is necessary," *id.* § 4336(b)(2).

Agency Defendants have unlawfully failed to publish (and, as far as Plaintiffs are aware, even conduct) any analysis of the Project's foreseeable impacts on "the quality of the human environment," 42 U.S.C. § 4332(2)(C). NEPA is an "action forcing" statute, designed to ensure that environmental effects are not "overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976). Regardless of whether an agency prepares an EIS or just an EA, it is "***obligat[ed]*** to consider every

34

significant aspect of the environmental impact of a proposed action." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978) (emphasis added). In other words, NEPA "ensures" through its procedural mandates "that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

Here, Agency Defendants have flouted these nondiscretionary safeguards—no NEPA review document has been published, despite the *already-commenced* work on the Project, *see supra* pp. 7-10. As a result, Agency Defendants have provided the public no opportunity to comment on the Project's environmental effects. And they have failed to consult with other agencies. Instead, they have advanced physical changes to the Kennedy Center on "incomplete information," *see Marsh*, 490 U.S. at 371, in violation of NEPA's fundamental requirements, *see Vt. Yankee*, 435 U.S. at 553.

Agency Defendants cannot evade their NEPA obligations by segmenting the Project into discrete phases. It is well-established that agencies may not "segment[]" their NEPA review by dividing "connected, cumulative, or similar federal actions into separate projects." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). This rule "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Id.* at 1314 (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (internal quotation marks omitted)). Here, the column repainting, façade alterations, and planned "complete rebuilding" are not independent actions—they are phases of a single Project that "fit with the others like puzzle pieces," *id.* at 1319. Agency Defendants cannot conduct piecemeal review (or no review at all) of

35

preliminary alterations while deferring analysis of the larger reconstruction. NEPA requires a comprehensive assessment of the Project's cumulative environmental effects.

Agency Defendants' failure to complete and publish EAs and, subsequently, EISs, is agency action unlawfully withheld, 5 U.S.C. § 706(1), and their proceeding with the Project without having completed and published an EA and an EIS is arbitrary, capricious, and not in accordance with law, *id.* § 706(2)(A).

## II.    Plaintiffs Will Be Irreparably Harmed Without a Preliminary Injunction.

Without a preliminary injunction, Plaintiffs and their members will suffer multiple forms of irreparable harm: demolition or major transformation of a historic landmark, inability to exercise procedural rights to protect that landmark, and loss of enjoyment of a beloved cultural institution. Each harm is "imminent" and "beyond remediation" by money damages. *Newby*, 838 F.3d at 7-8 (internal quotation marks omitted). Together, they necessitate preliminary injunctive relief.

1. *Destruction or major transformation of a historically important building*. The physical demolition and "Complete Rebuilding" of a historic landmark, Ex. 1, is a paradigmatic case of irreparable harm. The danger is "imminent," *Newby*, 838 F.3d at 8: Defendants have announced their intention to close the Kennedy Center after July 4, 2026, Ex. 1, with "significant construction work" to follow, LaFauci Decl. ¶ 5. The Kennedy Center's original marble façade, interior finishes, concert hall, and Modernist spatial design represent a unique and irreplaceable architectural legacy, erected as a living monument to President Kennedy. No amount of money can replace them. *See Nat'l Trust for Hist. Pres. in U.S. v. FDIC*, No. 93-0904, 1993 U.S. Dist. LEXIS 21469, at *8-9 (D.D.C. May 7, 1993) (finding irreparable harm where sale of building would remove it from scope of NHPA). Permanent destruction of that historic fabric "directly conflict[s] with" Plaintiffs' "mission[s]," *Newby*, 838 F.3d at 7-8 (internal quotation marks omitted), which focus on historical

and architectural preservation, *see, e.g.*, Miller Decl. ¶¶ 3-5, 13-17 ("[T]he Project will destroy or fundamentally alter the character-defining historic fabric of the Edward Durell Stone-designed Kennedy Center, permanently undermining DCPL's ability to fulfill its mission of preserving, protecting, and enhancing the historic and built environment of Washington, D.C., for current and future generations to enjoy.");[15] undermines their "core business activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), *see, e.g.*, Merritt Decl. ¶¶ 2, 6-14 ("The National Trust is a private charitable, educational, nonprofit corporation chartered by Congress in 1949 to further the historic preservation policies of the United States, and to 'facilitate public participation' in the preservation of historic properties." (quoting 54 U.S.C. § 312102(a))); and harms their members, who use and enjoy the Kennedy Center, *see Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (articulating the principles of associational standing); *see, e.g.*, Tiller Decl. ¶¶ 13-17 ("[T]he original public dedication in large bronze lettering is . . . a character-defining feature of the historic Kennedy Center" and "the installation by the Kennedy Center Defendants of new, large bronze lettering adding the words 'The Donald J. Trump and' on the east elevation . . . has adversely affected . . . my aesthetic enjoyment of the Kennedy Center[.]"); Burt Decl. ¶¶ 6-11 ("[A]s a character-defining feature, the gold columns figured prominently in our wedding ceremony on the promenade along the Potomac, as well as in our wedding photos," and their repainting to white has "changed the character of the building as I experienced it on my wedding day," "diminish[ing] my aesthetic enjoyment of the building."); Hoagland Decl. ¶¶ 13-15 ("[M]y experience of the Kennedy Center as an aesthetic achievement and cultural monument has been impaired" by the columns' repainting and Center's physical renaming.); Burns Decl. ¶¶ 6-

---

[15] *See also* Azaroff Decl. ¶¶ 8-9, 17, 25; Birnbaum Decl. ¶¶ 15-16, 25, 29; Cahill-Aylward Decl. ¶¶ 4-7; Smailes Decl. ¶¶ 3-7; Waytkus Decl. ¶¶ 8, 16, 24.

8 ("The Kennedy Center's Modernist design, its materials, its spatial qualities, and its setting along the Potomac are what make the building meaningful to me, and the proposed Project threatens to destroy or fundamentally alter those qualities."); Yglesias Livengood Decl. ¶¶ 15-20 ("The proposed demolition and reconstruction would permanently alter or destroy features that are essential to my professional engagement with the Kennedy Center" as a lecturer on architecture and landscape architecture.).[16]

2. *Loss of Procedural Rights.* The NHPA, NEPA, and the commission-review statutes recognize that damage to historical monuments and the environment is often irreversible. They mandate review processes *before* agencies undertake any major change to the Kennedy Center. *See Robertson*, 490 U.S. at 349; *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24–25 (D.D.C. 2009). Plaintiffs and their members are not passive beneficiaries of these processes. They are active participants who shape the decisions. *See, e.g.*, Miller Decl. ¶¶ 18-19 ("Defendants' failure to initiate or complete the required consultation has deprived DCPL of the opportunity to fulfill its core mission of participating in historic preservation review processes."); Tiller Decl. ¶¶ 13, 20 ("I have extensive knowledge and experience relating to the principles of professional historic preservation practice that prioritizes the preservation of original character-defining features of a historic structure" and, "[h]ad Section 106 review been initiated, I would have . . . present[ed] my concerns about the impact of the proposed alterations on my concrete interests in the Kennedy Center[.]").[17] Defendants' failure to initiate these processes

---

[16] *See also* Ballard Decl. ¶¶ 15-19, 21; Cahill-Aylward Decl. ¶¶ 12, 16-18; Carmichael Decl. ¶¶ 15-19; Landwehr Decl. ¶¶ 7-12; Leone Decl. ¶¶ 8, 12-18; Rhyu Decl. ¶¶ 10-15; Santos Rivera Decl. ¶¶ 11-13, 15; Smailes Decl. ¶¶ 13-17; Waddy Decl. ¶¶ 11-12, 16-18.

[17] *See also* Ballard Decl. ¶¶ 6-8, 25; Burns Decl. ¶¶ 13-14; Burt Decl. ¶¶ 13-16; Cahill-Aylward Decl. ¶¶ 20-23; Carmichael Decl. ¶¶ 22-25; Hoagland Decl. ¶¶ 16-17; Landwehr Decl. ¶¶ 15-18; Leone Decl. ¶¶ 21-25; Merritt Decl. ¶¶ 4-13; Rhyu Decl. ¶¶ 16-20; Santos Rivera Decl. ¶¶ 15-16; Smailes Decl. ¶¶ 5, 14, 18; Waddy Decl. ¶¶ 23, 25, 26; Yglesias Livengood Decl. ¶¶ 22-25.

makes it *impossible*, not just "more difficult," for Plaintiffs and their members to protect historic and architecturally significant buildings. *See Newby*, 838 F.3d at 9. "And that harm is irreparable because" changes, once made, cannot be undone. *See id.*; *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-95 (D.C. Cir. 2015) (organizational plaintiff injured, for standing purposes, because it was "precluded" from pursuing its mission through "normal process" ordinarily provided by agency); *Sierra Club v. FERC*, 827 F.3d 36, 43-44 (D.C. Cir. 2016) (agency's failure to adequately complete required environmental review was "the 'archetypal procedural injury' redressable under Article III," and associational standing existed where member faced concrete injuries tethered to agency's procedural violation (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013))).

These procedural harms are not just "imminent"; they have already begun. The NHPA and NEPA require informed review before "resources have been committed or the die otherwise cast," *Robertson*, 490 U.S. at 349; NCPC and CFA review (and corresponding public comment) must also occur early in the project-review process, *see* 40 U.S.C. § 8722(b)(1); 45 C.F.R. § 2102.10; *see also Massachusetts v. Watt*, 716 F.2d 946, 952 (1st Cir. 1983) (Breyer, J.) (explaining how "set[ting] aside the agency's action at a later date will not necessarily undo the harm" caused by a deprivation of procedural rights because "[t]he agency as well as private parties may well have become committed to the previously chosen course of action, and [while] new information . . . may bring about a new decision . . . it is that much less likely to bring about a different one" since "[i]t is far easier to influence an initial choice than to change a mind already made up"). But President Trump has stated that Defendants have "already purchased a lot of the marbles and some of the

39

things that are hard to get" for the reconstruction project.[18] Such expenditures fly in the face of the clear requirements of the review process. They underscore that Defendants have already shut Plaintiffs out of the very processes that Congress established to ensure public accountability to them and their members.

"When a procedural violation . . . is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign*, 612 F. Supp. 2d at 24; *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (procedural injury plus injury to aesthetic interest showed irreparable harm). Demolition and "Complete Rebuilding" of the Kennedy Center satisfy any conceivable standard for showing irreparable aesthetic injury to Plaintiffs' members and innumerable other Americans.

3. *Loss of Enjoyment*. Plaintiffs' members will also suffer irreparable injuries from the loss of their use of the Kennedy Center. *See Hunt*, 432 U.S. at 342-43. Plaintiffs' members regularly attend performances at the Kennedy Center and derive aesthetic, cultural, professional, and educational benefits from the preservation of the Center's historic and architectural values and the public's continued access to its buildings and grounds. *See Powder River Basin Resource Council v. Dep't of Interior*, 749 F. Supp. 3d 151, 162-63 (D.D.C. 2024); *see, e.g.*, Ballard Decl. ¶ 20 ("The closure would prevent me from attending concerts, theatre and other performing arts events . . . and would disrupt a pattern of use I have maintained for 50 years. I have no adequate substitute for the experience of visiting the Kennedy Center."); Carmichael Decl. ¶ 20 ("[T]he announced multi-year closure of the Kennedy Center . . . would deprive me of access to a site that I visit regularly and that is central to my personal and family traditions" and "disrupt a pattern of

---

[18] The White House, President Trump Participates in a Lunch with the Trump Kennedy Center Board Members, at 33:19-28, https://www.whitehouse.gov/videos/president-trump-participates-in-a-lunch-with-the-trump-kennedy-center-board-members/ (Mar. 16, 2026).

use I have maintained for forty years.").[19] Money cannot compensate Plaintiffs' members for the loss of those experiences.

The abrupt shuttering of the Kennedy Center, for years, inflicts irreparable harm not just on Plaintiffs' members, but the public at large. The Kennedy Center currently receives approximately two million visitors annually. Ex. 7 at 6. Last year, over 3,500 schools and universities attended or hosted one of over 1,500 performances. Ex. 37 at 5-6. And to ensure universal access to the arts, the Center hosted over 400 free events, *id.* open every single calendar day of the year, Ex. 38 at 2-3. Defendants' plans, if permitted to proceed, would disrupt all of that. The thousands of singular experiences that Plaintiffs' members and the public at large will lose during the closure constitute yet another form of irreparable harm warranting a preliminary injunction.

## III.    The Balance of Equities and Public Interest Favor a Preliminary Injunction.

Where, as here, "the government is the opposing party," *Global Health Council v. Trump*, 153 F.4th 1, 21-22 (D.C. Cir. 2025), the remaining *Winter* factors—the balance of the equities and the public interest—"merge," because "the government's interest *is* the public interest," *Pursuing America's Greatness*, 831 F.3d at 511. In weighing these factors, courts "consider the impacts of the injunction" not only on the parties, but "on nonparties as well." *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 84-85 (D.D.C. 2020) (citing *Pursuing America's Greatness*, 831 F.3d at 511-12).

The equities and the public interest overwhelmingly favor preliminary injunctive relief requiring Defendants to halt the Project until they comply with the law. Plaintiffs and the public

---

[19] *See also* Burns Decl. ¶ 9; Burt Decl. ¶¶ 4, 5, 7, 11; Cahill-Aylward Decl. ¶¶ 14, 18; Hoagland Decl. ¶ 12; Landwehr Decl. ¶¶ 12-13; Leone Decl. ¶¶ 18-19; Merritt Decl. ¶ 3; Miller Decl. ¶¶ 11, 17; Santos Rivera Decl. ¶¶ 13-14; Smailes Decl. ¶¶ 8-12, 17; Tiller Decl. ¶¶ 10-11, 20; Waddy Decl. ¶¶ 14, 20-21; Yglesias Livengood Decl. ¶¶ 9, 11, 12(c), 20(b).

have a substantial interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation omitted). Defendants, in contrast, have no legitimate interest in "perpetuation of unlawful agency action." *Id.*; *see Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Defendants have circumvented numerous statutory and regulatory guardrails designed to protect historically significant buildings and lands. The public bears the burden of those violations—combining an unauthorized, multi-year shutdown of the Center with an unauthorized major construction project that trades statutory compliance, historic fabric, and public enjoyment for personal executive preference.

The cost to the public cannot be overstated. It faces the loss of a historic building, a civic hub, a world-class artistic venue, and at least two years of programming that nurtures an entire community. The government has no countervailing interest: it "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."[20] *TikTok*, 490 F. Supp. at 85 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). Because Defendants' preference for an unauthorized project cannot outweigh the public's interest in the rule of law and the Center, these factors overwhelmingly favor Plaintiffs.

## IV.  The Court Should Waive Any Bond Requirement Because Defendants Face No Harm and Plaintiffs Are Nonprofit Entities Pursuing Public Interest Litigation.

The Court should also waive any requirement that Plaintiffs post a bond. The plain language of Rule 65(c) gives the Court "broad discretion to determine the appropriate amount of

---

[20] The fact that Defendants have *already* unlawfully damaged the Kennedy Center does not mean the equities or the public's interest favor permitting them to *continue* doing so, notwithstanding the government's recent assertion to this effect in other litigation, *see, e.g.*, Defs.' Mem. in Opp'n to Pl.'s Second Mot. for a Prelim. Inj., *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316 (D.D.C. Mar. 12, 2026), ECF 52 at 34 (claiming plaintiff's "threatened injury" from the construction of a massive ballroom on the former site of the East Wing "is plainly outweighed by the serious harms that would result from halting construction, leaving a large hole" where the East Wing stood before it was illegally demolished).

an injunction bond," including the "discretion to require no bond at all." *N. Am. Building Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (quoting *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020)).

"Requiring security in this case would serve no meaningful purpose." *See N. Am. Building Trades Unions*, 783 F. Supp. 3d at 315. Defendants cannot show "any tangible financial harm—let alone quantifiable costs—they would incur as a result of being temporarily restrained" from effecting any major change to the Kennedy Center without first complying with applicable legal requirements. *Id.*; *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025). The requested injunction would not bar all changes to the Kennedy Center. It would prohibit such changes only unless and until Defendants have complied with the NHPA, NEPA, and federal design-review statutes and have obtained any required express approvals from Congress and the Secretary of the Interior. *See* Proposed Order at 3-4. Compliance with that injunction imposes no "harm"; any costs are by definition attributable to legal requirements that protect the Kennedy Center's distinctive legacy. There is a "substantial public interest in having government agencies abide by the federal laws." *Newby*, 838 F.3d at 12 (internal quotation marks omitted). Defendants should not require any payment for doing so.

Imposing a bond would also "unduly burden Plaintiffs and potentially impair their ability to seek judicial relief, a concern that courts have repeatedly recognized in declining to require bonds in public interest litigation." *N.A. Building Trades Unions*, 783 F. Supp. 3d at 315; *P.J.E.S.*, 502 F. Supp. 3d at 520. Each Plaintiff is a nonprofit organization devoted to the importance and furtherance of cultural heritage, architecture, or both. *See, e.g.*, Miller Decl. ¶¶ 3-5. Requiring a bond would threaten their ability to pursue this case, which raises issues of public importance. *See, e.g.*, Merritt Decl. ¶¶ 15-20 ("The imposition of a security bond . . . would have a direct

43

chilling effect on the ability of the National Trust, and other public interest plaintiffs, to advance the public interest and enforce compliance with historic preservation laws through litigation."). Because "the risk of financial harm is speculative at best" and a "bond could have a chilling effect on access to justice," this Court should exercise its discretion to decline to impose a bond. *N.A. Building Trades Unions*, 783 F. Supp. 3d at 315; *P.J.E.S.*, 502 F. Supp. 3d at 520.

## CONCLUSION

On October 26, 1963, less than a month before he was assassinated, President Kennedy delivered remarks at Amherst College on his vision for the role of the arts in public life: "I see little of more importance to the future of our country and our civilization than full recognition of the place of the artist. . . . I look forward to an America which will reward achievement in the arts as we reward achievement in business or statecraft. I look forward to an America which will steadily raise the standards of artistic accomplishment and which will steadily enlarge cultural opportunities for all of our citizens. And I look forward to an America which commands respect throughout the world not only for its strength but for its civilization as well."[21]

When President Lyndon Johnson signed legislation renaming the then-nascent National Cultural Center for the late President Kennedy in 1964, he expressed "confiden[ce] . . . that the institution now given the breath of life will have a long and distinguished future," "not only honoring the memory of a very great man, but . . . enriching our whole American life."[22] For more than six decades, the Kennedy Center has stood as a beacon for President Kennedy's vision, his

---

[21] John F. Kennedy, *Remarks at Amherst College* (Oct. 26, 1963), https://www.arts.gov/about/kennedy-transcript (last visited Mar. 30, 2026).

[22] Lyndon B. Johnson, *Remarks Upon Signing Bill Concerning the John F. Kennedy Center for the Performing Arts* (Jan. 23, 1964), https://www.presidency.ucsb.edu/documents/remarks-upon-signing-bill-concerning-the-john-f-kennedy-center-for-the-performing-arts (last visited Mar. 30, 2026).

44

words from Amherst engraved into its very walls. It is a national treasure, a leading civic forum, and the "living memorial" to President Kennedy that Congress and President Johnson envisioned. It is a city upon a hill. It should not—and by federal law *cannot*—be demolished or overhauled in secret or at lightning speed, and certainly not at the executive's personal whim.

The Court should grant Plaintiffs' motion and preliminarily enjoin work on the Project until the Defendants obtain congressional authorization, complete all required reviews, and secure all necessary permits and approvals. Further, the Court should waive Rule 65's security bond requirement.

Respectfully submitted,

DC PRESERVATION LEAGUE,
NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,
THE AMERICAN INSTITUTE OF ARCHITECTS,
AMERICAN SOCIETY OF LANDSCAPE ARCHITECTS,
DOCOMOMO US,
SOCIETY OF ARCHITECTURAL HISTORIANS,
THE COMMITTEE OF 100 ON THE FEDERAL CITY, and
THE CULTURAL LANDSCAPE FOUNDATION

By their attorneys,

 /s/ Thaddeus A. Heuer                              /s/ Gregory Alan Werkheiser
Gregory B. Craig (164640)                 Gregory Alan Werkheiser (VA210)
FOLEY HOAG LLP                             Marion Forsyth Werkheiser (486465)
1717 K Street N.W.                         Lydia Dexter (OR0032)
Washington, DC 20006                       Jessie Barrington (VA224)
Tel: (202) 223-1200                        Caitlin McCurdy (NH0004)
gcraig@foleyhoag.com                       Katherine Lee Sorrell (TX0109)
                                           CULTURAL HERITAGE PARTNERS, PLLC
Thaddeus A. Heuer (*pro hac vice*)         1717 Pennsylvania Avenue NW, Suite 1025
Kevin Y. Chen (*pro hac vice*)             Washington, DC 20006
Matthew F. Casassa (*pro hac vice*)        Tel: (202) 567-7594
Marilyn Icsman (*pro hac vice*)            greg@culturalheritagepartners.com
FOLEY HOAG LLP                             marion@culturalheritagepartners.com
155 Seaport Boulevard, Suite 1600          lydia@culturalheritagepartners.com
Boston, MA 02210                           jessie@culturalheritagepartners.com
Tel: (617) 832-1000                        caitlin@culturalheritagepartners.com
theuer@foleyhoag.com                       katherine@culturalheritagepartners.com
kchen@foleyhoag.com
mcasassa@foleyhoag.com                      /s/ Abbe David Lowell
micsman@foleyhoag.com                      Abbe David Lowell (358651)
                                           Caleb Hayes-Deats (1643213)
                                           Isabella M. Oishi (90018056)
                                           Angela Reilly (*pro hac vice*)
                                           LOWELL & ASSOCIATES, PLLC
                                           1250 H Street N.W., Suite 250
                                           Washington, DC 20005
                                           T: (202) 964-6110
                                           F: (202) 964-6116
                                           alowellpublicoutreach@lowellandassociates.com
                                           chayes-deats@lowellandassociates.com
                                           ioishi@lowellandassociates.com
Dated: March 31, 2026                      areilly@lowellandassociates.com