**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| D.C. PRESERVATION LEAGUE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>BOARD OF TRUSTEES OF<br>THE JOHN F. KENNEDY CENTER<br>FOR THE PERFORMING ARTS, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00981 (CRC) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.    Legal Background ................................................................................................ 2

    B.    Factual Background ............................................................................................. 3

LEGAL STANDARDS ........................................................................................................ 5

ARGUMENT ....................................................................................................................... 6

I.    Plaintiffs Have No Cognizable APA Claims Against the "Agency Defendants" .............. 6

    A.    NPS, Interior, and Secretary Burgum ..................................................................... 7

    B.    USACE ..................................................................................................................... 9

    C.    NCPC ..................................................................................................................... 10

II.    Plaintiffs Are Not Likely to Succeed on Their *Ultra Vires* or Mandamus Claims Against the Center ................................................................................................................... 11

    A.    The Planned Renovations Do Not Require Further Action by Congress ............. 13

    B.    The Board's Closure of the Center for Renovation Fully Complies With— and, Indeed, Affirmatively Fulfills—the Board's Statutory Duties ...................... 15

    C.    There Is No Need for Any Other Regulatory Approvals ..................................... 17

    D.    NEPA and NHPA Review Are Not Required—Particularly Not at This Stage ..................................................................................................................... 19

        i.    NHPA Review ......................................................................................... 20

        ii.    Section 106 of the NHPA ........................................................................ 21

        iii.    Section 110 of the NHPA ........................................................................ 23

III.    The Balance of Equities Does Not Support a Preliminary Injunction ............................. 24

    A.    Plaintiffs Will Not Be Irreparably Harmed from the Renovations ....................... 25

    B.    The Balance of the Equities and the Public Interest Favors Defendants ............. 26

C.     The Court Should Tailor any Injunction to the Plaintiffs' Alleged Harm and Stay any Injunction Pending Appeal ................................................................. 27

CONCLUSION ..................................................................................................................... 29

**TABLE OF AUTHORITIES**

**CASES**

*13th Reg. Corp. v. Dep't of the Interior*,
654 F.2d 758 (D.C. Cir. 1980) ...................................................................................... 12

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014) ...................................................................................... 24

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........................................................................................................ 17

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ...................................................................................................... 12

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ...................................................................................................... 27

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ...................................................................................... 12

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
542 U.S. 367 (2004) ................................................................................................ 12, 19

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) .................................................................................... 20

*Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*,
791 F. Supp. 3d 29 (D.D.C. 2025),
*appeal filed*, No. 25-5266 (D.C. Cir. July 23, 2025) ................................................... 28

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ........................................................................................ 24

*Consol. Edison Co. v. Ashcroft*,
286 F.3d 600 (D.C. Cir. 2002) ...................................................................................... 12

*Def. Arlington v. U.S. Dep't of Def.*,
No. 23-441, 2023 WL 8600567 (D.D.C Dec. 12, 2023) ............................................... 20

*Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*,
753 F.3d 1304 (D.C. Cir. 2014) .................................................................................... 19

*Dellinger v. Bessent*,
766 F. Supp. 3d 57 (D.D.C. 2025) ................................................................................ 27

iii

*Depu v. Oath Holdings, Inc.*,
  715 F. Supp. 3d 1 (D.D.C. 2022) ...................................................................................... 27

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ............................................................................. 18, 21, 23

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
  15 F. Supp. 3d 32 (2014) .................................................................................................. 25

*Farmer-Paellmann v. Smithsonian Inst.*,
  No. 1:22-CV-3048 (Cooper, J.), 2022 WL 17976505 (D.D.C. Oct. 14, 2022) ......................... 21

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ........................................................................................... 11

*Fisheries Survival Fund v. Jewell*,
  236 F. Supp. 3d 332 (D.D.C. 2017) .............................................................................. 25, 26

*Fla. Health Scis. Ctr. Inc. v. Sec'y of Health & Hum. Servs.*,
  830 F.3d 515 (D.C. Cir. 2016) ........................................................................................ 16, 1

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ............................................................................................... 6

*Gill v. Whitford*,
  585 U.S. 48 (2018) ........................................................................................................... 28

*Griffith v. Fed. Lab. Rels. Auth.*,
  842 F.2d 487 (D.C. Cir. 1988) ...................................................................................... 11, 12

*Groce v. Rodriguez*,
  743 F. Supp. 3d 244 (D.D.C. 2024) .................................................................................... 11

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) ........................................................................................... 19

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
  485 U.S. 271 (1988) ......................................................................................................... 19

*Hilton v. Braunskill*,
  481 U.S. 770 (1987) ......................................................................................................... 28

*Hunter v. Fed. Energy Regul. Comm'n*,
  711 F.3d 155 (D.C. Cir. 2013) .......................................................................................... 22

*In re Nat'l Nurses United*,
47 F.4th 746 (D.C. Cir. 2022) ................................................................................ 12

*Karst Env't Educ. & Prot. v. E.P.A.*,
475 F.3d 1291 (D.C. Cir. 2007) .............................................................................. 20

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
808 F. Supp. 3d 29 (D.D.C. 2025),
*appeals filed,* Nos. 25-5476 & 5478 (D.C. Cir. Dec. 31, 2025) .............................. 28

*Learning Res., Inc. v. Trump*,
784 F. Supp. 3d 209 (D.D.C. 2025) ........................................................................ 28

*Maryland v. King*,
567 U.S. 1301 (2012) .............................................................................................. 27

*Munaf v. Geren*,
553 U.S. 674 (2008) .................................................................................................. 5

*Murphy v. Hunt*,
455 U.S. 478 (1982) ................................................................................................ 17

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, ("*NAPS*")
26 F.4th 960 (D.C. Cir. 2022) ........................................................................... 12, 15

*Nat'l Mining Ass'n v. Fowler*,
324 F.3d 752 (D.C. Cir. 2003) ................................................................................ 19

*Nat'l Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017) ........................................................................ 26

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
No. CV 25-4316 (RJL), 2026 WL 877779 (D.D.C. Mar. 31, 2026) ....................... 15

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................................. 5

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................................................... 6

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025), *on remand to*, 152 F.4th 686 (5th Cir. 2025) ............ 11, 12, 17

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......................................................................... 11, 12

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
  45 F.4th 291 (D.C. Cir. 2022)..................................................................................... 20

*Olds v. Rollins Coll.,*
  173 F.2d 639 (D.C. Cir. 1949)..................................................................................... 27

*Power v. Barnhart,*
  292 F.3d 781 (D.C. Cir. 2002)..................................................................................... 12

*Protect Our Parks, Inc. v. Buttigieg,*
  No. 21-cv-2006, 2021 WL 3566600 (N.D. Ill. Aug. 12, 2021),
  *aff'd,* 39 F.4th 389 (7th Cir. 2022)........................................................................... 23

*Rancho Vista del Mar v. United States,*
  640 F. Supp. 3d 112 (D.D.C. 2022).............................................................................. 20

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem,*
  793 F. Supp. 3d 19 (D.D.C. 2025),
  *appeal filed,* No. 25-5243 (D.C. Cir. July 3, 2025) .................................................... 28

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
  605 U.S. 168 (2025)...................................................................................................... 20

*Shelton v. King,*
  229 U.S.90,94 (1913)................................................................................................... 27

*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987)....................................................................................... 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  Civ. Action No. 24-2905 (JEB), 2025 WL 947469 (D.D.C. Mar. 28, 2025),
  *appeal filed,* No. 25-5198 (D.C. Cir. May 29, 2025)................................................. 24

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025)...................................................................................................... 27

*U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.,*
  981 F.2d 1339 (D.C. Cir. 1993).................................................................................... 23

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.,*
  302 F. Supp. 2d 672 (S.D. Tex. 2004)......................................................................... 25

*Wilbur v. U.S. ex rel. Kadrie,*
  281 U.S. 206 (1930)...................................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................. 5, 26

**STATUTES**

20 U.S.C. § 42 ........................................................................................................... 10

20 U.S.C. § 72 ........................................................................................................... 11

20 U.S.C. § 75b note (2003) .................................................................................... 22

20 U.S.C. § 76h ..................................................................................................... 8, 10

20 U.S.C. § 76i ........................................................................................................... 17

20 U.S.C. § 76j ................................................................................................... *passim*

20 U.S.C. § 76k .......................................................................................... 8, 10, 19, 22

20 U.S.C. § 76*l* ........................................................................................................... 2

20 U.S.C. § 76m ......................................................................................................... 17

20 U.S.C. § 76q-1 .................................................................................................. 7, 17

20 U.S.C. § 76r ............................................................................................................. 3

20 U.S.C. § 76s ........................................................................................................ 7, 8

33 U.S.C. § 403 ............................................................................................................. 9

33 U.S.C. §1344 ........................................................................................................... 9

40 U.S.C. § 6301 ...................................................................................................... 7, 8

40 U.S.C. § 8106 ......................................................................................................... 13

40 U.S.C. § 8722 .................................................................................................... 10, 18

40 U.S.C. § 9102 ......................................................................................................... 18

42 U.S.C. § 4332 ......................................................................................................... 19

54 U.S.C. § 306108 ................................................................................................ 20, 21

54 U.S.C. § 306113 ............................................................................................ 21, 23, 24

Act of Jan. 23, 1964,
  Pub. L. No. 88-260, 78 Stat. 4 ........................................................................................ 2

National Cultural Center Act,
  Pub. L. No. 85-874, 72 Stat. 1698 (1958)...................................................................... 2

One Big Beautiful Bill Act,
  Pub. L. No. 119-21, 139 Stat. 72 (2025)............................................... 3, 5, 10, 14, 27

Smithsonian Facilities Authorization Act,
  Pub. L. No. 108-72, 117 Stat 888 (2003)......................................................... 22, 22, 23

**REGULATIONS**

1 C.F.R. § 601.3 ............................................................................................................. 11

1 C.F.R. § 601.4 ............................................................................................................. 21

**OTHER AUTHORITIES**

Caitlin Yilek, *Trump posts renderings showing Kennedy Center exterior after planned
  renovation*, CBS News,
  https://perma.cc/X42H-VRPZ (last visited April 7, 2026) ........................................ 14

Javier C. Hernández, *Trump's Kennedy Center Would Get $257 Million in House Republican
  Plan*, N.Y. Times (May 6, 2025),
  https://perma.cc/QKB2-2YQ3 ...................................................................................... 3

NCPC Submission Guidelines, Final January 2026,
  https://perma.cc/26K6-Y8XK ...................................................................................... 11

Ron Blunt, *The John F. Kennedy Center for the Performing Arts*, Google Arts & Culture,
  https://perma.cc/6H4X-3MX6 (last visited April 7, 2026)........................................ 14

Trump Kennedy Center, Press Releases: *Trump Kennedy Center Board Unanimously Approves
  Landmark Renovation* (Mar. 16, 2026),
  https://perma.cc/89FZ-BRM9...................................................................................... 26

**INTRODUCTION**

After years of accumulating disrepair, the Center's Board of Trustees determined that a comprehensive renovation was necessary to restore the Center to safe, functional, and modern conditions. Congress agreed. Through a $257 million appropriation for capital repair and restoration, it endorsed a unified approach designed to address systemic deficiencies efficiently. That judgment reflects both common sense and statutory command: the Board is obligated to maintain and improve the Center consistent with "high quality operations," while minimizing taxpayer burden and mitigating safety risks. The planned renovations do exactly that.

Plaintiffs ask this Court to halt all of this. The request rests not on concrete legal violations, but on counterfactual conjecture, misreading of statutes, and a litigation strategy that attempts to conscript uninvolved federal agencies into a dispute where they have neither authority nor role.

Starting with the latter, Plaintiffs recognize they cannot sue the Center itself under the Administrative Procedure Act (APA), because the Center is not a federal agency. So, Plaintiffs instead attempt to entangle a cast of bystander agencies, none of which possesses jurisdiction, permitting authority, or regulatory control over the project. That disconnect leaves Plaintiffs grasping for theories that bear no relation to the project they seek to stop and pursuing APA claims without ever identifying any final agency action (or even the withholding of agency action required by law) by any of the so-called "Agency Defendants." All of this is mere distraction.

As to the Center itself, Plaintiffs resort by necessity to extraordinary remedies—*ultra vires* and mandamus theories that demand clear legal violations and nondiscretionary duties. But Plaintiffs offer nothing close. Congress has authorized and funded the renovations; no further approval is required. The Board's governing statute imposes duties that Plaintiffs invert: far from *prohibiting* renovations, it *mandates* them. Likewise, the obligations to consult with the National Capital Planning Commission (NCPC) and Commission of Fine Arts (CFA) are either inapplicable or are being voluntarily satisfied. The same goes for the supposed procedural requirements of the National Historic Preservation Act (NHPA) and National Environmental Policy Act (NEPA).

Plaintiffs' claims are also factually misdirected. Their fears appear to stem from a mistaken belief that the Center will be demolished or otherwise rebuilt from the ground up. But that premise is untethered from the record, as demonstrated by the declaration of the Center's Executive Director and Chief Operating Officer who is overseeing this overdue renovation plan.

Finally, the balance of harms cuts against any injunction. Plaintiffs cannot show irreparable harm of any significance. Meanwhile, the equities point decisively the other way, because the Center is in dire need of repairs, as everyone (including Congress) has acknowledged.

In sum, Plaintiffs' case constitutes a collection of mismatched claims that do not fit the project they seek to stop, and their attempt to leverage that mismatch into emergency relief fails in both law and equity. The motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    Legal Background

Congress established the National Cultural Center in 1958. National Cultural Center Act, Pub. L. No. 85-874, 72 Stat. 1698 (1958). Shortly after President Kennedy's assassination, Congress and President Johnson renamed the new entity as the "John F. Kennedy Center for the Performing Arts" ("the Center"). Act of Jan. 23, 1964, Pub. L. No. 88-260, 78 Stat. 4.

Congress bestowed the Board with "all the usual powers and obligations of a trustee in respect of all trust funds administered by it." 20 U.S.C. § 76*l*(b). The Board is empowered to enter into contracts; prepare a budget; employ personnel; negotiate planning, design, engineering, and construction contracts; and manage the grounds of the Center in accordance with the National Park Service regulations and agreements that were in effect on July 21, 1994. *See id.* § 76j(a)(2).

The Board's specific duties include presenting "classical and contemporary music, opera, drama, dance, and other performing arts." *Id.* § 76j(a)(1)(A). It must also "promote and maintain" the Center by "developing and maintaining a leadership role in national performing arts education policy and programs" and by maintaining a "comprehensive and broad program for national and community outreach." *Id.* § 76j(a)(1)(B). It must "provide facilities for other civic activities" and

2

"a suitable memorial in honor of the late President." *Id.* § 76j(a)(1)(D)–(E). It must develop and update annually a comprehensive building needs plan. *See id.* § 76j(a)(1)(F). It must provide "safe and convenient access" to the Center's site for pedestrians and vehicles. *Id.* § 76j(a)(1)(I).

As particularly relevant here, the Board must, "with respect to the building and site" of the Center, "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." *Id.* § 76j(a)(1)(G). And it must, "with respect to the building and site" of the Center, provide "all necessary maintenance, repair, and alteration of . . . the building and site, in a manner consistent with requirements for high quality operations." *Id.* § 76j(a)(1)(H)(ii).

In July 2025, Congress appropriated $256,657,000 to the Center for renovation. One Big Beautiful Bill Act, Pub. L. No. 119-21, §60025(a), 139 Stat. 72, 157 (2025). Specifically, Congress allocated funding "for necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy Center for the Performing Arts." *Id.* The funding is available until September 30, 2029. *See id.* That amount represents "roughly six times the amount" the Center "usually receives from the government." Javier C. Hernández, *Trump's Kennedy Center Would Get $257 Million in House Republican Plan*, N.Y. Times (May 6, 2025), https://perma.cc/QKB2-2YQ3; *see also, e.g.*, 20 U.S.C. § 76r(a)-(b) (authorizing a total of $51 million in similar funding for fiscal year 2024, $49 million for 2023, $47 million for 2022, $45 million for 2021, and about $43 million for 2020).

### B.    Factual Background

On February 1, 2026, President Trump announced that the Center would close for two years for construction, revitalization, and "[r]ebuilding," subject to Board approval. Compl. ¶ 52.

On March 23, 2026, Plaintiffs, a group of cultural and architectural organizations, filed their Complaint, challenging the renovation project and the Center's associated two-year closure. *See generally* Compl. Plaintiffs assert claims against the Board of Trustees of the John F. Kennedy

Center for the Performing Arts, the Smithsonian Institution, and President Trump in his capacity as Chair of the Board (collectively the "Kennedy Center Defendants"). Plaintiffs also assert claims against the National Park Service (NPS), the Department of the Interior (Interior), Secretary of the Interior Burgum, the United States Army Corps of Engineers (USACE), and the National Capital Planning Commission (NCPC) (collectively the "Agency Defendants").

A little over a week later, Plaintiffs moved for a preliminary injunction enjoining work on the renovations until Defendants "obtain congressional authorization, complete all required reviews, and secure all necessary permits and approvals." *See* Pls.' Mot. for a Prelim. Inj. at 45, ECF No. 24("Pls.' Mot."). Chief among Plaintiffs' concerns is the notion that the Kennedy Center will be demolished, or otherwise have its exterior appearance dramatically altered. *See id*. at 3, 9, 16, 36.

Matthew Floca, the Executive Director and Chief Operating Officer of the Center, has provided a declaration describing the extent of the planned renovations, and the development of his recommendation to close the Center for a 24-month period to permit renovation. *See* Decl. of Charles Matthew Floca, Ex. A ("Floca Decl."). The planned construction, renovation, and renewal efforts are "only limited to the current structures, buildings, and grounds." *Id.* ¶ 6. "No new structure or building will be erected on the campus" and the "exterior of the Center's main building will not be materially affected." *Id*. And contrary to Plaintiffs' fears, Mr. Floca also affirmed that the planned renovations "will not tear down the Center to its structural steel and rebuild a new structure from those foundations." *Id*.

Regarding the need to close the Center for two years, Mr. Floca explained that he has been conducting a review of the Center's infrastructure needs for more than two years, starting in approximately February 2024. *See id*. ¶ 8. To undertake that review, he relied on several external reports obtained from architectural and engineering firms in the years prior to and during his tenure at the Center. *See id*. ¶ 9. He considered a May 2024 Leak Investigation report documenting severe water intrusion from the Potomac River. *See id.* He relied on a 2022 Comprehensive Building Plan for the Center that found that the building's central plant had reached the end of its engineered

service life. *See id.* He considered a 2022 report showing that the Center's soffits—which overhang outdoor public spaces of the Center—had failed, *see id*. And he relied on a 2021 Comprehensive Building Plan, which showed that the Center's vertical plumbing risers had "reached a state of systemic failure" and its steel channels had corroded. *Id.* Considering those needs, Mr. Floca recommended to the Board that the Center be closed for a concentrated two-year closure to address significant infrastructure needs and renew the Center's public spaces. *See id.* ¶¶ 5, 15.

Renovation at the Center is projected to require a budget of $248.9 million, about $7 million less than the amount Congress appropriated. *See* Capital Improvement Plan at 2, Ex. E; *see also* § 60025, 139 Stat. at 157. The plans budget $38 million for structural rehabilitation; $4.4 million for site restoration; $5 million for security improvements; $37 million for public space improvements; $19 million for office renovations; $11 million for elevator modernization and escalator capital repair; $48.5 million for revitalization of the Center's performance venues; $78.2 million for the renewal of safety and building systems, including piping, the central plant, the condenser loop, the electrical system, and the Center's river pump room; and $8 million in administrative costs. *See id.* at 3, 6, 8, 10, 13. The Board voted to close the Center for two years for renovation. *See* Pls.' Mot. at 12.

## LEGAL STANDARDS

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded" as a matter "of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). A plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Against the federal government, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

**ARGUMENT**

Plaintiffs concede that the Center is not an APA "agency," yet attempt to circumvent that limitation by asserting APA claims against other agencies (NPS, Interior, Secretary Burgum, USACE, and the NCPC) that have nothing to do with the planned renovations and have neither taken final agency action nor withheld agency action required by law. This gambit fails. As for the Center, Plaintiffs are forced to resort to *ultra vires* and mandamus claims, yet both types of claims are available only in extraordinary circumstances to remedy clear violations of law; Plaintiffs do not come close to satisfying those demanding standards. Indeed, in seeking to block a long-overdue project that Congress has specifically funded, their claims largely rest on false factual assumptions and untenable legal leaps. There is no basis for any injunction, as a matter of law or equity.

**I.      Plaintiffs Have No Cognizable APA Claims Against the "Agency Defendants"**

The APA allows review of final agency action. If no such action has been taken, "the action is not reviewable." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,* 460 F.3d 13, 18 (D.C. Cir. 2006). The APA also permits an action to compel agency action unlawfully withheld, but "the only agency action that can be compelled under the APA is action legally *required.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004); *see also Sierra Club v. Thomas,* 828 F.2d 783, 793 (D.C. Cir. 1987) ("[Where] an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review.").

Here, Plaintiffs attempt to justify their claims against the Agency Defendants on two grounds: (1) that the agencies purportedly exercise jurisdiction, authority, or control over portions of the Center' campus or areas where Plaintiffs speculate work will occur, Pls.' Mot. at 17, 32-34; and (2) that these agencies will bear responsibility for future regulatory review or permitting of the renovations, *id*. at 13, 17, 25. For both legal and factual reasons, neither theory works to state a viable APA claim. The Agency Defendants bear no responsibility for the Center's renovations or any of the alleged legal violations that Plaintiffs assert; they have neither taken nor withheld any action that would support APA review. Each of the Agency Defendants is addressed *seriatim*.

6

### A. NPS, Interior, and Secretary Burgum

Starting with NPS, Interior, and Secretary Burgum (together, "NPS"), Plaintiffs argue that the Center's cantilevered west patio, the West Terrace, "falls within the vertical air rights of the Rock Creek and Potomac Parkway," a federally managed NPS unit listed on the National Register of Historic Places. Pls.' Mot. at 17; *see also id*. at 33-34. But even if that were true, so what? Plaintiffs do not identify any final agency action that NPS has taken, or any agency action that NPS is required by law to take but has improperly withheld. NPS is not involved in the planned renovations, and Plaintiffs do not contend otherwise. It is therefore entirely unclear what APA relief Plaintiffs seek from these defendants, or how it would redress their alleged injuries.

In any event, Plaintiffs' premise is incorrect. The Center, not NPS or any other agency, holds the air rights over the portion of the West Terrace patio that extends over the parkway. Congress expressly defined the scope of the Center's boundaries and jurisdiction in statute. *See* 40 U.S.C. § 6301(3); *see also* 20 U.S.C. § 76s (same). The maps referenced in Section 6301(3), and attached herein as Exhibits F and G, plainly confirm that these air rights remain with the Center (depicted in blue shading). *See* Map No. 844/82563 dated April 20, 1994, Ex. F; *see also* Map No. 844/82563A dated May 22, 1997, Ex. G; *see also* Decl. of Tammy Stidham at ¶¶ 8-10, Ex. B (Stidham Decl.). The cantilevered patio over the parkway therefore falls squarely within the Center's jurisdiction. 20 U.S.C. § 76q-1(e)(3) (recognizing that the "Board shall own, operate, and maintain the buildings and green spaces" established on the Plaza).

Plaintiffs also assert, in general terms, that other undefined lands administered by NPS are otherwise within those agencies' jurisdiction and will be affected. *See* Pls.' Mot. at 15, 32-33.[1]

---

[1] For some of these contentions, Plaintiffs appear to rely on a Memorandum of Agreement between NPS and the Center ("Kennedy Center MOA") executed more than a decade ago. Pls.' Mot. at 25; *see generally* ECF No. 24-21. That agreement concerned a separate expansion project (the REACH expansion) on the southern portion of the Center's campus and is unrelated to the renovations at issue here. *See* ECF No. 24-21 at 1-5, 19. In any event, the Kennedy Center MOA confirms that NPS transferred jurisdiction and air rights over the relevant property to the Center, which retains authority over the site. *Id*. at 2.

7

This fallback assertion fails as well. Congress has assigned responsibility for the Center's campus to the Board, which is expressly charged "to maintain and administer the John F. Kennedy Center for the Performing Arts and site thereof." 20 U.S.C. § 76h(a)(1). The maps cited above further confirm that the agencies lack jurisdiction over the project area. And this conclusion is further reinforced by 20 U.S.C. § 76k(c), which provides that "the property, liabilities, contracts, records, and unexpended balances of appropriations, authorizations, allocations . . . shall be transferred . . . to the Board." NPS, Interior, and the Secretary have no role or jurisdiction.

To remove any doubt, the declaration of Tammy Stidham, the Associate Regional Director for Lands and Planning for the NPS National Capital Region, confirms this understanding. *See generally* Stidham Decl. In her declaration, Ms. Stidham affirms that "NPS does not have administrative jurisdiction over the interior or the exterior of the Trump Kennedy Center, or over the associated property on which the building is located." *Id*. ¶ 10. Ms. Stidham also expressly confirms that "this building, and its grounds, including all areas previously transferred out of NPS jurisdiction, are not within the National Park System and are not National Park System resources." *Id*. And "NPS does not control the use of the Trump Kennedy Center or access to it." *Id.* ¶ 11.

Plaintiffs also argue, likewise without evidence, that NPS, Interior, and the Secretary will be responsible for obtaining or providing permits for the renovation, including "rights-of-way from NPS for any work affecting the adjacent federal grounds and parkway lands administered by NPS." Pls.' Mot. at 15. Here too, the argument is both legally misguided and factually mistaken. Even if NPS would be responsible for granting some sort of permit at some future hypothetical stage, that would not support APA review now. Regardless, the Center "does not need a permit from NPS to carry out construction, rehabilitation, maintenance, or other activities on its own land[,]" unless those activities propose to use lands under NPS jurisdiction and, to date, "NPS has not received an application from the Trump Kennedy Center for a permit to use NPS lands for construction staging, excavation, or access or for a right-of-way permit." *See* Stidham Decl. ¶¶ 12-13. All of the planned renovations will occur within the Center's site and grounds. *See* 20 U.S.C. § 76s; *see also* 40 U.S.C. § 6301(3).

8

**B. USACE**

As for USACE, Plaintiffs' claims are even more attenuated. Plaintiffs argue that Defendants will require "USACE permits for any construction staging, excavation, or discharge under the Clean Water Act and Rivers and Harbors Act." Pls.' Mot. at 15; *see* 33 U.S.C. §§ 403, 1344. But, for similar reasons as with NPS, that is both irrelevant and wrong.

It is irrelevant because the mere prospect of some future permitting decision that may require USACE to act at some later time does not somehow give rise to an APA claim against that agency now. If the agency at some point grants a permit, and Plaintiffs believe that decision is unlawful, they can challenge it then, but there is no cognizable APA claim against USACE now.

The argument is also wrong because, as with the other agencies, USACE has no jurisdiction over the planned renovations, or any authority to issue permits or approvals for the project. The declaration by Wade B. Chandler, the Chief of the Baltimore District Regulatory Division of USACE, confirms this. *See* Decl. of Wade B. Chandler, Ex. C ("Chandler Decl."). As he explains, the principal regulatory authorities of USACE are the Clean Water Act ("CWA"), codified at 33 U.S.C. §1344, and Section 10 of the Rivers and Harbors Act ("RHA") of 1899, codified at 33 U.S.C. § 403, *id*. ¶ 4. Based on Plaintiffs' Complaint and Preliminary Injunction Motion, as well as a summary of the planned renovations, and past records relating to the REACH expansion, the "[u]pland property, and activities thereon, administered by the Board . . . are not regulated by USACE under Section 404 of the CWA, or Section 10 of the RHA." *Id*. ¶¶ 7-8. Nor is Mr. Chandler "aware of any activities proposed" on the Center's property or in the Potomac River "that are regulated by USACE." *Id*. ¶ 9. Accordingly, USACE possesses "no jurisdiction, regulatory authority, or permitting authority over the renovations, and is not involved in the planning, decision making or execution of the work at issue in this litigation." *Id*. ¶ 15.[2]

---

[2] Plaintiffs appear to again rely on the Kennedy Center MOA between NPS and the Center to claim that USACE possesses permitting authority over the project. That inference is misplaced. USACE was only involved in the REACH expansion project, and thus the MOA, because the Center was at the time considering the construction of a "pier and/or performance pavilion in the river[.]" Chandler Decl. ¶ 11. USACE was involved as a concurring party because the undertaking

### C. NCPC

Last, the NCPC has neither unlawfully taken nor unlawfully withheld any agency action, and Plaintiffs therefore have not stated any viable APA claims against this agency either.

Plaintiffs' basis for including NCPC as a Defendant in this case is yet another MOA, but this time between the NCPC and the Smithsonian ("Smithsonian MOA"). Pls.' Mot. at 24-25; Smithsonian MOA, ECF No. 24-38. In short, the Smithsonian MOA acknowledges that, although the Smithsonian does not fall within the definition of a federal agency under NEPA regulations, certain projects it undertakes, such as the construction of new buildings, *see* 40 U.S.C. § 8722(d), trigger a requirement for NCPC approval, thereby requiring NCPC to conduct a NEPA assessment in connection with such approval. Smithsonian MOA, at 1-2. With respect to the NHPA, the MOA further recognizes that the Smithsonian is subject to Section 106 historic review requirements by statute and must complete such review for projects that require NCPC review and approval within the district. *See generally id.* Plaintiffs argue that because the *Smithsonian* entered into an MOA with the NCPC, the agreement must therefore apply to the *Center* too.

That premise is flawed, because the Center is formally and functionally independent from the Smithsonian. There is no similar agreement between the *Center* and the Commission, and the Center is not a party to nor bound by the Smithsonian's agreement. Although the Center is described as "a bureau" of the Smithsonian, the Center is overseen by a governing board that is statutorily defined as separate and independent from the Smithsonian Institution's Board of Regents. *See* 20 U.S.C. §§ 76j, 76k, 42(b)(2). Indeed, the composition of the board, *see* 20 U.S.C. § 76h(a)(2), is entirely different from that of the Smithsonian, *see* 20 U.S.C. § 42(a), and Congress appropriates funds to the Center separate from the Smithsonian's appropriation. *See* Pub. L. No.

---

contemplated a "pier, platform, and footbridges in the Navigable Waters of the United States." *Id*. ¶ 13. But the Center revised its plan and eliminated plans for all work contemplated to be performed in the Potomac River. *Id*. ¶ 14. Consequently, USACE did not review any permit applications for the REACH expansion, nor did it issue any other authorizations for the project. *Id*. And since those discussions nearly a decade ago, "no USACE regulated activities have occurred at the Kennedy Center since that time." *Id*.

119-21, § 60025, 139 Stat. 72, 157 (2025). Moreover, the National Gallery of Art, also statutorily listed as "a bureau" of the Smithsonian, 20 U.S.C. § 72(a), has been recognized as independent from the rest of the Smithsonian. *See Groce v. Rodriguez*, 743 F. Supp. 3d 244, 251, n.6 (D.D.C. 2024) (stating that the Gallery, though "[t]echnically . . . a bureau of the Smithsonian" was "independent[t] from the rest of the Smithsonian."). The Center is similarly situated to the Gallery and is likewise independent from the Smithsonian.

Indeed, the NCPC regulations and submission guidelines also confirm that the Smithsonian Institution and the Center are considered separate and distinct non-federal entities. *See* 1 C.F.R. § 601.3 (providing that "Non-Federal Agencies include . . . the Smithsonian Institution, [and] the John F. Kennedy Center for the Performing Arts."); *see, e.g.*, NCPC Submission Guidelines, Final January 2026, at 93, https://perma.cc/26K6-Y8XK (Definition of Non-Federal Agency). To bind the Center, there must be an agreement to which the Center itself is a party. The Smithsonian cannot confer authority over the Center that it does not possess. Therefore, the Smithsonian MOA provides no basis for jurisdiction over the Center or the planned renovations.

## II.    Plaintiffs Are Not Likely to Succeed on Their *Ultra Vires* or Mandamus Claims Against the Center

For the reasons explained above, the Agency Defendants are an irrelevant distraction in this case—a futile effort to invoke APA standards in a case involving a non-agency. The proper defendant is the Center itself. And as Plaintiffs recognize, they cannot sue the Center under the APA. Instead, they invoke non-statutory *ultra vires* claims and mandamus claims. Both types of claims impose extraordinarily high standards that Plaintiffs do not come close to satisfying.

*Ultra Vires*: As the Supreme Court reiterated just last year, *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), non-statutory *ultra vires* review has an "extremely limited scope," *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988), and thus an *ultra vires* claim "rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The D.C. Circuit has made clear that *ultra vires* review is *not* available to correct "mere legal" error. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

11

"Garden-variety errors of law or fact are not enough." *Griffith*, 842 F.2d at 493. And "vague statutory provisions . . . are not sufficiently clear and mandatory to warrant non-APA review." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("*NAPS*"). Similarly, the Supreme Court has rejected attempts to "dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Regul. Comm'n*, 605 U.S. at 682. As the Court has long explained, *ultra vires* review does not apply simply because an agency has arguably reached "a conclusion which does not comport with the law." *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964). Rather, "[o]nly error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022). Said another way, the doctrine permits judicial review of alleged statutory violations "only where," among other requirements, "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Nyunt*, 589 F.3d at 449; *see also Nuclear Regul. Comm'n*, 605 U.S. at 681 (requiring action "entirely" in excess of delegated powers and "contrary to a *specific prohibition*"). Such a claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

*Mandamus*: Mandamus is "one of the most potent weapons in the judicial arsenal," *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted), and a "drastic" remedy that is "invoked only in extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (citation omitted). The mandamus plaintiff must plausibly allege "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted). The purported duty owed to the plaintiff must "be clear and compelling." *13th Reg. Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980). Indeed, mandamus . . . is "inappropriate except where a public official has violated a 'ministerial' duty." *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002); *see also Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218-19 (1930).

Here, Plaintiffs have not shown anything remotely resembling the sort of manifest violation of an unambiguous statutory command, or the clear and indisputable right to relief that is necessary to prevail on either an *ultra vires* theory or a mandamus theory. Congress has appropriated funds for the Center's renovations; no further authorization is needed. The renovations fully comply with—and, in fact, affirmatively fulfill—the Board's statutory duties. And, for multiple reasons, the regulatory review and approval schemes that Plaintiffs invoke are not applicable here (or, to the extent applicable, are being satisfied regardless).

### A.    The Planned Renovations Do Not Require Further Action by Congress

Plaintiffs invoke 40 U.S.C. § 8106, which provides that "[a] building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." Pls.' Mot. at 17-20. Plaintiffs cannot attach an *ultra vires* claim to this statute for two reasons. *First*, the renovations do not contemplate a new "building or structure"; Plaintiffs are factually mistaken in presuming otherwise. *Second*, Congress has authorized these renovations by appropriating the funding for them.

To start, Plaintiffs' claim rests on the premise that the planned renovations contemplate the erection of a new structure. *Id*. at 17-18. But the sworn declaration of Matthew Floca, together with the available evidence, demonstrates that Plaintiffs' assumption is incorrect. Mr. Floca, as Executive Director and Chief Operating Officer of the Center, is the primary point of authority for the Center's planned renovations. *See* Floca Decl. ¶ 1. In his declaration, Mr. Floca "confirm[s] that the planned construction, renovation, and renewal efforts are only limited to the current structures, buildings, and grounds." *See id*. ¶ 6. "No new structure or building will be erected on the campus." *Id*. Nor will, as Plaintiffs fear, the planned renovations "tear down the Center to its structural steel and rebuild a new structure from those foundations." *Id*.; *see* Pls.' Mot. at 18. That alone means Section 8106 has no relevance here.

In arguing otherwise, Plaintiffs principally cite the President's social media post announcing the closure. But the President never stated that the Center would be "demolished" or

13

"destroyed." The other evidence that Plaintiffs cite—comments by the President that he will be "using the steel" and "'some of the marble' for the renovation"—does not suggest that the Center will be destroyed or stripped down to the studs. ECF No. 24-33 at 2-3. Indeed, the President expressly confirmed that he is "not ripping it down." *Id*. at 3.

Plaintiffs' own evidence reflects that the renovations are materially limited to "work on the building's exterior, as well as on its plumbing, electrical, fire protection, and technical stage systems." ECF No. 24-36 at 5. And the capital improvement plan further confirms that the Center will not demolish the building down to the structural steel and erect a new building, or any other new building or structure on the grounds. The capital improvement plan budgets for rehabilitation of the building by waterproofing specific levels of the building, conducting repairs, restoring the Center's fountain, and improving physical security on the Center's West Terrace and at the building's doors. *See* Capital Improvement Plan, at 2, Ex. E. The plan provides for the "renewal" of the Center's public spaces by, for example, renovating restrooms and improving wayfinding. *Id.* at 5. It provides for "restoration" of the performance spaces. *Id.* at 7. And it contemplates— under the largest allocation of funding in the plan—the renewal of "Safety & Building Systems," by, primarily, making mechanical, electrical, and plumbing improvements to the Center's piping, central plant, condenser loop, electrical system, and river pump room. *Id.* at 9. Even cursory review of additional evidence that Plaintiffs cite—like renderings of the Center that the President posted on social media—plainly shows that any assertion that the Center will be destroyed has no basis in fact. *Compare* Caitlin Yilek, *Trump posts renderings showing Kennedy Center exterior after planned renovation*, CBS News, https://perma.cc/X42H-VRPZ (last visited April 7, 2026) (showing renderings after renovation), *with* Ron Blunt, *The John F. Kennedy Center for the Performing Arts*, Google Arts & Culture, https://perma.cc/6H4X-3MX6 (last visited April 7, 2026) (current structure).

Even if Section 8106 did apply, Congress has provided express authorization. Congress did so by appropriating $256,657,000 for "necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of the John F. Kennedy

14

Center for the Performing Arts." Pub. L. No. 119-21, § 60025, 139 Stat. at 157; Pls.' Mot. at 18. It is not an accident that the appropriated sum closely matches the project's budget; Congress effectively *signed off* on the plans by appropriating these amounts. In the only other case applying Section 8106, Judge Leon recently held that a congressional appropriation of funding would suffice to provide the necessary authorization. *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 877779 at *10 (D.D.C. Mar. 31, 2026) (stating that "§ 8106 is most naturally read to require *some form* of authorization from Congress to construct a building, and an appropriation of funds—either a lump sum for construction or a specific appropriation for a particular project—would easily satisfy that requirement"). By that standard, the Center's renovations pose no legal problem. Nor could they possibly support extraordinary relief under the "Hail Mary" of an *ultra vires* claim.

### B.    The Board's Closure of the Center for Renovation Fully Complies With—and, Indeed, Affirmatively Fulfills—the Board's Statutory Duties

Plaintiffs next argue that the Kennedy Center's governing statute prohibits the planned renovations because they are ostensibly not "necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G); Pls.' Mot. at 20-23. That argument fails on multiple levels.

Most fundamentally, Plaintiffs again premise their argument on the assumption that the Center will be demolished or rebuilt from the ground up. Pls.' Mot. at 20-21. As explained above, that premise is incorrect. And the actual work that is planned is tailored closely to maintaining the functionality of the building at current standards of life, safety, security, and accessibility. Take, for example, the severe water intrusion at the main electrical vaults of the Center, or the systemic failure of the vertical plumbing risers and the Center's steel channels that have been corroded. *See* Floca Decl. ¶¶ 9, 10, 14, 19.

Moreover, Plaintiffs ignore that the Board is also obligated and empowered to conduct "maintenance, repair, and alteration" of the Center's "building and site" in "a manner consistent with requirements for high quality operations," 20 U.S.C. § 76j(a)(1)(H)(ii), and further to

15

"maintain the Hall of Nations, the Hall of States, and the Grand Foyer of the John F. Kennedy Center for the Performing Arts in a manner that is suitable to a national performing arts center that is operated as a Presidential memorial and in a manner consistent with other national Presidential memorials." *Id*. § 76j(a)(2)(E). The anticipated renovations fall within the scope of those authorities too—for example, the Concert Hall requires "the total replacement of stage lifts and rigging systems" and the "replacement of high-voltage electrical switchgear[s] and primary chillers and boilers." *See* Floca. Decl. ¶ 10.

At minimum, Plaintiffs' arguments cannot possibly satisfy the heightened standards that apply to *ultra vires* claims. Plaintiffs cannot identify with any clarity or specificity the line that it contends Congress drew. Plaintiffs claim that the statute contemplates only circumscribed repairs or renovations instead of a "major renovation" or "major aesthetic transformation," Pls.' Mot. at 20-21, but when does a renovation become sufficiently "major" that it no longer fits within the statutory authorization? The statutory phrases "necessary to maintain the functionality," "in a manner consistent with requirements for high quality operations," and "in a manner that is suitable to a national performing arts center" present judgment calls—not bright lines. But vague statutes cannot support an *ultra vires* claim. *NAPS*, 26 F.4th at 971. In short, Plaintiffs fail to identify any "discernible standards," *id.* at 972, that would allow the court to hold that the renovations here are "obviously" on the wrong side of that line, *Fla. Health Scis. Ctr. Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016).[3]

Finally, Plaintiffs argue that a two-year closure would violate 20 U.S.C. § 76j(a)(2)(F), which provides that "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." *See* Pls.' Mot. at

---

[3] Relatedly, Plaintiffs contend that *closing* the Center temporarily for the renovations is contrary to the statute, because doing so does not "maintain the functionality of the building." 20 U.S.C. § 76j(a)(1)(G); *see* Pls.' Mot. at 21. But that statute obviously does not require the Center to remain open at all times, night and day. Rather, it is the *long-term* functionality that Congress wished to protect. The planned renovations are targeted at that objective. Moreover, as explained in the text, the Center is also authorized to undertake maintenance, repairs, and alterations for other purposes that are sufficient here. *See* 20 U.S.C. §§ 76j(a)(1)(H)(ii), 76j(a)(2)(E).

16

22-23. But there has been no change in the "management" or "operation" of the grounds; the Center is not selling them, or leasing them out, or allowing some other entity to operate them, or excluding them from public access. To be sure, as with any construction project, there may be downstream effects on how the grounds may be accessed or used during phases of the renovations. But that is obviously not what this statute was meant to capture, or else the Center would not have been able to build the underground parking garage expansion, or the REACH expansion, or the plaza project, all funded by Congress and taking place on the Center's grounds, and all taken in the past two decades. 20 U.S.C. §§ 76i, 76m, 76q-1. Here too, at minimum, the Center is not engaging in action that is "obviously beyond the terms of the statute," *Fla. Health Scis. Ctr.*, 830 F.3d at 522; at most, Plaintiffs seek to "dress up a typical statutory-authority argument as an ultra vires claim," *Nuclear Regul. Comm'n*, 605 U.S. at 682.

## C.    There Is No Need for Any Other Regulatory Approvals

Plaintiffs next object that the renovations require approval or consultation with the NCPC and CFA.

As an initial matter, however, the Center has begun consulting with the NCPC and CFA on certain changes to the Center's building and site. *See* Floca Decl. ¶ 7. To be clear, the Board does not believe it must submit to those commissions, but the Center is nonetheless engaging with them to obtain the benefit of their expertise on certain renovation matters, in the spirit of cooperation and comity. Any basis for halting construction for lack of regulatory approval thus fails as such claims are now moot (or at a minimum premature)—Defendants are engaging with the commissions. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III when the issues presented are no longer 'live'") (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).

In any event, it is far from clear that the Center is required to consult or receive approval from either entity. As to the NCPC, the only approval requirement attaches to decisions that impact "the location, height, bulk, number of stories, and size of federal public buildings, . . . and the

17

provision for open space in and around" those buildings. 40 U.S.C. § 8722(d). Since no new building will be erected on the Center's campus, *see* Floca Decl. ¶ 6, it does not appear that this statute applies or that any NCPC approval is required. And the NCPC has certainly not yet determined otherwise. The statute also includes a requirement to submit development plans to the NCPC for review (not approval), but that requirement applies only to "[a]gencies of the Federal Government," 40 U.S.C. § 8722(a), and the Center—like the institution it is a bureau of, the Smithsonian—is not an agency. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997). Plaintiffs elsewhere acknowledge as much. Pls.' Mot. at 20.[4]

As to the CFA, it "advise[s]" on "the location of statues, fountains, and monuments in the public squares, streets, and parks in the District of Columbia" and on "the selection of models" and "artists" for "statues, fountains, and monuments erected under the authority of the Federal Government." 40 U.S.C. § 9102(a)(1)–(4). As above, the Center does not act "under the authority of the Federal Government" because it does not "exercise" governmental authority. *Dong*, 125 F.3d at 881. Moreover, the CFA's advisory authority extends only to proposals for *new* "statues, fountains, and monuments," given that the scheme contemplates advising on each fixture's location—which is fixed after the statue, fountain, or monument is installed—and on the selection of models and artists to "carry out" the "erect[ion]" of such fixtures. 40 U.S.C. § 9102(a). Plaintiffs have not alleged that the Center plans to erect a statue, fountain, or monument necessitating CFA review. And nothing in the record suggests that the renovations will be sufficiently "material" to result in the kind of new structure—be it a statue, fountain, or monument—that might qualify under these provisions. The Center's building—to the extent it might qualify as a "monument"—will not be moved or require a new "model" for construction. Floca Decl. ¶ 6; 40 U.S.C. § 9102(a).

---

[4] Plaintiffs again contend that the Smithsonian MOA binds the Center's hands and forces the Board to submit the project to NCPC review and approval, even if the statute does not. Pls.' Mot. at 30-31. But as discussed above, *supra* Part I.C, the *Smithsonian* is not the *Center* and the Smithsonian's separate agreements with the NCPC are not imputed to the Center, which holds independent decision-making authority. *See* 20 U.S.C. § 76j(a)(2)(A). Plaintiffs also do not explain how they would have any right to enforce an MOA between the Smithsonian and the NCPC.

Finally, relevant to both regulatory entities, Congress expressly granted the Center unique and expansive independence to operate without being tied by the restraints that apply to federal agencies. Congress affirmed that the "actions of the Board relating to . . . payments made or directed to be made by the Board from any trust funds shall not be subject to review *by any officer or agency other than a court of law*." 20 U.S.C. § 76k(e) (emphasis added). The Board's actions "relating to" its expenditure of funds appropriated by Congress for capital repair and restoration fall squarely within the plain text of the limitation in § 76k(e). The Board's decision to expend such funds to repair and improve the Center's building and site "shall not be subject to review," other than in court. *Id.* The NCPC and CFA are not courts.

At minimum, the ostensible duties to consult or seek approval from the NCPC and CFA are not clear or ministerial enough to warrant relief under the applicable mandamus standard. Again, because the Center is not subject to APA review, Plaintiffs are forced to resort (for these claims) to mandamus. But mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary causes." *Cheney*, 542 U.S. at 380. Only "exceptional circumstances amounting to a judicial 'usurpation of power'" will justify issuance of the writ. *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 289 (1988). Plaintiffs' construction of the statutes purportedly requiring the Center to submit to NCPC and CFA review does not rise to that level—or even close.

**D.      NEPA and NHPA Review Are Not Required—Particularly Not at This Stage**

The NHPA and NEPA impose procedural obligations on federal agencies before taking certain major actions. Their purpose is "to ensure fully formed and well-considered decisions by federal agencies"—not to "mandate particular results." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1309–10 (D.C. Cir. 2014) (citation modified); *see also Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003).

NEPA requires agencies to consider the reasonably foreseeable environmental impacts of a proposed major federal action and to evaluate alternatives. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 798 (D.C. Cir. 2022) (citing 42 U.S.C. § 4332(2)(B)–(C)). And the NHPA

19

requires agencies to consider the effect of an undertaking on any historic property. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 296 (D.C. Cir. 2022) (citing 54 U.S.C. § 306108). The NHPA and NEPA share "operational similarity," *Karst, Env't Educ. & Prot. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

Insofar as Plaintiffs suggest their NHPA or NEPA claims may proceed against the Center under the APA even though their other APA claims cannot, that is mistaken for reasons explained further below. And, for the reasons already explained, Plaintiffs cannot sue the Agency Defendants over the renovations because none of them exercise control over the project, much less sufficient discretionary control to subject their actions to NHPA or NEPA. *See Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) (explaining that these statutes are "inapplicable" if the defendant "does not have sufficient discretion to affect the outcome"); *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 124 (D.D.C. 2022). At minimum, these claims are premature at this early juncture.

### i.    NEPA Review

Plaintiffs claim that the planned renovations amount to a "major federal action" and are therefore subject to NEPA. Pls.' Mot. at 33. But even Plaintiffs acknowledge that the Center is not itself subject to NEPA; instead, they direct this claim only to the "Agency Defendants." *Id.* at 15, 33-36. This claim fails.

For the reasons explained in Part I, the Agency Defendants have no role in the Center's renovations. And "agencies are not required to analyze the effects of projects over which they do not exercise regulatory authority." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 188 (2025). "Even a foreseeable environmental effect is outside of NEPA's scope if the agency could not lawfully decide to modify or reject the proposed action on account of it. *Id.* at 202 (Sotomayor, J., concurring); *see, e.g.*, *Def. Arlington v. U.S. Dep't of Def.*, No. 23-441, 2023 WL 8600567, at *11 (D.D.C Dec. 12, 2023) (explaining that an agency not involved in "making, reviewing, or altering" the final action was not subject to NEPA suit). Again, as explained above,

NPS, Interior, Secretary Burgum, and USACE possess no "shared authority," jurisdiction, or role in the management and operation of the Center's campus. *See* Stidham Decl. ¶¶ 5-13; Chandler Decl. ¶ 15. That means they have no NEPA obligations here.

As to NCPC, Plaintiffs argue that, under the 2018 Smithsonian MOA, the NCPC serves as the lead agency for NEPA review on every Smithsonian project within the District. Pls.' Mot. at 33 (citing ECF No. 24-38). But once more, the Smithsonian is *not* the Center, and the MOA does not bind the Center in any way. *See supra* Part I.C, n.4. Even setting that aside, Plaintiffs readily admit that submission of Smithsonian projects for NEPA review under the MOA is only "triggered by Smithsonian's submission of project plans to NCPC." ECF No. 24-38 at 3. NCPC regulations confirm that any obligation imposed under NEPA springs into existence only *after* a "Non-Federal Agency" submits an application that "requires Commission approval." 1 C.F.R. § 601.4(b). But neither the Smithsonian nor the Center has yet submitted plans related to the planned renovations to the NCPC for approval, nor has NCPC determined that approval is required. So even if NCPC may ultimately be required to conduct a NEPA review, no such obligation has yet attached. To be clear, however, if NCPC determines that its approval is required, NCPC will undertake whatever processes NEPA requires. *See* Decl. of Diane Elizabeth Sullivan at ¶¶ 4-5, Ex. D ("Sullivan Decl."). There is no basis for any injunction.

### i.   Section 106 of the NHPA

Under Section 106 of the NHPA (codified as 54 U.S.C. § 306108), the requirement to submit any federal "undertaking" for review by the Advisory Council on Historic Preservation applies only to the "head" of any "Federal agency." 54 U.S.C. § 306108. But the Center is not an "agency" for the purposes of the NHPA because the term "agency" has the meaning given in the APA. *See* 54 U.S.C. § 300301; *see also Dong*, 125 F.3d at 88; *see also Farmer-Paellmann v. Smithsonian Inst.*, No. 1:22-CV-3048 (Cooper, J.), 2022 WL 17976505 (D.D.C. Oct. 14, 2022) (holding that the Smithsonian's actions are not subject to judicial review under the APA because it is not an "agency"). This is a point already explained and that Plaintiffs generally acknowledge.

21

Plaintiffs argue, however, that Congress directed otherwise in the Smithsonian Facilities Authorization Act. *See* 20 U.S.C. § 75b note (2003) (Patent Office Building Improvements); Pub. L. No. 108-72, 117 Stat. at 889. That Act, appended as a note to an appropriation for the Smithsonian Board of Regents to make improvements to the Patent Office Building, *see* § 3, 117 Stat. at 888, deems the Smithsonian to be "an agency for purposes of compliance with" Section 106 and its implementing regulations in "carrying out other projects in the District of Columbia which are subject to the review and approval of the [NCPC]," *id.* at 889, sec. 3(c). Plaintiffs argue that, as a bureau of the Smithsonian, the Center is subject to this statute and MOA and therefore must comply with Section 106 of the NHPA for this project. Pls.' Mot. at 25. That argument fails for several reasons.

*First*, the Act applies to the Smithsonian and its Board of Regents but makes no mention of the Center or its independent Board. *See id.* at 888–89. And as previously stated, the Center's statutory independence means that the Smithsonian's status cannot be imputed to the Center. Indeed, Congress has specifically provided that the Center's actions relating to its expenditure of trust funds "shall not be subject to review by any officer or agency other than a court of law," 20 U.S.C. § 76k(e)—a protection that does not apply to the Smithsonian. The Smithsonian Facilities Authorization Act should not be read to override the plain text of the provisions in which Congress granted the Center this unique independence from external review. *See Hunter v. Fed. Energy Regul. Comm'n*, 711 F.3d 155, 159 (D.C. Cir. 2013) ("repeals by implication are not favored").

*Second*, even if the Smithsonian's statute governed, the Smithsonian is only required to submit to Section 106 review for projects "which are subject to the review and approval of the [NCPC]." Pub. L. No. 108-72, 117 Stat. at 889. For the reasons explained above, it is far from clear that NCPC approval is required for these largely interior renovations, and the NCPC has not yet determined that its approval is required. Once more, however, to the extent that NCPC ultimately determines that such approval is required, NCPC will follow the Section 106 process, as it typically does. *See* Sullivan Decl. ¶ 5.

22

*Third*, at minimum, Plaintiffs cannot meet the high bar for *ultra vires* relief. Importantly, although Pub. L. 108-72 made the Smithsonian an agency for purposes of complying with the NHPA, it did not make the Smithsonian an agency for purposes of judicial review under the APA. Smithsonian Facilities Authorization Act, Pub. L. No. 108-72, § 3(c), 117 Stat 888, 889 (2003). *See Dong*, 125 F.3d at 881. Plaintiffs therefore cannot pursue their NHPA claims against the Center through the APA; they could only pursue them through non-statutory *ultra vires* review. That erects a hurdle that they cannot clear. *U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.*, 981 F.2d 1339, 1343 (D.C. Cir. 1993) (stating that the strict limitations on non-statutory review are "nearly insurmountable").[5]

### iii.    Section 110 of the NHPA

Plaintiffs' backup argument is that, by painting some columns and erecting new signage, the Center intentionally violated Section 106, and thereby "triggered a second, heightened federal review requirement" for certain Agency Defendants under Section 110(k) (codified as 54 U.S.C. § 306113). Pls.' Mot. at 26. This theory, too, fails on multiple levels.

To start, the premise is wrong. Section 110(k) only applies if an applicant "has intentionally significantly adversely affected" an historic site with "intent to avoid the requirements of" Section 106. 54 U.S.C. § 306113. Here, as the Center is not subject to Section 106 review, it cannot have an intent to avoid those non-binding requirements. *See Protect Our Parks, Inc. v. Buttigieg*, No. 21-cv-2006, 2021 WL 3566600 at *18-19 (N.D. Ill. Aug. 12, 2021), *aff'd*, 39 F.4th 389 (7th Cir. 2022) (concluding that because entity engaging in construction genuinely believed that it did not implicate federal review, it also then did not have *intent* to avoid Section 106 review).

---

[5] None of this is affected by Plaintiffs' invocation of the Kennedy Center MOA, which (again) was an agreement between the Center and NPS in connection with the decade-old REACH expansion. Pls.' Mot. at 25; ECF No. 24-21; *supra* n.2. There, Planning Commission review occurred not due to the Center's involvement but because NPS—a federal agency—transferred its jurisdiction over portions of land to be used for the project, *see* ECF No. 24-21 at 3. The Center participated as a "Consulting Party" because it was "invited" to the review, *id.* at 3–4, not because the Center was required to subject itself to the review independent of NPS's involvement.

*Second*, even if the Center had engaged in such conduct, the consequence under Section 110(k) is that other federal agencies presumptively may not grant a "loan, loan guarantee, permit, license, or other assistance" to the applicant for related work. 54 U.S.C. § 306113. Here, however, none of the Agency Defendants is granting any such loan, permit, or assistance to the Center. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, Civ. Action No. 24-2905 (JEB), 2025 WL 947469, at *4 (D.D.C. Mar. 28, 2025) (Boasberg, C.J.) ("At best . . . [Section 110(k) review] would become relevant to this suit only once the Corps granted an easement . . . something the Complaint acknowledges has not yet occurred"), *appeal filed*, No. 25-5198 (D.C. Cir. May 29, 2025). So, there is no agency action to which Section 110(k) could apply.

*Finally*, the NHPA allows federal agencies to carve out exceptions to this prohibition if they determine that "circumstances justify granting the assistance despite the adverse effect created . . . by the applicant." 54 U.S.C. § 306113. Hence, as Chief Judge Boasberg observed in *Standing Rock*, that "grant of discretionary exception-making is the polar opposite of the 'unequivocal command' required to compel agency action under § 706(1)." 2025 WL 947469, at *4.

## III.    The Balance of Equities Does Not Support a Preliminary Injunction

Merits aside, the Court should deny a preliminary injunction because the balance of equities weighs heavily against Plaintiffs' proposed relief. Plaintiffs cannot demonstrate that they are "likely to suffer irreparable injury in the absence of preliminary relief," *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014), which is reason alone for denial of the motion, *see, e.g.*, *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Plaintiffs fail to clear that hurdle as to any of its claimed procedural, construction-related, or aesthetic injuries.

Even if they could, those marginal harms are plainly outweighed by the serious threats that would result from halting construction. Defendants are remedying severe structural and safety deficiencies at the Center that require immediate attention. And the Center's two-year closure will minimize the project's total timeline, enabling repairs and restoration to occur expeditiously and for the Center to reopen after two years. Each factor weighs strongly against Plaintiffs.

### A.    Plaintiffs Will Not Be Irreparably Harmed from the Renovations

Plaintiffs will suffer no irreparable injury from the Board's decision to undergo renovation for two years. "Plaintiffs have the 'considerable burden' of proving that their purported injuries are 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (citation omitted). In particular, the movant "must demonstrate that the claimed injury is 'both certain and great' and that the alleged harm is 'actual and not theoretical.'" *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (2014) (citation omitted). And, "because 'the court must decide whether the harm will in fact occur[,]' a party seeking injunctive relief must 'substantiate the claim.'" *Id.* (citation omitted). Plaintiffs fall well short of this high standard. And a failure to demonstrate concrete irreparable harm can alone serve as a basis to deny preliminary-injunctive relief. *See Fisheries*, 236 F. Supp. 3d at 337–38.

*First*, Plaintiffs' theory of irreparable harm is premised on the destruction of the Center's building. Pls.' Mot. at 36-38. This, as established above, is unfounded. The evidence shows only that the Center will be restored and repaired, consistent with the congressional appropriation and the Center's charter. *See* Floca Decl. ¶ 6.

*Second*, Plaintiffs argue that their members' loss of enjoyment in visiting the Center for the two years that it will be closed amounts to irreparable harm. Pls.' Mot. at 40-41. But this time-limited, temporary deprivation does not come close to qualifying as the "great harm" necessary to warrant the extraordinary remedy of a preliminary injunction. Nor would the two-year temporary closure amount to a harm that is "irreparable." *See, e.g., W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) (finding that "temporary effects" caused by construction do not amount to irreparable harm because the time construction will occur "is not permanent or of long duration").

*Third*, Plaintiffs argue that irreparable harm attaches because of a loss in procedural rights. Pls.' Mot. at 38-40. They contend that the failure to complete NHPA and NEPA reviews, as well as submit the project plans to the NCPC and CFA, makes it "impossible" for Plaintiffs and their

25

members to protect buildings of interest. *Id*. at 39. Yet "procedural harm standing alone is insufficient to constitute irreparable harm." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017); *see also Fisheries*, 236 F. Supp. 3d at 336. In any event, the Center is voluntarily consulting with the NCPC and the CFA. And if NEPA or NHPA review is required, NCPC has committed to undertake it.

## B.     The Balance of the Equities and the Public Interest Favors Defendants

The balance of the equities and the public interest tilt even more strongly in Defendants' favor. The purpose of the proposed closure for renovation is to limit the total amount of time and expense necessary to undertake renovation that will directly address critical infrastructure failures and limit safety risks to the public. The severity of the Center's existing infrastructure needs necessitates repair and renewal. And the complete closure will permit those needs to be addressed in as timely, cost-effective, and safe a manner as possible. Floca Decl. ¶¶ 13-15, 19.

To assess the balance of the equities and public interest, courts "must balance the competing claims of injury," consider "the effect on each party of the granting or withholding of the requested relief," and "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

As explained above, Plaintiffs will not suffer any "great" harm from the Center's closure for renovation. And, indeed, the Center itself will suffer no irreparable harm, given that it will reopen after two years following improvements aimed at addressing serious structural deficiencies and providing updated facilities consistent with high quality performing-arts operations. Should an injunction issue, though, the Center will be hamstrung in its ability to address "critical infrastructure" needs, like "severe water intrusion" from the Potomac River and "systemic failure" of the Center's vertical plumbing risers. Floca Decl. ¶¶ 8, 9. Indeed, routine maintenance has been "deferred" for "decades." Trump Kennedy Center, Press Releases: *Trump Kennedy Center Board Unanimously Approves Landmark Renovation* (Mar. 16, 2026), https://perma.cc/89FZ-BRM9. Preventing the Board from addressing those issues will only magnify harm to the Center.

Moreover, an injunction against the Board will prevent the Board from undertaking capital repair and restoration activities that directly fulfill its statutory duties. *See Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70–71 (D.D.C. 2025); *see also* 20 U.S.C. § 76j(a)(1)(G)–(H); § 60025(a), 139 Stat. at 157. An adverse decision could undermine the Board's statutory and common-law discretion to pursue the means it believes will best fulfill its duties. *See Olds v. Rollins Coll.*, 173 F.2d 639, 642 n.7 (D.C. Cir. 1949) (citing *Shelton v. King*, 229 U.S.90,94 (1913)). That constitutes a harm in itself, both to the Board and to the public interest in the effective management of charitable trusts. *See Depu v. Oath Holdings, Inc.*, 715 F. Supp. 3d 1, 26–27 (D.D.C. 2022) (trusts creating a "public benefit" and "social gains" should not be subject to the "recurring burdens" of "vexatious litigation" (citations omitted)); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Finally, the public interest will be harmed should the Board be forced to undertake repairs while keeping the Center open, as the work will result in safety risks should construction occur while public access is maintained. *See* Floca Decl. ¶¶ 5, 8, 13. Further, an injunction could result in work taking *longer* than two years to complete, thus threatening the ability to utilize the funding afford by Congress, which must be used for the renovation prior to September 30, 2029. *See* 139 Stat. at 157. And overall costs will increase if the Center is forced to remain open while the work is being done. *See* Floca Decl. ¶¶ 13, 15.

C.    **The Court Should Tailor any Injunction to the Plaintiffs' Alleged Harm and Stay any Injunction Pending Appeal**

If the Court concludes that injunctive relief is warranted, it must ensure relief is no broader than necessary to redress the alleged harm Plaintiffs face. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); *Trump v. CASA, Inc.*, 606 U.S. 831, 851-52 (2025) (equity power does not allow court to remedy harms to non-parties).Should the Court conclude that the Board was required to submit plans for approval to the commissions or to comply with NEPA or NHPA review, any injunctive relief that might be available to Plaintiffs is limited to that

27

required to remedy the asserted procedural injury. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 84 (D.D.C. 2025), *appeals filed,* Nos. 25-5476 & 5478 (D.C. Cir. Dec. 31, 2025); *Gill v. Whitford*, 585 U.S. 48, 68 (2018). Here, that means requiring that the Center receive the proper approvals before proceeding with renovation. It does not mean halting the renovation, even after the approvals are obtained. Likewise, any relief appropriate against a particular defendant should be limited to that particular defendant.

If the Court ultimately decides to issue an injunction impeding construction, Defendants respectfully request that this Court stay any such order pending appeal. Given the exigencies involved in suspending a major construction project, Defendants request this relief in advance of any ruling, to facilitate expedited proceedings on appeal. The factors governing whether to issue a stay largely overlap with the preliminary injunction factors already discussed: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

In similar circumstances, other courts have granted stays pending appeal, or at least temporary stays to allow the D.C. Circuit to adjudicate a stay motion in an orderly way. *See, e.g.*, *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209, 233 (D.D.C. 2025) (Contreras, J.) (staying a preliminary injunction "for fourteen days so that the parties may seek review in the Court of Appeals"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 111 (D.D.C. 2025) (Moss, J.) ("postpon[ing] the effective date of its class-wide order for fourteen days to permit Defendants to seek a stay pending appeal from the Court of Appeals"), *appeal filed*, No. 25-5243 (D.C. Cir. July 3, 2025); *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 60 (D.D.C. 2025) (Sullivan, J.) (granting summary judgment to plaintiffs but entering administrative stay), *appeal filed*, No. 25-5266 (D.C. Cir. July 23, 2025). This Court should follow those examples if it decides to award injunctive relief.

28

**CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' motion for a preliminary injunction. Should the Court grant Plaintiffs' motion, the Court should tailor any injunctive relief as appropriate and stay the relief pending appeal.

Dated: April 17, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General, Civil Division

                                         YAAKOV M. ROTH
                                         Principal Deputy Assistant Attorney General

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General

                                         DIANE KELLEHER
                                         Branch Director

                                         STEPHEN M. ELLIOTT
                                         Assistant Branch Director

                                         */s/ Pierce J. Anon*
                                         PIERCE J. ANON
                                         N.Y. Bar No. 6184303
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20530
                                         (202) 305-7573
                                         Pierce.Anon@usdoj.gov

                                         *Counsel for Defendants*