**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DC PRESERVATION LEAGUE**, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>**BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00981 |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 3

I. Plaintiffs Are Likely to Succeed on the Merits. ..... 3

A. Defendants Lack Statutory Authority for the Project. ..... 3

1. The Project Violates 40 U.S.C. § 8106 (Counts VI & IX). ..... 3

2. The Board's Limited Capital Authority Under 20 U.S.C. § 76j(a)(1)(G) Does Not Authorize The Project (Count X). ..... 6

3. The Project Violates 20 U.S.C. § 76j(a)(2)(F)'s Prohibition on Unapproved Changes to Ground Operations (Counts VII & XI). ..... 8

B. Defendants Have Failed to Comply with Mandatory Historic Preservation, Design Review, and Environmental Review Statutes. ..... 8

1. Section 76k(e) Does Not Bar Non-Judicial Review Of The Project. ..... 9

2. Defendants Have Failed To Comply With The NHPA. ..... 10

a. Section 106 Applies To The Kennedy Center. ..... 10

b. Defendants Have Failed To Comply With Section 106 (Counts I & VIII). ..... 11

c. Defendants Have Violated Section 110(k) (Count II). ..... 14

3. NCPC Review And Approval Is Required (Counts IV & XII). ..... 15

4. Defendants Must Seek CFA's Advice (Counts V & XIII). ..... 17

5. The Project Requires NEPA Review (Count III). ..... 18

II. Plaintiffs Face Severe Risk Of Irreparable Harm Absent A Preliminary Injunction. ..... 19

III. The Balance Of Equities And Public Interest Favor An Injunction. ..... 22

IV. The Court Should Not Stay Its Injunction Pending Appeal. ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ..... 17

*Beatty v. Trump*,
25-cv-04480 (D.D.C. Apr. 6, 2026) ..... 6

*Beatty v. Trump*,
No. 1:25-cv-04480-CRC (D.D.C. Mar. 25, 2026), ECF 29-21 & ECF 29-20 ..... 16

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..... 4, 7

*Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*,
791 F. Supp. 3d 29 (D.D.C. 2025) ..... 25

*Corley v. United States*,
556 U.S. 303 (2009) ..... 9

*Dong v. Smithsonian Institution*,
125 F.3d 877 (D.C. Cir. 1997) ..... 10

*Groce v. Rodriguez*,
743 F. Supp. 3d 244 (D.D.C. 2024) ..... 10

*Ill. Com. Comm'n v. Interstate Com. Comm'n*,
848 F.2d 1246 (D.C. Cir. 1988) ..... 14

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
119 F.4th 58 (D.C. Cir. 2024) ..... 24

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..... 22

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) ..... 7

*Minney v. U.S. Off. of Pers. Mgmt.*,
130 F. Supp. 3d 225 (D.D.C. 2015) ..... 23

*Nat'l Parks Conservation Ass'n v. Semonite*,
282 F. Supp. 3d 284 (D.D.C. 2017) ..... 19

*Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*,
No. 25-cv-4316, 2026 U.S. Dist. LEXIS 69920 (D.D.C. Mar. 31, 2026) ..... *passim*

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) ....................20

*Nken v. Holder*,
556 U.S. 418 (2009) ....................24

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ....................8

*Padgett v. Vilsack*,
No. 24-cv-02954, 2024 WL 5283897 (D.D.C. Nov. 8, 2024) (Cooper, J.) ....................23, 24

*Protect Our Parks, Inc. v. Buttigieg*,
2021 U.S. Dist. LEXIS 151806 (N.D. Ill. Aug. 12, 2021), *aff'd*, 39 F.4th 389 (7th Cir. 2022) ....................14, 15

*Russello v. United States*,
464 U.S. 16 (1983) ....................17

*Safari Club Int'l v. Salazar*,
852 F. Supp. 2d 102 (D.D.C. 2012) ....................23

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) ....................18

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015) ....................18

*TikTok Inc. v. Trump*,
490 F. Supp. 3d 73 (D.D.C. 2020) ....................22

*Tohono O'Odham Nation v. U.S. Dep't of Interior*,
138 F.4th 1189 (9th Cir. 2025) ....................14

*United States v. Abass*,
779 F. Supp. 3d 1 (D.D.C. 2025) ....................24

*Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) (per curiam) ....................19

**Statutes**

3 U.S.C. § 105(d) ....................7

5 U.S.C. § 706(2)(A) ....................4

5 U.S.C. § 706(2)(C) ....................4

20 U.S.C. §§ 76h(a) ....................10

20 U.S.C. § 76h(a)(1) ....10, 17, 18

20 U.S.C. § 76i(a) ....9, 17

20 U.S.C. § 76j(a)(1)(G) ....6, 7

20 U.S.C. § 76j(a)(1)(H)(ii) ....7

20 U.S.C. § 76j(a)(2)(E) ....7

20 U.S.C. § 76j(a)(2)(F) ....8, 9

20 U.S.C. § 76k(a) ....9, 10, 11

20 U.S.C. § 76k(e) ....9, 11

33 U.S.C. § 403 ....12

33 U.S.C. § 1344 ....12, 13

40 U.S.C. § 8106 ....3, 4, 5

40 U.S.C. § 8722(b)(1) ....15

40 U.S.C. § 8722(d) ....15, 16

40 U.S.C. § 9102 ....17

40 U.S.C. § 9102(b) ....17

40 U.S.C. § 9102(c) ....17

42 U.S.C. § 4336e(10)(A) ....18

54 U.S.C. § 300301 ....10

54 U.S.C. § 306108 ....11, 14

54 U.S.C. § 306113 ....10, 14, 15

Pub. L. 108-72, § 3, 117 Stat. 888, 889 (2003) ....10

Pub. L. No. 88-260, 78 Stat. 4 (1964) ....17

Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025) ....6

**Other Authorities**

36 C.F.R. § 800.1(c) ....14

36 C.F.R. § 800.9(c)(2) ....................15

36 C.F.R. § 800.16(y) ....................11

45 C.F.R. § 2101.1(a)(1) ....................17, 18

Federal Rule of Civil Procedure 65(c) ....................25

Local Civil Rule 7(b) ....................25

CNN (Apr. 22, 2026), https://www.cnn.com/2026/04/22/politics/kennedy-center-renovations-tour-closure-matt-floca ....................13

Kennedy Center, *Announcing The Kennedy Center's 2025-2026 Theater Season* (May 19, 2025), https://www.kennedy-center.org/news-room/press-release-landing-page/2025-2026-theater-season-announcement/ ....................21

*National Capital Planning Act*, https://www.ncpc.gov/about/authorities/ (last visited Apr. 21, 2026) ....................16

NCPC, Submission Guidelines (Jan. 2026 https://www.ncpc.gov/docs/Submission_Guidelines_Jan2026.pdf ....................16

Sunlen Serfaty, *Two year closure was his idea, says Trump's new Kennedy Center leader, defending dramatic move* ....................13

## INTRODUCTION

Defendants assure the Court that their two-year closure of the Kennedy Center is for the purposes of maintenance and upkeep—nothing more. But the Chair of the Kennedy Center's Board has announced something very different: that the building's steel structure will be "fully exposed" and that a "*brand new* and really beautiful" building will replace it. Ex. 30, ECF 24-33, at 2-3 (emphasis added).[1] These two descriptions cannot both be true. Like Schrödinger's cat, the Project exists in two mutually exclusive states—one for the Court, and another for the public.

The problem is not just Defendants' lack of credibility, although the administration's demolition of the East Wing after assuring the public that construction would not "interfere with the current building" should dispel any presumption of regularity that might otherwise be afforded to their actions. *See* Ex. 22, ECF 24-25, at 3; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316, 2026 U.S. Dist. LEXIS 69920, at *5-6 (D.D.C. Mar. 31, 2026). And it is not just that Mr. Floca's supposed two-year review—which appears to have consisted of little more than examining four previously prepared reports—was a cursory process seemingly dead-set on a predetermined result. *See* Floca Decl., ECF 27-2, ¶ 9. The problem is also that Defendants' representations are facially irreconcilable: Mr. Trump's description of "Construction, Revitalization, and Complete Rebuilding" of a "brand new" building, and assertions that "tremendous amounts" of private funds have already been raised, Ex. 1, ECF 24-4, at 2; Ex. 30; *see* Mem. 13, cannot be squared with Mr. Floca's claims that the Project is "limited to the current structures," and that "no new structure or building will be erected," Floca Decl. ¶ 6. One of these

[1] This Reply uses the same abbreviations defined in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF 24-1 ("Mem.").

descriptions must be false, and recent history gives no reason to think that it is Mr. Trump's.[2]

This Court need not determine which of these competing stories is false to grant Plaintiffs' motion for a preliminary injunction. Either way, the Project demands numerous reviews and approvals, none of which Defendants have commenced or obtained. Take Defendants' own self-styled "Capital Improvement Plan," a high-level budget document that provides few if any details about a gargantuan project set to commence in mere months. *See* Ex. E, ECF 27-6. Defendants' "Plan," for example, allocates $38 million for "Building Envelope & Structural" work (including on "Hardscapes" and the "Terrace Level Overhang & Roof"). *Id.* at 3. This is work that, as described, clearly requires review and approval for alterations to the Center's building and grounds. The "Plan" also sets aside $350,000 for "Rock Creek Parkway Stabilization." *Id.* This is work that will take place along an NPS-administered unit listed on the National Register of Historic Places, which, as described, triggers both NPS permitting and Section 106 review. Even if the "Plan" were a complete and reliable account of the Project—which it is not—forging ahead with the Project without the required reviews and approvals will violate the law and irreparably harm Plaintiffs.

Where Defendants cannot explain or resolve the contradictions between their own public utterances and their "Plans," as set forth in Exhibit E, the Court should not give them the benefit of the doubt. The "brand new" building promised by Mr. Trump requires congressional approval, NCPC and CFA review, NCPC approval, compliance with the NHPA and NEPA, and issuance of all necessary permits—none of which Defendants have secured. And there is much in Defendants'

[2] Although Donald J. Trump is President of the United States, he is also Chair of the Kennedy Center's Board of Trustees. In their opening Memorandum and in this Reply, Plaintiffs quote statements to the public that Mr. Trump has made in his capacity as Chair and on behalf of the Board.

"Plan"—even at its jaw-dropping level of generality—that also qualifies for review and permitting under the statutes and compliance with the fundamental laws of historic preservation. Unless and until Defendants satisfy those requirements, the Project cannot move forward. And because, with mere months before the Project is set to begin, Defendants have not commenced any of these processes, Plaintiffs' motion for a preliminary injunction should be granted.

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits.

Whether the Project amounts to a "Complete Rebuilding" of the Kennedy Center (as its Chair has publicly promised) or something less (as Defendants now claim), it violates multiple statutory requirements that Defendants have made no effort to satisfy. Defendants lack the congressional authorization required by the Center's enabling statutes and 40 U.S.C. § 8106. And they have failed to initiate, much less complete, the review processes required by federal law. Plaintiffs are therefore likely to succeed on the merits of their claims.

#### A. Defendants Lack Statutory Authority for the Project.

Defendants need express approval of Congress for the Project. They have none. Unable to satisfy the clear mandate imposed on the Project by the Kennedy Center's enabling statutes and, for the "Complete Rebuilding," by 40 U.S.C. § 8106, Defendants now resort to declarations that contradict statements of the Center's Chair, and strained misreadings of plain statutory text. Neither can salvage Defendants' unauthorized Project from the governing law's clear prohibitions.

##### 1. The Project Violates 40 U.S.C. § 8106 (Counts VI & IX).

Section 8106 is unequivocal: "A building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress." The Kennedy Center indisputably sits on federal public grounds, Ex. 18, ECF 24-21, and the Project as described by the Center's own Chair—"Construction,

Revitalization, and ***Complete Rebuilding***" of a "***new*** and spectacular Entertainment Complex" and a "***new*** and beautiful Landmark," Ex. 1 at 2 (emphasis added)—constitutes erection of a new structure. Because Congress has not expressly authorized the Project, it violates the APA, 5 U.S.C. § 706(2)(A) & (C), and is *ultra vires* of § 8106's "specific prohibition," *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (quotations omitted); Mem. 17-20.

Defendants' principal response is to claim, in essence, that Mr. Trump's statements are false. *See* Opp. 13-14. Relying almost exclusively on Mr. Floca's declaration, they assert that planned work on the Kennedy Center is "limited to the current structures, buildings, and grounds," and that "no new structure or building will be erected." Opp. 4, 13 (quoting Floca Decl. ¶ 6). But Mr. Floca's assertions are directly contradicted by the public statements of Mr. Trump—the Chair of the Center's Board—who made clear that the building's steel would be "***fully exposed***" and that he would be "using the steel," "the structure," and "some of the marble" to construct a "***brand new*** and really beautiful" building. Ex. 30 at 2-3 (emphasis added). Defendants attempt to minimize those statements, arguing that Mr. Trump "never stated that the Center would be 'demolished' or 'destroyed.'" Opp. 13-14. But Mr. Trump was clear: he intends to strip the building down to its structural steel and build something "brand new." Mem. 18. Put simply, that is the erection of a new structure, and, without express approval from Congress, it is prohibited by § 8106. *See* 40 U.S.C. § 8106.

Despite Defendants' urging, there is no reason to credit Mr. Floca's declaration over Mr. Trump's statements. *See* Opp. 13-14. Mr. Floca does not even attempt to explain the discrepancies between his claims and Mr. Trump's. He ignores the significant exterior renovations ***already*** completed—including repainting the building's historic columns from gold to white and altering the Center's façade by installing new signage placing Mr. Trump's name above President

Kennedy's—that render his assertion that "[t]he exterior of the Center's main building will not be materially affected" demonstrably false. *See* Floca Decl. ¶ 6; Mem. 8-9 (explaining that the exterior columns are integral to the Center's historic character forming the basis for its eligibility for the National Register). Mr. Floca's claim that "[a] full two-year closure is the only responsible path forward" is unsupported by the reports on which he supposedly relied. *See* Mem. 11-12. And he fails to acknowledge the "tremendous amounts of money" that Mr. Trump claims had been raised from private donors, *see id.* at 13, let alone explain the purposes to which those sums will be put.

Defendants' other efforts to downplay Mr. Trump's promise to erect a "brand new" building fare no better. The pair of unattributed renderings shared to social media by Mr. Trump without any context, and disconnected from any plan, *see* Opp. 14, prove nothing about the Project's actual scope or design. The Capital Improvement Plan fails to fill the void: the "draft" document, last updated over two months ago, consists of vague budget line items and a handful of photos without any executable construction plans. Like Mr. Floca's declaration, it fails to account for the "tremendous amounts" of private funds Mr. Trump represents have been received. *See* Opp. 14-15 (claiming that the proposed renovations "pose no legal problem" because they are being funded with appropriations). And, to underscore its deficiencies, the work that Defendants have already completed—alteration to the columns and façade—appears nowhere in the Plan.

Beyond Mr. Floca's declaration, Defendants' argument crumbles. Defendants hardly dispute that they lack congressional authorization for a "brand new" building. The $256,657,000 appropriation certainly provides none, and the dicta from *National Trust* cited by Defendants *undercuts* their position. *See* Opp. 15 (citing *Nat'l Tr. for Historic Pres.*, 2026 U.S. Dist. LEXIS 69920). While the Court observed there that "§ 8106 is most naturally read to require *some form*

of authorization from Congress to construct a building, and an appropriation of funds—either a lump sum for construction or a specific appropriation for a particular project—would easily satisfy that requirement," it emphasized that "an appropriation from Congress is authorization to use funds ***for a specified purpose*** " and, as such, may not be used for purposes "beyond what Congress has approved." *Nat'l Tr. for Historic Pres.*, 2026 U.S. Dist. LEXIS 69920, at *25 (emphasis added) (quotations omitted).

Here, Congress specified that the appropriation was to be used for "necessary expenses for capital repair, restoration, maintenance backlog, and security structures." Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025). The accompanying House report confirms that narrow purpose: funding "to address deferred maintenance and upkeep," including "water system upgrades, office space improvements, electric enhancements, elevator updates," and similar items. Mem. 6-7, 18-19 (quoting H.R. Rep. No. 119-106, Book 1, at 1175 (2025)). And, if more were needed (it is not), the minutes from the Board's March 16, 2026, meeting provide further confirmation: At that meeting, Trustee and House Speaker Mike Johnson stated that "there was a line item for every ***repair*** necessary. $257 Million was not a random number; ***it's not aesthetics***." Second Decl. of Joseph LaFauci, Ex. 1 at 8, *Beatty v. Trump*, 25-cv-04480 (D.D.C. Apr. 6, 2026), ECF 34-5 ("Mar. 16 Minutes") (emphasis added). The upshot is clear: Congress appropriated the funds for specific, itemized "repair[s]"—not for "aesthetics" or transformative rebuilding.

**2. The Board's Limited Capital Authority Under 20 U.S.C. § 76j(a)(1)(G) Does Not Authorize The Project (Count X).**

Separately, the Project exceeds the Board's statutory capital authority, which is confined to "repair, replacement, improvement, rehabilitation, alteration, or modification" projects "***necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility***." 20 U.S.C. § 76j(a)(1)(G) (emphasis added). Each of the terms—"repair,"

"replacement," "improvement," "rehabilitation," "alteration," "modification"—shares a common character: preserving an *existing* structure. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026) (where "neighboring words" in a statutory list share a common character, a court will not read one term to encompass a "distinct and extraordinary power" not suggested by the others). "Complete Rebuilding" of a "brand new" building, Ex. 1; Ex. 30, is by definition not "necessary to maintain the functionality" of the existing building, and it exceeds the statute's scope. Mem. 20-22.

In response, Defendants again principally rely on Mr. Floca's declaration, claiming that "the actual work that is planned is tailored closely to maintaining the functionality of the building at current standards of life, safety, security, and accessibility." Opp. 15-16. But as explained, there is no reason to credit Mr. Floca's self-serving declaration over Mr. Trump's admissions. The Board's duty to "maintain[]" the *existing* facility cannot possibly authorize it to completely rebuild the Center. *See* 20 U.S.C. §§ 76j(a)(1)(H)(ii), 76j(a)(2)(E); Mem. 5-6. Even the version of the Project described by Mr. Floca would defy § 76j(a), as it would needlessly shutter rather than "maintain" operations. Mem. 21-22.

As a last resort, Defendants assert that Plaintiffs "cannot possibly satisfy the heightened standards that apply to *ultra vires* claims." Opp. 16. Not so. The gap between the Board's capital authority and the Project as described by Mr. Trump is not a matter of degree; it is a difference in kind. And § 76j(a)(1)(G) is not too "vague" to support *ultra vires* review. Opp. 16. To the contrary: Construing the Board's limited capital authority to authorize "Complete Rebuilding" of a "brand new" structure is precisely the sort of "patent[] . . . misconstruction" that warrants *ultra vires* relief. *See Changji*, 40 F.4th at 722 (quotations omitted); *see also Nat'l Tr. for Historic Pres.*, 2026 U.S. Dist. LEXIS 69920, at *18 (interpretation of "alteration" and "improvement" in 3 U.S.C. § 105(d) to encompass "wholesale demolition of entire buildings and construction of new ones" was

*ultra vires*).

#### 3. The Project Violates 20 U.S.C. § 76j(a)(2)(F)'s Prohibition on Unapproved Changes to Ground Operations (Counts VII & XI).

Finally, the Project—both Mr. Floca's version and Mr. Trump's version—violates 20 U.S.C. § 76j(a)(2)(F), which mandates that "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." 20 U.S.C. § 76j(a)(2)(F). The Project's two-year total closure of grounds that receive approximately 2 million visitors annually, Ex. 7, ECF 24-10, at 6, is a paradigmatic "change" in their "management and operation." Mem. 22-23.

Defendants protest that the Center is not "selling," "leasing," or "allowing some other entity to operate" the grounds. Opp. 16-17. But that reads exceptions into statutory text that contains none: Section 76j(a)(2)(F) prohibits *any* change in the grounds' management and operation, not simply selling or leasing. 20 U.S.C. § 76j(a)(2)(F) (permitting "***[n]o change*** . . . without the express approval of Congress" (emphasis added)). Defendants' efforts to analogize to past construction projects (including work on the Center's parking garage, REACH, and plaza, Opp. 17) likewise fail, as none of those projects required complete closure of the Center and its grounds. In any event, each *was* expressly authorized by Congress through separate legislation—the very process Defendants now seek to circumvent. *See* Mem. 5 & n.2. And Defendants' effort to evade *ultra vires* review (Opp. 16-17) is again unavailing: Section 76j(a)(2)(F)'s clear proscription on any "change in the management and operation of the [Center's] grounds" is exactly the sort of "specific prohibition" enforceable by *ultra vires* review. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958)).

### B. Defendants Have Failed to Comply with Mandatory Historic Preservation, Design Review, and Environmental Review Statutes.

Rather than carry out their federal review obligations, Defendants seek to avoid them. By

declining to submit to NCPC or CFA the plans and specifications that would trigger formal review, and claiming that review, if any, will occur at some unspecified later date, Defendants have attempted to manufacture the very absence of federal involvement they now invoke in an effort to evade judicial scrutiny. The agency declarations they proffer—from officials who profess to be "[un]aware" of regulated activities, *see, e.g.*, Chandler Decl., ECF 27-4, ¶ 9—reflect nothing more than Defendants having kept those officials in the dark. As shown below, Defendants' obligations under each of these statutes are clear, mandatory, and unfulfilled.

**1. Section 76k(e) Does Not Bar Non-Judicial Review Of The Project.**

At the outset, Defendants seek to immunize the Kennedy Center from federal review requirements altogether, contending that 20 U.S.C. § 76k(e) grants the Center "unique and expansive independence." Opp. 19; *see id.* at 22. But that misconstrues § 76k(e)'s text and context. Section 76k(e) governs only "trust funds"—money "given, bequeathed, or devised," *id.* § 76k(a)—not a $256,657,000 congressional *appropriation*. And even if appropriated funds were somehow covered by § 76k(e), the statute's scope is limited to actions "relat[ing]" "to performing arts ***and*** to payments . . . from any trust funds." *Id.* § 76k(e) (emphasis added). Congress, in other words, afforded the Board *artistic* independence for trust fund expenditures—not a blanket exemption from federal historic preservation and design reviews.

Statutory context confirms as much: Congress has expressly subjected the Kennedy Center to non-judicial federal reviews, including CFA approval. *See* 20 U.S.C. § 76j(a)(2)(F) (requiring "the express approval of Congress and of the Secretary of the Interior" to change the manner of operation of the Center's grounds); *id.* § 76i(a) (requiring the Kennedy Center to "be in accordance with plans and specifications approved by [CFA]"). Interpreting § 76k(e) as Defendants propose would impermissibly nullify these provisions. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (citations omitted) (statutes must be construed to give effect to all provisions).

### 2. Defendants Have Failed To Comply With The NHPA.

Defendants' NHPA arguments fail on all fronts. Section 106 applies to the Kennedy Center through its statutory designation as a bureau of the Smithsonian. Yet Defendants have not initiated the required review process, and have compounded that failure by intentionally evading Section 106's requirements and unilaterally altering the Center's exterior, in violation of Section 110(k).

#### a. Section 106 Applies To The Kennedy Center.

As Plaintiffs have explained, the Center is designated by statute as a "bureau" of the Smithsonian, 20 U.S.C. §§ 76h(a)(1), 76k(a), and the Smithsonian, in turn, is designated by statute as an "agency" for Section 106 purposes—bringing the Center within Section 106's scope. Mem. 15-16 n.8; Pub. L. 108-72, § 3, 117 Stat. 888, 889 (2003). And, because Section 106 incorporates the APA's definition of "agency," *see* 54 U.S.C. § 300301, the Smithsonian's status as an "agency" for Section 106 purposes subjects it (and its bureaus) to APA review for violations of Section 106, notwithstanding the Smithsonian's exemption from APA review in other contexts.[3]

The fact that the Board enjoys some degree of operational independence does not (as Defendants suggest, Opp. 22) override that explicit statutory classification.[4] *See* 20 U.S.C.

---

[3] Defendants claim that Plaintiffs "recognize [that] they cannot sue the Center under the APA." Opp. 11. That is wrong; Plaintiffs' complaint and preliminary-injunction motion make clear that the Center is subject to suit under the APA for violations of Section 106. *See* ECF 1, Counts I-II; Mem. 15-16 n.8.

[4] The government's comparison to the National Gallery of Art is misplaced. *See* Opp. 11 (citing *Groce v. Rodriguez*, 743 F. Supp. 3d 244 (D.D.C. 2024)). *Groce* addressed whether the Gallery is an "agency" under the APA for purposes of sovereign immunity—a question governed by *Dong*'s functional analysis of whether an entity "exercis[es] governmental authority." *Groce*, 743 F. Supp. 3d at 251 & n.6 (citing *Dong v. Smithsonian Institution*, 125 F.3d 877, 880-82 (D.C. Cir. 1997)). But the Smithsonian Facilities Authorization Act expressly overrides *Dong* for Section 106 purposes, designating the Smithsonian an "agency" for NHPA compliance regardless of whether it otherwise exercises governmental authority. *See* Pub. L. 108-72, § 3, 117 Stat. at 889. For Section 106, then, the operative legal classification is the Kennedy Center's statutory designation as a Smithsonian "bureau," 20 U.S.C. §§ 76h(a)(1), 76k(a)—not the *Dong*/*Groce* line of cases addressing APA "agency" status, generally.

§§ 76h(a)(1), 76k(a). Nor does § 76k(e). *See supra* at 9. Defendants' contention that the Center's Section 106 obligations are not triggered because it is "far from clear" that the Project is "subject to the review and approval of the [NCPC]" likewise fails to move the needle. Opp. 22 (quoting Pub. L. No. 108-72, 117 Stat. 888, 889). Any lack of clarity is, of course, Defendants' own fault—as they have chosen to divulge hardly any details about the Project—and they cannot take refuge behind their competing and contradictory plans to completely evade NCPC review. In any event, the limited plans that Defendants *have* produced make clear that the Project, even as described by Mr. Floca, is subject to NCPC—and therefore Section 106—review.[5] *See infra* at 15-17.

**b. Defendants Have Failed To Comply With Section 106 (Counts I & VIII).**

The Project—whether in its publicly announced "Complete Rebuilding" form or the version now proffered to the Court—implicates multiple federal "undertakings" that each independently trigger Section 106 review. As described by the Center's Chair, the Project threatens adverse effects to two historic properties: the Kennedy Center and Rock Creek and Potomac Parkway, both determined eligible for or listed in the National Register. Mem. 24-25. And it requires multiple federal permits. Section 106 review is therefore required. *See* Mem. 23-26; 54 U.S.C. § 306108; 36 C.F.R. § 800.16(y) ("undertaking" under the NHPA includes "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval").

Even taking Defendants' Capital Improvement Plan on its own terms, the Project triggers

---

[5] Further, and as previously explained, even if the Kennedy Center Defendants were not subject to APA review with respect to the NHPA, their failure to carry out their obligations under the statute would be subject to *ultra vires* review. Mem. 15-16 n.8.

Section 106 review several times over. Mem. 15, 25. Defendants intend to undertake extensive work to the "Shell & Site Infrastructure" of the Kennedy Center, whose historic building and grounds falls within the ambit of the statute. Ex. E at 3.

Defendants also plan to undertake work implicating NPS and USACE permitting authority. The Capital Improvement Plan reflects the Project's reach into NPS-jurisdictional areas: It includes a line item for "Rock Creek Parkway Stabilization"—a project that, by its name alone, implicates access to the Parkway. Ex. E at 3. And it contemplates $3,500,000 in site landscaping, including on steep embankments along the Potomac River. *Id.* at 3, 5. Thus, at minimum, the fact that the Project extends onto the Rock Creek and Potomac Parkway—an NPS unit listed on the National Register—belies Defendants' claim that NPS "is not involved," Opp. 7.[6] The bank stabilization and landscaping work on Rock Creek Parkway will not be feasible absent NPS construction and right-of-way permits. *See* Stidham Decl., ECF 27-3, ¶ 12 (acknowledging that use of NPS-jurisdictional lands requires a permit); Mem. 25-26. That work also very likely requires USACE to issue a permit for (at minimum) discharges of sediment or other fill material to navigable waters. *See* 33 U.S.C. §§ 403, 1344.

---

[6] Far from "remov[ing] any doubt" that NPS is uninvolved (Opp. 8), the Stidham Declaration confirms that NPS permits are required. Ms. Stidham asserts that "NPS does not have administrative jurisdiction over the interior or the exterior of the [] Kennedy Center" and that the Center "does not need a permit from NPS to carry out construction, rehabilitation, maintenance, or other activities on its own land." Opp. 8; Stidham Decl., ECF 27-3, ¶¶ 10, 12. But Ms. Stidham's declaration acknowledges that "[i]f the [] Kennedy Center proposed to use lands under NPS jurisdiction for construction staging, excavation, access, or other activities then a permit or other written authorization would be required." Stidham Decl. ¶ 12. That is precisely what the Board minutes and Exhibit E describe. Defendants cannot simultaneously admit (in Board proceedings and budget documents) that the Project encompasses work requiring access to Rock Creek Parkway while claiming (in litigation) that NPS has no role. Ms. Stidham further states that "NPS has not received an application from the [] Kennedy Center for a permit." *Id.* ¶ 13. But the absence of an application is evidence only that Defendants have failed to apply for permits they need—not that none are required.

Further, the Project contemplates work on the HVAC systems "***under*** Rock Creek Parkway," which systems Mr. Floca noted draw "water from [the] Potomac," further implicating NPS jurisdiction and USACE permitting authority. Mar. 16 Minutes at 7-8 (emphasis added).[7] Any alteration to those cooling systems may require USACE to revise or reissue the Center's water use permit. *See* 33 U.S.C. §§ 403, 1344. The Chandler Declaration does not undermine this conclusion: Mr. Chandler reviewed just a "summary" of the Board's plans and stated only that he is "not aware" of any proposed activities regulated by USACE, Chandler Decl. ¶¶ 8-9—a far cry from an affirmative determination that no USACE permit is required, *see* Opp. 9.

Section 106's applicability should come as no surprise to Defendants. The Kennedy Center has complied with Section 106 for past undertakings, submitting at least three projects in the last decade alone.[8] Yet now, Defendants claim that Section 106 has no applicability to their proposed activities and they have not meaningfully commenced the Section 106 process. (They held an informal meeting with NCPC staff months after they began altering the Center's exterior and one week after Plaintiffs filed suit. *See* Sullivan Decl., ECF 27-5, ¶ 3.) The Center has submitted no Project plans to NCPC and has not committed to submitting any. *Id.* ¶ 5 (NCPC will "conduct[] all required reviews," including under Section 106, "***[i]f*** the Center submits the [Project] to NCPC for review and approval" (emphasis added)). And Defendants' announced timeline makes compliance

---

[7] *See* Sunlen Serfaty, *Two year closure was his idea, says Trump's new Kennedy Center leader, defending dramatic move*, CNN (Apr. 22, 2026), https://www.cnn.com/2026/04/22/politics/kennedy-center-renovations-tour-closure-matt-floca (discussing Center's "us[e] [of] the Potomac River as a cooling source").

[8] In accordance with the 2018 Memorandum of Agreement between the NCPC and the Smithsonian, *see* Ex. 35, ECF 24-38, NCPC would serve as the lead agency for Section 106 purposes for the Project. Prior project files are available at https://www.ncpc.gov/review/search/ and include the REACH Expansion (NCPC File No. 7523), its Expansion Lightning Protection System (NCPC File No. 7523, completed three years after the original REACH approval), and its Expansion Connection Project (NCPC File No. 7763).

impossible. Even starting today, there is no realistic possibility they could complete the mandatory review process before the Center's closure in less than three months.

Finally, Defendants' contention that the Project does not require NHPA review "at this stage" is untenable. Opp. 19; *see also id.* at 22. Defendants cannot begin the Project and then conduct Section 106 review later. Review must occur "*prior* to the approval of the expenditure of any Federal funds on the undertaking or *prior* to the issuance of any license." 54 U.S.C. § 306108 (emphasis added); 36 C.F.R. § 800.1(c); *see Tohono O'Odham Nation v. U.S. Dep't of Interior*, 138 F.4th 1189, 1194 (9th Cir. 2025). And for good reason: the Section 106 process is designed to *improve* project design and reduce adverse effects to historic properties while meaningful changes can still be made. Mem. 24, 39-40; *Ill. Com. Comm'n v. Interstate Com. Comm'n*, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988) (Section 106 "is a 'stop, look, and listen' provision."). Section 106 is not just a box to be checked; it requires meaningful review and an opportunity for the public to be heard.

**c. Defendants Have Violated Section 110(k) (Count II).**

Adding to the necessity for injunctive relief, the Kennedy Center Defendants have *already* "intentionally significantly adversely affected" the exterior of the building—by painting its historic columns and altering its façade—without any prior review. This work violates Section 110(k) of the NHPA, 54 U.S.C. § 306113. *See* Mem. 26-28. Defendants' only response is to contend that they did not "intentionally" avoid Section 106's requirements because the Kennedy Center is not subject to Section 106. *See* Opp. 23-24. But this stretches belief well beyond breaking. Defendants cannot credibly contend that Section 106 does not apply to the Kennedy Center, as the Center has submitted prior projects for Section 106 review. *See supra* at 13.[9]

[9] *Protect Our Parks*, relied upon by Defendants (at Opp. 23), is inapposite. There, the City of Chicago consulted with NPS *before* beginning work, and NPS advised that the proposed work did

Because Kennedy Center Defendants have already "intentionally significantly adversely affected" the exterior of the building, Agency Defendants have a non-discretionary duty to consult the ACHP before deciding whether to permit the Project *notwithstanding* the damage already caused. Mem. 26-28. Yet none of the Agency Defendants has initiated this consultation as required by 54 U.S.C. § 306113 and 36 C.F.R. § 800.9(c)(2). And Defendants' attempt to evade the required ACHP review by claiming that no permits or assistance are required from Agency Defendants misses the mark. Opp. 24 (citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 24-2905, 2025 WL 947469, at *4 (D.D.C. Mar. 28, 2025)). As Plaintiffs have already explained, the Project requires numerous permits and other assistance from Agency Defendants. *See supra* at 12-13; Mem. 27.

**3. NCPC Review And Approval Is Required (Counts IV & XII).**

Defendants have yet to submit any plans for the Project to NCPC, even as "preliminary work" proceeds and "significant construction" looms in early July. *See* Mem. 13. Yet the National Capital Planning Act leaves no room for delay: federal agencies must "advise and consult" with NCPC on "proposed developments and projects" that "affect the plan and development of the National Capital" "*before* preparing construction plans" and "as the agency prepares plans and programs in preliminary and successive stages." 40 U.S.C. § 8722(b)(1) (emphasis added). NCPC's approval is likewise required before any project affecting "location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia" or implicating "the provision for open space in and around federal public buildings in the District" may proceed. *Id.*

---

not require federal review. *Protect Our Parks, Inc. v. Buttigieg*, 2021 U.S. Dist. LEXIS 151806, *26-27 (N.D. Ill. Aug. 12, 2021), *aff'd*, 39 F.4th 389 (7th Cir. 2022). When the ACHP and other federal agencies determined that the work did require Section 106 review, the City agreed to cease all construction until that process was complete. *Id.* No such advance cooperation or communication occurred here.

§ 8722(d) (emphasis added); *see* NCPC, Submission Guidelines (Jan. 2026) ("NCPC Submission Guidelines"), at 2, 5, https://www.ncpc.gov/docs/Submission_Guidelines_Jan2026.pdf (listing "renovation, with or without site improvements, . . . grading, landscaping and street and road construction or improvements," and changes to "perimeter security," as subject to NCPC review).

As described by both Mr. Trump and Mr. Floca, the Project plainly requires NCPC review—contrary to Defendants' assertions, *see* Opp. 17. The Project's "planned renovations will occur within the Center's site and grounds," which are "on federal land." Floca Decl. ¶¶ 6, 19. Mr. Trump asserts that the project will entail "Complete Rebuilding" of the Center. Ex. 1. And Defendants' Capital Improvement Plan budgets at least $3,500,000 for "Site & Landscaping Upgrades" and contemplates changes to "Perimeter & Physical Security" and "Building Envelope" (including "Plaza Level . . . Hardscapes" and "Terrace Level Overhang & Roof"). Ex. E at 3.[10] Whichever is true, both amount to "proposed developments and projects," and both implicate NCPC review of the Center's "open space," "bulk," and "size." *See* 40 U.S.C. § 8722(d); NCPC Submission Guidelines at 2. Yet Defendants have made no submission to the NCPC whatsoever. Sullivan Decl. ¶ 5. And their belated meeting with NCPC does not come close to satisfying their obligations under § 8722. *See supra* at 13-14.[11]

---

[10] According to the leak investigation report relied on by Mr. Floca, *see* Floca Decl. ¶ 9, the Project's contemplated waterproofing work will require over 130,000 cubic feet of excavation around the original building to expose and waterproof portions of the foundation and potentially up to 12,000 square feet of roadway demolition and reconstruction. *See Beatty v. Trump,* No. 1:25-cv-04480-CRC (D.D.C. Mar. 25, 2026), ECF 29-21 & ECF 29-20 at 2, 10, 15, 19–20, 24, 30, 34, 41, 45.

[11] Defendants do not—and cannot—dispute the NCPC's authority over the Kennedy Center. *See* NCPC, *Legislative Authorities: National Capital Planning Act*, https://www.ncpc.gov/about/authorities/ (last visited Apr. 21, 2026) (stating that NCPC's "approval authority . . . extends to projects undertaken by non-federal agency applicants on federal land within the District of Columbia," including "the Kennedy Center"). Their reference to § 8722(a), concerning federal agencies' use of NCPC as a "central planning agency," is a straw man. *See* Opp. 18. Plaintiffs never invoked that provision.

These failures constitute a "transparent violation[] of a clear duty to act" supporting both the APA claims against the Agency Defendants and the mandamus claims against the Kennedy Center Defendants. *See In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (citation omitted); Mem. 28-31.

**4. Defendants Must Seek CFA's Advice (Counts V & XIII).**

The Project also requires CFA review, which Defendants have failed to initiate. Mem. 31-33; 40 U.S.C. § 9102; *see* Floca Decl. ¶ 7 (stating that the Center had merely "begun to engage" CFA in "an initial, staff-level meeting"). Grasping for a way out, they claim that the Center is exempt from CFA review because it is not an "agency." *See* Opp. 18. But § 9102(b) does not limit its reach to agencies; it directs that "***officers*** . . . required to decide" questions relating to public buildings and art in the District "***shall*** request the Commission to provide the advice." *Id.* (emphasis added). The Board qualifies: it is the statutorily designated decision-maker over the Kennedy Center's physical building and grounds. *See* 20 U.S.C. § 76h(a)(1).[12]

CFA's regulations reinforce that advice must be obtained *before* plans receive "final approval" or "action" is taken on "public buildings to be erected in the District of Columbia by the federal government and for other structures to be so erected which affect the appearance of the city." 45 C.F.R. § 2101.1(a)(1). The Project meets this standard—which is not limited to statues, fountains, and monuments, as Defendants suggest, Opp. 18.[13] Defendants have announced plans

[12] Nor can Defendants claim any exemption. When Congress wants to exempt a building from CFA review, it says so—as it did for the Capitol Building and Library of Congress. *See* 40 U.S.C. § 9102(c); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[I]t is generally presumed that Congress acts intentionally and purposely" in its inclusions and exclusions within a statute. (citation omitted)). Yet, far from exempting the Kennedy Center, Congress did the opposite: it *affirmatively required* CFA approval in the Center's founding legislation. *See* 20 U.S.C. § 76i(a).

[13] Even if it were, Congress specifically designated the Kennedy Center a "living memorial" to President Kennedy. Pub. L. No. 88-260, 78 Stat. 4 (1964).

to close the Kennedy Center for two years for "Complete Rebuilding" of what Mr. Trump has described as a "brand new" complex. Ex. 1; Ex. 30. A building stripped to its structural steel and rebuilt as something new is a building being "erected," *see supra* at 4—triggering CFA review. And even the more modest alterations to the Center's grounds and façade claimed by Mr. Floca will affect the Center's visual character as a defining feature of the District's riverfront skyline, itself necessitating CFA review. *See* 45 C.F.R. § 2101.1(a)(1); Mem. 32. Thus, the Kennedy Center is required to seek CFA advice and obtain final approval before taking action on this Project. It has not, and that "transparent violation[] of a clear duty to act" can be remedied by a writ of mandamus, as Plaintiffs have explained, Mem. 33 (quoting *In re Aiken Cnty.*, 725 F.3d at 258).

**5. The Project Requires NEPA Review (Count III).**

Defendants have prepared no environmental assessment or impact statement for the Project—yet NEPA unambiguously requires one. NEPA mandates environmental review of "major Federal action[s]," defined as actions "subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A); *see Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015). The Project satisfies this standard. It is occurring on federal public grounds, over which the Board has management and operational authority. 20 U.S.C. § 76h(a)(1). And, contrary to Defendants' urging, Opp. 20-21, it requires multiple federal agency approvals, including NPS and USACE permits. *See supra* at 12-13. Thus, despite Defendants' efforts to minimize and distort the Project's scope, the Project is unavoidably a major federal action requiring—at minimum—an environmental assessment. Mem. 33-36.

The government's reliance on *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168 (2025), is misplaced. *See* Opp. 20. *Seven County* addressed whether an agency must analyze the environmental effects of *separate, future projects*—like oil drilling and refining—that fall outside the agency's regulatory authority. *Seven County*, 605 U.S. at 186-88. Here, by contrast,

the Project itself is the federal action at issue, and Agency Defendants possess direct regulatory authority over it through the permits they must issue. Such approvals demand NEPA review; Agency Defendants' failure to initiate, let alone conduct, such a review violates the APA. Mem. 36.

## II. Plaintiffs Face Severe Risk Of Irreparable Harm Absent A Preliminary Injunction.

Defendants insist that the Center will not be destroyed, that loss of use will be temporary, and that procedural harms are not irreparable. Opp. 25-26. Those contentions understate the impact of their conduct. Absent injunctive relief, Plaintiffs will suffer multiple types of harm that cannot be remediated after the fact and are of "such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (citations and quotations omitted). These harms, some of which have already occurred, will likely materialize "before a decision on the merits can be reached." *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 288-89 (D.D.C. 2017). Construction is set to begin in early July, and even construction projects in their "infancy" can outpace litigation, rendering a subsequent victory on the merits "too little, too late!" *Nat'l Tr. for Historic Pres.*, 2026 U.S. Dist. LEXIS 69920, at *36 n.19.

First, destruction, rebuilding, or major transformation of a historical landmark is the epitome of imminent, irreparable harm. Mem. 36-38. Defendants ask the Court to ignore the statements of Mr. Trump—the Chair of the Board—and instead credit the self-serving declaration of Mr. Floca. *See supra* at 1-2, 4-5. Yet, even standing alone, Mr. Floca's statements cannot withstand the barest scrutiny: Mr. Floca asserts that "[t]he exterior of the Center's main building will not be materially affected." Floca Decl. ¶ 6. But that assertion cannot be reconciled with the material changes *already* made to the Center's exterior at Mr. Trump's direction. *See supra* at 14-15. Mr. Floca's assertion about what construction is "planned," Floca Decl. ¶ 6, even if credited,

provides no guarantee against what the President may direct tomorrow.

The demolition of the East Wing vividly illustrates the harm threatened by Mr. Trump's vicissitudes. In July 2025, he offered reassurance that the proposed ballroom would not "interfere with the current building." Ex. 22 at 3. Three months later, the entire East Wing lay in ruins. Ex. 24, ECF 24-27. Here, in contrast, Mr. Trump has *stated* his intention to conduct "Complete Rebuilding." Ex. 1. The Court should not bet the Kennedy Center on Mr. Floca's ability to persuade Mr. Trump to adhere to Mr. Floca's untethered interpretation of a six-page list of projects with six pages of photographs, *see* Ex. E, especially when Mr. Trump expressed an entirely different plan for the Center.

Second, Plaintiffs' members will be irreparably harmed by the deprivation of the aesthetic, cultural, professional, and educational benefits the Kennedy Center. Mem. 40-41. Plaintiffs' declarations identify "specific ways in which, in the absence of the injunction," their "interests in . . . their aesthetic . . . use and enjoyment" of the Kennedy Center "will be irreparably injured." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 324 (D.C. Cir. 1987). Defendants' lone rebuttal is an out-of-circuit case finding that the temporary closure of some, but not all, lanes of a highway would not cause irreparable harm. *See* Opp. 25 (citing *W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*, 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004)). The "temporary effects of the construction project such as inconvenience [and] increased traffic" from the partial closure of a highway, *id.* at 684, cannot seriously be compared to the complete shuttering of the Kennedy Center to its two million annual visitors for two full years.

More fundamentally, Defendants conflate temporary with reparable. The proposed two-year complete closure would effectively erase July 2026 to July 2028 from the Kennedy Center's history: Two years of concerts, theater performances, educational programming, and cultural

enrichment—gone. Performances of *Back to the Future* (July 7-19, 2026), *Mrs. Doubtfire* (July 14-August 2, 2026), *The Outsiders* (July 28-August 16, 2026), all announced as part of the 2025-2026 Kennedy Center theater season,[14] have been wiped from the calendar. "Aesthetic and environmental injuries are typically 'irreparable' because they are 'seldom . . . adequately remedied by money damages' and are 'often permanent or at least of long duration.'" *Nat'l Tr. for Historic Pres.*, 2026 U.S. Dist. LEXIS 69920, at *34 (quoting *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). Nothing can replace these experiences, as Plaintiffs' members have attested. *See, e.g.*, Leone Decl., ECF 24-51, ¶ 19 ("There is no adequate substitute for the experience of visiting the Kennedy Center."). Two years of aesthetic, cultural, professional, recreational, and educational harms will not magically be undone upon the Kennedy Center's reopening and certainly cannot be remedied with money damages. *See, e.g.*, Santos Rivera Decl., ECF 24-55, ¶ 14.

Defendants also ignore the fact that, when the Kennedy Center would reopen in July 2028, it would be forever changed. The aesthetic value Plaintiffs' members derive from the Kennedy Center's unique and irreplaceable architectural legacy would be erased. *See, e.g.*, Burns Decl., ECF 24-45, ¶¶ 4, 8 (explaining, from his perspective as an architect, that the "proposed alterations would personally and concretely harm me because [they] would significantly compromise the historic character of the Kennedy Center in ways that will destroy its function as a national memorial to the deceased President" and that the Center "is not just a performance venue; it is a living memorial"). That effect is not "temporary." Opp. 25.

---

[14] *See* Kennedy Center, *Announcing The Kennedy Center's 2025-2026 Theater Season* (May 19, 2025), https://www.kennedy-center.org/news-room/press-release-landing-page/2025-2026-theater-season-announcement/.

Finally, Plaintiffs face irreparable harm from Defendants' failure to complete the required review processes. Mem. 38-40; *see supra* at 8-19. Defendants argue that "procedural harm standing alone is insufficient to constitute irreparable harm." Opp. 26 (quoting *Semonite*, 282 F. Supp. 3d at 290). But that is not what Plaintiffs alleged or argued. Instead, Plaintiffs have identified procedural violations "combined with a showing of environmental or aesthetic injury." Mem. 40 (quoting *Brady Campaign*, 612 F. Supp. 2d at 24). Defendants do not contest that such *is* irreparable harm. Accordingly, Plaintiffs have more than met their burden of establishing the risk of imminent, irreparable harm absent injunctive relief.

## III. The Balance Of Equities And Public Interest Favor An Injunction.

Defendants claim their position is in the public interest and any weighing of equities favors them. Not so. To begin, the balance of equities and the public interest weigh heavily in favor of an injunction because the Government has no legitimate interest in the "perpetuation of unlawful agency action," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required," *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation omitted). Rather than address this precedent, Defendants argue that complying with the law would leave the Center "hamstrung" and unduly cabin the Board's "discretion." Opp. 26-27. That is a non-starter.

Defendants ignore that the proposed injunction does not seek to bar all repairs (e.g., the kind Congress had in mind for the appropriations it approved), but instead only major renovations that have not met legal requirements. *See* Proposed Order, ECF 24-2. The requested injunction need not prevent any repairs, much less leave the Center "hamstrung," Opp. 26, because Defendants can simply comply with statutory requirements. Defendants' failure to obtain necessary approvals for what it claims are pressing repairs cannot justify forgoing those mandatory approvals. Otherwise, the NHPA and NEPA would be dead letters, as would countless other

statutory requirements. At most, Defendants' failure to meet requirements is the type of self-inflicted harm that courts have found not to be cognizable. *See, e.g., Padgett v. Vilsack*, No. 24-cv-02954, 2024 WL 5283897, at *4 (D.D.C. Nov. 8, 2024) (Cooper, J.) (harm attributable to failure to obtain permit "through ordinary processes" not cognizable); *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (similar). Defendants' desire for convenience and expedition do not grant any license to disregard statutory guardrails.

Nor can Defendants rely on "the Board's statutory and common-law discretion." Opp. 27. Such discretion exists *only* within the boundaries of the Board's mandatory legal obligations. The Board does not have the discretion to ignore federal environmental and preservation mandates any more than it has the discretion to ignore a criminal statute or a direct congressional spending limit. Compliance with the law is not "vexatious," *id.*; it is a prerequisite to any major renovation the Center undertakes. The Board's failure to adhere to these procedural mandates threatens far greater harm than any injunction, namely, exposing the Center's historic fabric to permanent, unauthorized alterations without the required public scrutiny. The "public interest is harmed when the government ham-handedly exercises its responsibilities." *Minney v. U.S. Off. of Pers. Mgmt.*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015).

The Court should also view Defendants' factual assertions with skepticism. Defendants' only support for their assertion that maintenance has been "deferred" for "decades" is their own press release issued last month. Opp. 26. And Defendants' vague invocation of unspecified "safety risks," *id.* at 27; Floca Decl. ¶ 15, cannot be credited given that the Center is currently open, had events planned through the year, and had not previously planned to close until a variety of decisions caused the abrupt announcement of the two-year hiatus. Such self-serving submissions cannot outweigh the irreparable harm to Plaintiffs.

## IV. The Court Should Not Stay Its Injunction Pending Appeal.

The Court should deny Defendants' premature request for a stay pending appeal. Opp. 28. Defendants' request presumes that Plaintiffs have prevailed on their motion for an injunction. In such a scenario, the burden shifts to Defendants to prove that factors that "largely overlap" with the test for a preliminary injunction, *id.*, favor a stay, i.e., that (1) Defendants have a "strong" likelihood of success on the merits; (2) they will be "irreparably injured absent a stay"; (3) a stay will not "substantially injure the other parties"; and (4) the "public interest" favors a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).

The Defendants have not met their burden to show that the Court should "exercise [its] discretion" to grant the "extraordinary remedy" of a stay pending appeal. *United States v. Abass*, 779 F. Supp. 3d 1, 4-5 (D.D.C. 2025) (quoting *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020)). For one thing, unless and until an actual injunction is issued, Defendants cannot know whether they will suffer irreparable harm (or any harm at all) without a stay of that injunction—which is a "necessary prerequisite" to obtaining relief. *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024) ("[A] showing of irreparable harm is a necessary prerequisite for a stay."). In any event, Defendants fail to meet their burden to show that they will be irreparably harmed without a stay. They assert that "exigencies involved in suspending a major construction project" support a stay, Opp. 28—yet they offer no explanation whatsoever for what "exigencies" supposedly preclude pausing a project that has not even begun.

Even if the Court could look past Defendants' failure to show irreparable harm—and it cannot, *see KalshiEX*, 119 F.4th at 64—the other factors also disfavor a stay. A finding that Plaintiffs will likely succeed on the merits precludes any argument that Defendants, on the same record, have a "strong" likelihood of obtaining the opposite result. And if the Court enjoins Defendants' ongoing violations of statutory requirements, then a stay would undo the very

protection obtained—authorizing continuing legal violations and permitting the very harm that the Court (in entering the injunction) would have found irreparable. And a finding that the balance of equities and public interest favor an injunction precludes any showing that Defendants or the public interest will be "irreparably injured" by that injunction.

The cases Defendants cite granted only a "fourteen-day administrative stay 'to allow for the Solicitor General to determine whether to appeal and seek a stay pending appeal.'" *Citizens for Resp. & Ethics in Wash. v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 60 (D.D.C. 2025). Even that limited stay is unwarranted here. Because Defendants do not plan to close the Kennedy Center until July 2026—over two months away—they will have ample time to determine whether to appeal and seek a broader stay without the need for an administrative stay. Moreover, the requested injunction bars only major renovations undertaken *without required approvals*. Defendants should not need a stay unless they intend to proceed without such approvals, and the Court should not afford them any opportunity to do so.

## CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' opening memorandum, the Court should grant Plaintiffs' motion and preliminarily enjoin work on the Project until the Defendants obtain congressional authorization, complete all required reviews, and secure all necessary permits and approvals. Further, the Court should waive Rule 65's security bond requirement.[15]

---

[15] Defendants' Opposition fails to address Plaintiffs' argument that the Court should not require a bond under Rule 65(c), Mem. 42-44, thereby conceding that issue, Local Civil Rule 7(b).

Respectfully submitted,

DC PRESERVATION LEAGUE,
NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,
THE AMERICAN INSTITUTE OF ARCHITECTS,
AMERICAN SOCIETY OF LANDSCAPE ARCHITECTS,
DOCOMOMO US,
SOCIETY OF ARCHITECTURAL HISTORIANS,
THE COMMITTEE OF 100 ON THE FEDERAL CITY, and
THE CULTURAL LANDSCAPE FOUNDATION

By their attorneys,

*<u>/s/ Gregory B. Craig</u>*
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer (*pro hac vice*)
Kevin Y. Chen (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Marilyn Icsman (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel: (617) 832-1000
theuer@foleyhoag.com
kchen@foleyhoag.com
mcasassa@foleyhoag.com
micsman@foleyhoag.com

*<u>/s/ Gregory Alan Werkheiser</u>*
Gregory Alan Werkheiser (VA210)
Marion Forsyth Werkheiser (486465)
Lydia Dexter (OR0032)
Jessie Barrington (VA224)
Caitlin McCurdy (NH0004)
Katherine Lee Sorrell (TX0109)
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
lydia@culturalheritagepartners.com
jessie@culturalheritagepartners.com
caitlin@culturalheritagepartners.com
katherine@culturalheritagepartners.com

*<u>/s/ Abbe David Lowell</u>*
Abbe David Lowell (358651)
Caleb Hayes-Deats (1643213)
Isabella M. Oishi (90018056)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
chayes-deats@lowellandassociates.com
ioishi@lowellandassociates.com
areilly@lowellandassociates.com

Dated: April 24, 2026

**CERTIFICATE OF SERVICE**

I certify that on April 24, 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as nonregistered participants.

*/s/ Gregory B. Craig*