**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**DC PRESERVATION LEAGUE**, *et al.*,

     *Plaintiffs*,

v.

**BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS**, *et al.*,

     *Defendants*.

</td><td>

Civil Action No. 1:26-cv-00981

</td></tr>
</table>

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

No one disputes the Kennedy Center needs repairs, or that "significant construction work" is imminent, Decl. of Joseph LaFauci, *Beatty v. Trump,* 25-cv-04480 (D.D.C. Mar. 10, 2026), ECF 19-1 ¶ 5. But before such work begins—and regardless of whether funded through special appropriations or routine ones—the law requires compliance with numerous statutory obligations. Defendants seek to comply with none of them. Instead, they are barreling toward construction in early July, on a quarter-billion-dollar project involving a major federal memorial, *without any actual plan*.

On the stand, Mr. Floca admitted he speaks only for himself, cannot predict or control the Chair's intentions, and can be fired at any time—by the same person who promised the East Wing of the White House would not be touched, then leveled it without warning. And Mr. Floca's testimony confirmed that even the more limited project that he intends to carry out requires congressional authorization and compliance with statutory review processes. His personal desire to maintain Project "momentum" cannot override Congress's statutory prerogatives.

The Court should grant Plaintiffs' requested injunction. Plan or no plan, Defendants intend to engage in construction of a type and magnitude implicating Section 106 of the NHPA, NEPA, and other statutes requiring process *before* action.[1] Any order meaningful enough to protect Plaintiffs' rights must restrain Defendants from proceeding without that process, and *at minimum* prevent demolition. And the Court certainly should not deny the motion before reviewing the plans Defendants insist support their claims of limited scope, but refuse to disclose.

## I.    Mr. Floca Cannot Be Relied Upon To Define Or Limit The Project's Scope.

Mr. Floca testified unequivocally that, when he speaks, he is "speaking for [him]self"— not for the Board or its Chair. Apr. 29, 2026 Prelim. Inj. Hr'g Tr. ("Tr."), 8:14. Thus, he cannot

---

[1] This brief uses the same abbreviations defined in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF 24-1 ("Mem.").

bind the Kennedy Center's ultimate decision-maker and does not purport to.[2] This admission is dispositive of the minimal weight the Court should afford his testimony about the Project's scope.

Mr. Floca made abundantly clear that he can neither predict nor control the Chair's intentions. When confronted with the Chair's public statements describing the "Complete Rebuilding" of a "new and spectacular Entertainment Complex" and a "brand new and really beautiful" building, Ex. 1, ECF 24-4; Ex. 30, ECF 24-33, he conceded, again and again: "*I have no idea what [Mr. Trump's] intentions are*" for the Project. Tr. 51:20 (emphasis added); *see id.* at 37:12-13, 32:18-24, 90:21. And he emphasized that he is "not in control of [Mr. Trump's] personal decision-making." *Id.* at 47:11-12. Far from reconciling Mr. Trump's vision with his own, Mr. Floca's testimony made clear that *Mr. Trump*—with whom Mr. Floca sometimes talks "multiple times a day," *id.* at 11:21-23—is in charge.

Even Mr. Floca's plans remain unclear. Mr. Floca confirmed that no defined Project plan exists despite substantial imminent work. *Id.* at 83:18-19. He claimed the comprehensive plan for a project *set to begin in only two months* is still being "updat[ed]" and developed into a construction "master schedule," a draft of which he represented would be ready by "the end of April." *Id.* at 36:8-21, 67:23-68:13. Yet, despite Plaintiffs requesting both, Defendants have provided neither and all but admitted that as of last Friday *no Project-specific plans yet exist*.[3] All the Court has is a high-level budget document that the Court itself described as "light on detail." *See* Tr. 35:11-14,

---

[2] Defendants argued that "it's not like the [C]hair can order something without any process" by the Board. Tr. at 155:21-25. Yet given the President's appointment authority over the vast majority of Board seats, *see* 20 U.S.C. § 76h, Mr. Trump's dual role as President and Chair ensures the Board answers to him alone. *See* Mem. at 1-2, 7-8; Ex. 12, ECF 24-15. And his comment at the March 16 meeting that it's "a little late" for the Board to act on the Project—because he had already announced it—shows his clear disregard for the Board's authority. *See* Tr. 81:5-20.

[3] After Plaintiffs requested these materials, Defendants' counsel responded on May 8, 2026, over a week after the end of April: "The Center continues to finalize the referenced building plan and master schedule; we will respond to your request in the normal course of this litigation."

106:18-24 (referencing remarks from prior day's hearing); Ex. E, ECF 27-6; Reply, ECF 30, 2, 5.

The testimony confirmed precisely what Plaintiffs feared: without insight into the Chair's intentions and without any plan, Mr. Floca could not assure the Court that the Kennedy Center would not meet the same fate as the East Wing—demolished without warning despite representations that proposed changes "[wouldn't] interfere with the current building." Ex. 22, ECF 24-25, at 3; Tr. 46:4-47:12. Mr. Floca stated: "we have no plans to demolish the [C]enter." Tr. 46:8. But when pressed, he clarified: "*I* have no plans to demolish" it, *id.* at 46:11 (emphasis added)—underscoring that his assurance that the building would not be demolished without warning extends only to himself. Such personal assurance provides no comfort, given his at-will employment status. After watching Mr. Trump's statement threatening to fire him if he fails to perform, Mr. Floca acknowledged Mr. Trump can summarily remove him. *Id.* at 8:15-19, 9:2-25. Mr. Floca's assurances, in short, last only as long as he does.

Mr. Floca also repeatedly dismissed the need for statutory reviews based on his own subjective assessment of whether proposed changes were "material." *See id.* at 20:18-20, 29:2-3, 42:21-43:5, 78:6-8. But his personal materiality standard has no legal relevance. Indeed, Mr. Floca described prior substantial exterior changes to the Center (including its weeping willow trees and columns) as immaterial even though those same features are listed as contributing to the Center's eligibility for the National Register of Historic Places.[4] Section 106 asks not whether *Mr. Floca* personally considers a change to be significant, but whether an undertaking may adversely affect

---

[4] Among other features, the Center's National Register eligibility determination lists the weeping willow trees as "contributing features" to the West Terrace, the columns as contributing features to all four façades, "[b]ronze wall signage" as contributing features to the East Façade, and "water features" as contributing features to the Entrance Plaza. *See* D.C. State Historic Preservation Office, Determination of Eligibility, The John F. Kennedy Center for the Performing Arts (Feb. 13, 2012), *available at* https://parkplanning.nps.gov/document.cfm?documentID=45798.

the characteristics that qualify a property for National Register status. *See* 36 C.F.R. § 800.5(a)(1). The same is true of the other statutes at issue—none of which delegate to Mr. Floca's personal whim the authority to determine what is "material" under the law. His willingness to substitute his own subjective judgment for congressional standards underscores why his assurances ring hollow.

## II.    Even Under Mr. Floca's Account, The Proposed Work Triggers Mandatory Reviews.

Even if the Project work consists of Mr. Floca's narrower description, it still must complete mandatory design, historic preservation, and environmental reviews. Reply 2-3, 10-19.

*NCPC/CFA.* At minimum, the work described by Mr. Floca will alter the Center's "open space," triggering the requirements for NCPC approval under 40 U.S.C. § 8722(d). Mr. Floca conceded the Project would involve installation of "hardened security perimeters" around the Center's exterior, including new bollards and locked security doors. Tr. 42:6-20; *see* Ex. E at 3. He acknowledged that "[t]he majority of the grounds directly around the building will be behind a construction fence" for the two-year-long duration of the project. Tr. 69:10-12. He admitted that the historic weeping willow trees on the River Plaza—part of the original design representing "the grief of the nation for a fallen president," *id.* at 26:25-27:5—had been themselves felled and would be replaced with an entirely different species, and that other alterations to the grounds would follow as part of a new "comprehensive landscape plan," *id.* at 28:11-22; *see* Ex. E at 3. Regardless of Mr. Floca's subjective beliefs about the materiality of these changes, *see* Tr. 43:7-8, the Project— even as he describes it—would alter the Center's "open space."

The Project may also affect the Center's "bulk," as the Court recognized. *See id.* at 129:11-14; 40 U.S.C. § 8722(d). Mr. Floca testified that exterior cladding work will expose structural steel, Tr. 44:14-15; that 2,200-pound concrete soffit panels will be replaced, *id.* at 56:15-57:14; and that new security doors will be installed, *id.* at 42:17-18. Indeed, tens of millions of dollars are budgeted for "Building Envelope & Structural" work likely to affect bulk, Ex. E at 3, yet Defendants *still*

4

have not finalized the plans they claim govern how those funds will be used. *Supra* at 2 & n.2; Tr. 44:22-25 ("The comprehensive building plan tells us what steel we need to expose."). And no plans have been formally submitted to NCPC for review, Tr. 102:13-14—notwithstanding that § 8722(b)(1) requires NCPC consultation "*before* preparing construction plans" (emphasis added). Similarly, Mr. Floca described work that requires CFA advice, including work on exterior fountains. Tr. 85:5-14; 40 U.S.C. § 9102. The requirements of NCPC and CFA review cannot be met by the informal staff-level meetings Mr. Floca described. Tr. 101:20-21.

*NHPA*. Mr. Floca's testimony also confirmed the necessity of Section 106 review. To start, because the Project affects (at minimum) the Center's "open space," the Center's Section 106 obligations are triggered under the Smithsonian Facilities Authorization Act ("SFAA"), Pub. L. 108-72, § 3, 117 Stat. 888, 889 (2003).[5] Mr. Floca also admitted that essential Project work on the West Terrace "will need to coordinate with NPS on traffic control of Rock Creek Parkway," itself an NPS unit listed on the National Register. Tr. 82:21-25, 85:21-86:5. Such access requires an NPS permit—regardless of whether the Project will effect "any changes to the parkway" itself. *See id.* The need for such a permit triggers review requirements under Section 106 (as well as NEPA).[6]

---

[5] Contrary to Defendants' argument, Tr. 166:19-24, Plaintiffs are not limited to an *ultra vires* claim to enforce Defendants' Section 106 obligations. Rather, because the SFAA makes the Smithsonian (and the Kennedy Center) an agency for purposes of Section 106, and Section 106 agencies are subject to the APA, Plaintiffs may assert violations of the NHPA through the APA's framework. Mem. 15-16 n.8; Reply 10. Similarly, alteration to open space at the Center or alteration to the building's bulk need not rise to the level of *ultra vires* conduct, since for the purposes of Plaintiffs' NHPA claim, those alterations merely serve as triggers for the Center's agency status.

[6] The permitting requirement independently triggers Section 106—regardless of the scope of the SFAA. Even if the SFAA exempted the Center from undertaking Section 106 review in its own right (and it does not), nothing in that statute exempts the Center's *building* from Section 106 review wholesale when another agency is obligated to perform Section 106 review for permitting or other reasons. Tr. at 168:19-169:1; *see* 54 U.S.C. § 307104 (exempting only "the White House and its grounds, the Supreme Court building and its grounds, or the United States Capitol and its related buildings and grounds" from Section 106 review).

Reply 12, 18. And such reviews must consider the entire project, not just a discrete segment. *See* 36 CFR 800.16(y) (defining "undertaking" as entire "project," not just the portion requiring federal license or approval); *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001) ("caution[ing]" against "equating the size of the government's action with its potential for injury" under NHPA); *see also Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (agencies may not "segment[]" NEPA review); Mem. 35-36.

Beyond planning future work triggering these requirements, Defendants have *already* undertaken significant alterations without Section 106 approval, violating Section 110(k). Notably, the Center's historic gold columns have been repainted—work begun without Board approval or even a contract. Tr. 18:14-18, 23:7-25:15. Mr. Floca's explanation? He did not view the columns' color as contributing to their historic significance and thus considered changing their color "[im]material." *Id.* at 33:13-17. But again, his personal view of materiality is legally irrelevant.

Indeed, Mr. Floca appears to be under the broader misapprehension that a nominal like-for-like exchange of building features and materials requires no Section 106 review at all. *See, e.g.*, *id.* at 57:10-14 (stating that the Center is "rebuilding [the soffits] the way they look now"). Yet, as Plaintiffs explained, *id.* at 133:5-134:23, Section 106 review evaluates not just whether the resulting modification to a historic property looks the same from a distance but, instead, whether the "integrity of the property's location, design, setting, materials, workmanship, feeling, or association" are adequately preserved. *See* 36 C.F.R. § 800.5(a)(1); *supra* at 3 n.3. Consider, for example, the 3,700 tons of Carrara marble used for both the Center's exterior and its interior gifted by the Italian government. Ex. 4, ECF 24-7, at 16. In a letter thanking the Italian Ambassador for the nation's "magnificent gift," then-Chair Roger L. Stevens stated that he could "think of no greater contribution" than that the marble "should ***bear permanent testimony***" to Italy's generosity

6

and would "constitute a vital part of [the] Center *for all time to come*." *Id.* at 17 (emphasis added). Defendants cannot circumvent Section 106 simply by swapping this historically significant material for inferior substitutes that Mr. Floca personally deems indistinguishable.

At bottom, Mr. Floca justifies bypassing these mandatory reviews in the interests of "efficien[cy]" and "maintain[ing] this momentum." *See, e.g.*, Tr. 72:14-16, 73:3-6, 74:4-10, 101:24-102:2. No doubt, the Project *could* be completed more "efficiently" if there were no need to comply with the law. Yet Congress has repeatedly made the policy choice to require projects involving federal funds or federal buildings to "stop, look, and listen" where historic preservation, design, and environmental interests are at stake. *See, e.g.*, *Ill. Com. Comm'n v. Interstate Com. Comm'n*, 848 F.2d 1246, 1260-61 (D.C. Cir. 1988). That choice must be respected.

### III. Under Either Account, The Board Lacks Statutory Authority For The Project.

Mr. Floca's testimony confirmed that the Project—even by his own account—exceeds the Board's statutory authority. To start, he described many planned aesthetic changes that exceed the Board's statutory authority, because they are not "necessary to maintain [] functionality," 20 U.S.C. § 76j(a)(1)(G): replacing the weeping willows with another species (Tr. 28:11-22), painting the gold columns white (*id.* at 18:15-18), adding Mr. Trump's name to the façade (*id.* at 17:2-6), and replacing seats with different designs and "color schemes" (*id.* at 14:3-7).

Mr. Floca further described a Project that would impermissibly "change . . . the management and operation of the [Kennedy Center] grounds . . . without the express approval of Congress[.]" *See* 20 U.S.C. § 76j(a)(2)(F). He confirmed: "The majority of the grounds directly around the building will be behind a construction fence." Tr. 69:10-11. Based on Mr. Floca's testimony, the basis for not phasing the work (and thereby keeping the Center open) hinges on his personal view that doing so would be "irresponsible." *Id.* at 98:25-99:7. Yet § 76j(a)(2)(F) makes clear that *Congress* gets to decide when and how the Center's grounds may be closed, balancing

7

any interests in closure against its performing arts and educational mandate, *id.* § 76j(a)(1).[7]

The limits imposed by § 76j(a)(2)(F) are reinforced by the statute's incorporation of "[NPS] regulations and agreements in effect on July 21, 1994."[8] This includes 36 C.F.R. § 1.5(b) (1983), which provides that "a closure . . . that will result in a significant alteration in the public use pattern of the park area" or "adversely affect the park's natural, aesthetic, scenic or cultural values . . . shall be published as rulemaking in the Federal Register."[9] Notwithstanding Mr. Floca's troubling unawareness of the Center's own statutory obligations, *see* Tr. 81:24-82:11, Congress expressly reserved for itself decisions resulting in any change to the management and operation of the Center's grounds, even imposing *additional* approval requirements beyond § 1.5(b).

As Mr. Floca recognized, Defendants have obtained no congressional approval here, nor have they attempted to do so. *See* Tr. 50:16-23 (conceding that walking tours for members of Congress and formal plan submission are "two different things"). This failure is especially egregious given that the Center has previously submitted capital projects of comparable or lesser scope to Congress for approval. Mem. 5. Nor did Defendants' most recent congressional budget justification even mention closing the Center during renovations—to the contrary, Mr. Floca admitted that it "contemplated that the [C]enter would remain open." Tr. 97:8-14. His explanation for not informing Congress of this about-face? A "clerical error." *Id.* at 97:15-18. This explanation

---

[7] Mr. Floca's vague reference to the potential continued use of the REACH, *see* Tr. 71:7-25, is no consolation—the requirements of § 76j(a)(2)(F) still apply to the rest of the site and grounds.

[8] Plaintiffs have not "forfeited" argument regarding the regulations' applicability, Tr. at 160:20-23, having relied on § 76j(a)(2)(F) from the outset, *see* Compl., ECF 1, ¶¶ 223-230, 273-282. Indeed, Plaintiffs provided the regulations in response to the Court's inquiry, Tr. at 118:17-25, and not only do Defendants have a full opportunity to be heard, but its interpretation is a pure question of law. Defendants cannot claim ignorance of the regulations; NPS promulgated them.

[9] The Kennedy Center's grounds fall within the broad regulatory definition of "park area." *See* 36 C.F.R. § 1.4(a). But even if not, § 76j(a)(2)(F) *statutorily* imposes 36 C.F.R. § 1.5(b)'s requirements on the Center, overriding any regulatory ambiguity.

strains belief. Having submitted (and obtained) a budget based on the premise that the Center would remain *open*, Defendants cannot now claim a two-year *closure* is an operational necessity.

## IV.     The Equities Decidedly Favor An Injunction.

Mr. Floca's testimony did nothing to disturb that the equities heavily weigh in Plaintiffs' favor. Plaintiffs face irreparable harm absent an injunction. The destruction or major transformation of a historical landmark is irreversible, Mem. 36-38; Reply 19-20, and Mr. Floca's personal view of what changes are "material" is not the standard. *Supra* at 3-4. The closure will also irreparably deprive Plaintiffs' members of their use and enjoyment of the Center and its grounds. Mem. 40-41; Reply 20-21.[10] And Plaintiffs have been denied their procedural rights to participate in Section 106 and NEPA processes, to which they are entitled. Every day of continued construction without the required processes compounds the resulting harm. Mem. 38-40.

The balance of equities and public interest also favor an injunction. Mem. 41-42; Reply 22-23. Defendants have no legitimate interest in the "perpetuation of unlawful [] action," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and Mr. Floca's testimony makes plain that in whatever form it takes, the Project requires multiple review processes and approvals that Defendants simply have no intention of obtaining absent judicial intervention.

Nor can they rely on "self-inflicted" harm to avoid equitable relief. *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012). Defendants prematurely announced the closure without engaging in required legal processes. *See* Tr. 80:20-81:1-20. They did so without any cost-benefit analysis: Mr. Floca testified there was "no need" and that he focused on the "needs of the building" alone. *Id.* at 90:1-5, 93:6-24, 94:3-24. Moreover, he admitted the Center "***could***" complete the proposed work in phases, as prior comprehensive plans have "***always*** been phased."

---

[10] Mr. Floca testified that some performances *might* continue at the REACH—but then conceded this was only being "explor[ed]." *See* Tr. 71:7-13.

*Id.* at 89:3-9, 91:8-17 (emphasis added). In fact, he "was actively working on the plans to do all of these things in an occupied building" when Mr. Trump summarily announced the closure. *Id.* at 80:11-19. Finally, Mr. Floca's newfound contention that phasing would be "irresponsible," *id.* at 91:12, provides no basis for evading statutory mandates: the work, ***whether phased or not***—and regardless of its funding source—requires Section 106, NEPA, NCPC, and CFA review.[11]

Instead, the public's "substantial" interest in Defendants "abid[ing] by the federal laws that govern their existence and operations" favors preventing the Project from proceeding without the requisite reviews and approvals. *See Newby*, 838 F.3d at 12. This is especially so where the government has forfeited its presumption of regularity, demonstrating a preference for haste over compliance with legal obligations. *See* Reply 1; *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316, 2026 U.S. Dist. LEXIS 69920, at *5-6 (D.D.C. Mar. 31, 2026).

## V. The Record Warrants an Injunction, and the Court Should Not Deny Injunctive Relief Without Review of Actual Construction Plans.

The Court should grant Plaintiffs' requested injunction. On the record before the Court—Mr. Floca's own testimony and Defendants' limited disclosures (including that "significant construction work" is imminent, whether involving demolition or not)—the only reasonable conclusion is that Defendants are proceeding without the pre-construction statutory reviews and approvals Plaintiffs have identified. And the Court certainly should not deny relief without first reviewing the supposed comprehensive construction plans Defendants have steadfastly refused to disclose and evaluating what statutory reviews and approvals those plans trigger. Defendants cannot evade an injunction by demanding that the Court defer to Mr. Floca's testimony about plans Defendants not only insist on keeping hidden, but admit do not yet exist. *Supra* at 2 & n.2.

---

[11] Nor does the 2029 appropriation expenditure deadline exempt the Center from complying with federal law. *See* Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025); Tr. 74:11-75:5, 174:16-20.

Respectfully submitted,

DC PRESERVATION LEAGUE,
NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES,
THE AMERICAN INSTITUTE OF ARCHITECTS,
AMERICAN SOCIETY OF LANDSCAPE ARCHITECTS,
DOCOMOMO US,
SOCIETY OF ARCHITECTURAL HISTORIANS,
THE COMMITTEE OF 100 ON THE FEDERAL CITY, and
THE CULTURAL LANDSCAPE FOUNDATION

By their attorneys,

 /s/ Gregory B. Craig
Gregory B. Craig (164640)
FOLEY HOAG LLP
1717 K Street N.W.
Washington, DC 20006
Tel: (202) 223-1200
gcraig@foleyhoag.com

Thaddeus A. Heuer (*pro hac vice*)
Kevin Y. Chen (*pro hac vice*)
Matthew F. Casassa (*pro hac vice*)
Marilyn Icsman (*pro hac vice*)
FOLEY HOAG LLP
155 Seaport Boulevard, Suite 1600
Boston, MA 02210
Tel: (617) 832-1000
theuer@foleyhoag.com
kchen@foleyhoag.com
mcasassa@foleyhoag.com
micsman@foleyhoag.com

 /s/ Gregory Alan Werkheiser
Gregory Alan Werkheiser (VA210)
Marion Forsyth Werkheiser (486465)
Lydia Dexter (OR0032)
Jessie Barrington (VA224)
Caitlin McCurdy (NH0004)
Katherine Lee Sorrell (TX0109)
CULTURAL HERITAGE PARTNERS, PLLC
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Tel: (202) 567-7594
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
lydia@culturalheritagepartners.com
jessie@culturalheritagepartners.com
caitlin@culturalheritagepartners.com
katherine@culturalheritagepartners.com

 /s/ Abbe David Lowell
Abbe David Lowell (358651)
Caleb Hayes-Deats (1643213)
Isabella M. Oishi (90018056)
Angela Reilly (*pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
chayes-deats@lowellandassociates.com
ioishi@lowellandassociates.com
Dated: May 11, 2026            areilly@lowellandassociates.com

11

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 11, 2026, the foregoing document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). Paper copies will be sent via first class mail to those indicated as nonregistered participants.

<u>/s/ Gregory B. Craig</u>

12