**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| D.C. PRESERVATION LEAGUE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:26-cv-00981 (CRC) |

**DEFENDANTS' POST-HEARING SUPPLEMENTAL BRIEF**

On Wednesday, April 29, this Court held a preliminary injunction hearing where Plaintiffs requested, and Defendants did not oppose, the live testimony of Matthew Floca, the Executive Director of the Center. Mr. Floca's testimony confirms that there is no factual basis for Plaintiffs' claims. Indeed, his testimony refutes *all* of the predicates for Plaintiffs' claims, like the notion that the Center will be destroyed (it will not be), the allegation that new structures or buildings will be erected (they will not be), and the argument that the Center's exterior will be materially altered (it will not be). Mr. Floca's testimony also underscored that the array of bystander agencies that Plaintiffs hope to entangle into this action in fact have no role, at this juncture, with the planned renovations. Plaintiffs' claims have continually shifted in an apparent effort to ensnare an agency defendant, leaving Defendants to litigate against a moving target.[1] But speculation is insufficient to sustain the extraordinary relief that Plaintiffs seek here.

Plaintiffs' belated theory as to why the proposed renovations are an impermissible change to the "management and operation" of the Center's "grounds" is likewise unavailing. This new theory, presented for the first time at the April 29 hearing—and thus forfeited for purposes of this preliminary injunction motion—is in any event meritless for several independent reasons.

Finally, as to the balance of harm, Mr. Floca's testimony underscored that enjoining the temporary closure of the Center would jeopardize the responsible execution of a project that all agree is critical for the Center's future viability. That would impair the public interest without remedying any harm to Plaintiffs here. An injunction is therefore unwarranted.

---

[1] *Compare* Pls.' PI Mot., ECF No. 24-1 at 15, 17 (asserting that NPS jurisdiction arose from cantilevered west patio and USACE review was required for staging, excavation, and water discharge), *with* Pls.' PI Reply, ECF No. 30 at 12-13 (abandoning any claims that NPS retains jurisdiction over patio's air rights and instead raising new theories regarding "Rock Creek Parkway Stabilization" and purported USACE involvement based on the Center's water intake).

## I.    The Testimony Refutes Each of Plaintiffs' Claims.

Defendants have explained why each of the claims that Plaintiffs press in their motion is unlikely to succeed, especially in light of the heightened standard that applies to non-statutory *ultra vires* review and mandamus actions.  Mr. Floca's testimony confirms as much.

Starting with 40 U.S.C. § 8106—that provision only governs *new* buildings or structures (*i.e.*, those that are being "erected").  But, as Mr. Floca testified, no new buildings or structures will be erected as part of the Center's plans.  Apr. 29, 2026, Hearing Transcript, ECF No. 39 (Hr'g Tr.) at 78:9-10.  Indeed, when this Court asked Plaintiffs' counsel whether there was "anything other than [the President's] statements, that's in my record, that show that a new structure or building is going to be erected," counsel responded that there was not.  Hr'g Tr. at 112:19-113:6. This defeats their Section 8106 claim.

Next, Plaintiffs contend that the planned renovations would exceed the Center's powers under its organic statute.  Mr. Floca's testimony establishes otherwise.  The Center is authorized to "plan, design, and construct each capital repair, replacement, improvement, rehabilitation, alteration, or modification necessary to maintain the functionality of the building and site at current standards of life, safety, security, and accessibility."  20 U.S.C. § 76j(a)(1)(G).  It is empowered also to conduct "maintenance, repair, and alteration" of the Center in "a manner consistent with requirements for high quality operations," *id*. § 76j(a)(1)(H)(ii), and to "maintain" various spaces "in a manner that is suitable to a national performing arts center," *id*. § 76j(a)(2)(E).

As Mr. Floca testified in detail, the actual work that is planned is tailored closely to the objectives of maintaining the functionality of the building at current standards of life, safety, security, and accessibility; and to maintain the Center in a manner that is "suitable" for its unique

role and so that it can continue to present "high quality" programming to patrons. Just a handful of examples from Mr. Floca's testimony make this abundantly clear:

- The soffit panels—each weighing some 2200 pounds and hanging approximately 50 to 60 feet above the terrace spaces where "hundreds of thousands of people" traverse every year—are failing. Hr'g Tr. at 57:2-59:3. Indeed, one of these panels already failed, and "wedged itself against the building." *Id*. at 58:9-10. The only thing supporting these failing soffit panels are thousands of small cables connecting the soffits to the steel superstructure, *id*. at 57:2-7, and "[a]ll of those cables are [now] rusting," with the Center currently tracking "six or seven really dangerous locations" where other soffit panels could fail. *Id*.

- The structural steel beams in loading dock one, situated *directly under* one of the Center's two grand halls—the Hall of States, which a "million people" might traverse every year—have degraded to such an extent that the Center needed to install a "bandaid" to prevent possible collapse. *Id*. at 61:13-62:5.

- The Center's chillers, boilers, and hot water heating equipment are all "well past [their] end-of-useful life." *Id*. at 63:7-10. This equipment is central to the building's cooling and heating and is critical to how the Center moves water around the building. *Id*. at 63:11-25 "We've been lucky there hasn't been a failure with that equipment." *Id*. at 63:15-16 Indeed, because the filtration system for the pump room has not worked since the mid-1990's, the Center is forced to bring "dirty, unfiltered Potomac water" into the central plant to cool different parts of the building. *Id*. at 63:18-25.

- There is "significant water intrusion across the entire campus"—with some of the most significant water issues located in the Center's electrical vaults. *Id*. at 59:11-17. When asked what jumps out to Mr. Floca visually when he enters the electrical vaults, he mentioned "stalactites . . . hanging from the ceiling." *Id*. at 60:7-14. This, along with significant rust and failure of the electrical equipment itself (most of which is at least fifty years old), has created a safety hazard that "could lead to a fire" or in the worst case, "an explosion." *Id*. And although "[i]t's a safety concern now . . . if we continue to let it degrade, it [will] only [get] exponentially worse." *Id*. at 60:16-19.

- The staging and rigging equipment operated by the stagehands in the concert halls and opera houses fares no better. The line sets that the stagehands use to control parts of the stage performances with ropes are also over fifty years old. *Id*. at 64:4-10. Some of the line sets lack critical safety mechanisms like fall protection, posing a significant safety risk to the stagehands operating the equipment. *Id*. at 64:11-65:10.

- Beyond the safety concerns of the building's present condition, Mr. Floca explained the need for various public-facing improvements, like servicing outdated bathrooms. *Id*. at 62:20-25. Indeed, one of the Concert Hall bathrooms was out of service for three months because of failing plumbing infrastructure that has not been dealt with in some fifty years. *Id*.

Given these realities, it is undeniable that the planned renovations comport with the Board's statutory mandates—and, indeed, that the Board would be *failing* to carry out its statutory responsibilities if it did not take the steps necessary to allow this project to succeed.  And, as Mr. Floca explained, closing the Center to the public so that these renovations can proceed through a concentrated two-year stretch is the only responsible way to proceed; a phased approach would cause further delay, increase costs, and create unacceptable risks to the safety of its patrons and employees.  Hr'g Tr. at 74:11-74:25, 76:7-77:3.  Although prior leadership at the Center prioritized the programming mission at the expense of the mandate to maintain the building, adjustment is needed to ensure that the Center can continue to provide programming in the future.  *Id*. at 99:8-100:24.

Turning to the various regulatory bodies that Plaintiffs contend must review the proposed renovations, Mr. Floca's testimony again undercuts the premises of each claim.  With respect to the Commission of Fine Arts (CFA), it "advise[s]" on "the location of statues, fountains, and monuments in the public squares, streets, and parks in the District of Columbia" and on "the selection of models" and "artists" for "statues, fountains, and monuments erected under the authority of the Federal Government."  40 U.S.C. § 9102(a)(1)–(4).  Yet Mr. Floca testified that no new fountains will be constructed, and that no fountains will be moved or have their design or footprint altered.  Hr'g Tr. at 85:7-14.  And Plaintiffs have not suggested that any statues or monuments will be affected.  CFA review is therefore inapplicable for the proposed renovations.

As to the NCPC, the Commission's approval is required only for actions that impact "the location, height, bulk, number of stories, and size of federal public buildings, . . . and the provision for open space in and around" those buildings.  40 U.S.C. § 8722(d).  Mr. Floca confirmed that no new building will be erected on the Center's campus and that none of those other elements of the

4

existing building would change during the course of the proposed renovations. Hr'g Tr. at 78:6-10. Nor have Plaintiffs provided any evidence that the "provision for open space" around the Center will change. In fact, the Center's grounds will mostly remain open around the REACH, and all of the open space will remain accessible after a temporary closure for construction. *Id*. at 69:3-71:25. That cannot possibly be sufficient to require NCPC approval, or else every construction project within the District of Columbia would trigger the approval requirement merely by virtue of requiring temporary construction fencing.

Given that NCPC approval is not required, it also need not undertake NEPA nor Section 106 review. Plaintiffs concede as much—arguing at the hearing that NEPA and Section 106 review go hand-in-hand with NCPC approval. *Id*. at 138:8-140:24. Indeed, even the Smithsonian Institution is subject to Section 106 review only as to projects that require NCPC approval. *Id*. Further, even if NCPC approval is triggered in the future, NCPC has acknowledged the need to comply with both NEPA and Section 106 review as part of that approval process. *Id.* at 167:4-8.

## II.      Plaintiffs' New Argument Based on NPS Regulations is Forfeited and Meritless.

Plaintiffs' remaining claim is that the Center's renovation or temporary closure will cause a violation of the statutory obligation to "manage and operate the grounds . . . in a manner consistent with National Park Service regulations and agreements in effect on July 21, 1994" and that "[n]o change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior." 20 U.S.C. § 76j(a)(2)(F). Although Plaintiffs had raised this claim in their Complaint and preliminary injunction papers, they nowhere identified any NPS regulation or agreement from 1994 that the Center was poised to violate. *See* Pls.' PI Motion, ECF No 24-1 at 22-23; *see also* Pls.' PI Reply, ECF No. 30 at 8; *see also* Pls.' Compl., ECF No. 1 at 63-64.

5

At the April 29 hearing, Plaintiffs' counsel, for the first time, presented to the Court a copy of certain NPS regulations applying to parks and identified one, 36 C.F.R. § 1.5(b), that counsel claimed would be violated by the closure of the Center.  Hr'g Tr. at 118:21-119:6, 121:7-10.  That regulation was cited nowhere else in their 45-page Preliminary Injunction Motion, ECF No. 24-1, or in any of the appended 38 Exhibits and 19 Declarations.  The belated regulation is also not mentioned in their 25-page reply brief, ECF No. 30, or their 79-page Complaint, ECF No. 1.

At the threshold, this Court should conclude that this argument is forfeited for purposes of the preliminary injunction motion.  In the absence of exceptional circumstances, "arguments raised for the first time at oral argument are forfeited," and Plaintiffs have identified no circumstances that excuse their failure to raise this argument in their briefing.  *U.S. ex rel. Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015).  To be sure, Plaintiffs had invoked the *statutory provision*, but they had failed to explain how the Center would violate it.  *See* Pls.' PI Mot. at 22-23.  "A party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).  The Court should not indulge such sandbagging.  *Williams v. Romarm, SA*, 756 F.3d 777, 783 (D.C. Cir. 2014).  The Court could end its analysis there.

Having said that, if the Court prefers to resolve the issue on the merits based on Defendants' opportunity to file a supplemental brief, Plaintiffs' new argument misses the mark, for at least five independent reasons.

*First*, 36 C.F.R. § 1.5(b) only applies to closures that would result in a significant alteration of "the park area."  In the immediately preceding definitions section, "park area" is defined as "any area of land and water now or hereafter administered by the Secretary of the Interior through the

National Park Service for park, monument, historic, parkway, recreational, or other purposes."[2] 36 C.F.R. § 1.4(a). Yet it is the Board, not the Secretary of the Interior, that administers the Center. *See* 20 U.S.C. § 76h(a)(1) (stating that the Board's duty "shall be to maintain and *administer* the John F. Kennedy Center for the Performing Arts and site thereof" (emphasis added)).

*Second*, even if this regulation applies to the Center, it is limited to certain closures. And temporary ones, as here, do not qualify. *See Mashack v. Jewell*, 149 F. Supp. 3d 11, 37-39 (D.D.C. 2016) (finding that NPS would only have to undertake the analysis required by 36 C.F.R. § 1.5(b) only if the change in use is *permanent*, and that NPS should be given deference to determine if "rulemaking was not necessary" under the regulation.). Indeed, in *Mashack*, the court noted that the closure of a marina was not "of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area," and thus did not trigger Section 1.5(b) because the closure was (1) "temporary in nature" and (2) the Park Service had considered the fact that there are other nearby marinas available that provided a similar service. *Mashack*, 149 F. Supp. 3d at 37. Because the Center intends to reopen all public areas after it is safe to do so, and because there are numerous other "parks" close by that are available for the public's enjoyment,[3] the regulation is inapplicable.

*Third*, even if the regulation applies to the Center and to this temporary closure, it does not *prohibit* the closure. Rather, it *permits closure* so long as notice is provided through rulemaking

---

[2] Even Plaintiffs implicitly acknowledge that the Center is not a "park." One of the statutes that they invoke, 40 U.S.C. § 8106, applies only to a "reservation, park, or public grounds of the Federal Government in the District of Columbia." Pls.' PI Mot. at 17. But Plaintiffs did not say that the Center is or is located on a *park*, Plaintiffs expressly stated that the Center instead "is located on *federal public grounds*." *Id*. (emphasis added).

[3] The Rock Creek trail runs parallel to the Center, the National Mall is less than a mile away from the Center, and the Theodore Roosevelt Island park, directly across from the Center's west patio, is readily accessible with a short drive.

published in the Code of Federal Regulations.  36 C.F.R. § 1.5(b) (stating only that the closure "shall be published as rulemaking in the Federal Register").  Here, the Center can provide such public notice of the temporary grounds closure, whether by rulemaking or otherwise.  *See* 40 U.S.C. § 6304(a) (granting the Center limited authority to publish regulations in the Federal Register for the protection and maintenance of the building and grounds.).  That is all that is required.  Neither the statute nor the regulation provides any basis to enjoin the temporary closure at this juncture.

*Fourth*, the statute permits changes to the Center's operations of the grounds subject to the "express approval of Congress" and the Secretary of Interior.  20 U.S.C. § 76j(a)(2)(F).  Here, the $257 million capital renovation project authorized by Congress inevitably requires the Center to temporarily close certain parts of its grounds—even under a phased plan, certain work will require closure of certain spaces as a matter of basic safety.  Congress therefore necessarily approved of such closures when it authorized the work.  *See Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. CV 25-4316 (RJL), 2026 WL 877779 at 2-3, 21, 28 (D.D.C. Mar. 31, 2026) (stating that "either a lump sum for construction or a specific appropriation for a particular project—would easily satisfy" the requirement for Congressional authorization because "an appropriation from Congress is [the] authorization to use funds for a specified purpose.").  And the Center is prepared to seek the approval of the Secretary of the Interior if the Court deems that necessary.  Again, there is no basis for an injunction.

*Finally*, given all of these contentions, any possible future violation is not patent or obvious enough to warrant an injunction of any kind under the extraordinarily demanding *ultra vires* standard, oft described as a "Hail Mary pass" that "rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  Nor could it possibly qualify for the drastic

remedy of mandamus, where Plaintiffs must, yet fail, to plausibly show that they have (1) a clear right to relief; (2) Defendants have a clear duty to act; and (3) there is no other adequate remedy available to Plaintiffs here. *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022).

### III.    The Testimony Underscored the Irreparable Harm an Injunction Would Cause.

Mr. Floca's testimony also demonstrated why the equitable factors cut so strongly against any injunctive relief.

Mr. Floca explained that because the Congressional authorization funding the renovations expires in 2029, there is a real concern that temporarily pausing the renovations, or phasing the renovations, would make it difficult to complete the work before the funding authorization expires. Hr'g Tr. at 74:13-23. Mr. Floca took time to emphasize that "this is an incredibly unique time, and it's probably *the only time* in the center's history where an opportunity like [the renovations] has ever been possible." *Id*. at 75:10-17 (emphasis added). And that "we have the time in our programming schedule to do this now and we have the funding available that's never been available, and we have a leadership team that will prioritize these improvements." *Id*. Given this contextual backdrop, any pause in the renovation plans would put the entire construction effort behind schedule and put the Center at real risk of opening much later than the contemplated two-year temporary closure. It would make it difficult, even "impossible to do some of the things" discussed before the Court to hit the 2029 deadline to complete renovations before the funding authorization expires forever. The equities point decisively in Defendants' favor. Any injunction now would put the entire project in jeopardy, in addition to wasting precious time needed to undertake these mission critical actions, and waste countless tax-payer dollars in the process.

On the other side of the balance, part of the "irreparable harm" that Plaintiffs allege consists of consternation as to architectural changes. But the testimony demonstrated that this will not

happen.  Hr'g Tr. at 78:6-15.  Plaintiffs' constituents want to attend the shows at the Center, Pls.'

Reply, ECF No. 30 at 20-21.  But as Plaintiffs point out, most of the programming has already

been cancelled.  *Id.*  It is not realistic to expect that the programming will resume in the short term,

given how far in advance the Center schedules many of these performances.  As a basis for an

injunction, it is patently deficient, and it certainly cannot overcome the serious threat of harm

posed by halting the renovation plans just weeks before the work commences.

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: May 11, 2026                    Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General, Civil Division

                                       YAAKOV M. ROTH
                                       Principal Deputy Assistant Attorney General

                                       ERIC J. HAMILTON
                                       Deputy Assistant Attorney General

                                       DIANE KELLEHER
                                       Branch Director

                                       STEPHEN M. ELLIOTT
                                       Assistant Branch Director

                                       */s/ Pierce J. Anon*
                                       PIERCE J. ANON
                                       N.Y. Bar No. 6184303
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW
                                       Washington, DC 20530
                                       (202) 305-7573
                                       Pierce.Anon@usdoj.gov

                                       *Counsel for Defendants*

10