**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DC PRESERVATION LEAGUE** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 26-cv-981 (CRC) |
| **BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS** *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

The John F. Kennedy Center for the Performing Arts is an iconic landmark in Washington, D.C.  The Modernist building sits on a seventeen-acre campus overlooking the Potomac River, nestled between Rock Creek Parkway and a tangle of intersecting highways at the edge of Foggy Bottom.  It was designed by American architect Edward Durell Stone and, due to its association with the slain president and notable architectural pedigree, determined eligible for inclusion on the National Register of Historic Places in 2012.

For years, however, the Kennedy Center has needed serious repairs.  Last summer, Congress appropriated roughly $257 million to cover "necessary expenses for capital repair, restoration, maintenance backlog, and security structures of the building and site of" the Kennedy Center.  See One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, § 60025, 139 Stat. 72, 157 (2025).  Plans for the work proceeded apace until February 1 of this year, when the Chairman of the Center's Board of Trustees—who also happens to be President of the United States—announced on Truth Social that the Center would temporarily close for "Construction, Revitalization, and Complete Rebuilding."  Compl. ¶ 52.

In light of the abrupt demolition of the East Wing of the White House only three months earlier, President Trump's announcement sounded alarm bells for many, including a group of historic preservationists, architects, and historians who have filed suit to challenge the work planned for the Kennedy Center over the next few years.  As their opening salvo, the Plaintiffs (hereinafter referred to collectively as "DC Preservation League" or "the League") moved for a preliminary injunction to prevent the Defendants, including the Kennedy Center Board and various federal agencies, from carrying out the planned work "until they have completed all required [planning and environmental] reviews, secured all necessary approvals and permits, and been expressly authorized by Congress to proceed."  Mot. for Prelim. Inj. at 2.

At this early juncture, the Court concludes that the DC Preservation League has not established that a preliminary injunction is warranted because it has not shown a likelihood of success on its myriad Administrative Procedure Act ("APA"), *ultra vires*, and mandamus claims. Sworn testimony in this case by the Kennedy Center's recently-installed Executive Director indicates that the Center will not in fact be demolished or rebuilt—at least as things stand now. Instead, it is slated to undergo a substantial renovation, which, if the Center were a federal agency or if the project were to affect the fundamental footprint of the campus, would trigger a slate of planning, historic preservation, and environmental review obligations.  Yet the Court is bound by the D.C. Circuit's ruling that the Smithsonian Institution, the Kennedy Center's parent entity, does not qualify as an agency for relevant statutory purposes.  See Dong v. Smithsonian Inst., 125 F.3d 877, 883 (D.C. Cir. 1997).  And DC Preservation League has not established that the currently-contemplated version of the renovation project goes so clearly beyond the Kennedy Center's statutory authority or so clearly neglects applicable statutory obligations to satisfy the

stringent standards for *ultra vires* or mandamus relief.  The League's uphill battle is made steeper by the burden of persuasion it bears at the preliminary injunction stage.

The Court nevertheless remains circumspect about the possibility that the Kennedy Center renovation will encompass more than its Executive Director has promised, especially given the paucity of concrete details as to the project's scope.  If the work is, say, more transformative than present testimony suggests or requires permits that the Center has yet to acknowledge or secure, the Court's legal analysis might look substantially different.  In other words, this preliminary ruling may not be the "final word in this case."  Beatty v. Trump, No. 25-cv-4480 (CRC), 2026 WL 712814, at *2 (D.D.C. Mar. 14, 2026).

Given the lingering factual uncertainties, the Court will direct the parties to confer and file a joint status report within seven days of this ruling that proposes next steps in the case, including the possibility of periodic status reports to elucidate the scope and timing of the Kennedy Center renovation project.

## I.    Background

### A.  Regulatory Background

Washington, D.C. has been a carefully planned city since it became the seat of the United States government in 1790.  See, e.g., Nat'l Cap. Planning Comm'n, Planning History, https://www.ncpc.gov/about/history/ [https://perma.cc/FU8M-PBUM] (last visited May 21, 2026).  In the early twentieth century, Congress established several federal planning agencies to ensure that the District grew in a coordinated manner, under centralized oversight.  Today, various intersecting statutory regimes continue to govern the city's growth and development.

Originally enacted in 1912, 40 U.S.C. § 8106 is the perhaps the most straightforward of Congress's planning directives:  "A building or structure shall not be erected on any reservation,

park, or public grounds of the Federal Government in the District of Columbia" without Congress's "express" authorization.

Congress has also established the Commission of Fine Arts ("CFA"), which is responsible for advising on the location and design of "statues, fountains, and monuments" in the public spaces of D.C., see 40 U.S.C. § 9102(a), and the National Capital Planning Commission ("NCPC"), which is the "central federal planning agency for the Federal Government" in the capital and "preserve[s] [its] important historical and natural features" through consultation and/or approval of various federal projects, 40 U.S.C. §§ 8711(a), 8722.

The National Historic Preservation Act ("NHPA") establishes another framework for promoting the "preservation of historic property" owned or controlled by federal agencies. See 54 U.S.C. § 306101(a)(1). The Act requires agency heads to "take into account the effect of" any of their "undertakings" (i.e. federal or federally-assisted projects) on "any historic property." 54 U.S.C. § 306108. In what is known as the "Section 106" review process, see generally 36 C.F.R. pt. 800, agency officials must consult with the Advisory Council on Historic Preservation ("ACHP") well before a project begins in order to mitigate the potential adverse effects it may have on historically-significant properties.

Finally, federal construction projects in the capital may trigger the environmental review requirements of the National Environmental Policy Act ("NEPA"). See 42 U.S.C. § 4321 et seq. Given the value in integrating planning, historic preservation, and environmental review, projects submitted to the NCPC are also subjected to the NEPA process. See 1 C.F.R. §§ 601.1, 601.2(d). A federal agency that must independently comply with NEPA takes the lead on environmental review for its own projects, whereas the NCPC serves as the "Lead Agency" for NEPA purposes when it reviews applications submitted by "non-federal agencies," see 1 C.F.R.

4

§ 601.4 (cleaned up), which include the Smithsonian Institution and the Kennedy Center, among other entities, see 1 C.F.R. § 601.3.

> B. Factual Background[1]

>> 1. *Upheaval at the Kennedy Center*

2025 was a tumultuous year at the John F. Kennedy Center for the Performing Arts. Shortly after retaking office in January, President Trump replaced several general trustees on the Kennedy Center Board and appointed himself as a trustee, as well. The newly-reconstituted Board promptly elected President Trump as their Chair. Around the same time, the President sacked the Center's former president and replaced her with Richard Grenell, a longtime political ally. See generally Compl. ¶¶ 33–35.

Over the summer, the Kennedy Center received an influx of federal dollars through the OBBBA. Congress appropriated roughly $257 million to cover "necessary expenses for capital repair, restoration, maintenance backlog, and security structures" of the Center's "building and site." Pub. L. No. 119-21, § 60025. An accompanying House Budget Committee report explained that the funding would "address deferred maintenance and upkeep of the Kennedy Center's building and grounds" and "[m]ore specifically" support "water system upgrades, office space improvements, electric enhancements, elevator upgrades, rigging replacement . . ., seating replacement, lighting and backstage improvements, hydronic system (water heaters) modernization, and bathroom upgrades, among other items." See H.R. Rep. No. 119-106, pt. 1, at 1175 (2025). President Trump publicly touted the appropriation, claiming that "in the coming months, we'll fully renovate . . . the entire infrastructure of the building." Compl. ¶ 38.

---

[1] This background section relies on facts alleged in the complaint, sources incorporated by reference into the complaint and subject to judicial notice, and documentary and testimonial evidence adduced thus far in this proceeding.

Weeks later, in September, the Kennedy Center announced on social media that "work has begun!"  See Mot. for Prelim. Inj., Ex. 17 (X post declaring start of renovation).  "President Trump has given the Kennedy Center $257 million to renovate and restore America's Premiere Arts Institution to its glory," the Center proclaimed.  Id.  "Today, we start refurbishing and re-painting the 200 iconic columns around the Kennedy Center with a new color – Site White."  Id. President Trump has been "part of many conversations involving that" and "other pieces of work" at the Center, as he is "in the details" of the renovation.  Prelim. Inj. Motion Hr'g Tr. at 18:19–22, 15:10–12 ("Hr'g Tr.") (testimony of Kennedy Center Executive Director Matthew Floca, referred to hereinafter as "Floca testimony").  But Center staff apparently sought no input or permission from any federal planning agency regarding the task.  Compl. ¶ 41.

In December, the Board made another landmark decision, voting to rename the Kennedy Center "The Donald J. Trump and the John F. Kennedy Memorial Center for the Performing Arts," or the "Trump Kennedy Center," for short.  Compl. ¶ 43.  The Board meeting had been called the day before the decision was made, and renaming the institution was not on its agenda. Id.; see also Beatty v. Trump, No. 25-cv-4480 (CRC), Defs.' Resps. to Pl.'s Stmt. of Mat. Facts, ECF No. 33-1 ¶ 16.[2]  Yet the day after the Board vote, President Trump's name was added to the Center's front portico above President Kennedy's.  Compl. ¶ 44.  As the speedy turnaround suggests, the lettering had been "prepared and/or purchased prior to the Board's vote the day before."  Beatty, Defs.' Resps. to Pl.'s Stmt. of Mat. Facts, ECF No. 33-1 ¶ 20.  This addition to the building's façade was also not vetted by any planning agency.  Compl. ¶ 44.

---

[2] The Court will take judicial notice of evidence adduced in Beatty that is "not subject to reasonable dispute," as that case and this one are closely related, and the parties have cross-cited liberally to the record in each case as a result of the factual overlap between them.  See Fain v. Islamic Rep. of Iran, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing Fed. R. Evid. 201(b)).

The Kennedy Center is not the only D.C. landmark that the new administration has sought to remake.  In October 2025, officials announced that the entire East Wing of the White House would be demolished, just a few months after the President reassured the public that the ballroom he planned for the site would not "interfere with" and would "pay[] total respect to the existing building, which [he was] the biggest fan of."  Compl. ¶ 48.  After breaking ground, demolition crews razed the East Wing within four days.  Id.

> *2.  A "Complete Rebuilding" of the Kennedy Center*

Upheaval at the Kennedy Center continued into this year.  On February 1, President Trump delivered another big reveal by social media:  The Kennedy Center would close for roughly two years, during which time it would undergo serious construction work.  "After a one year review . . . that has taken place with Contractors, Musical Experts, Art Institutions, and other Advisors and Consultants, deciding between either Construction with Closure and Re-Opening or, Partial Construction while continuing Entertainment Operations through a much longer period of time," he explained,

> I have determined that the Trump Kennedy Center, if temporarily closed for Construction, Revitalization, and Complete Rebuilding, can be, without question, the finest Performing Arts Facility of its kind, anywhere in the World. . . .
>
> Based on these findings, and totally subject to Board approval, I have determined that the fastest way to bring The Trump Kennedy Center to the highest level of Success, Beauty, and Grandeur, is to cease Entertainment Operations for an approximately two year period of time . . .
>
> Therefore, the Trump Kennedy Center will close on July 4th, 2026, in honor of the 250th Anniversary of our Country, whereupon we will simultaneously begin Construction of the new and spectacular Entertainment Complex.  Financing is completed, and fully in place!  This important decision, based on input from many Highly Respected Experts, will take a tired, broken, and dilapidated Center . . . and turn it into a World Class Bastion of Arts, Music, and Entertainment, far better than it has ever been before.  America will be very proud of its new and beautiful Landmark for many generations to come. . . .

7

Mot. for Prelim. Inj., Ex. 1 at 2–3 (Feb. 1, 2026 Trump Truth Social post).  Perhaps responding to concerns that the Kennedy Center might meet the same fate as the East Wing, President Trump clarified to the press the next day that he was "not ripping [the Center] down."  Id., Ex. 30 at 2 (Feb. 2, 2026 ABC News article).  He added that he would be "using the steel," the "structure," and "some of the marble," though "some of the marble" would "come down."  Id. at 3.  The steel would be "all be checked out because [it would] be fully exposed."  Id.  Ultimately, when the Center opened, it would be "brand new and really beautiful."  Id.

Almost immediately, Kennedy Center staff began taking steps to effectuate the closure. By mid-February, a high-level budget document had been drawn up, outlining several generic categories of construction work slated for the two-year closure period—namely, "Shell & Site Infrastructure," "Public & Support Spaces," "Performance Venue Revitalization," and "Safety & Building Systems."  See generally Opp. to Mot. for Prelim. Inj. ("Opp. Br."), Ex. E.  The budget alludes to discrete projects within those categories, such as "Sanitary & Domestic Piping" improvements, "Electrical System Upgrades," "Front of House Renewal," and "Rock Creek Parkway Stabilization."  Id. at 3, 6, 10.  But it offers no detail about specific site projects.  And remarkably, despite being mere weeks away from the announced closure date, there is no "one deliverable" that outlines the construction work planned for the Kennedy Center.  Hr'g Tr. at 83:18–19 (Floca testimony).

Matthew Floca, who was then serving as a facilities-focused vice president of the Kennedy Center, first presented the closure proposal to the Board's Building and Grounds Committee on March 2.  See generally Beatty, Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj., ECF No. 29-7, Ex. P (March 2 Building and Grounds Committee meeting minutes).  The full Board convened two weeks later on March 16.  As its first order of business, the Board voted to

appoint Mr. Floca as Executive Director of the Center, replacing Mr. Grenell.  Compl. ¶ 57.

Floca then offered a high-level review of the need for closure while the Center engaged in capital

repairs and upgrades.  Although members had received no written materials whatsoever about

the closure until the weekend before the Monday meeting—and then only as a result of this

Court's issuance of a temporary restraining order in the related Beatty case—the Board voted to

ratify the shutdown in under half an hour.  See generally Beatty, Defs.' Cross-Mot. for Summ. J.,

ECF No. 34-5, Ex. 1 (March 16 Board meeting minutes).

### 3.  Planned Campus Renovations

Litigants rushed to the courthouse to challenge the Kennedy Center's recent actions.

Congresswoman and Kennedy Center trustee Joyce Beatty filed a suit contesting the Center's

renaming and the lawfulness of its closure.  See generally Beatty v. Trump, No. 25-cv-4480

(CRC), First Amended Compl., ECF No. 12.  In this case, a coalition of historic preservationists,

architects, and historians challenge the Center's ability to carry out the planned renovations

without first seeking Congressional and regulatory approvals from various planning agencies.

As both sets of plaintiffs have litigated their motions for preliminary relief, more

information about the closure and planned renovations has come to light.  The story begins years

ago, in 2021 and 2022, when the Center issued two Comprehensive Building Plans ("CBPs") that

outlined a variety of structural and mechanical issues throughout the main campus building that

required attention.  See Beatty, Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj., ECF No. 29-15,

Ex. X (2022 CBP); ECF No. 29-16, Ex. Y (2021 CBP).  In 2022 and 2024, external consultants

prepared reports concerning a displaced soffit panel at the northwest corner of the Center and

water intrusion elsewhere in the building.  See id., ECF No. 29-17, Ex. Z (2022 Soffit Failure

Field Report); ECF No. 29-18, Ex. AA (2024 Leak Investigation Report Part 1); ECF No. 29-19,

Ex. BB (2024 Leak Investigation Report Part 2); ECF No. 29-20, Ex. CC (2024 Leak

Investigation Report Part 3).  Notwithstanding the Center's serious repair needs, these plans and

reports did not presume a prolonged or total closure of the Kennedy Center campus.  To the

contrary, the CBPs contemplated that any necessary renovations would be done in a "phased"

manner so that the building could remain open.  Hr'g Tr. at 89:8–9.

Mr. Floca has indicated, both in sworn declarations and live testimony, that the

construction planned for the two-year closure period largely tracks the repair needs outlined in

the CBPs and external consultant reports.  See, e.g., Opp. Br., Ex. A ("Floca Decl.") ¶¶ 8–9.

There will be "three buckets" of construction work: (1) structural and waterproofing repairs

aimed at addressing soffit and structural steel failure driven by water intrusion; (2) "public

patron-facing improvements," including restroom improvements, signage upgrades, and box

office relocation; and (3) overhauls to "mechanical, electrical and plumbing systems" that have

experienced "substantial failures."  Hr'g Tr. at 55:16–56:5.

Although there is no single, up-to-date document or compendium detailing all the

planned projects, the Court can piece together some details from Mr. Floca's declarations, his

testimony, and the high-level budget filed by the Defendants.  Construction crews will assess and

replace failing soffit panels, which sit on the underside of the overhang surrounding the

perimeter of the main building.  See Hr'g Tr. at 56:6–57:18.  They will engage in waterproofing

to address "significant water intrusion across the entire campus," especially in the Center's

electrical vaults, a task which will entail "excavat[ing] along the entire length of the service

road."  See id. at 59:11–23, 66:8–14.  And they will upgrade plumbing infrastructure, as well as

chillers, boilers, and the campus water filtration system.  See id. at 62:16–63:25.  The plans

encompass updates not only to "back-of-the-house infrastructure," but also "back-of-the-house

theatrical spaces." Id. at 64:12–13.  The Center will "replace hundreds of actual ropes that are the age of the building, as well as some of the lacking safety mechanisms," thereby enhancing "fall protection" for stagehands. Id. at 64:13–65:10.  This work will "involve[] the demolition of stage floors and the reconfiguration of overhead structural steel[.]"  Floca Decl. ¶ 10.

A raft of more aesthetic changes is also anticipated.  Mr. Floca testified that the Center is "contemplating . . . replac[ing]" seats in the Concert Hall and Opera House, see Hr'g Tr. at 14:1–2, while President Trump has reported that "seating" had already been "purchased," Beatty, Pl.'s Reply in Supp. of Mot. for Prelim. Inj., ECF No. 37-3, Ex. NN ("March 16 Press Conf. Tr.") at 15–16.  Floca described a "comprehensive interior design package" that will apparently include changing out red carpets for ones with a black-and-gold pattern. Hr'g Tr. at 30:14–25.  Outdated bathrooms will be serviced and upgraded. See id. at 62:23–25.  There will be no change to the "footprint" of the campus' several fountains, but their "guts" will be replaced. Id. at 85:9–14. Landscaping around the REACH Expansion of the Kennedy Center campus will be improved. Id. at 86:7–9.  Most of the weeping willow trees that were part of the Center's original design have already been felled due to decay, and Floca believes that "weeping cherry tree[s]" would serve as a "perfect" replacement. Id. 28:2–22.

Mr. Floca has further described a "hardening of the security perimeter."  Floca Decl. ¶ 8. He elaborated in court that this perimeter would include "bollards at the service tunnel," "[v]ehicle force protection," and locking doors. Hr'g Tr. at 42:15–25.

Mr. Floca's testimony also sheds light on what the construction project will *not* entail—at least in his own view, as he is "not in control" of the President's "personal decision-making." Id. at 47:11–12.  Floca avers that "planned construction, renovation, and renewal efforts are only limited to the current structures, buildings, and grounds"; "[n]o new structure or building will be

11

erected on the campus"; and "the planned construction, renovation, and renewal efforts will not tear down the Center to its structural steel and rebuild a new structure from those foundations." Floca Decl. ¶ 6. And he has testified that neither he nor anyone else at the Center has active "plans to demolish" the building, nor will any new structure or building be erected or rebuilt from the bare structural steel. See Hr'g Tr. at 46:11; 47:6–8; 78:9–13.

Yet Mr. Floca's testimony leaves quite a bit up in the air. For one, there are evident discrepancies between President Trump's heralding of a "Complete Rebuilding" of the premises, which he has repeated well past February 1,[3] and Floca's more modest, but sworn, representation that the Center will not be torn down and rebuilt. Floca could not directly resolve these tensions at the hearing, admitting that he could not "speak to" what President Trump might have "intend[ed]" in his various statements to the press. Id. at 32:18–24.

For another, it is unclear just how much of the campus will be closed for the two-year construction period. Mr. Floca recognized that "[t]he majority of the grounds directly around the building will be behind a construction fence" during the closure, id. at 69:10–12, but he also stated that the REACH Expansion will remain open to some extent for limited programming and memorial purposes, id. at 69:11–23.

Third, numerous budget line items are too vague to fully interpret. For instance, the Center has designated $20 million for "Front of House Renewal," but provides no detail as to what that expenditure will cover. See Opp. Br., Ex. E at 6. Likewise, the budget mentions front- and back-of-house "restoration" of the Center's performance spaces, the total cost of which will

---

[3] At the press conference before the March 16 Board meeting, for instance, President Trump again described the construction project as a "rebuilding." March 16 Press Conf. Tr. at 5.

be nearly $50 million.  Id. at 8.  Does this work encompass only the aforementioned changes in carpeting, seating, and rigging, or might there be yet other alterations to those spaces?

Lastly, it is conceivable that the construction may involve other federal agencies like the National Park Service ("NPS"), which exercises jurisdiction over Rock Creek Parkway and other adjacent federal parklands, though no concrete plans are yet in place.  Mr. Floca testified, for example, that the "Rock Creek Parkway Stabilization" project and site landscaping on the Potomac River embankments would require "coordinat[ing] with NPS on traffic control," but said that "structurally we are not making any changes to the parkway."  Hr'g Tr. 85:21–86:12.  Whatever the anticipated intrusion upon physical spaces under other agencies' jurisdiction, the extent of coordination that will be required and potential permitting obligations remain opaque.

C.  Procedural Background

DC Preservation League filed suit in late March 2026, soon after the Kennedy Center Board voted to shutter the Center for at least two years pending renovations.  It has brought APA, *ultra vires*, and mandamus claims against a suite of defendants, including "Agency Defendants" (NPS, the U.S. Department of the Interior, Interior Secretary Douglas J. Burgum, the U.S. Army Corps of Engineers ("USACE"), and the NCPC) and "Non-Agency Defendants" (the Kennedy Center Board of Trustees, the Smithsonian Institution, and President Trump).[4]

Shortly after filing its complaint, the League moved for a preliminary injunction, requesting that the Court prohibit any proposed demolition or major reconstruction until the Defendants obtained Congressional approval and satisfied a host of purported planning

---

[4] The Court uses the "Agency"/"Non-Agency" shorthand in recognition of the fact that, according to the D.C. Circuit, the Smithsonian Institution is not an "authority of the government of the United States" under the Privacy Act or APA.  Dong, 125 F.3d at 883.  By extension, and for substantially the same reasons laid out in Dong, neither is the Kennedy Center (or its Chair).

obligations.  The parties briefed the motion, and the Court held a hearing during which both DC

Preservation League and Defendants' counsel had an opportunity to elicit testimony from Mr.

Floca.  The Court afforded the parties two weeks to file post-hearing supplemental briefs in light

of the additional testimony and legal issues aired at the hearing.  DC Preservation League's

motion for preliminary injunction is now ripe for adjudication.

## II.    Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  To secure one, a plaintiff "must establish that

he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest."  Id. at 20.  The movant bears the burden to show that the "four factors, taken

together," support an injunction.  Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014).

This case presents APA, ultra vires, and mandamus causes of action.  Prevailing on the

latter two claim types is no walk in the park.  Ultra vires claims are reserved for scenarios where

a government entity "has stepped so plainly beyond the bounds of its statutory authority, or acted

so clearly in defiance of it, as to warrant the immediate intervention of an equity court."  Fed. Ex.

Corp. v. U.S. Dep't of Commerce, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up) ("FedEx").

"To prevail on an ultra vires claim, the plaintiff must establish that (1) review is not expressly

precluded by statute, (2) there is no alternative procedure for review of the statutory claim[,] and

(3) the challenged action is plainly in excess of the agency's delegated powers and contrary to a

specific prohibition in the statute that is clear and mandatory."  Glob. Health Council v. Trump,

153 F.4th 1, 20 (D.C. Cir. 2025) (cleaned up).  The third requirement means that "[o]nly error

that is patently a misconstruction of the [relevant statute], that disregards a specific and

unambiguous statutory directive, or that violates some specific command of a statute will support relief." FedEx, 39 F.4th at 764 (cleaned up).

As *ultra vires* review "could become an easy end-run around the limitations" of judicial review statutes, the Supreme Court has "strictly limited" its scope. Nuclear Reg. Comm'n v. Texas, 605 U.S. 665, 681 (2025). The exception does not apply "simply because" government action "does not comport with law." Id. (cleaned up). Rather, the challenged conduct must be plainly "unauthorized." Id. at 680 (cleaned up). As such, an *ultra vires* claim is often viewed as a "Hail Mary pass," Nyunt v. Chairman, Broad. Bd. of Governors, 589 F.3d 445, 449 (D.C. Cir. 2009), though the hurdle is not entirely "insurmountable," Nat'l Trust for Hist. Pres. v. Nat'l Park Serv., No. 25-cv-4316 (RJL), 2026 WL 877779, at *6 (D.D.C. Mar. 31, 2026).

Mandamus is similarly an "extraordinary remedy, reserved only for the most transparent violations of a clear duty to act." In re Ctr. for Bio. Diversity, 53 F.4th 665, 670 (D.C. Cir. 2022) (citing In re Bluewater Network, 234 F.3d 1305, 1315 (D.C. Cir. 2000)). To be entitled to mandamus, the plaintiff must demonstrate "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016). "These three threshold requirements are jurisdictional," and even if satisfied, a court may still only grant mandamus relief when it finds "compelling equitable grounds" to do so. Id. (cleaned up).

## III. Analysis

With these legal standards in mind, the Court turns to its preliminary injunction analysis. It evaluates the likelihood of success of each count in the complaint, first considering the viability of the APA claims against the Agency Defendants before pivoting to the *ultra vires* and mandamus claims against the Non-Agency Defendants. On the available record, the Court

15

concludes that DC Preservation League is unlikely to succeed on the merits of any of its claims, and it need not address the remaining preliminary injunction factors. See, e.g., Apotex, Inc. v. FDA, 449 F.3d 1249, 1254 (D.C. Cir. 2006).

Before the claim-by-claim breakdown, some factual table-setting is in order. As mentioned, there is a significant discrepancy between President Trump's grandiose vision for the Center's transformation and Mr. Floca's more measured representations. The Court places greater weight on the latter, given that Floca has submitted several sworn declarations in this case and Beatty and then testified under oath in a generally credible fashion as to the details of the planned construction. On the current record, the Kennedy Center does not appear poised for large-scale demolition and rebuilding. See Floca Decl. ¶ 6; Hr'g Tr. at 46:11; 47:6–8; 78:9–13. Nor does it seem that the physical footprint of the campus' buildings and structures will change. While the Center will undergo significant infrastructural alterations and upgrades, there are apparently no plans to tear down existing buildings or structures on site or erect any new ones.

To be sure, the planned construction is anything but minor. There *will* be demolition and replacement of component parts of performing spaces, overhauls of heating and cooling systems, and considerable remediation to the Center's external frame. This is not routine maintenance.

Aside from general descriptors, the precise nature of the construction is shrouded with uncertainty. There is, again, no "one deliverable" that lists the specific construction projects planned for the next two years and the timetable on which they will be achieved. Hr'g Tr. at 83:18–19. The budget document the Defendants have produced to the Court is light on specifics. This paucity of detail renders the Court's factual determinations necessarily tentative.

There is also an atmospheric sense that what may be true today may not be true tomorrow. This administration has already demolished one historic building in the Washington

16

D.C. area without advance warning, after months of reassurances that it would remain untouched.  President Trump has publicly suggested that he could fire Floca on a whim, should he be unsatisfied with the Executive Director's performance.  See March 16 Press Conf. Tr. at 9 ("But if I don't think he will do a good job, I'll say, Matt, you're fired, I'm getting somebody else.  So you're under no pressure, Matt.").  And the Kennedy Center Board has further demonstrated its capacity for caprice.  As the Court concludes in its companion ruling in the Beatty case, the trustees voted to rename the Center in President Trump's honor, violating Congress's clear command that the institution be named only for President Kennedy.  Board members also voted to close the Center with scant regard for their duties under the Center's organic statute to operate the institution as a performance venue and presidential memorial.

Still, the Court cannot issue a preliminary injunction based on hypotheticals when the sworn testimony before it tells a different story.  Cf. Postal Police Off. Ass'n v. USPS, 502 F. Supp. 3d 411, 425–26 (D.D.C. 2020) (Cooper, J.) (explaining that courts cannot issue injunctions based on theoretical possibilities of harm).  For purposes of this motion, the Court will proceed on the understanding that full demolition and a "Complete Rebuilding" are not in the cards.

A.  APA Claims against Agency Defendants

DC Preservation League has lodged an array of APA claims against the Agency Defendants based on their purported failure to satisfy obligations under Section 8106, the NCPC and CFA planning review statutes, Sections 106 and 110(k) of the NHPA, NEPA, and the Kennedy Center's organic statute.  See generally Compl. Counts I–VII.  Despite bringing these claims under the auspices of the APA, the League has not shown that any of the "Agency Defendants" has territorial jurisdiction over land or waterways implicated by the renovations as currently scoped, nor has it established that any of their statutory obligations have yet come due.

17

The APA authorizes courts to review "final agency action."  5 U.S.C. § 704.  Agency action is final where it "marks the consummation of the agency's decisionmaking process" and is an action "by which the rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (cleaned up).  Under the APA, courts may also review an agency's failure to act, so long as the action in question was discrete, legally required, and improperly withheld.  See Norton v. Southern Utah Wild. All., 542 U.S. 55, 61–64 (2004).

The APA claims in this case hit a snag on final agency action.  Consider, first, the claims against NPS, Interior, and Secretary Burgum.  DC Preservation League initially contended that Kennedy Center's "cantilevered west patio" fell "within the vertical air rights of the Rock Creek and Potomac Parkway, a federally managed NPS unit," so the renovation project necessarily triggered planning obligations as to NPS and its parent agency.  Mot. for Prelim. Inj. at 17.  The government has submitted an unrebutted declaration from NPS director Tammy Stidham, clarifying that the Center's property "includes the air rights over the Rock Creek and Potomac Parkway" and under the west patio.  Opp. Br., Ex. B ("Stidham Decl.") ¶¶ 8–10.  It thus appears that NPS and Interior lack jurisdiction over the air space above the Parkway and below the cantilevered terrace, which served as the League's original territorial hook for these Defendants.

The League further posits that the Kennedy Center renovations will encroach on NPS territory because the bare-bones budget document outlining the Kennedy Center's construction plan alludes to "Rock Creek Parkway Stabilization," work on HVAC systems under the Parkway, and landscaping on Potomac River embankments.  See Reply Br. in Supp. of Mot. for Prelim. Inj. ("Reply Br.") at 12–13.  Mr. Floca testified that some of this work would necessitate "coordinat[ing] with NPS on traffic control," but explained that "structurally we are not making

18

any changes to the parkway." Hr'g Tr. at 85:21–86:12. The Court reiterates that the Kennedy Center's plans are remarkably vague, given how soon renovations are set to begin. It may be that work alluded to in the budget document will require some kind of access permit from NPS. See Reply Br. at 12–13. The Defendants' counsel has confirmed that such permitting is "possible." Hr'g Tr. at 150:21–24; see also Stidham Decl. ¶ 12 (explaining that if the Center "propose[s] to use lands under NPS jurisdiction for construction staging, excavation, access, or other activities then a permit or other written authorization would be required").[5]

Still, DC Preservation League has not established why the Agency Defendants can be held responsible for another government entity's failure to submit its plans or seek required permits in a timely fashion. Absent some kind of "consummation" of each agency's *own* "decisionmaking process," Bennett, 520 U.S. at 177–78, or the unlawful withholding of a "discrete agency action" that the agency *itself* is "required to take," Norton, 542 U.S. at 64 (emphasis removed), the League's APA challenge as to those defendants is premature.

The same goes for USACE. DC Preservation League insists that the renovations will require Army Corps "permits for any construction staging, excavation, or discharge under the Clean Water Act and Rivers and Harbors Act." Mot. for Prelim. Inj. at 15. It elaborates on reply that work on the Rock Creek Parkway "very likely requires USACE to issue a permit for (at minimum) discharges of sediment or other fill material to navigable waters" and that work on the

---

[5] If the Center eventually applies for a permit from a federal agency like NPS, that permitting process would seem to trigger at least some form of planning review to which the Non-Agency Defendants maintain they are not subject. See, e.g., 54 U.S.C. § 306108 (subjecting both the "head of any Federal agency having direct *or indirect* jurisdiction" over an undertaking and "the head of any Federal department or independent agency *having authority to license*" such an undertaking to the Section 106 historic preservation review process (emphases added)). Thus, as a purely practical matter, the Non-Agency Defendants would seem to risk further delay on the renovation work by postponing the permitting process.

HVAC systems, which apparently draw water from the Potomac, "may require USACE to revise or reissue the Center's water use permit." Reply Br. at 12–13. According to government counsel, however, no such permitting will likely be necessary.[6] Although Defendants have not submitted concrete evidence on this sub-point, it remains unclear why the *Kennedy Center's* purported failure to seek the requisite permits authorizes an APA suit against the permitting agency, which has nothing before it to decide.

This reasoning applies equally to the last named Agency Defendant, NCPC. The Kennedy Center has engaged in informal, "staff-level consultation" with the Commission, although it has not "submitted" any "official[]" plans and maintains it is not legally obligated to do so. See Hr'g Tr. at 101:14–102:18; 163:9–25. The NCPC is thus more involved in the renovation process than the NPS, Interior, or the Army Corps. However, because the Commission has not received any official submissions from the Kennedy Center, the status of NCPC's official decisionmaking process is murky. Has it begun? Has it been completed? Has NCPC withheld a discrete action that it is legally required to take? Without answers to these questions, the League cannot maintain an APA claim.

At this early stage, then, the DC Preservation League's APA claims against the Agency Defendants do not appear likely to succeed. The Court lacks sufficient evidence to conclude that any of the agencies has direct territorial control over the planned renovation work. And the League has not demonstrated that the agencies have engaged in final agency action or unlawfully withheld some discrete action they were required to carry out. In fact, as the Plaintiffs' counsel

---

[6] See Hr'g Tr. at 151:14–20 ("MR. ROTH: . . . I will say that on the Army Corps point, we don't think there is going to be any permit necessary. The water system has been permitted for decades. What needs to be updated is the filter. When the water comes into the building, it should be filtered before it's used. But the process of taking the water out has already been properly permitted for a long time.").

noted at the motion hearing, these agencies "have nothing to review" thus far. Id. at 140:16. If "fault lies with" anyone, then, it lies with the Kennedy Center for failing to initiate various permitting and review processes that it is purportedly required to initiate. Id. at 140:17–19. The remainder of this opinion therefore focuses on the claims brought against the Non-Agency Defendants—i.e., the Center's Board of Trustees, its Chair, and its parent agency, the Smithsonian.

### B.  Claims against Non-Agency Defendants

DC Preservation League's claims against the three remaining Defendants take multiple forms. A few counts allege that the Non-Agency Defendants have acted beyond their statutory authority. The remainder assert that these Defendants have failed to engage in various mandatory planning processes. The Court ticks through each claim in turn.

#### 1.  Statutory Authority Claims

##### a.  Section 8106 *Ultra Vires* Claim

Count IX of DC Preservation League's complaint is an *ultra vires* claim against the Non-Agency Defendants for violating 40 U.S.C. § 8106, which mandates that a "building or structure shall not be erected on any reservation, park, or public grounds of the Federal Government in the District of Columbia without express authority of Congress."

If the Kennedy Center were slated to be demolished and rebuilt in some fashion, the League might have a strong *ultra vires* claim on its hands, given the statute's plain prohibition on erecting buildings and structures without Congress's express permission. Cf. Nat'l Trust, 2026 WL 877779, at *10–12 (holding that plaintiffs challenging East Wing ballroom construction were likely to succeed on their Section 8106 claim because Congress had not authorized the project). Any implication that Congress specifically approved the demolition and rebuilding of

21

the Kennedy Center by way of the OBBBA, see, e.g., Opp. Br. at 14–15, is far-fetched.  See Pub. L. No. 119-21, § 60025 (appropriating roughly $257 million to cover "necessary expenses for capital repair, restoration, maintenance backlog, and security structures"); H.R. Rep. No. 119-106, pt. 1, at 1175 (explaining that the funding would "address deferred maintenance and upkeep"); see also Nat'l Trust, 2026 WL 877779, at *10 ("[A]n appropriation from Congress is authorization to use funds *for a specified purpose*." (emphasis added)).

Yet, as the Court has noted, Mr. Floca's sworn testimony disavows the "erect[ing]" of a building or structure, notwithstanding President Trump's long shadow over his job security and the construction project more generally, as well as the administration's vicissitudes concerning the East Wing.  Floca has attested under oath that "planned construction, renovation, and renewal efforts are only limited to the current structures, buildings, and grounds" and that "[n]o new structure or building will be erected on the campus."  Floca Decl. ¶ 6.  He likewise testified that neither he nor anyone else at the Center has active "plans to demolish" the building, and that no new structure or building will be erected or rebuilt from the bare structural steel.  See Hr'g Tr. at 46:11; 47:6–8; 78:9–13.  To the Court's knowledge, there were no such statements made under oath before the East Wing's destruction.

The Court cannot disregard Mr. Floca's sworn testimony.  And DC Preservation League's counsel conceded that there was nothing in the record beyond the President's statements to "show that a new structure or building" would be "erected on the Kennedy Center grounds."  Hr'g Tr. at 112:19–113:6.  Any resulting factual uncertainty on this score does not bode well for the League's *ultra vires* claim.  Recall that it is not enough, under that strict rubric, for the Non-Agency Defendants to act unlawfully; they must "step[] so plainly beyond the

bounds of [their] statutory authority, or act[] so clearly in defiance of it, as to warrant" judicial "intervention." FedEx, 39 F.4th at 764. Such a determination eludes the Court on this record.[7]

b.    Section 76j(a)(1)(G) *Ultra Vires* Claim

DC Preservation League's next *ultra vires* claim—Count X—posits that the Non-Agency Defendants have exceeded their statutory authority to carry out construction work at the Center because the Board's capital authority extends only to "capital repair, replacement, improvement, rehabilitation, alteration, or modification" projects that are "*necessary to maintain the functionality of the building and site* at current standards of life, safety, security, and accessibility." 20 U.S.C. § 76j(a)(1)(G) (emphasis added). The planned construction, the League says, goes beyond the needs of essential functionality.

Notwithstanding the Center's lack of construction plans for a project slated to begin in mere weeks, the Court cannot say that the League has established a likelihood of success on Count X for two principal reasons. *First*, much of the contemplated construction is aimed at consummating the repairs laid out in the 2021 and 2022 CBPs, as well as in reports on external soffit failure and water intrusion. See, e.g., Floca Decl. ¶ 9; Hr'g Tr. at 34:19–21 ("[W]e have the comprehensive building plan and that tells us the needs[.]"); Hr'g Tr. at 88:15–17 ("The 2021 [CBP] touches on the majority of the [repairs] I have been talking about[.]"). Such capital repairs fall neatly within the scope of Section 76j(a)(1)(G), and DC Preservation League offers

---

[7] DC Preservation League correctly points out that the Kennedy Center has sought Congressional authorization for several construction projects in the past. See, e.g., Mot. for Prelim. Inj. at 5 n.2. That past practice does not resolve the specific *ultra vires* claim presented here. Some of those projects—for instance, the REACH Expansion and the addition to the Center's parking garage—would have required Congress's permission because they added new structures to the campus. As for the seemingly less intrusive addition of a "photovoltaic system" on the roof of the main building, see 20 U.S.C. § 76m, the Kennedy Center had to go to Congress anyway to secure a specific appropriation for the work, see id. § 76r(d), and it is not entirely clear from the statute itself whether express Congressional authorization was otherwise required.

no reason to think this work is not necessary to "maintain the functionality of the building and site" at the requisite levels—especially when the text of the statute permits not just repairs and rehabilitations, but also "alteration," "modification," and "improvement."[8]

*Second*, Section 76j(a)(1)(G) is not the only provision in the organic statute that bears on the Board's capital repair authority. The Board is also charged with "provid[ing] . . . with respect to the building and site of the [Center], all necessary maintenance, repair, and alteration of, and all janitorial, security, and other services and equipment necessary for the operations of, the building and site, in a manner consistent with requirements for high quality operations[.]" 20 U.S.C. § 76j(a)(1)(H). And Congress mandated that "the Hall of Nations, the Hall of States, and the Grand Foyer" be maintained "in a manner that is suitable to a national performing arts center that is operated as a Presidential memorial[.]" Id. § 76j(a)(2)(E).

The evidentiary record reveals some amount of work that may not strictly "maintain the functionality" of the Kennedy Center campus—for instance, upgrades to the seats in the performance halls and campus landscaping. But even if the Court could quibble with the Board's designation of these projects as necessary to "maintain the functionality of the building and site"—a dubious endeavor under the *ultra vires* framework given that the phrase is subject to rather wide interpretation—such work would arguably fall within the broad scope of Section 76j(a)(1)(H) or (a)(2)(E). While the Defendants are hard-pressed to argue that the Center's wholesale rebuilding would fall comfortably within these statutory bounds, the Board's

---

[8] The League also suggests that Section 76j(a)(1)(G) prevents the Kennedy Center from closing for a prolonged period. See Mot. for Prelim. Inj. at 21–22. In its opinion in the related Beatty case, the Court has preliminarily enjoined the Board from effectuating its March 16 vote to close the Center. So the League's argument would seem to have been overtaken by events. In any case, it is far from clear that Section 76j(a)(1)(G), by its own terms at least, precludes a closure necessary to effectuate essential building repairs.

construction authority is otherwise "ambiguous," suggesting that its limit is not "sufficiently clear and mandatory" to serve as a yardstick for *ultra vires* purposes. Nat'l Ass'n of Postal Supervisors v. USPS, 26 F.4th 960, 971–72 (D.C. Cir. 2022). In other words, the Court cannot say that the projects described in Mr. Floca's sworn testimony go "patently" beyond the Board's capital repair authority or run afoul of a "specific and unambiguous statutory directive" in the organic statute. FedEx, 39 F.4th at 764 (cleaned up).

c.   Section 76j(a)(2)(F) *Ultra Vires* Claim

DC Preservation League's final statutory authority claim—Count XI—is anchored in Section 76j(a)(2)(F) of the Kennedy Center's organic statute, which dictates:

> The Board shall manage and operate the grounds of the [Kennedy Center] in a manner consistent with National Park Service regulations and agreements in effect on July 21, 1994. No change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior.

According to the League, the latter sentence of this provision categorically precludes the Center's two-year closure of the grounds without approval from Congress and Interior. In its view, the March 16 closure decision, which will place the "majority of the grounds directly around the building . . . behind a construction fence," is *ultra vires*. Hr'g Tr. at 69:10–11.

This claim starts on stronger footing than the others because Section 76j(a)(2)(F) includes a clear statutory prohibition, and it is at least plausible to read the provision as preventing the closure of the grounds absent Congressional and agency approval. In the colloquial sense, a closure of the grounds may qualify as a "change in . . . operation" prohibited by the organic statute. Meanwhile, the Defendants' proposed reading of Section 76j(a)(2)(F), which would require external approval only where the Center wishes to "sell[]," "lease[]," or "allow[] some other entity to operate the grounds," seems unduly cramped. Opp. Br. at 17.

25

Yet it is also possible—and, in the Court's view, more natural—to read "management and operation" in a different manner.  Section 76j(a)(2)(F) begins by directing the Board to "manage and operate" the Kennedy Center's grounds "in a manner consistent with" NPS regulations.  The Court will presume that the terms "manage" and "operate," which are used in both sentences of the statutory provision, "bear the same meaning" in both places.  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012).  Reading the two sentences in sequence, Congress seems to be saying that the Board must seek legislative and agency approval before "manag[ing] and operat[ing]" the grounds in a manner *in*consistent with NPS regulations—not that the Board must seek such affirmative approval *any* time it makes even a marginal change in the operation of the grounds.  Under DC Preservation League's read of the statute, something as minute as an adjustment in the campus' operating hours would necessitate Congressional and Interior consent.  That interpretation makes little sense.

The question remains whether a two-year closure of the Kennedy Center grounds (partial or full, depending on the extent to which the REACH Expansion will remain open) is *per se* inconsistent with governing NPS regulations.  The parties have not grappled with *that* question very fulsomely in their briefs, perhaps because neither side parsed the first sentence of Section 76j(a)(2)(F) until the Court referenced it at the motions hearings in this case and in Beatty.

The Defendants insist that any argument pertaining to the regulations is thus forfeited.  See Defs.' Suppl. Br. at 5–6.  Not so.  DC Preservation League's Complaint duly raises the Section 76j(a)(2)(F) claim, and the Court will not ignore the first sentence of that statutory provision just because the League's briefs have largely focused on the second.  Cf. Glob. Health Council, 153 F.4th at 13 ("[O]nce an argument is before us, it is our job to get the relevant . . . law right." (quoting United States v. Hillie, 39 F.4th 674, 684 (D.C. Cir. 2022)).  Moreover, after

the Court asked about the NPS regulations at the hearings, the parties had an opportunity to address them in their post-hearing supplemental briefs.  Id. at 14 (holding that argument was not forfeited where an adverse party had the chance to respond in a subsequent brief).

Just because a line of argument is not forfeited, however, does not mean it's a winner.  To be sure, the general park management regulations identified by DC Preservation League at the motion hearing and in their post-hearing supplemental brief seem pertinent here.  See 36 C.F.R. § 1.1 *et seq.*  To the extent that the Defendants suggest these regulations do not apply because the Kennedy Center is not a "park area" under NPS's jurisdiction within the definition of the regulations, see Defs.' Suppl. Br. at 6–7, they have missed the point:  It is the Center's *own* organic statute which mandates that the grounds be operated "in a manner consistent with [NPS] regulations and agreements."  20 U.S.C. § 76j(a)(2)(F).

That said, DC Preservation League's supplemental brief fails to fully ventilate the legal obligations that those NPS park management regulations impose, if applied.  For instance, the rules do not flatly prohibit the closure of park grounds, though under non-emergency circumstances, closures do require on-site public notice, id. § 1.7(a); a "written determination justifying the action," id. § 1.5(c); and, under certain circumstances, rulemaking in the Federal Register, id. § 1.5(b).[9]  Even though Section 76j(a)(2)(F) requires that the Board "manage and operate the grounds" in a "manner consistent with" these regulations, it is not apparent that a

---

[9] The Court observes that, contrary to the Defendants' representation at the motions hearing, the Kennedy Center has the authority to "prescribe . . . regulations necessary for— (1) the adequate protection of [its] specified buildings and grounds and individuals and property in those buildings and grounds[.]"  40 U.S.C. § 6304(a)(1).  In their post-hearing supplemental brief, the Defendants suggest that they "can provide . . . public notice of the temporary grounds closure," including by "rulemaking."  Defs.' Suppl. Br. at 8.  Given that the renovation work will likely require a "long-term or significant modification" in the Kennedy Center grounds and is of a "highly controversial nature," 36 C.F.R. § 1.5(b), rulemaking would seem to be in order.

partial or full closure of a park ground, even one that "result[s] in a significant alteration in the public use pattern of the park area," 36 C.F.R. § 1.5(b), demands Congressional approval.

Given various plausible interpretations of Section 76j(a)(2)(F) and the can of worms opened by the seemingly applicable NPS regulations, DC Preservation League has not established a likelihood of success on its *ultra vires* claim. Section 76j(a)(2)(F) may be as restrictive as the second sentence sounds. Yet interpreting the statute to permit grounds closures in a manner consistent with NPS regulations, but without Congressional or Interior approval, is not so wrong as to constitute a patent misconstruction of the statute. See, e.g., FedEx, 39 F.4th at 764 (cleaned up). As a result, the Court cannot conclude that the League is likely to succeed on Count XI, which is rooted in the contention that the Kennedy Center grounds may not close without the permission of Congress and Interior.

### 2. *Planning and Environmental Review Claims*

#### a. Commission of Fine Arts Mandamus Claim

The Court finally turns to the slate of claims that DC Preservation League brings against the Non-Agency Defendants pursuant to various planning statutes. It begins with Count XIII, the mandamus claim against the Kennedy Center, the Smithsonian, and President Trump based on their alleged failure to consult with the CFA on the Center's renovation.

By statute, the CFA is required to "advise" on "the location of statues, fountains, and monuments in the public squares, streets, and parks in the District of Columbia," as well as the "selection of models" and "artists" for such structures. 40 U.S.C. § 9102(a). "The officers required to decide" such questions bear the burden of "request[ing] the Commission to provide the advice[.]" Id. § 9102(b). The CFA's regulations lay out an even broader regulatory remit. "For public buildings to be erected in the District of Columbia by the federal government and for

other structures to be so erected which affect the appearance of the city, the Commission comments and advises on the plans and on the merits of the designs before final approval or action." 45 C.F.R. § 2101.1(a)(1). And again, "statues, fountains and monuments to be erected in the District of Columbia under authority of the federal government" must be "advise[d] upon" by the CFA. Id. § 2101.1(a)(2).

DC Preservation League's likelihood of success on Count XIII depends on the Court's current understanding of the scope of renovation work at the Kennedy Center. If the plan were closer to what President Trump has described on social media—a "Complete Rebuilding"—the CFA's regulations could create a clear duty to consult with the Commission according to its regulatory parameters "on the merits of the designs before final approval or action." 45 C.F.R. § 2101.1(a)(1).[10] And recall that "[a]bsent a violation of a clear duty," courts are "powerless to grant mandamus." In re Ctr. for Bio. Diversity, 53 F.4th at 670.

The Defendants suggest that the Center has discharged any duty to consult with the CFA by voluntarily engaging the CFA (and the NCPC, for that matter) in a "couple of staff-level meetings." Hr'g Tr. at 101:20–21 (Floca testimony); see also Opp. Br. at 17. The Court disagrees. CFA (and NCPC) consultation processes entail far more than *ad hoc*, closed-door staff meetings. At minimum, they require public input and actual, detailed submissions. See, e.g., 45 C.F.R. § 2102.10 *et seq.* Whatever voluntary contact the Center has made with capital planning agencies, it falls short of the purported legal requirements.

---

[10] The parties do not address the extent to which a regulation, rather than a statute, can create a "clear" legal duty for mandamus purposes. A regulatory duty would seem sufficient, under some circumstances, to establish such a duty. See, e.g., United Gov't Sec. Off. of Am., Local 52 v. Chertoff, 587 F. Supp. 2d 209, 218 n.7 (D.D.C. 2008); Milton S. Hershey Med. Ctr. v. Becerra, Nos. 23-1382, 23-1384 (JDB), 2024 WL 3673614, at *5 (D.D.C. Aug. 6, 2024).

At the risk of repetition, the bigger problem for DC Preservation League at this stage is the factual record.  In light of Mr. Floca's sworn testimony, the Court cannot say that the construction will entail "erect[ing]" any statues, fountains, monuments, or public buildings.  Thus, the project is arguably not within the CFA's statutory or regulatory purview.  Again, one of the threshold requirements for a mandamus claim is that the government defendant has neglected a clear duty.  In re Ctr. for Bio. Diversity, 53 F.4th at 670.  The Court lacks sufficient evidence to conclude that the Non-Agency Defendants have a clear-cut duty to consult with the CFA on this renovation project, at least as currently portrayed.

b.  NCPC Mandamus Claim

Count XII is a mandamus claim premised on the failure of the Kennedy Center Board, Smithsonian, and President Trump to request review and approval from the NCPC for the planned renovation work.  Under 40 U.S.C. § 8722, government construction projects in the capital triggers two requirements.  Section 8722*(b)(1)* requires that federal and District of Columbia "agenc[ies]" "advise and consult with the Commission" "before preparing construction plans the agency originates for proposed developments and projects."  The agency is not bound by the Commission's recommendations, but must engage in a formal consultation process that involves input from the general public.  Id.  Separately, Section 8722*(d)* mandates that "[i]n order to ensure the orderly development of the National Capital, the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around federal public buildings in the District of Columbia are subject to the approval of [NCPC]."

The Court considers each of these statutory bases for DC Preservation League's NCPC mandamus claim independently—keeping in mind that, in the mandamus context, the challenged

30

defendant must have neglected to carry out a "crystal-clear legal duty." In re Ctr. for Bio. Diversity, 53 F.4th at 670. "Although the term 'duty' . . . must be narrowly defined, this does not mean that mandamus actions are ruled out whenever the statute allegedly creating the duty is ambiguous." Lovitky v. Trump, 949 F.3d 753, 760 (D.C. Cir. 2020) (cleaned up). Where a particular duty-conferring statute requires some interpretation, the question is whether "once interpreted, the statute creates a peremptory obligation for the [government] officer to act," and if it does, a mandamus action may lie. Id. (cleaned up). Still, at the preliminary injunction stage, the plaintiff bears the burden of persuading the court that its read of the statute is correct.

Start with the Section 8722(b)(1) consultation requirement, which applies to federal and District "agencies." Neither Section 8722 nor its surrounding provisions define the term "agency." The Smithsonian is understood to be an agency for some purposes (e.g., the Federal Tort Claims Act and the U.S. Constitution), but not others (e.g., the Privacy Act and the APA). Compare Raven v. Sajet, 334 F. Supp. 3d 22, 28–32 (D.D.C. 2018), with Dong, 125 F.3d 877 at 882–83. And the Kennedy Center presumably has the same designations under the same statutes for the same reasons. Cf. Groce v. Rodriguez, 743 F. Supp. 3d 244, 251–52 (D.D.C. 2024) (concluding that the National Gallery of Art, which is institutionally comparable to the Kennedy Center, is not an agency for the purpose of the APA under the logic of Dong); Polcari v. John F. Kennedy Ctr. for the Performing Arts, 712 F. Supp. 230, 231–32 (D.D.C. 1989) (ruling that the Kennedy Center is a federal agency covered by the Federal Tort Claims Act by virtue of being a bureau of the Smithsonian). It is not entirely clear from the face of Section 8722, or surrounding context, whether Smithsonian and Kennedy Center are covered by the (b)(1) consultation mandate. They may be. But given the Center's differential treatment under different statutes, that conclusion is not a given, and DC Preservation League has not argued the point

31

comprehensively.  The Court therefore cannot say that the League has established a likelihood of success on this first score.

Section 8722(d), by contrast, is not limited to work undertaken by federal agencies.  It applies to any "federal public buildings in the District of Columbia," and no one disputes that the Kennedy Center qualifies as such.  The pertinent inquiry is thus whether the planned renovation will impact the building's "location, height, bulk, number of stories, [or] size," or the "provision for open space in and around" the building, in which case NCPC approval is required.

On the available record, the League is not likely to establish that the Center has a "crystal-clear legal duty" to submit its project to the NCPC under Section 8722(d).  If a "Complete Rebuilding" of the Center is off the table, the Court struggles to see how infrastructural upgrades, soffit remediation, waterproofing, and other repairs will ultimately change the building's "height, bulk, number of stories, [or] size."  Said another way, crediting Mr. Floca's construction-related testimony, the Center's footprint and overall shape and size seem unlikely to change in a permanent manner.  And DC Preservation League does not explain why the temporary changes to the exterior of the building or grounds which naturally attend the construction process—think, scaffolding, short-term exposure of steel, or replacement of faulty soffits—*themselves* trigger NCPC review, see Reply Br. at 16 n.10; otherwise, as the Defendants point out, Section 8722(d) would effectively cover every federal construction project.  Such an interpretation would be strange, not least because it would mean that Section 8722(d)'s tailored approval requirement sweeps more widely than (b)(1)'s broader consultation mandate.

As for changes in the "provision for open space in and around" the Kennedy Center building, the League points to the planned installation of bollards and locked security doors, as well as to landscaping upgrades and felled historic trees.  See Pls.' Suppl. Br. at 4–5.  Without

32

more, these relatively limited alterations do not strike the Court as the kinds of changes that trigger NCPC review because they do not meaningfully restrict public access to the Kennedy Center, change its building area, or affect the ground plan.  If every aesthetic landscaping decision or minor security measure qualified as a change to a federal building's "provision for open space," NCPC would surely be flooded with applications to review *de minimis* alterations.

At best, it is simply not clear whether Section 8722(d) demands NCPC approval for the scope of work that Mr. Floca has described.  In light of that uncertainty, DC Preservation League has not demonstrated a likelihood of success on its NCPC mandamus claim at this juncture.

### c.   NHPA Section 106 Claim

DC Preservation League brings two final *ultra vires* claims against the Non-Agency Defendants under the NHPA, a "chiefly procedural" statute that requires regulated parties to "stop, look, and listen" before embarking on projects that may impact historic properties. Tohono O'odham Nation v. U.S. Dep't of the Interior, 138 F.4th 1189, 1193–94 (9th Cir. 2025) (cleaned up); see also Ill. Com. Comm'n v. ICC, 848 F.2d 1246, 1261 (D.C. Cir. 1988).  The League brings its first NHPA claim under Section 106 of the Act, which provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property.  The head of the Federal agency shall afford the [ACHP] a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306108.

All else equal, the Kennedy Center renovation project would likely trigger the historic preservation review processes mandated by Section 106.  The Center is a "historic property" because it is "eligible for inclusion" on the National Register of Historic Places.  See id. §

33

300308 (defining "historic property"); see generally D.C. State Historic Preservation Office, Determination of Eligibility Report (Feb. 13, 2012), https://parkplanning.nps.gov/document.cfm?documentID=45798 [https://perma.cc/Z4XH-CD8Q]. And the construction planned for the Center qualifies as an "undertaking" because it will be "carried out with Federal financial assistance," in the form of a large Congressional appropriation. See 54 U.S.C. § 300320 (defining "undertaking").

The catch is that Section 106 only imposes obligations on the head of a "Federal agency" or, alternatively, the head of a "Federal department or independent agency" with licensing authority. See, e.g., Sheridan Kalorama Hist. Ass'n v. Christopher, 49 F.3d 750, 755 (D.C. Cir. 1995); Lee v. Thornburgh, 877 F.2d 1053, 1056–57 (D.C. Cir. 1989); Kingman Park Civic Ass'n v. Gray, 956 F. Supp. 2d 230, 251 (D.D.C. 2013). The Kennedy Center has no licensing authority. And it is not a "Federal agency" because the NHPA has adopted the APA's definition of "agency," 54 U.S.C. § 300301, and the D.C. Circuit has held that the Smithsonian is not an agency for APA purposes, see Dong, 125 F.3d 877 at 883. Whether because the Kennedy Center is a "bureau" of the Smithsonian, or because the logic of Dong naturally applies to the Center, binding Circuit precedent seems to foreclose an understanding of the Kennedy Center as a "Federal agency" for Section 106 purposes.

Perhaps recognizing this oversight, Congress enacted the Smithsonian Facilities Authorization Act ("SFAA") in 2003, which states in relevant part that

> [I]n carrying out other projects in the District of Columbia *which are subject to the review and approval of the National Capital Planning Commission in accordance with section 16 of the Act of June 20, 1938 (sec. 6–641.15, D.C. Official Code)*, the Smithsonian Institution shall be deemed to be an agency for purposes of compliance with regulations promulgated by the Advisory Council on Historic Preservation pursuant to section 106 of the National Historic Preservation Act (16 U.S.C. 470f).

34

Pub. L. No. 108-72, § 3(c)(2), 117 Stat. 888, 889 (2003) (emphasis added).  This language is not the model of legislative clarity.  But it is fairly understood to subject to Section 106 review all Smithsonian projects that must be reviewed and approved by the NCPC, pursuant to D.C. Code § 6-641.15.  That provision of the D.C. Code, in turn, mirrors Section 8722(d) in requiring that "the location, height, bulk, number of stories, and size of federal public buildings in the District of Columbia and the provision for open space in and around the same will be subject to the approval of the [NCPC]."  D.C. Code § 6-641.15.

In plainer English: when the Smithsonian constructs or alters federal public buildings in a manner that affects their location, height, bulk, number of stories, size, and surrounding open space, its plans are subject to NCPC approval.  And under the SFAA, Smithsonian projects submitted for NCPC approval must also be reviewed in accordance with Section 106 and its implementing regulations.[11]  Even though the Kennedy Center is in some ways institutionally independent from the Smithsonian, see 20 U.S.C. §§ 42, 76k(e), the Court sees no reason why the Kennedy Center, as a "bureau" of the Smithsonian, 20 U.S.C. § 76h(a)(1), would not be covered by the SFAA.[12]

---

[11] Separately, the Smithsonian and NCPC have entered into a Memorandum of Agreement that confirms that the "Smithsonian must comply with Section 106 of the NHPA for those projects it submits to NCPC for review and approval in the District."  Mot. for Prelim. Inj., Ex. 35 at 3.

[12] The Defendants suggest that Section 76k(e) of the Kennedy Center's organic statute precludes the application of the SFAA to this "unique[ly] independen[t]" bureau.  Opp. Br. at 22. That argument is unavailing.

Section 76k(e) provides that the "actions of the Board relating to performing arts and to payments made or directed to be made by the Board from any trust funds shall not be subject to review by any officer or agency other than a court of law."  Whatever actions this provision insulates from external review—i.e., whether it applies to any action relating to trust fund payments or only those actions related to performing arts and trust fund payments, given the conjunctive connector—the Court is not persuaded that it supersedes external planning requirements, including the one posed by the SFAA.  There are, after all, several sections of the

Where does this interpretive maze leave us?  As the Court has already concluded, the Kennedy Center is not likely to succeed in demonstrating that the renovations will affect the buildings on the campus along any of the aforementioned vectors, at least in a permanent manner.  Because the project as currently conceptualized likely need not be approved by the NCPC, it is also not subject to the Section 106 process because the SFAA expressly links these two forms of regulatory review.

The Court acknowledges that this statutory quirk renders the Kennedy Center virtually unique among federal public buildings and presidential memorials in the District of Columbia in its partial insulation from Section 106 review.  Without subjecting the planned renovation project to external consultation, Kennedy Center staff and the Board—rather than the experts in historic preservation who comprise the ACHP—become the final arbiters of historic significance.  The consequences of this statutory loophole are cause for concern.

Take, for instance, the marble panels and walls that contributed to the Kennedy Center's designation as eligible for the National Register of Historic Places.  See D.C. State Historic Preservation Office, Determination of Eligibility Report at 10–13.  When it was originally built, the Center received gifts from many foreign countries.  See Mot. for Prelim. Inj., Ex. 4 at 16–17 (official Kennedy Center blog post regarding the Center's historical development).  Among them

---

organic statute that impose external agency review on Board conduct.  See, e.g., 20 U.S.C. § 76i(a) (requiring that the Kennedy Center building be constructed "in accordance with plans and specifications approved by the Commission of Fine Arts"); id. § 76j(a)(2)(F) ("No change in the management and operation of the grounds may be made without the express approval of Congress and of the Secretary of the Interior"); id. § 76k(g) (making "plans" and "projects to improve pedestrian and vehicular access" "[s]ubject to the approval of the Secretary of the Interior"); id. § 76l(d) (subjecting the "functions of the Board funded by [appropriated] funds" to the oversight of the Inspector General of the Smithsonian).  Section 76k(e) is simply no answer to a later-enacted and more specific statute subjecting the Smithsonian—and by extension, the Kennedy Center—to historic preservation review under certain circumstances.

were approximately 3,700 tons of marble from the Italian government.  Id.  The marble was collected from three quarries, including the Bufalini family's quarry in Carrara, and "transported across the Atlantic Ocean in over a dozen shipments."  Id.  A 1963 letter of gratitude from then-Board Chairman Robert Stevens to the Italian ambassador explained that he could "think of no greater contribution" to the building's design and construction "than that [its] walls, floors and paving . . . should bear permanent testimony, both to [Italy's] gracious generosity and to the excellence of one of [its] national products."  Id.  Stevens pledged that the "resource" would "constitute a vital part" of the Center "for all time to come."  Id.

President Trump has stated to the press that the Kennedy Center will only keep "some of the marble," and "some of the marble" will "come[] down" during renovations.  Mot. for Prelim. Inj., Ex. 30 at 3.  He has also stated that the Center has "already purchased a lot of [new] marble."  March 16 Press Conf. Tr. at 15–16.  Yet as DC Preservation League points out, a "like-for-like exchange of building features and materials"—even if specialized materials like the gifted Italian marble could be matched and purchased today—does not necessarily preserve the historic character of the property.  Pls.' Suppl. Br. at 6.

There are other concerning examples of the Defendants' apparent disregard for the Kennedy Center's historic features.  By the Center's own institutional admission, it has long been "known for its . . . golden pillars."  Mot. for Prelim. Inj., Ex. 4 at 2.  The columns and another important feature—the Center's willow trees—were key contributors to its eligibility for the National Register.  See D.C. State Historic Preservation Office, Determination of Eligibility Report at 10–13.  But last year, the columns were painted white overnight, and the willows are poised to be replaced with a different species.  These changes seem based purely on the personal preferences of President Trump and Mr. Floca.  See Mot. for Prelim. Inj., Ex. 34 at 6 (CNN

Politics article) (President Trump opining that "[the columns] look[] so much better. Before they had the steel painted gold, and the gold was very cheap. . . . We got rid of the gold columns, which was always terrible—they looked cheap and they looked fake."); Hr'g Tr. at 28:17–19 (Floca testifying that "[President Trump and I] haven't specifically talked about the weeping willows or the replacement. I think that a weeping cherry tree would be perfect.").

When pressed on the alterations, Mr. Floca posited that the "historical significance [of the columns] is not the[ir] color," but instead their "low overhang" and "slender nature," Hr'g Tr. at 33:13–15, and "going from a weeping willow to a weeping cherry" would not qualify as a "material change to the exterior," id. 29:2–3. Scores of architects and historians who have attested to the historical significance of these and other unique finishes would surely disagree. See generally Mot. for Prelim. Inj., Exs. 42, 44, 47, 48, 49, 54, 55, 58, 60 (sworn declarations from members of Plaintiff associations).

One therefore wonders what other design and architectural changes will be explained away as immaterial during the forthcoming renovation. These impromptu changes to historic features of the Center underscore the importance of the Section 106 consultation process, which, although "limited" in "reach," is "aimed" at "discouraging" federal officials from entirely "ignoring preservation values" in their construction projects. Lee, 877 F.2d at 1056. The possibility of under-informed but irreversible alterations to historic property also highlights why preservation review should happen "*before*" the responsible officials "undertak[e] a course of action." Solenex, LLC v. Haaland, 626 F. Supp. 3d 110, 115 (D.D.C. 2022) (emphasis added); see also City of Grapevine, Tex. v. DOT, 17 F.3d 1502, 1509 (D.C. Cir. 1994) (recognizing the "desir[e] for the § 106 process to occur as early as possible in a project's planning stage").

Nevertheless, the Court's hands are tied.  This Kennedy Center renovation project occupies a sort of historic preservation no-man's-land.  The Center is not a federal agency, which would bring it within the NHPA's direct ambit.  And reading Section 106 and the SFAA together, not all construction work on the Kennedy Center site triggers preservation review.  The scope of the project that Mr. Floca has described under oath appears to fall outside that purview.

The Court is not at liberty to stretch these admittedly convoluted statutes beyond their limits.  And even if viable alternative constructions of these statutes *could* bring the Center's renovation within Section 106's coverage, it remains difficult to conclude that the Center has "disregard[ed] a specific and unambiguous statutory directive" in sidestepping the historic preservation process on the project, at least in its currently understood scope.  FedEx, 39 F.4th at 764 (cleaned up).[13]  As that is the standard the DC Preservation League must satisfy to succeed on its *ultra vires* claim, it has not carried its burden here.[14]

---

[13] To be sure, other Smithsonian projects of seemingly comparable magnitude have been submitted for NCPC and Section 106 review in the past.  See, e.g., Mot. for Prelim. Inj. at 30 n.14 (citing renovations at the National Air and Space Museum and to the Smithsonian Institution Castle that were submitted to the NCPC).  Those filings strongly suggest that formally submitting renovation plans to the NCPC and ACHP would be the most responsible course of action here.  Yet the Court lacks sufficient information to conclude that those projects and the one challenged here are so similar as to justify an apples-to-apples comparison.  More fundamentally, although past government practice may sometimes aid in liquidating statutory meaning, see, e.g., Learning Res. v. Trump, 146 S. Ct. 628, 640 (2026), the Smithsonian's prior voluntary submissions do not in and of themselves signal that Section 106 and the SFAA issue a "specific [statutory] command" bearing on a project of the present scope.  FedEx, 39 F.4th at 764 (cleaned up).

[14] The League posits that the plaintiffs "are not limited to an *ultra vires* claim to enforce Defendants' Section 106 obligations."  Pls.' Suppl. Br. at 5 n.5.  It argues that "because the SFAA makes the Smithsonian (and the Kennedy Center) an agency for purposes of Section 106, and Section 106 agencies are subject to the APA, Plaintiffs may assert violations of the NHPA through the APA's framework."  Id.  The Court is not persuaded by this transitive argument.  The SFAA "deem[s]" the Smithsonian an "agency for purposes of compliance with regulations promulgated by the [ACHP] pursuant to section 106," under certain circumstances.  But this careful formulation does not redefine "agency" for *APA* purposes, just because Section 106 otherwise adopts the APA's definition of "agency."  The Court is loath to imply the availability

d.   NHPA Section 110(k) Claim

DC Preservation League's final claim invokes a lesser-cited provision of the NHPA,

Section 110(k), which requires "[e]ach [f]ederal agency" to "ensure that":

> the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of [Section 106], has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the [ACHP], determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant.

54 U.S.C. § 306113.

The probability of success on this count is slim because the claim is premature. By its

terms, Section 110(k) contemplates that an "applicant" has applied for some "loan, loan

guarantee, permit, license, or other assistance," and that the federal agency charged with issuing

or disbursing that assistance must withhold it based on the applicant's intentional disregard for

Section 106. Even if the Court were to assume that the Kennedy Center has "intentionally

significantly adversely affected a historic property"—for instance, by painting the Center's gold

columns white or altering its façade by adding President Trump's name to the front portico—the

Center has not applied for any form of assistance from another federal agency, and no agency

has yet granted a form of assistance it is barred from granting. As a result, consistent with the

analysis as to the Agency Defendants above, see supra at Section III.A, and notwithstanding

what might transpire in the future, the Court cannot conclude that Section 110(k) has been

clearly "violat[ed]," Pls.' Suppl. Br. at 6.

---

of an APA cause of action in such an oblique manner, especially where the D.C. Circuit has held such a cause of action to be otherwise unavailable against institutions like the Smithsonian.

## IV.    Conclusion

Like its parent the Smithsonian Institution, the Kennedy Center is an "odd federal bird." Raven, 334 F. Supp. 3d at 29.  It has both governmental and non-governmental qualities.  That hybrid character leads to some likewise odd, and perhaps unintended, results.  One such consequence is that the Center's planned construction project—which is of substantial, though perhaps not entirely transformative, magnitude—does not plainly trigger the kinds of planning obligations it otherwise might.  Another is that, because the Center does not qualify as an agency for APA purposes, DC Preservation League must overcome more exacting standards imposed by *ultra vires* and mandamus review.  Those standards are not likely satisfied here, based on the available record.

Though confident in its conclusions, the Court would note that this case presents interpretive questions of first impression raised by an interlocking set of unwieldy capital planning statutes.  These questions have been served to the Court on a less-than-silver platter: with murky facts, in a preliminary injunction posture, and by way of demanding claims that require more legislative clarity than might otherwise be required.  As a result, this opinion does not purport to answer the novel interpretive questions presented in a definitive manner.

The Court further emphasizes that its factual findings are necessarily preliminary and "may be revisited down the road, especially to the extent the . . . circumstances change." Beatty, 2026 WL 712814, at *2 (cleaned up).  If the construction work does implicate the jurisdiction of one or more of the Agency Defendants, the APA claims against them may have force.  If it turns out that Mr. Floca's sworn representations cannot be relied upon or the scope of the construction project changes, such factual developments may undermine the foundation on which the Court's

41

preliminary legal analyses have rested.  In other words, "[t]entative conclusions made now may not harden into settled judgments later."  Id. at *17.

The Court closes by observing that the paucity of public information about the Kennedy Center's renovation plans could frustrate continued adjudication of this dispute; it is difficult to assess the legality of an illusory target, and the Defendants may not play keep-away in order to evade either judicial or regulatory review.  The Court also encourages the Defendants to consider voluntary consultation and review with relevant historic preservation and regulatory authorities, even though it may not be legally required.  After all, no one should dispute the importance of renovating the Center in a manner that befits its historic pedigree and honors President Kennedy in the most thoughtful way possible.

The Court will, accordingly, direct the parties to meet and confer in good faith to discuss appropriate next steps in this proceeding.  Within seven days of this ruling, they shall file a joint status report with their proposals, which should address the potential submission of status reports to elucidate the scope and timing of the Kennedy Center renovation project, as well as any efforts by the Center to engage in regulatory review and permitting, voluntarily or otherwise.

Meanwhile, the Court will DENY Plaintiffs' Motion for a Preliminary Injunction for the reasons stated above.  A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  May 29, 2026

42