**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

D.C. PRESERVATION LEAGUE, *et al*.,

*Plaintiffs*,

v.

BOARD OF TRUSTEES OF THE JOHN F. KENNEDY CENTER FOR THE PERFORMING ARTS, *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-00981 (CRC)

**DECLARATION OF CHARLES MATTHEW ("MATT") FLOCA**

In accordance with the provisions of 28 U.S.C. § 1746, I, Charles Matthew Floca, state as follows, under penalty of perjury, pertinent to the above-styled and numbered case:

1. I currently serve as the Executive Director and Chief Operating Officer of the John F. Kennedy Center for the Performing Arts ("the Center"). In this capacity, I exercise operational authority over all institutional departments, managing a complex integration of both trust and federal functions, including all elements of the Center's physical footprint. I represent the executive management of the Center before its Board of Trustees. In my employment, I report to the Board.

2. The matters set forth in this Declaration are true and correct from my own personal knowledge and from information made available to me in the course of my official duties.

3. The Center's Board of Trustees convened for a meeting on August 13, 2026. I attended that meeting. At the meeting, I observed a third-party analyst, a consultant from the Delta Consulting Group, give a presentation on the Center's operational and programming status. The independent analyst outlined two possible operational models that the Board could adopt to achieve the construction activities contemplated under the July 2025 congressional appropriation of capital repair and restoration funding to the Center. One proposal contemplated revolving partial closures (of roughly one-third of public space within the main building of the Center) over four years of construction. The independent analyst estimated that this proposal would require roughly $560 million in funding. The second proposal contemplated a partial closure of the Center (a full closure of the main building of the Center) over two years of construction. The analyst estimated that this proposal would require roughly $285 million in funding, much of which would be covered by the existing $257 million congressional appropriation.

4. The independent analyst emphasized that the first operational model, involving revolving partial closures of the main building, would not only increase the cost and length of the project, but would also present substantial safety concerns. He also expressed his opinion, based on his experience with similar public venues, that the Center would suffer a significant reduction in both revenue and fundraising ability over the entire four years of the project, and would suffer reputational damage as a result of patrons attempting to enjoy performances in and around a construction site. He advised that the second model, in which the main building would be fully closed but for a much shorter period, would best preserve the Center's reputation as a world-class performing-arts venue. The analyst recommended to the Board that it proceed with the second proposal.

5. Following discussion and review of the analyst's recommendation, as well as a comprehensive project development plan produced by JLL, a real-estate services and development firm, the Board voted (23 to 3) to adopt the second proposal: a full closure of the main building of the Center for two years of construction while maintaining fine- and performing-arts programming in the REACH building and while maintaining support for offsite performances by the National Symphony Orchestra. The proposal contemplates that educational programming and opportunities will continue during the closure, and that signature productions put on by the Center—including the Kennedy Center Honors and the Mark Twain Prize for American Humor—will occur offsite. The proposal also contemplates that the Center will preserve public access to the memorial experience for President Kennedy by relocating that experience to the REACH building during construction.

6. Further, as previously discussed, the Board of Trustees was provided with the comprehensive project development plan which details the scope of construction. Also appended to the development plan was an integrated schedule laying out project timelines for renovation related action items, as well as a budgetary document describing each discrete subproject and its associated budget allocation.

7. These documents confirm that the scope of construction, as represented to the Court in my April 29, 2026 live testimony, has not changed. The documents demonstrate that the Center will not be demolished, no new building will be erected on the campus, and the exterior architecture of the Center will not be materially altered. Any future changes would follow the ordinary approval process, including Board approval.

Executed in Washington, DC, on Tuesday, August 18, 2026.

Charles Matthew Floca